# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

ROBIN ALTOBELLI and F. DAYLE
ANDERSEN, on behalf of themselves
and all others similarly situated,

                              Plaintiffs,

        v.

GENERAL MOTORS LLC,

                              Defendant.

No. 2:20-cv-13256

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.      Plaintiffs Robin Altobelli and F. Dayle Andersen, by and through counsel, bring this action on behalf of themselves and all others similarly situated against GENERAL MOTORS LLC (hereinafter "General Motors" or "GM") (hereinafter "Defendant"). All allegations made in this complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs, which are based on personal knowledge.

2.      This consumer class action arises out of General Motors's failure to disclose a uniform and widespread defect in the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery"). The defect causes the high voltage battery to overheat when charged to full capacity and results in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. These vehicles

(hereinafter "Class Vehicles") are the 2017, 2018, and 2019 models of the Chevrolet Bolt (hereinafter "Chevy Bolt" or "Bolt").

3.      The Defective Battery contains a serious manufacturing defect that causes the battery system to overheat when the battery is charged to full or nearly full capacity, putting the battery at risk of exploding or catching fire. This can result in catastrophic damage to the Class Vehicles, and it also causes an immediate safety risk to the vehicles' occupants or the property surrounding the vehicles.

4.      On November 13, 2020, after receiving numerous complaints regarding the Defective Battery, General Motors issued Recall No. 20V-701 (hereinafter, the "Recall" or "GM Recall") for the Class Vehicles.[1]

5.      The GM Recall proposes an "interim remedy" for the Class Vehicles: the Vehicles will be reprogrammed to limit the full charge of the Defective Batteries to 90% of the Batteries' actual capacity.[2] The revised capacity will result in the Class Vehicles having a lower driving range and needing to be charged more often. As a result, Class Vehicle owners and lessees have been burdened with vehicles that do not perform as advertised, and instead require additional charging time and maintenance.

6.      Due to the undisclosed Defective Battery, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles; further, Plaintiffs and Class Members suffered an ascertainable loss of money,

---

[1] NHTSA, Part 573 Safety Recall Report 20V-701 (Nov. 13, 2020) [hereinafter Exhibit A].

[2] *Id.* at 3.

property, and/or value of their Class Vehicles. Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles. Plaintiffs seek monetary damages and injunctive and other equitable relief for Defendant's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles as alleged in this Complaint.

## II.    JURISDICTION AND VENUE

7.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and there are 100 or more class members who are citizens of different states from Defendant.

8.    **Personal Jurisdiction.** This Court has personal jurisdiction over GM because GM is headquartered in this District, and because a substantial part of the events, omissions, or misrepresentations giving rise to these claims emanated from this District.

9.    **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391 because GM is headquartered and transacts business in this District, and a substantial part of the events, transactions, and conduct giving rise to the claims occurred in and emanated from this District.

## III.   PARTIES

**A.   Plaintiff Robin Altobelli**

10.    Plaintiff Robin Altobelli is a citizen and resident of Tucson, Arizona.

11.    On April 15, 2019, Ms. Altobelli purchased a new 2019 Chevy Bolt (for purposes of this section, "the Vehicle").

12.    Prior to her purchase, neither Defendant nor any of their agents, dealers, or other representatives informed Ms. Altobelli of the Defective Battery. Ms. Altobelli reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

13.    Ms. Altobelli purchased the Vehicle for personal, family, or household use. Ms. Altobelli has always attempted to use the Vehicle in the normal and expected manner.

14.    Since the recall, Ms. Altobelli and her husband have activated the Target Change Level feature in the Vehicle to limit the charge level to 90%, per the recall instructions.[3]

15.    As a result, Ms. Altobelli has been left with a vehicle with reduced range. Ms. Altobelli has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not

---

[3] *See* Letter to Regina Carto, Executive Director – Global Safety Field Investigations & Regulatory, General Motors LLC, from Joshua Neff, Chief – Recall Management Division, National Highway Traffic Safety Administration (Nov. 13, 2020) [hereinafter Exhibit B].

receive the benefit of her bargain when she purchased the Vehicle. Had Ms. Altobelli known that her vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased his Bolt or would have paid much less for it.

**B.      Plaintiff F. Dayle Andersen**

16.      Plaintiff F. Dayle Andersen is a citizen and resident of Spokane, Washington.

17.      In August 2018, Mr. Andersen with his wife, Mrs. Anita Andersen-Sather, purchased a new 2018 Chevy Bolt (for purposes of this section, "the Vehicle"). The Andersens chose the Bolt over the Tesla 3, Hyundai Ioniq, and forthcoming extended battery Nissan Leaf, all direct competitors, due to the battery pack size, travel mileage, and total cost.

18.      Further, the Andersens were specifically attracted to the Bolt because of their concerns with the fire hazards that electric vehicle batteries posed. They chose the Bolt over other vehicles in part because of its purported "well engineered battery thermal management system,"[4] which helps to cool the battery and reduce the risk of fires.

---

[4] *See* Armen Hareyan, *If You Want Nissan Leaf or Chevy Volt/Bolt Check Out How The Battery Is Cooled*, TORQUENEWS (July 6, 2018) [hereinafter Exhibit C], https://www.torquenews.com/1/if-you-want-nissan-leaf-or-chevy-voltbolt-check-out-how-battery-cooled (last visited Dec. 10, 2020).

19.     Prior to his purchase, neither Defendant nor any of their agents, dealers, or other representatives informed the Andersens of the Defective Battery. The Andersens reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

20.     The Andersens purchased the Vehicle for personal, family, or household use. The Andersens have always attempted to use the Vehicle in the normal and expected manner.

21.     Since the recall was announced, the Andersens have brought the Vehicle into a Chevrolet dealership to have the Vehicle's hybrid control module reprogrammed in order to limit the Vehicle's full battery charge to 90%, per the recall instructions.[5]

22.      As a result, the Andersens have been left with a vehicle with reduced range. The Andersens have suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had the Andersens known that their vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased his Bolt or would have paid much less for it.

## C.     Defendant General Motors LLC

23.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Ctr., Detroit, Michigan.

---

[5] *See* Exhibit B.

24. General Motors is a motor vehicle manufacturer and a licensed distributer of new, previously untitled motor vehicles. GM is one of the "Big Three" American automakers. GM engages in commerce by distributing and selling new motor vehicles under the Chevrolet, Buick, GMC, and Cadillac brands throughout the United States.

25. GM has designed, manufactured, imported, distributed, marketed, and leased a number of vehicles that feature the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery").

26. From its headquarters in Detroit, Michigan, General Motors marketed the Class Vehicles and the Defective Battery.

## IV.  FACTUAL ALLEGATIONS

27. In early 2016, General Motors introduced the Chevrolet Bolt EV (also known as the "Chevy Bolt") as "the 200-mile-range EV with cool connectivity that people can actually afford."[6] The Bolt quickly gained a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, and Automobile Magazine 2017 All Star awards.[7] These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]."[8]

---

[6] Nicole Lee, *Presenting the Best of CES 2016 winners!*, ENDGADGET (Jan. 8, 2016) [hereinafter Exhibit D], https://www.engadget.com/2016-01-08-presenting-the-best-of-ces-2016-winners.html (last visited Dec. 10, 2020).

[7] *See, e.g.*, Jeff Cobb, *2017 Chevy Bolt's Trophy Case Is Filling Up*, HYBRIDCARS (Nov. 23, 2016) [hereinafter Exhibit E], https://www.hybridcars.com/2017-chevy-bolts-trophy-case-is-filling-up/ (last visited Dec. 10, 2020).

[8] *Id.*

28.     The record range of the Bolt was advertised as the result of an

"unprecedented" partnership between Defendant GM and LG Corporation.[9] In late

2015, GM explained that:

> Offering consumers the first long-range, affordable EV, required an unprecedented supplier relationship combining expertise in infotainment, battery systems and component development with GM's proven in-house capabilities in electric motor design, battery control, system validation and vehicle body/system integration.
>
> Following joint planning and research, GM and LG Corp. brought the Chevrolet Bolt EV to reality.[10]

29.     LG Chem, an LG subsidiary, was included in the development of the Bolt

"from the start," helping to achieve the "key element in driving down costs" by

developing the battery.[11] LG Chem designed and produced the Bolt's battery at its South

Korea facility.

---

[9] John Voelcker, *Bolt EV Powertrain: How Did GM And LG Collaborate On Design, Production?*, GREEN CAR REPORTS (Feb. 3, 2016) [hereinafter Exhibit F], https://www.greencarreports.com/news/1102176_bolt-ev-powertrain-how-did-gm-and-lg-collaborate-on-design-production (last visited Dec. 10, 2020).

[10] Kevin Kelly, *Chevrolet Develops Bolt EV Using Strategic Partnership*, Chevrolet: Pressroom (Oct. 20, 2015) [hereinafter Exhibit G], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.print.html/content/Pages/news/us/en/2015/oct/1020-bolt.html (last visited Dec. 10, 2020).

[11] Sam Abuelsamid, *New GM-LG Partnership On Chevy Bolt EV Shows Why Barra Is Resisting Fiat Merger*, FORBES (Oct. 21, 2015) [hereinafter Exhibit H], https://www.forbes.com/sites/samabuelsamid/2015/10/21/general-motors-and-lg-team-up-to-jointly-develop-2017-chevrolet-bolt-ev/?sh=3b73c2cd380d (last visited Dec. 10, 2020).

**A.     Defendant's Marketing to Class Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt**

30.     Increased range is critical to the success of an all-electric vehicle. Car and Driver describes range as "*the* all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel," and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station," increased range is one of the primary considerations for purchasers or lessees of electric vehicles.[12]

31.     GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging.[13] GM went to great lengths to prove that range, including taking a Car and Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."[14]

32.     This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric

---

[12] Rich Ceppos, *FAQs for Electric Vehicle Shoppers*, CAR AND DRIVER (May 27, 2020) [hereinafter Exhibit I], https://www.caranddriver.com/shopping-advice/a32668797/ev-faqs/ (last visited Dec. 10, 2020).

[13] *See Chevrolet Bolt EV – 2017*, CHEVROLET NEWSROOM [hereinafter Exhibit J], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.html (last visited Dec. 10, 2020).

[14] Joey Capparella, *2017 Chevrolet Bolt EV First Drive*, CAR AND DRIVER (Sept. 13, 2016) [hereinafter Exhibit K], https://www.caranddriver.com/reviews/a15099295/2017-chevrolet-bolt-ev-first-drive-review/ (last visited Dec. 10, 2020).

vehicle—the Tesla Model 3.[15] Both vehicles advertised a range of over 200 miles on a

single charge, making them some of the "first [electric vehicles] that could conceivably

function as a family's lone car."[16] The Model 3, however, advertised a significantly

faster charging time than the Bolt—the Bolt's fastest charging option, the direct-current

fast-charging capability, costs consumers an extra $750 and charges at roughly half of

the rate of the Tesla Superchargers.[17]

33.     The slower charging time, combined with limited access to charging

stations, meant that consumers would not be able to make longer trips with the Bolt

without significant planning. For example, a driver wouldn't make "the 600-mile drive

from Kansas City to Denver in a Chevrolet Bolt unless [they didn't] mind charging for

upwards of 30 hours on 110-volt outlets along the way."[18] The inconvenience of

charging combined with the slower charging time of the Bolt when compared to its

---

[15] *See* Bradley Berman, *EV Comparison: Tesla Model 3 vs. Chevy Bolt*, INSIDEEVS (Oct. 25, 2018) [hereinafter Exhibit L], https://insideevs.com/reviews/340642/ev-comparison-tesla-model-3-vs-chevy-bolt/ (last visited Dec. 10, 2020) (describing the Tesla Model 3 and the Chevy Bolt as the "two leading compact electric vehicles").

[16] Christian Seabaugh, *2017 Chevrolet Bolt EV vs. 2016 Tesla Model S 60: High-Voltage*, MOTORTREND (Oct. 31, 2016) [hereinafter Exhibit M], https://www.motortrend.com/cars/chevrolet/bolt-ev/2017/2017-chevrolet-bolt-ev-vs-2016-tesla-model-s-60/ (last visited Dec. 10, 2020) (comparing the Bolt to the Tesla Model S 60, a discontinued model that cost almost double the price of the Bolt and Model 3, in anticipation of the release of the Model 3, which the articles notes is a more appropriate comparison).

[17] Eric Tingwall, *2017 Chevrolet Bolt EV*, CAR AND DRIVER (Oct. 28, 2016) [hereinafter Exhibit N], https://www.caranddriver.com/reviews/a15099446/2017-chevrolet-bolt-ev-test-review/ (last visited Dec. 10, 2020).

[18] *Id.*

direct competitors made every additional mile of the Bolt's range critically important to GM's marketing and to consumers.

34.    GM therefore emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV . . . .[19]

---

[19] Liz Winter, *Bolt EV Offers 238 Miles of Range*, CHEVROLET: PRESSROOM (Sept. 13, 2016) [hereinafter Exhibit O], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/sep/0913-boltev.html (last visited Dec. 10, 2020).

Defendant further displayed the range of the Bolt at the forefront of a number of

advertisements, like this ad from The Washington Post in June 2017, which prominently

asks consumers to "begin a long-distance relationship, now"[20]:



---

[20] John Voelcker, *Yes, ads for the Chevy Bolt EV electric car do actually exist; here's one*, GREEN CAR REPORTS (June 19, 2017) [hereinafter Exhibit P], https://www.greencarreports.com/news/1111082_yes-ads-for-the-chevy-bolt-ev-electric-car-do-actually-exist-heres-one (last visited Dec. 10, 2020).

35.     GM also displayed the range in this commercial from 2017[21]:



36.     One of the Bolt's first three customers even stated in a GM press release that it was "the range and technology" that attracted him to the Bolt.[22]

37.     For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements.[23]

---

[21] *The All Electric Chevrolet Bolt EV - 238 Miles Per Full Charge | Chevrolet Bolt EV - Commercial TVC*, YOUTUBE (Jan. 11, 2017) [hereinafter Exhibit Q], https://www.youtube.com/watch?v=uVIed Ksm-Kg (last visited Dec. 10, 2020) (screen captured at 1:32).

[22] *Chevrolet Delivers First Bolt EVs to Customers*, CHEVROLET: PRESSROOM (Dec. 13, 2016) [hereinafter Exhibit R], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/ Pages/news/us/en/2016/dec/1213-boltev.html (last visited Dec. 10, 2020).

[23] *See, e.g.*, *2018 Chevrolet Bolt EV Specification*, CHEVROLET: PRESSROOM [hereinafter Exhibit S], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.tab1.html (last visited Dec. 10, 2020); *Chevrolet Bolt EV – 2019*, CHEVROLET: PRESSROOM [hereinafter Exhibit T], https:// media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.tab1.html (last visited Dec. 10, 2020).

38.     Despite GM's representations, the most critical aspect of the Bolt's much-lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without dangerously overcharging the battery.

**B.     The Defective Battery Poses a Significant Safety Risk to Class Vehicle Owners and Lessees**

39.     Lithium ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge."[24] However, these batteries also have a well-documented history of fire issues.[25]

40.     Beginning in 2019, the Class Vehicles began to experience issues with the lithium ion batteries.[26] On information and belief, the Class Vehicles are equipped with Defective Batteries that are susceptible to catching fire when fully charged.

---

[24] *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit U], https://afdc.energy.gov/vehicles/electric_batteries.html#:~:text=Lithium%2DIon%20Batteries,-Lithium%2Dion%20batteries&text=They%20also%20have%20a%20high,%2C%20and%20low%20self%2Ddischarge.&text=Most%20of%20today's%20PHEVs%20and,that%20of%20consumer%20electronics%20batteries (last visited Dec. 10, 2020).

[25] *See* Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020) [hereinafter Exhibit V], https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire9d166c5b3af1#:~:text=Although%20rare%2C%20Lithium%2Dion%20batteries,overheats%2C%20resulting%20in%20a%20fire (last visited Dec. 10, 2020); *see also* Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020) [hereinafter Exhibit W], https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited Dec. 10, 2020).

[26] *See* Exhibit A (stating that the first fire incident appears to have occurred on March 17, 2019).

41.     The NHTSA database contains all motor-vehicle consumer complaints submitted to the National Highway Traffic Safety Administration ("NHTSA") since January 2000. NHTSA maintains a database of motor-vehicle consumer complaints. GM, like other large automakers, regularly reviews these complaints and communicates directly with NHTSA. NHTSA has "[r]egular engagements with Original Equipment Manufacturers (OEMs), including weekly calls with large manufacturers."[27]

42.     Consumers are able to submit Vehicle Owner Questionnaires in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, whether the incident involved a crash or fire, whether any people were injured or killed, the speed of the vehicle at the time of the incident, and a description of the incident.

43.     A number of NHTSA complaints concerning the Defective Battery have been submitted to the database. Each of these complaints cites fire or smoke coming from the Class Vehicles while they are being charged.

44.     These NHTSA complaints demonstrate the significance of the notice that Defendant received from NHTSA and customers, but also by and through GM authorized dealerships, regarding the Defective Battery.

---

[27] *Advancing Safety by Addressing Defects and Raising Awareness*, NHTSA [hereinafter Exhibit X], https://www.nhtsa.gov/advancing-safety-addressing-defects-and-raising-awareness (last visited Dec. 10, 2020).

45.     Below are examples of consumer complaints submitted to NHTSA

regarding fires from the Class Vehicles[28, 29, 30]:

NHTSA ID Number: 11365622
NHTSA Posting Date: Oct. 21, 2020

I BROUGHT THE CAR TO THE DEALER ON 2 SEPARATE
OCCASIONS WITH CONCERNS OF A FAULTY BATTERY. THE
BATTERY SUDDENLY STOPPED CHARGING FULLY. HOWEVER, I
WAS TOLD BY THE DEALER TWICE THAT THE BATTERY WAS
FUNCTIONING PROPERLY AND THERE WAS NOTHING THEY
COULD DO. I OPENED A CLAIM WITH GM REGARDING THIS
INCIDENT, ASKING THEM TO REPLACE THE BATTERY, SINCE IT
WAS STILL UNDER WARRANTY, AND THERE WAS CLEARLY AN
ISSUE. AFTER MONTHS OF BACK-AND-FORTH, GM CLOSED MY
CASE STATING IT WAS NORMAL DEPRECIATION OF THE
BATTERY. ONE WEEK AFTER THEY CLOSED MY CASE, **THE
BATTERY SPONTANEOUSLY CAUGHT FIRE WHILE
CHARGING IN MY GARAGE OVERNIGHT**. IT TOTALED 2
VEHICLES, CHARRED EVERYTHING IN MY GARAGE, AND
CAUSED SUCH SEVERE SMOKE DAMAGE THAT ALMOST
EVERYTHING IN MY HOME WAS A TOTAL LOSS. THE FIRE
DEPARTMENT DETERMINED THE FIRE ORIGINATED FROM THE
TRUNK AREA, WHERE THE BATTERY IS. MY FAMILY IS
DISPLACED WHILE REPAIRS ARE BEING DONE TO MY HOME,
AT A TUNE OF APPROXIMATELY $200,000 AT THIS POINT. WE
LOST APPROXIMATELY $105,000 IN CONTENTS, AS WELL AS
THE 2 TOTALED VEHICLES ($75,000).


NHTSA ID Number: 11372429
NHTSA Posting Date: Oct. 30, 2020

IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND
3AM, **WE WERE WOKEN UP BY SMOKE/FIRE ALARMS**. WE
STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE
CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF

---

[28] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited Dec. 10, 2020).
[29] NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited Dec. 10, 2020).
[30] NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited Dec. 10, 2020).

SEARCHING INSIDE THE HOME AND FINDING NOTHING, WE
REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING
FROM THE GARAGE AND WHEN THE MUDROOM DOOR WHICH
LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT **THE
CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE
IN THE GARAGE**. THE CHEVY BOLT WAS
PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE
AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF
THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS
EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON
FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE
WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE
TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE
BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE
CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT, AS HAS
BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN
FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON
AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES
ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD
WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE
GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP
OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM
ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE
OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8
MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND
HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION,
EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING
ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE
FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE
BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND
SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE
CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP
FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE
SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE
INVESTIGATION.

NHTSA ID Number: 11364692
NHTSA Posting Date: Oct. 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED TO
SMOKE FROM UNDER THE CAR. THE SOUND OF POPPING

NOISES WERE HEARD AND THEN **10 MINUTES LATER THE CAR WAS ENGULFED IN FLAMES**. THE CARS BATTERY PACK STARTING POPPING THEN EXPLODED IN FLAMES.


NHTSA ID Number: 11374956
NHTSA Posting Date: Nov. 17, 2020

2017 BOLT EV WAS PARKED NOSE INTO GARAGE PLUGGED INTO WALL CHARGER CHARGING UNATTENDED WITH MY PHONE SET TO ALERT ME WHEN ESTIMATED TO BE FULLY CHARGED. WHEN I CAME OUT OF THE HOUSE TO UNPLUG CHARGER THERE WAS FIRE VISIBLE UNDER BACK SEAT IN PASSENGER COMPARTMENT OF VEHICLE. CALLED 911 AND BY THE TIME POLICE AND FIRE RESPONDED WITHIN A FEW MINUTES **ENTIRE BATTERY UNDER VEHICLE ENGULFED CAR IN FLAMES** CAUSING GARAGE FIRE WHICH DESTROYED GARAGE AND ALL IT CONTENTS.JUST LEARNED FROM CARFAX THAT GM ISSUED RECALL NOVEMBER 15 FOR POTENTIAL BATTERY FIRES WHEN AT OR NEAR FULL CHARGE.


NHTSA ID Number: 11339878
NHTSA Posting Date: July 17, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND DRIVEN FOR 12 MILES TO OUR DESTINATION, A TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT THE BACK OF THE CAR. I CALLED 911 AND FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN HOUR AFTER SMASHING THE REAR WINDOW TO GET ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE RESTARTED. SMOLDERING WAS SO HOT IT PARTLY BURNED THE BACKSEAT. ONCE THE CAR WAS COOL ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE SMOKE WAS SMALL AND STARTED ON THE AREA WHERE THE BACKSEAT WAS

PREVIOUSLY LOCATED; MINUTES LATER THE SAME HEAVY
SMOKE CAME OUT FAST FROM UNDERNEATH THE FRONT
PASSENGER SIDE. THE POLICE WERE THERE TO WITNESS THAT
INCIDENT. IT WAS AROUND MIDNIGHT THEN.

**3 SPONTANEOUS COMBUSTIONS IN 4 HOURS**; DOOR CAMERA
VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN OUR ARRIVAL
AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS
DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE
CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE
DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT
ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE
PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY
THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY,
THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR
INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT
ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA
AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW
MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING
AND PEOPLE GETTING HURT? **HOW MANY WILL IT TAKE FOR
GM TO CARE?**

46.    The first complaint of spontaneous fire from the Class Vehicles was

submitted to NHTSA on July 8, 2019:

NHTSA ID Number: 11230072
NHTSA Posting Date: July 8, 2019

ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED
THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE
BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2)
CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE
ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED
SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE
BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA
OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS
CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO
CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT
EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH

UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE
FUMES FROM THE BURNING MATERIALS WAS SO THICK AND
NOXIOUS IT PERMEATED OUR HOME, REQUIRING
PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES
FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A
TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO
OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS
FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE
BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE
COMPANY**.

47.     Despite evidence of fires resulting from charging the Bolt's batteries to

100%—and despite GM's apparent purchase of an affected vehicle for investigative

purposes and knowledge of the fires—a GM engineer gave an interview just months

after the first NHTSA complaints, saying that "[w]e engineered the battery system so

that you can charge to 100% and maximize range. If you want maximum range, charge

to 100%."[31]

48.     As the numerous NHTSA complaints show, this is untrue. The Defective

Battery is at risk of catching fire at full or near-full charge unless the Class Vehicles are

modified to deplete the battery capacity by 10%, reducing the vehicle range well below

the advertised 238-mile range that consumers were promised when they purchased or

leased the Class Vehicles.

---

[31] Steve Birkett, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*,
TORQUENEWS (Oct. 31, 2019) [hereinafter Exhibit Y],
https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last
visited Dec. 10, 2020).

**C.    The Proposed Recall is Insufficient to Remedy the Harm to Class Vehicle Owners and Lessees**

49.    On November 13, 2020, more than a year after the first known incident of fire in the Class Vehicles, and more than four years after GM began manufacturing and distributing Class Vehicles, GM announced its intent to recall over 50,000 vehicles with high voltage batteries that "may pose a risk of fire when charged to full, or very close to full, capacity."[32] Instead of completely recalling the Class Vehicles to replace the dangerous batteries, GM's recall proposes an "interim remedy" for Class Vehicles that will limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module.[33]

50.    GM notified consumers that dealerships would offer a software update to implement the interim remedy on November 17, 2020, and also instructed consumers how to reduce the vehicle change settings themselves in order to limit the charging capacity.[34] GM also instructed consumers not to park their vehicles in their garages or carports until after they had implemented the software changes:

---

[32] Exhibit A.

[33] Exhibit A.

[34] *See* Email from Steve Hill, U.S. Vice President, Chevrolet, to 2017 Bolt Owners (2020) [hereinafter Exhibit Z], https://static.nhtsa.gov/odi/rcl/2020/RMISC-20V701-4450.pdf (last visited Dec. 10, 2020).

We will be providing our dealers with a software update
beginning November 17, 2020 that will limit the charge
for all the vehicles in this population to 90% while we
continue to investigate the cause of these incidents.
In the meantime, we know that the safety of our owners
and their families is paramount, which is why we're
asking owners to take the following steps now that
will limit the charge capacity to 90% and reduce the
risk of fire.

**For your 2017 model-year Bolt EV:**

- Change the vehicle charge settings to use the
  Hill Top Reserve option

For instructions on how to activate these settings,
please view the video at our website:
Chevy.com/boltevrecall ›

If you are unable to successfully make these changes,
or do not feel comfortable making these changes, we
ask you to not park your car in your garage or carport
until after you have visited your dealer.

51.     This "fix" leaves consumers with a vehicle with considerably less range

than advertised—an issue that Class Vehicle owners and lessees quickly raised via

NHTSA complaints. Two such complaints are below[35]:

> NHTSA ID Number: 11376229
> NHTSA Posting Date: Nov. 25, 2020
>
> TODAY I RECEIVED RECALL NOTIFICATION GM N202311730
> ABOUT DEFECTIVE BATTERIES THAT CAN CAUSE A FIRE WHEN
> CHARGED TO 100%. GM'S SOLUTION IS TO CHANGE SOFTWARE
> TO LIMIT MY VEHICLE'S CHARGE TO 90%. THIS IS NOT A
> SOLUTION. IT IS A BAND AID. THE BATTERIES ARE DEFECTIVE
> AND SHOULD BE REPLACED. WHY SHOULD I SUFFER THE
> CONSEQUENCE OF THIS AND HAVE TO DEAL WITH REDUCED
> VEHICLE RANGE AND MORE FREQUENT CHARGING. IF THE
> BATTERIES ARE A FIRE HAZARD, THEY SHOULD BE REPLACED
> WITH SAFE BATTERIES AT NO-COST TO THE OWNER.

---

[35] NHTSA Complaint Database for 2017 Chevrolet Bolt (last visited Dec. 10, 2020).

NHTSA ID Number: 11376136
NHTSA Posting Date: Nov. 24, 2020

GM RECALL DUE TO BATTERY FIRES AFFECTS THIS CAR. THE
RECALL SOLUTION TO SIMPLY LIMIT MY DRIVING TO 90% OF
THE RANGE IS ABHORRENT. MY CAR IS NOW LESS THAN 90%
EFFECTIVE--THERE ARE DESTINATIONS I CAN NO LONGER
REACH IN A SINGLE CHARGE, AND RECHARGING IS NOWHERE
NEAR AS FAST OR UBIQUITOUS AS GAS. GM NEEDS A
SOLUTION THAT RESTORES THE FULL DISTANCE ABILITY OF
THIS CAR, OTHERWISE IT'S OUTRIGHT FRAUD.

52.     GM has been aware of the Defective Battery in the Class Vehicles since at
least July 2019, when it received the first complaint of a spontaneous fire when charging
a Chevy Bolt and when GM purchased the vehicle at issue, purportedly to determine the
cause of the fire. But GM knew or should have known of the risk long before that—
before putting the Class Vehicles on sale in the first place. For more than a year after the
first fire, GM operated with a cynical "business-as-usual" attitude, even going so far as
to reiterate to Class Members that they could and should charge their Vehicles to
100%,[36] before opening a formal investigation into the fires in August 2020.[37] After
opening this investigation, it took months for GM to communicate to Plaintiffs and
Class Members that the danger from the Class Vehicles was so high that the Vehicles
should be parked outside.

53.     There is no justifiable reason for this delay, particularly since GM has still
done little more than warn consumers not to park their vehicles inside their garage lest

[36] Exhibit Y.
[37] Exhibit A.

the Defective Battery burn their home down. There is a possible financial motive, though: the delay allowed GM to continue selling its remaining inventory of Class Vehicles before switching over to a new battery design for the 2020 model year.

54.    Despite knowledge of the fires dating back to the summer of 2019 at the latest, GM has sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that they contain defective and dangerous batteries that pose a risk to consumers. Instead, GM proposes a recall that results in reduced vehicle range and the need for additional charging by Class Vehicle owners and lessees.

55.    Had GM disclosed the defect to Class Members, reasonable consumers would have been aware of it. Instead, Defendant remained silent until more than a year after the first incident of a Bolt catching fire while charging.

56.    GM's knowledge of the Battery Defect, and its subsequent inaction, has resulted in harm to Plaintiff and Class Members.

## V.    CLASS ACTION ALLEGATIONS

57.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

58.    Class Vehicles are defined as follows:

2017, 2018, and 2019 model year Chevrolet Bolt.

59.    In addition, state subclasses are defined as follows:

**Arizona Subclass:** All persons in the state of Arizona who bought or leased, other than for resale, a Class Vehicle.

**Washington Subclass:** All persons in the state of Washington who bought or leased, other than for resale, a Class Vehicle.

60.     The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

61.     **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses thousands of individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendant.

62.     **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

  i.     whether Defendant engaged in the conduct alleged herein;

  ii.    whether Defendant had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.   whether Defendant should have had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.   when Defendant became aware of the Battery Defect in the Class Vehicles;

v.   whether Defendant knowingly failed to disclose the existence and cause of this defect in the Class Vehicles;

vi.   whether Defendant knowingly concealed the defect in the Class Vehicles;

vii.   whether Defendant's conduct as alleged herein violates consumer protection laws;

viii.   whether Defendant's conduct as alleged herein violates warranty laws;

ix.   whether Defendant's conduct as alleged herein violates other laws asserted herein;

x.   whether Plaintiff and Class Members overpaid for their Class Vehicles as a result of the defect;

xi.   whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of the defect;

xii.   and whether Plaintiffs and Class Members are entitled to damages and equitable relief.

63.    **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

64.    **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiffs and their counsel.

65.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and

expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.    Discovery Rule

66.    The tolling doctrine was made for cases of concealment like this one. Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to overheat when fully charged.

67.    Plaintiffs and Class Members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles spontaneously set on fire and would have had no reason to individually believe that the problems with their vehicles were the result of a widespread design and/or manufacturing defect.

68.    Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

## VI.    CLAIMS FOR RELIEF

**A.    Claims Brought on Behalf of the Nationwide Class**

### COUNT ONE — FRAUD & FRAUDULENT CONCEALMENT

69.    Plaintiffs reallege and incorporate all preceding allegations as though fully set forth herein.

### 1.    Affirmative Misrepresentation

70.    Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

71.    Defendant advertised the Chevy Bolt as having a range of 238 miles and meeting consumers' needs as a vehicle that will take drivers "beyond their average daily driving needs—with plenty of range to spare."[38] Defendant communicated through these advertisements that the Class Vehicles were safe, durable, and would travel farther on a single charge than comparable vehicles.

72.    Defendant has known since mid-2019 at the very latest that its representations regarding the material fact of the Class Vehicles range were false and intended Plaintiffs and Class Members to rely on them. Even now, GM advertises the Chevy Bolt to have a driving range of 238 miles.[39]

---

[38] Exhibit O.
[39] *See* Exhibit J; Exhibit S; Exhibit T.

73.     Plaintiffs and Class Members did rely on Defendant's affirmative misrepresentations regarding the safety, durability, and range of the Class Vehicles when deciding to purchase or lease the Class Vehicles.

## 2.     Fraudulent Concealment: Range Representation

74.     Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes, against Defendant.

75.     The Class Vehicles that Plaintiffs and Class Members purchased or leased were defective and unsafe because they were subject to spontaneous combustion when charging to a full or almost-full battery level due to the Defective Battery.

76.     Defendant intentionally concealed the Defective Battery and acted with reckless disregard for the truth when Defendant did not represent to consumers that there would be any issues with charging the Class Vehicles to 100% until over a year after they became aware of the risk of spontaneous combustion. Further, after Defendant became aware of the risk of fire when charging the Class Vehicles in 2019, Defendant represented to consumers that the Class Vehicles could be safely charged to 100%.[40]

77.     Defendant had a duty to disclose this material safety information to Plaintiffs and Class Members because of the safety hazards posted by the alleged defects and because Defendant had knowledge of the Defective Battery and took

---

[40] Exhibit Y.

affirmative actions to conceal the Defect, including representing to consumers that the Class Vehicles could be safely charged to 100%.

78.     Plaintiffs and Class Members did not know of the Defective Battery and could not have discovered it through reasonably diligent investigation until their vehicles spontaneously set on fire without warning, causing significant damage.

79.     But for Defendant's fraud, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class Members have sustained damage because they purchased or leased vehicles that were not as represented and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

80.     Defendant's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class Members, and to enrich themselves. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### COUNT TWO — UNJUST ENRICHMENT

81.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

82.     Plaintiffs and Class Members paid Defendant the value of non-defective, fully operational Class Vehicles with a driving range of 238 miles. In exchange, Defendant provided Plaintiffs and Class Members with defective vehicles that are not fully operational and cannot be operated with a driving range of 238 miles without the risk of catching fire while charging.

83.     Further, Defendant provided Plaintiffs and Class Members with Class Vehicles that are in need of significantly more charging time than advertised and a reduced range. Plaintiffs provided Defendant GM with the value of vehicles with none of these defects.

84.     As such, Plaintiffs conferred value upon GM which would be unjust for GM to retain.

85.     As a direct and proximate result of GM's unjust enrichment, Plaintiffs and Class Members have suffered and continue to suffer various injuries. As such, they are entitled to damages, including but not limited to restitution of all amounts by which GM was enriched through its misconduct.

## COUNT THREE — VIOLATION OF THE MAGNUSON–MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

86.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

87.      Plaintiffs are "consumers" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(3).

88.     Defendant is a "supplier" and a "warrantor" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

89.     The Class Vehicles are a "consumer product" within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(1).

90.     The Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(d)(1) provides for a cause of action for any consumer who is damaged by the failures of a warrantor to comply with a written warranty.

91.     Defendant's representations as described herein that Class Vehicles sold to Plaintiffs and Class Members have an estimated range of "238 miles" on a fully charged battery are written warranties within the meaning of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301(6).[41]

92.     Through written and implied warranties, GM warranted that the Class Vehicles are free from defects, of merchantable quality, and fit for their ordinary and represented use.

93.     GM breached the warranties as described herein. Contrary to Defendant's representations, Plaintiffs and other Class Members are faced with the choice of limiting their battery charge to 90% and accepting the resulting reduced range or be subjected to the risk of potential car fires. As such, the Class Vehicles do not perform as promised and are unfit and unreasonably dangerous for ordinary use.

---

[41] *See* Exhibit J; Exhibit S; Exhibit T.

94.     Defendant knew, or should have known, of the Defective Battery in the Class Vehicles.

95.     Defendant knew, or should have known, that it's representations regarding the capabilities of the Class Vehicles were false, yet proceeded with a multi-year advertising campaign through which GM promised consumers that the Class Vehicles had a range of 238 miles on a full charge, and that the Class Vehicles could be safely charged to 100%.

96.     Plaintiffs and Class Members were damages as a result of Defendant's breach of warranty because they received a product incapable of performing as Defendant represented without extreme risks to Plaintiffs' and Class Members' safety, rendering the Class Vehicles less valuable than as represented.

**B.      Claims Brought on Behalf of the Arizona Class**

**COUNT FOUR — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**ARIZ. REV. STAT. ANN. § 47-2314**

97.     Plaintiff Altobelli realleges and incorporates by reference all preceding allegations as though fully set forth herein.

98.     Plaintiff Altobelli brings this action on behalf of herself and the Arizona State Subclass against Defendant.

99.     GM is a merchant with respect to the Class Vehicles. *See* ARIZ. REV. STAT. § 47-2314(A).

100.   As such, Defendant was obliged to provide Class Vehicles that were fit for their ordinary purpose.

101.   The Class Vehicles are at risk of spontaneous combustion when charged to full or almost-full battery levels, which Defendant represented was appropriate and safe. The Class Vehicles are thus not fit for their ordinary purpose of transporting the driver and passengers in reasonable safety during normal operation.

102.   Defendant breached the implied warranty that the Class Vehicles were appropriate and safe for ordinary use by marketing, distributing, and selling and leasing the Class Vehicles with the Defective Batteries.

103.   These defects existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time the Class Vehicles were sold to Plaintiff Altobelli and Class Members.

104.   As a direct and proximate result of these breaches, Plaintiff Altobelli and the Arizona Class have suffered various injuries, included diminution in value of the Class Vehicles.

## COUNT FIVE — BREACH OF EXPRESS WARRANTY
## ARIZ. REV. STAT. ANN. § 47-2313

105.   Plaintiff Altobelli realleges and incorporates by reference all preceding allegations as though fully set forth herein.

106.   Plaintiff Altobelli brings this action on behalf of herself and the Arizona State Subclass against Defendant.

107. Defendant expressly warranted through statements and advertisements that the Class Vehicles were of high quality, would work properly and safely, and could be safely fully charged for a driving range of 238 miles. *See* ARIZ. REV. STAT. § 47-2313(A).

108. GM breached this warranty by knowingly selling vehicles equipped with Defective Batteries that could not be safely charged to 100%, and had a significantly reduced driving range.

109. Plaintiff Altobelli and the Arizona Class have been damaged as a direct and proximate result of Defendant's breaches in that the Class Vehicles purchased by Plaintiff Altobelli and the Arizona Class were and are worth far less than what Plaintiff and the Arizona Class Members paid to purchase them.

110. The Class Vehicles were defective as herein alleged at the time they left Defendant's factories, and the vehicles reached Plaintiff Altobelli and Class Members without substantial change in the condition in which they were sold.

111. As a direct and proximate result of these breaches, Plaintiff Altobelli and the Arizona Class have suffered various injuries, included diminution in value of the Class Vehicles.

## COUNT SIX — VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT ARIZ. REV. STAT. ANN. § 44-1522

112. Plaintiff Altobelli realleges and incorporates by reference all preceding allegations as though fully set forth herein.

113.    Plaintiff Altobelli brings this action on behalf of herself and the Arizona State Subclass against Defendant.

114.    Arizona prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." ARIZ. REV. STAT. § 44-1522(A).

115.    As alleged herein, Defendant advertised the Class Vehicles to have a range of 238 miles and that the Class Vehicles could be safely charged to 100%.

116.    Defendant intended that consumers would rely on these misrepresentations, inducing Plaintiff Altobelli and Class Members to purchase the Class Vehicles over comparable other vehicles.

117.    Plaintiff Altobelli and Class Members did, in fact, rely on these representations when choosing to purchase the Class Vehicles over comparable other vehicles.

118.    Plaintiff Altobelli and Class Members are therefore entitled to damages in an amount to be proven at trial.

## C.     Claims Brought on Behalf of the Washington Class

### COUNT SEVEN — BREACH OF EXPRESS WARRANTY
#### WASH. REV. CODE  §  62.A.2-313 and  §  62A.2A-210

119.   Plaintiff Andersen realleges and incorporates by reference all preceding allegations as though fully set forth herein.

120.   Plaintiff Andersen brings this action on behalf of himself and the Washington State Class against Defendant.

121.   Defendant was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under Wash. Rev. Code § 2.103(a)(4).

122.   With respect to leases, GM was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

123.   The Class Vehicles were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

124.   Defendant expressly warranted through statements and advertisements that the Class Vehicles were of high quality, would work properly and safely, and could be safely fully charged for a driving range of 238 miles.

125.   However, GM knew or should have known that this warranty was false and/or misleading, because GM knew or should have been aware that the Class Vehicles contained the Defective Battery. Further, GM attempted to conceal this defect by continuing to represent that the Class Vehicles could be safely fully charged after it knew of the fire risk.

126.     Plaintiff Andersen and the Washington State Class reasonably relied on GM's express warranty concerning proper manufacturing and design when purchasing or leasing the Class Vehicles. However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiff and the Washington State Class, the Class Vehicles were designed and/or manufactured with a dangerous flaw that resulted in dangerous fire risks when charging the Vehicles. GM therefore breached its express warranty by providing a product containing defects that were never disclosed to Plaintiff Andersen and the Washington State Class.

127.     Plaintiff Andersen and the Washington State Class have been damaged as a direct and proximate result of GM's breaches and seek damages in an amount to be determined at trial.

### COUNT EIGHT — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### WASH. REV. CODE § 62A.2-314 and § 62A.2A-212

128.     Plaintiff Andersen realleges and incorporates by reference all preceding allegations as though fully set forth herein.

129.     Plaintiff Andersen brings this action on behalf of himself and the Washington State Class against Defendant.

130.     GM was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under Wash. Rev. Code § 2.103(a)(4).

131.   With respect to leases, GM was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

132.   The Class Vehicles were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

133.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

134.   GM sold and/or leased Class Vehicles that were not in merchantable condition or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design and/or manufacture can cause the vehicles to spontaneously ignite when charged to full or nearly-full capacity.

135.   GM's breach of the implied warranty of merchantability caused damage to the Plaintiff and the Washington State Class. The amount of damages due will be proven at trial.

## COUNT NINE — VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE ANN. § § 19.86.010, *et seq.*

136.   Plaintiff Andersen realleges and incorporates by reference all preceding allegations as though fully set forth herein.

137.   Plaintiff Andersen brings this action on behalf of himself and the Washington State Class against Defendant.

138. GM, Plaintiff Andersen, and the Washington State Class Members are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

139. GM is engaged in "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010(1).

140. The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

141. In the course of its business, GM, through its agents, employees, and/or subsidiaries, violated the Washington CPA.

142. As detailed in the common law fraud allegations: (1) GM affirmatively misrepresented the range of the Class Vehicles through its advertisements and press releases; and (2) GM affirmatively misrepresented the safety and durability of the Class Vehicles through its advertisements and press releases, causing danger to the Class Members and other drivers. In doing so, and by marketing, offering for sale, and selling the defective Class Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.020:

    A. Representing that the Class Vehicles are of a particular standard, quality, and grade when they are not;

    B. Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

C.  Engaging in other conduct which created a likelihood of confusion or of

misunderstanding; and/or

D.  Using or employing deception, fraud, false pretense, false promise or

misrepresentation, or the concealment, suppression or omission of a

material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the advertisement and

sale/lease of the Class Vehicles, whether or not any person has in fact

been misled, deceived or damaged thereby.

143.  Defendant's scheme and concealment of the Defective Battery was
material to Plaintiff Andersen and the Washington State Class. Had they known the
truth, Plaintiff Andersen and the Washington State Class would not have purchased or
leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and
mitigated, and the Vehicles rendered legal to sell—would have paid significantly less
for them.

144.  Plaintiff Andersen and the Washington State Class Members had no way of
discerning that Defendant GM's representations were false or misleading, or otherwise
learning the facts that Defendant had concealed or failed to disclose, because the
Defective Battery was not discoverable until it lit on fire when charging. Plaintiff
Andersen and Washington State Class Members did not and could not have unraveled
GM's deception on their own.

145.   Defendant had an ongoing duty to Plaintiff Andersen and the Washington State Class to refrain from unfair and deceptive practices under the Washington CPA in the course of their business. Specifically, Defendant owed Plaintiff Andersen and Washington State Class Members a duty to disclose all the material facts concerning the Defective Battery because Defendant possessed exclusive knowledge, intentionally concealed it from Plaintiff and the Washington State Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

146.   Plaintiff Andersen and Washington State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

147.   Defendant's violations present a continuing risk to Plaintiff Andersen and the Washington State Class, as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

148.   Pursuant to Wash. Rev. Code § 19.86.090, Plaintiff Andersen and the Washington State Class seek an order enjoining Defendant's unfair and/or deceptive acts or practices, and awarding damages, treble damages, and any other just and proper relief available under the Washington CPA.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and Subclasses as defined above;

B.      Appoint Plaintiffs as representative of the Nationwide Class and applicable State Classes and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential damages and restitution to which Plaintiff and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief, including an order requiring Defendant to repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that GM is financially responsible for all Class notice and administration of Class relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 10th day of December, 2020.

KELLER ROHRBACK L.L.P.


By *s/ Gretchen Freeman Cappio*

Gretchen Freeman Cappio (P84390)
Lynn Lincoln Sarko
Ryan McDevitt (P84389)
Emma Wright, admission forthcoming
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900
Fax (206) 623-3384
gcappio@kellerrohrback.com
lsarko@kellerrohrback.com
rmcdevitt@kellerrohrback.com
ewright@kellerrohrback.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

*Attorneys for Plaintiffs*