## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| *In re Chevrolet Bolt EV Battery Litigation* | Case No. 2:20-13256-TGB-CI |
|  | Honorable Terrence G. Berg |
|  | **CONSOLIDATED CLASS ACTION COMPLAINT** |
|  | **DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    Plaintiffs Robin Altobelli, F. Dayle Andersen, Bruce James Cannon, Mary Carr and Jan G. Wyers, Yohanes Chitra, John DeRosa, Kevin Harris and Pamela Duprez, Michael Hickey, Keith Khorey, James Kotchmar, Robert Kuchar, Joseph Poletti, Evi Schulz, Michael Smith, Jeanne Sterba, Ashley Strong, Alucard Taylor, Andres Torres, Jason Vaaler, Shawn Walker, and Thomas and Carol Whittaker, by and through their counsel, bring this action on behalf of themselves and all others similarly situated against Defendant GENERAL MOTORS LLC (hereinafter "General Motors," "GM," or "Defendant"). All allegations made in this complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs' vehicles, which are based on personal knowledge.

2.    This consumer class action arises out of General Motors's failure to disclose or adequately repair a uniform and widespread defect in the 60 kWh 350 V

lithium-ion battery (hereinafter the "Defective Battery"). The defect causes the high voltage battery to overheat when charged to full capacity and results in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. These vehicles (hereinafter "Class Vehicles") are the 2017, 2018, and 2019 models of the Chevrolet Bolt (hereinafter "Chevy Bolt" or "Bolt").[1] GM's belated, so-called "permanent" fix for the battery problem purportedly restores the advertised range of the Class Vehicles. But on July 14, 2021, GM and NHTSA warned that Bolts have caught fire after having all of the recall work performed, and warned against charging Vehicles overnight and parking them in garages or near other structures.  Upon information and belief, then, the recall work does not actually solve the defect or prevent fires.

3.      The Defective Battery contains a serious manufacturing defect that causes the battery system to overheat when the battery is charged to full or nearly full capacity, putting the battery at risk of exploding or catching fire. This can result in catastrophic damage to the Class Vehicles, as seen below, and it also causes an immediate safety risk to the vehicles' occupants and the property surrounding the vehicles.

---

[1] Plaintiffs note that his list may expand to include more recent model years as the litigation and discovery progress, as there is reason to believe that the defect is not limited to 2017–19 Bolt vehicles equipped with LG Chem batteries.



4.     On November 13, 2020, after receiving numerous complaints regarding the Defective Battery, and despite knowing about the defect for years, General Motors issued Recall No. 20V-701 (hereinafter, the "Recall" or "GM Recall") for a subgroup of the Class Vehicles that were equipped with design-level N2.1 batteries produced at LG Chem's Ochang, Korea plant.[2]

5.     The GM Recall initially proposed an "interim remedy" for the Class Vehicles: the Vehicles would be reprogrammed to limit the full charge of the Defective Batteries to 90% of the Batteries' actual capacity.[3] This interim software fix would reprogram the hybrid propulsion system control module 2 (HPCM2) to limit the battery's range to approximately 214 miles on a single battery charge, as compared to the 238-mile range on a fully charged vehicle. Prior to taking their vehicles in for

---

[2] NHTSA, Part 573 Safety Recall Report 20V-701 (Nov. 13, 2020) [hereinafter Exhibit A].

[3] *Id.* at 3.

reprogramming, GM recommended that owners and lessees of the Class Vehicles enable either "Hilltop Reserve" or "Target Charge Level" mode on their vehicles, both of which are other ways of limiting the batteries' charge to 90%. GM also recommended that if vehicle owners and lessees were unable to make these changes to limit the charging level of their vehicles, they should not park their car in their garage or carport, lest the vehicle burst into flames and threaten the structure and its occupants.

6.     Ultimately, a software fix cannot resolve the defect in the Class Vehicle batteries that leads to thermal runaway and fire or explosions of the battery cells. Merely reducing the maximum charging capacity does not resolve the underlying flaws in the batteries, and as continuing fire incidents demonstrate, diagnostic software capable of warning of a thermal runaway event underway can merely inform that a catastrophic runaway event is already underway and that a fire is inevitable within seconds. Moreover, GM's failure to disclose the defect or to fully remedy it continues to endanger every owner, lessee, and passenger of Class Vehicles, as well as residents and neighbors of structures where Class Vehicles are parked.

7.     Range is a key consideration for purchasers and lessees of electric vehicles. It takes substantially longer to charge an electric vehicle than it does to fill up a tank of gas, and a fully charged electric vehicle cannot travel as far on a single charge as most gas-powered vehicles can travel on a full tank of gas. Even if the purported repair actually remedied the underlying defect, the revised and limited charging capacity has resulted in the Class Vehicles having a lower driving range than advertised and needing

to be charged more often. As a result, Class Vehicle owners and lessees have been burdened with vehicles that do not perform as advertised, and instead require additional charging time and maintenance. Moreover, as detailed herein, neither the interim remedy nor the purported permanent fix actually repairs the defect or prevents the Class Vehicles from catching fire.

8. On April 29, 2021, GM announced a revised "fix" for the Class Vehicles, consisting of a dealer implemented service procedure to identify potential battery anomalies in conjunction with the installation of software that, according to GM, has the ability to detect potential issues before problems can develop. GM's most recent remedy does not, however, fix the Defective Batteries in the Class Vehicles. It merely alerts consumers to potential problems. But once a thermal runaway event has begun, an explosion or fire may occur within seconds. Moreover, there have been numerous reports of Class Vehicle battery fires even *after* this most recent, and supposedly permanent, procedure was implemented. GM has provided no reasonable assurance that consumers may safely charge the Class Vehicles to 100% capacity or that the vehicles are safe.

9. On the contrary, GM knows the Class Vehicles are still dangerous. On July 14, 2021, GM reversed course again, telling owners and lessees of the Class Vehicles to "park their vehicles outside away from homes and other structures immediately after charging and … not leave their vehicles charging overnight," even if the vehicles have

had the interim or final recall remedies performed.[4] Despite GM's multiple recalls and claim of a "fix," Plaintiffs and Class Members are now left with vehicles that cannot reach the advertised range, that they cannot charge at convenient times or locations, and that may spontaneously burst into flame, causing serious harm to the vehicle, its owners or lessees themselves, or their property.

10.     The purported recall "fix" is particularly insidious and deceptive in that it was purported to solve the serious safety risks that result from the Defective Battery, but failed to actually fix it, as evidenced by the catastrophic fires that have continued to occur in vehicles that have had the recall performed. Even after it belatedly acknowledged the defect, GM has continued to deceive consumers about the Defective Battery—this time, about whether GM could fix the problem and render the vehicles safe.

11.     Due to the undisclosed Defective Battery, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles; further, Plaintiffs and Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles. Plaintiffs seek monetary damages and injunctive and other equitable relief for

---

[4] *Consumer Alert: Important Chevrolet Bolt Recall for Fire Risk*, NHTSA (July 14, 2021) [hereinafter Exhibit B], https://www.nhtsa.gov/press-releases/consumer-alert-important-chevrolet-bolt-recall-fire-risk (last visited July 15, 2021).

Defendant's misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles as alleged in this Complaint.

12.     Despite its knowledge, GM failed to notify Plaintiffs and the Class members of these problems and associated hazards at the time of purchasing their vehicles. Instead, GM did not perform a recall until several fires occurred in the Class Vehicles. Delaying the recall of the Class Vehicles avoided—at least temporarily—the financial fallout from having to acknowledge that the Class Vehicles and its batteries were simply incapable of *safely* providing customers with GM's long advertised 238-mile driving range. Moreover, as detailed herein, GM's purported remedies fail to alleviate the risk of a battery fire.

13.     The software fix is clearly inadequate, and only a buyback of all Class Vehicles, or at the very least replacement of all Class Vehicle batteries with non-defective ones, could possibly solve the problem. But consumers would still have been damaged by GM's deception at the time of purchase, during their ownership or the term of their lease, on an ongoing basis by the reduced range and inconvenience resulting from GM's inadequate recalls, and, of course, if they experienced a fire, as some Plaintiffs and many Class Members have.

## II.     JURISDICTION AND VENUE

14.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of

$5,000,000, exclusive of interest and costs, and there are 100 or more class members who are citizens of different states from Defendant.

15. **Personal Jurisdiction.** This Court has personal jurisdiction over GM because GM is headquartered in this District, and because a substantial part of the events, omissions, or misrepresentations giving rise to these claims occurred in and emanated from this District.

16. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391 because GM is headquartered and transacts business in this District, and a substantial part of the events, transactions, and conduct giving rise to the claims occurred in and emanated from this District.

## III. PARTIES

### A. Plaintiff Robin Altobelli

17. Plaintiff Robin Altobelli is a citizen and resident of Tucson, Arizona.

18. On or about April 15, 2019, Robin Altobelli purchased a new 2019 Chevy Bolt from O'Reilly Chevrolet in Tucson, Arizona (for purposes of this section, "the Vehicle").

19. Plaintiff Altobelli made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

20.     Prior to her purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Altobelli of the Defective Battery. Plaintiff Altobelli reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

21.     Plaintiff Altobelli purchased the Vehicle for personal, family, or household use. Plaintiff Altobelli has always attempted to use the Vehicle in the normal and expected manner.

22.     Plaintiff Altobelli learned of the recall from an email from General Motors and various news reports. After modifying the Vehicle to reduce the current charging allowance, the estimated range on Plaintiff Altobelli's car fell to far less than the range that Plaintiff Altobelli expected she would be getting when she purchased her vehicle. Her vehicle's range after the recall was even lower than the amount represented by the recall notice. Plaintiff Altobelli is concerned of reports of additional vehicle fires and GM's July 2021 guidance to avoid parking the Vehicle indoors. Plaintiff Altobelli must now choose between damaging her vehicle by regularly parking it outdoors during the heat of an Arizona summer, during which the Vehicle can heat up to over 140 degrees, or endangering her property if she parks it in her garage.

23.     As a result, Plaintiff Altobelli has been left with a vehicle with reduced range. Plaintiff Altobelli has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff

Altobelli known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, or that it would be unsafe to park her vehicle in her garage, she would not have purchased her Bolt.

**B.      Plaintiff F. Dayle Andersen**

24.      Plaintiff F. Dayle Andersen is a citizen and resident of Spokane, Washington.

25.      On or about September 2, 2018, Mr. Andersen and his wife, Anita Andersen-Sather, purchased a new 2018 Chevy Bolt from Bill Pierre Chevrolet in Seattle, Washington (for purposes of this section, "the Vehicle").

26.      Plaintiff Andersen made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

27.      Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Andersen of the Defective Battery. Plaintiff Andersen reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

28.      Plaintiff Andersen purchased the Vehicle for personal, family, or household use. Plaintiff Andersen has always attempted to use the Vehicle in the normal and expected manner.

29.     Plaintiff Andersen learned of the recall from a postcard in May 2021. He was previously aware of news reports of fires.

30.     After installing the software modification, the estimated range on Plaintiff Andersen's car fell to far less than the range of 238 miles that Plaintiff Andersen expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice, with range falling as low as 110 miles in the winter.

31.     As a result, Plaintiff Andersen has been left with a vehicle with reduced range. Plaintiff Andersen has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Andersen known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## C.     Plaintiff Bruce James Cannon

32.     Plaintiff Bruce James Cannon is a citizen and resident of Monrovia, California.

33.     On or about December 1, 2018, Plaintiff Cannon purchased a new 2019 Chevy Bolt from Penske Chevrolet in Cerritos, California (for purposes of this section, "the Vehicle").

34.     Plaintiff Cannon made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

35.     Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Cannon of the Defective Battery. Plaintiff Cannon reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

36.     Plaintiff Cannon purchased the Vehicle for personal, family, or household use. Plaintiff Cannon has always attempted to use the Vehicle in the normal and expected manner.

37.     Plaintiff Cannon learned of the recall through a letter from General Motors. Plaintiff Cannon then installed the software modification to limit his Vehicle's charge to 80%.

38.     After installing the software modification, the estimated range on Plaintiff Cannon's car fell to far less than the range of 238 miles that Plaintiff Cannon expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice, with range falling as low as 130 miles.

39.     As a result, Plaintiff Cannon has been left with a vehicle with reduced range. Plaintiff Cannon has suffered an ascertainable loss resulting from Defendant's

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Cannon known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**D.     Plaintiffs Mary Carr and Jan G. Wyers**

40.     Plaintiffs Mary Carr and the Honorable Jan G. Wyers are citizens and residents of Portland, Oregon.

41.     On or about November 27, 2018, Plaintiffs Carr and Wyers purchased a new 2019 Chevy Bolt from Carr Auto Group in Beaverton, Oregon (for purposes of this section, "the Vehicle").

42.     Plaintiffs Carr and Wyers made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. They purchased an all-electric vehicle for environmental reasons and selected the Bolt over other electric vehicles because the represented range would allow them to visit family in Seattle and take other customary trips on a single charge. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

43.     Prior to their purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs Carr and Wyers of the Defective Battery. Plaintiffs

Carr and Wyers reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

44.     Plaintiffs Carr and Wyers purchased the Vehicle for personal, family, or household use. Plaintiffs Carr and Wyers have always attempted to use the Vehicle in the normal and expected manner.

45.     After receiving notice of the recall, Plaintiffs Carr and Wyers had a local dealership inspect the Vehicle's battery and perform the service order. They were then able to charge the Vehicle to approximately 80% to 90% of battery capacity. The range often was even less than they should have had at that reduced battery charge. Plaintiffs Carr and Wyers experienced significant range anxiety, and limited the trips they normally would have taken.

46.     On May 20, 2021, Plaintiffs Carr and Wyers had a local dealership inspect the Vehicle again and perform the updated recall service order. The dealership did not replace their Vehicle's battery. Since the second recall service order, Plaintiffs Carr and Wyers have been unable to charge the Vehicle to more than 80% capacity at certain fast chargers and at times have experienced less than 230 miles of range. They continue to experience significant range anxiety.

47.     Plaintiffs Carr and Wyers are further inconvenienced by the newest recall because they charge their Vehicle in their garage and do not have a fast charger. They are now unable to charge their Vehicle overnight in their garage and must park it outdoors where it is more vulnerable to weather and theft or vandalism. They no longer

fully charge the Vehicle for fear that doing so will cause a fire, and so continue to suffer range anxiety and be limited in the distances they travel.

48.     As a result of Defendants' actions and inaction, Plaintiffs Carr and Wyers have been left with an unsafe vehicle with reduced range. Plaintiffs Carr and Wyers have suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs Carr and Wyers known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased their Bolt.

## E.     Plaintiff Yohanes Chitra

49.     Plaintiff Yohanes Chitra is a citizen and resident of Diamond Bar, California.

50.     In or around December 31, 2018, Plaintiff Chitra purchased a new 2019 Chevrolet Bolt from Premier Chevrolet in Buena Park, California (for purposes of this section, "the Vehicle").

51.     Plaintiff Chitra made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

52.     Prior to buying his Bolt, GM did not inform Plaintiff Chitra of the Battery Defect. Plaintiff Chitra reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

53.     Plaintiff Chitra regularly charged his Vehicle, up until the Vehicle caught fire while charging. It is now in unusable condition, and Plaintiff Chitra did not receive the full value of the Vehicle from his insurance company.

54.     When Plaintiff Chitra purchased his Chevrolet Bolt, he was not aware of the Battery Defect.

55.     As a result, Plaintiff Chitra has been left with an unusable vehicle. Plaintiff Chitra has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Chitra known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**F.     Plaintiff John DeRosa**

56.     Plaintiff John DeRosa is a citizen and resident of Seattle, Washington.

57.     On or about December 30, 2018, Plaintiff DeRosa purchased a new 2019 Chevy Bolt from Bill Pierre Chevrolet in Seattle, Washington (for purposes of this section, "the Vehicle").

58.     Plaintiff DeRosa made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

59.     Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff DeRosa of the Defective Battery. Plaintiff DeRosa reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

60.     Plaintiff DeRosa purchased the Vehicle for personal, family, or household use. Plaintiff DeRosa has always attempted to use the Vehicle in the normal and expected manner.

61.     Plaintiff DeRosa learned of the recall from a letter from General Motors.

62.     After installing the software modification, the estimated range on Plaintiff DeRosa's car fell to far less than the range of 238 miles that Plaintiff DeRosa expected he would be getting when he purchased his vehicle. His vehicle's battery range was approximately 210 miles after the modification

63.     As a result, Plaintiff DeRosa has been left with a vehicle with reduced range. Plaintiff DeRosa has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff DeRosa known that the vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**G.     Plaintiffs Kevin Harris and Pamela Duprez**

64.     Plaintiffs Kevin Harris and Pamela Duprez are citizens and residents of Weymouth, Massachusetts.

65.     On or about June 26, 2017, Plaintiffs Harris and Duprez purchased a new 2017 Chevy Bolt from Best Chevrolet in Hingham, Massachusetts (for purposes of this section, "the Vehicle").

66.     Plaintiffs Harris and Duprez made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

67.     Prior to their purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs Harris and Duprez of the Defective Battery. Plaintiffs Harris and Duprez reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

68.     Plaintiffs Harris and Duprez purchased the Vehicle for personal, family, or household use as well as business. Plaintiffs Harris and Duprez have always attempted to use the Vehicle in the normal and expected manner.

69.     After receiving notice of the recall, Plaintiffs Harris and Duprez set the maximum charge of their Vehicle to 90% and no longer parked it in their garage. They frequently stopped charging the Vehicle at 80% charge. The range capacity was lessened to approximately 80%, and in the winter months the range was as low as 180 miles. This caused Plaintiff Duprez to alter her driving and commuting habits, often going as far as driving without heat in a Northeast winter in order to conserve range.

70.     As a result, Plaintiffs Harris and Duprez have been left with a vehicle with reduced range. Plaintiffs Harris and Duprez have suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs Harris and Duprez known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased their Bolt.

## H.    Plaintiff Michael Hickey

71.     Plaintiff Michael Hickey is a citizen and resident of Gorham, Illinois.

72.     On or about September 21, 2020, Plaintiff Hickey purchased a used 2017 Chevy Bolt from Holm Automotive Center in Abilene, Kansas (for purposes of this section, "the Vehicle").

73.     Plaintiff Hickey made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile

range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

74.     Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Hickey of the Defective Battery. Plaintiff Hickey reasonably expected that the Vehicle, including its range, would function normally and in accordance with Defendant's specifications and representations.

75.     Plaintiff Hickey purchased the Vehicle for personal, family, or household use. Plaintiff Hickey has always attempted to use the Vehicle in the normal and expected manner.

76.     Plaintiff Hickey learned of the recall from a letter from General Motors.

77.     After installing the software modification, the estimated range on Plaintiff Hickey's car fell to far less than the range of 238 miles that Plaintiff Hickey expected he would be getting when he purchased his vehicle. His vehicle's battery range was approximately 110–50 miles after the modification.

78.     As a result, Plaintiff Hickey has been left with a vehicle with reduced range. Plaintiff Hickey has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Hickey known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## I.      Plaintiff Keith Khorey

79.     Plaintiff Keith Khorey is a citizen and resident of Rolling Hills Estates, California.

80.     On or about March 17, 2017, Plaintiff Khorey purchased a new 2017 Chevy Bolt from Martin Chevrolet in Torrance, California (for purposes of this section, "the Vehicle").

81.     Plaintiff Khorey made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

82.     Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Khorey of the Defective Battery. Plaintiff Khorey reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

83.     Plaintiff Khorey purchased the Vehicle for personal, family, or household use, including for his daily commute. Plaintiff Khorey has always attempted to use the Vehicle in the normal and expected manner.

84.     Plaintiff Khorey learned of the recall from a letter from General Motors.

85.     After installing the software modification, the estimated range on Plaintiff Khorey's car fell to far less than the range of 238 miles that Plaintiff Khorey expected

he would be getting when he purchased his vehicle. His vehicle's battery capacity was lessened to approximately 215–20 miles.

86.     As a result, Plaintiff Khorey has been left with a vehicle with reduced range. Plaintiff Khorey has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Khorey known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## J.     Plaintiff James Kotchmar

87.     Plaintiff James Kotchmar is a citizen and resident of Thiells, New York.

88.     In or around September 2017, Plaintiff Kotchmar purchased a new 2017 Chevrolet Bolt from an authorized dealership in Naunet, New York (for purposes of this section, "the Vehicle").

89.     Plaintiff Kotchmar purchased his Chevrolet Bolt for economic reasons. He has solar panels installed on his property, allowing him to easily recharge his vehicle daily before his commute to work or running errands. There is no added cost involved for him to refuel his vehicle in this manner.

90.     Plaintiff Kotchmar made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range.

91. Prior to buying his Bolt, GM did not inform Plaintiff Kotchmar of the Battery Defect. Plaintiff Kotchmar reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with GM's representations.

92. After Plaintiff Kotchmar was notified about the recall in November 2020, he took his vehicle into his local authorized dealership on or about November 10, 2020 to have the update installed.

93. After installing the software modification, the estimated range of Plaintiff Kotchmar's car fell well below the range of 238 miles that Plaintiff Kotchmar expected he would be getting when he purchased his vehicle. Plaintiff Kotchmar now has range anxiety whenever he drives the car due to the reduced range, a major concern.

94. When Plaintiff Kotchmar purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

95. As a result, Plaintiff Kotchmar has been left with a vehicle with reduced range. Plaintiff Kotchmar has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Kotchmar known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## K.     Plaintiff Robert Kuchar

96.     Plaintiff Robert Kuchar is a citizen and resident of New River, Arizona.

97.     On or about July 27, 2018, Plaintiff Kuchar purchased a new 2018 Chevy Bolt from Harbor Chevrolet in Long Beach, California (for purposes of this section, "the Vehicle").

98.     Plaintiff Kuchar made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

99.     Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Kuchar of the Defective Battery. Plaintiff Kuchar reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

100.    Plaintiff Kuchar purchased the Vehicle for personal, family, or household use. Plaintiff Kuchar has always attempted to use the Vehicle in the normal and expected manner.

101.    Plaintiff Kuchar learned of the recall from a letter from General Motors.

102.    After installing the software modification, the estimated range on Plaintiff Kuchar's car fell to far less than the range of 238 miles that Plaintiff Kuchar expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was lessened to approximately 70–75% of full charge.

103.   As a result, Plaintiff Kuchar has been left with a vehicle with reduced range. Plaintiff Kuchar has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Kuchar known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**L.      Plaintiff Joseph Poletti**

104.   Plaintiff Joseph Poletti is a citizen and resident of Chandler, Arizona.

105.   In or around June 2, 2018, Plaintiff Poletti purchased a new 2018 Chevrolet Bolt from an authorized dealership in Gilbert, Arizona (for purposes of this section, the "Vehicle").

106.   Plaintiff Poletti made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

107.   Prior to buying his Bolt, GM did not inform Plaintiff Poletti of the Battery Defect. Plaintiff Poletti reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with GM's representations.

108.   After Plaintiff Poletti was notified about the recall on or around December 1, 2020, he took his vehicle into his local authorized dealership on December 7, 2020 to have the update installed.

109.   After installing the software modification, the estimated range on Plaintiff Poletti's car fell well below the range of 238 miles that Plaintiff Poletti expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%. Plaintiff Poletti's vehicle is also now taking two to three times longer to charge.

110.   Plaintiff Poletti now has range anxiety on his commute to work due to the reduced range after the software update, which is a major concern for him.

111.   When Plaintiff Poletti purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

112.   As a result, Plaintiff Poletti has been left with a vehicle with reduced range. Plaintiff Poletti has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Poletti known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## M.  Plaintiff Evi Schulz

113.   Plaintiff Evi Schulz is a resident of Orlando, Florida.

114.   On or about October 6, 2018, Evi Schulz purchased a new 2019 Chevy Bolt from Autonation Chevrolet West Colonial in Orlando, Florida (for purposes of this section, "the Vehicle").

115.   Plaintiff Schulz made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

116.   Prior to her purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Schulz of the Defective Battery. Plaintiff Schulz reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

117.   Plaintiff Schulz purchased the Vehicle for personal, family, or household use. Plaintiff Schulz has always attempted to use the Vehicle in the normal and expected manner.

118.   Plaintiff Schulz learned of the recall from an email from General Motors and a Recall Notice from Autonation Chevrolet West Colonial.

119.   After installing the software modification, the estimated range on Plaintiff Schulz's car fell to far less than the range of 238 miles that Plaintiff Schulz expected she would be getting when she purchased her vehicle. Her vehicle's battery capacity was

even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 210 miles of range.

120.    As a result, Plaintiff Schulz has been left with a vehicle with reduced range. Plaintiff Schulz has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Schulz known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

## N.    Plaintiff Michael Smith

121.    Plaintiff Michael Smith is a citizen and resident of Trevor, Wisconsin.

122.    On or about September 14, 2017, Plaintiff Smith purchased a new 2017 Chevy Bolt from Currie Motors in Forest Park, Illinois (for purposes of this section, "the Vehicle").

123.    Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Smith of the Defective Battery. Plaintiff Smith reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

124.    Plaintiff Smith purchased the Vehicle for personal, family, or household use. Plaintiff Smith has always attempted to use the Vehicle in the normal and expected manner.

125.   After receiving notice of the recall on November 13, 2020, Plaintiff Smith brought his Vehicle to a local dealership in December 2020 and February 2021 to have the battery inspected and the service order performed.

126.   Plaintiff Smith's Vehicle had a substantially reduced range after the November 13, 2020 recall was performed. During the winter months, his Vehicle was limited to approximately 160–70 miles per "full" charge. Plaintiff Smith was occasionally forced to modify his typical commute and experienced fear that he would not have sufficient charge to complete a drive safely. On multiple occasions during his typical commute Plaintiff Smith experienced a warning that his vehicle had a low charge.

127.   Plaintiff Smith received notice of GM's April 2021 recall update and took his vehicle to a dealership to have the procedure performed in May 2021. At this time, onboard diagnostic software was installed in his Vehicle but the battery was not replaced.

128.   As a result of the foregoing, Plaintiff Smith has been left with a vehicle with reduced range and/or that is still at risk of a battery fire. Plaintiff Smith has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Smith known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range

would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## O.    Plaintiff Jeanne Sterba

129.   Plaintiff Jeanne Sterba is a citizen and resident of San Clemente, California.

130.   On or about July 15, 2018, Plaintiff Sterba purchased a new 2018 Chevy Bolt from Mark Cristopher Chevrolet in Ontario, California (for purposes of this section, "the Vehicle").

131.   Plaintiff Sterba made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

132.   Prior to her purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Sterba of the Defective Battery. Plaintiff Sterba reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

133.   Plaintiff Sterba purchased the Vehicle for personal, family, or household use. Plaintiff Sterba has always attempted to use the Vehicle in the normal and expected manner.

134.   Plaintiff Sterba learned of the recall from a letter from General Motors. Prior to receiving notice of the recall, she had reviewed reports of multiple vehicle fires.

135.   After installing the software modification, the estimated range on Plaintiff Sterba's car fell to far less than the range of 238 miles that Plaintiff Sterba expected she would be getting when she purchased her vehicle. Her vehicle's battery capacity was lessened to approximately 75% of full charge.

136.   As a result, Plaintiff Sterba has been left with a vehicle with reduced range. Plaintiff Sterba has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Sterba known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

## P.   Plaintiff Ashley Strong

137.   Plaintiff Ashley Strong is a citizen and resident of Grovetown, Georgia.

138.   On or around March 11, 2019, Plaintiff Strong purchased a used 2017 Chevrolet Bolt through Carvana (for purposes of this section, "the Vehicle").

139.   Plaintiff Strong made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, particularly the thermo-regulated battery.

140.    Prior to buying her Bolt, GM did not inform Plaintiff Strong of the Battery Defect. Plaintiff Strong reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with GM's representations.

141.    After Plaintiff Strong was notified about the recall by GM, she went to a local dealership to have the recall performed, reducing the charge of the vehicle to 90%.

142.    After installing the software modification, the estimated range on Plaintiff Strong's car declined to far less than the range of 238 miles that Plaintiff Strong expected she would be getting when she purchased her vehicle. Her vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 70%. Plaintiff Strong was unable to use the Vehicle due to the reduced range, and used a long-term rental vehicle for approximately six months.

143.    As result of significant range reduction caused by GM's software modification, Plaintiff Strong now suffers from anxiety when driving the Vehicle longer distances—fearing that a full charge will not provide enough range to reach her intended destination.

144.    As a further result of the software modification, Plaintiff Strong has been limited in her ability to drive to certain locations, thereby significantly diminishing her use and enjoyment of the Vehicle

145.    When Plaintiff Strong purchased her Chevrolet Bolt, she was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce her vehicle's range and battery capacity.

146.    As a result, Plaintiff Strong has been left with a vehicle with reduced range. Plaintiff Strong has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Strong known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

**Q.    Plaintiff Alucard Taylor**

147.    Plaintiff Alucard Taylor is a citizen and resident of Portland, Oregon.

148.    On or about July 27, 2020, Plaintiff Taylor purchased a used 2017 Chevy Bolt from Ron Tonkin Chevrolet in Portland, Oregon (for purposes of this section, "the Vehicle").

149.    Plaintiff Taylor made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

150.    Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Taylor of the Defective Battery. Plaintiff Taylor

reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

151.   Plaintiff Taylor purchased the Vehicle for personal, family, or household use. Plaintiff Taylor has always attempted to use the Vehicle in the normal and expected manner.

152.   Plaintiff Taylor learned of the recall through a letter from General Motors.

153.   Due to needing the Vehicle to occasionally reach the advertised Range, Plaintiff Taylor did not receive the Fall 2020 software update. Rather, per instructions from GM's letter, he set his car to Hilltop Reserve, stopped charging the Vehicle overnight, and unplugged the vehicle once the battery charged to 90%.

154.   As a result, Plaintiff Taylor has been left with a vehicle with reduced range. Plaintiff Taylor has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Taylor known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## R.   Plaintiff Andres Torres

155.   Plaintiff Andres Torres is a citizen and resident of Bolingbrook, Illinois.

156.   In or around August 2019, Plaintiff Torres purchased a used 2017 Chevy Bolt from an authorized dealership in Downers Grove, Illinois (for purposes of this section, "the Vehicle").

157.   Plaintiff Torres made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

158.   Prior to his purchase, neither GM nor any of its agents, dealers, nor other representatives informed Plaintiff Torres of the Defective Battery. Plaintiff Torres reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

159.   Plaintiff Torres purchased the Vehicle for personal, family, or household use. Plaintiff Torres has always attempted to use the Vehicle in the normal and expected manner.

160.   Plaintiff Torres learned of the recall in or around November 2020, which prompted him to bring the Vehicle to his dealership and contact GM about what to do about the fact that he would have difficulty completing his commute with the reduced Vehicle range. While GM offered him a loaner vehicle, it did not offer him an electric vehicle like a newer-model Bolt, which is what he had requested, so he did not accept the loaner. Plaintiff Torres also temporarily relocated the Vehicle on account of the fire risk.

161.   After installing the software modification, the estimated range on Plaintiff Torres' car fell to far less than the range of 238 miles that Plaintiff Torres expected he would be getting when he purchased his vehicle. His Vehicle's battery capacity was even lower than the 10% reduction that he was expecting.

162.   As a result, Plaintiff Torres was left with a vehicle with reduced range and he suffered increased range anxiety. Plaintiff Torres ultimately had to have a charging station installed at his workplace in order to be able to complete his daily commute.

163.   Plaintiff Torres has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery. He did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Torres known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, and that despite multiple supposed fixes, there still exists potential fire risk, he would not have purchased his Vehicle.

## S.   Plaintiff Jason Vaaler

164.   Plaintiff Jason Vaaler is a citizen and resident of Dunlap Loop, Texas.

165.   On June 6, 2020, Plaintiff Vaaler purchased a used 2019 Chevrolet Bolt from an authorized dealership in Beaumont, Texas (for purposes of this section, "the Vehicle").

166.   Plaintiff Vaaler made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the approximate 238-

mile range. He chose the Chevy Bolt based primarily on its represented range, which is one of the best in its class for electric vehicles.

167.   Prior to buying his Bolt, GM did not inform Plaintiff Vaaler of the Battery Defect. Plaintiff Vaaler reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with GM's representations.

168.   After Plaintiff Vaaler was notified about the recall on or around November 13, 2020, he took his vehicle into his local authorized dealership in November of 2020 to have the update installed.

169.   After installing the software modification, the estimated range on Plaintiff Dickinson's car declined to far less than the range of 238 miles that Plaintiff Vaaler expected he would be getting when he purchased his vehicle.

170.   Plaintiff Vaaler now has range anxiety on long drives due to the reduced range after the software update, which is a concern for him.

171.   When Plaintiff Vaaler purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his vehicle's range and battery capacity.

172.   As a result, Plaintiff Vaaler has been left with a vehicle with reduced range. Plaintiff Vaaler has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Vaaler known that the vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**T.    Plaintiff Shawn Walker**

173.   Plaintiff Shawn Walker is a citizen and resident of Phoenix, Arizona.

174.   On or about August 5, 2020, Plaintiff Walker purchased a used 2019 Chevy Bolt from Carvana in Tolleson, Arizona (for purposes of this section, "the Vehicle").

175.   Plaintiff Walker made the decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

176.   Prior to his purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Walker of the Defective Battery. Plaintiff Walker reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

177.   Plaintiff Walker purchased the Vehicle for personal, family, or household use. Plaintiff Walker has always attempted to use the Vehicle in the normal and expected manner.

178.   Plaintiff Walker learned of the recall from a Bolt owners' group on Facebook, which prompted him to contact GM via the EV Concierge Line to inquire about driving his Vehicle on a long-distance trip. He was informed that he should not make any drive that required him to charge his car beyond 90%, and GM insisted that

Plaintiff Walker rent a car for his trip. Plaintiff Walker was also informed that he needed to return to a local dealership in order to have the software update applied to his Vehicle, which he did on December 8, 2020.

179.   After installing the software modification, the estimated range on Plaintiff Walker's car fell to far less than the range of 238 miles that Plaintiff Walker expected he would be getting when he purchased his vehicle. His vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 90%.

180.   As a result, Plaintiff Walker has been left with a vehicle with reduced range. Plaintiff Walker has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Walker known that the vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

## U.   Plaintiffs Thomas and Carol Whittaker

181.   Plaintiffs Thomas and Carol Whittaker are citizens and residents of Illinois.

182.   On or about June 22, 2017, Plaintiffs Whittaker purchased a new 2017 Chevy Bolt from a Chevrolet dealership in Lake Forest, Illinois (for purposes of this section, "the Vehicle").

183.   Plaintiffs Whittaker made their decision to purchase the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 238-mile range. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

184.   Prior to this purchase, neither GM nor any of its agents, dealers, or other representatives informed Plaintiffs Whittaker of the Defective Battery. Plaintiffs Whittaker reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

185.   Plaintiffs Whittaker purchased the Vehicle for personal, family, or household use. Plaintiffs Whittaker have always attempted to use the Vehicle in the normal and expected manner.

186.   After learning of the recall, Plaintiffs Whittaker brought their Vehicle to a local dealership in order to have the software update applied to the Vehicle, which they did in or around December 2020.

187.   After installing the software modification, the estimated range on the Vehicle fell to far less than the range of 238 miles that Plaintiffs Whittaker expected they would be getting when purchasing their vehicle.

188.   As a result, Plaintiffs Whittaker were left with a vehicle with reduced range. Plaintiffs Whittaker suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs

Whittaker known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased the Vehicle.

## V.    Defendant General Motors LLC

189.    Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Ctr., Detroit, Michigan.

190.    General Motors is a motor vehicle manufacturer and a licensed distributer of new, previously untitled motor vehicles. GM is one of the "Big Three" American automakers. GM engages in commerce by distributing and selling new motor vehicles under the Chevrolet, Buick, GMC, and Cadillac brands throughout the United States.

191.    GM has designed, manufactured, imported, distributed, marketed, and leased a number of vehicles that feature the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery").

192.    From its headquarters in Detroit, Michigan, General Motors designed, developed, marketed, and distributed the Class Vehicles with the Defective Battery. Furthermore, General Motors made determinations as to warranty coverage at its headquarters in this District and developed and disseminated its various inadequate recalls and communications to Class members at and from its headquarters.

## IV.    FACTUAL ALLEGATIONS

193.    GM markets and sells the Chevrolet Bolt. It is a front-motor, five-door, all-electric, plug-in hatchback. A picture of the 2017 Chevy Bolt is below:



194.   Since its release, approximately 94,958 Bolts have been sold worldwide, and they remain available for purchase in the United States, South Korea, Mexico, and Canada.[5] GM introduced the Chevy Bolt EV concept in the 2015 Detroit Auto Show and presented it as "a vision for an affordable, long-range all-electric vehicle designed to offer more than 200 miles of range starting around $30,000."[6]

195.   On January 6, 2016, General Motors Chair and CEO Mary Barra formally unveiled the 2017 Chevy Bolt and touted the vehicle's 200+ mile range and comparatively low charging time required to reach 80 percent capacity, noting that "the

---

[5] *See Chevrolet Bolt EV Sales Numbers*, GM AUTHORITY [hereinafter Exhibit C], https://gmauthority.com/blog/gm/chevrolet/bolt-ev/chevrolet-bolt-ev-sales-numbers/ (last visited July 18, 2021).

[6] Mircea Panait, *Chevrolet Bolt Concept EV Looks Premium at 2015 Detroit Auto Show*, AUTOEVOLUTION (Jan. 12, 2015) [hereinafter Exhibit D], https://www.autoevolution.com/news/chevrolet-bolt-concept-vehicle-looks-unfinished-at-2015-detroit-auto-show-live-photos-90958.html#press (last visited July 18, 2021).

Bolt EV can actually give you time back."[7] Highlighting their EV experience derived from the similarly named Chevy Volt, GM partnered with Korean supplier LG Corporation and its Korean and American subsidiaries (together, hereinafter "LG") to develop and manufacture "an all-new cell and battery pack to offer more than an estimated 200 miles of range."[8]

196.   The Bolt was GM's version of an all-electric vehicle, competing with emerging all-electric vehicle lines promoted by new market entrants like Tesla, Nissan, and BMW. It quickly garnered a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, 2017 Green Car of the Year, and Automobile Magazine 2017 All Star awards.[9] These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]."[10] *Green Car Reports* stated that the "most important thing about the Bolt EV" was "how far you can go on a single charge," noting

---

[7] *GM Chairman and CEO Addresses CES*, CHEVROLET: PRESSROOM (Jan. 6, 2016) [hereinafter Exhibit E], https://media.gm.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.detail.html/content/Pages/news/us/en/2016/Jan/boltev/0106-barra-ces.html (last visited July 18, 2021).

[8] *Drive Unit and Battery at the Heart of Chevrolet Bolt EV*, CHEVROLET: PRESSROOM (Jan. 11, 2016) [hereinafter Exhibit F], https://media.gm.com/media/us/en/chevrolet/vehicles/bolt-ev/2021.detail.html/content/Pages/news/us/en/2016/Jan/naias/chevy/0111-bolt-du.html (last visited July 18, 2021).

[9] *See, e.g.*, Jeff Cobb, *2017 Chevy Bolt's Trophy Case Is Filling Up*, GM INSIDE NEWS (Nov. 28, 2016) [hereinafter Exhibit G], https://www.gminsidenews.com/threads/2017-chevy-bolt%E2%80%99s-trophy-case-is-filling-up.300285/ (last visited July 19, 2021); Sebastian Blanco, *Chevy Bolt Wins 2017 Green Car of the Year*, AUTOBLOG (Nov. 17, 2016) [hereinafter Exhibit H], https://www.autoblog.com/2016/11/17/chevy-bolt-wins-2017-green-car-of-the-year/ (last visited July 18, 2021).

[10] *See* Exhibit G.

that the 2017 Bolt offered "the range of a Tesla, for roughly half the price."[11] The Bolt was lauded as "the 200-mile-range EV with cool connectivity that people can actually afford."[12]

197.   The impressive range of the Bolt was advertised as being the result of an "unprecedented" partnership between Defendant GM and LG.[13] In late 2015, GM explained that:

> Offering consumers the first long-range, affordable EV, required an unprecedented supplier relationship combining expertise in infotainment, battery systems and component development with GM's proven in-house capabilities in electric motor design, battery control, system validation and vehicle body/system integration.
>
> Following joint planning and research, GM and LG Corp. brought the Chevy Bolt EV to reality.[14]

198.   LG Chem, an LG subsidiary, was included in the development of the Bolt "from the start," helping to achieve the "key element in driving down costs" by

[11] John Voelcker, *Chevrolet Bolt EV: Green Car Reports' Best Car to Buy 2017*, GREEN CAR REPORTS (Nov. 14, 2016) [hereinafter Exhibit I], https://www.greencarreports.com/news/1106584_chevrolet-bolt-ev-green-car-reports-best-car-to-buy-2017#:~:text=The%20most%20important%20thing%20about,much%20faster%20than%20other%20uses (last visited July 18, 2021).

[12] Nicole Lee, *Presenting the Best of CES 2016 winners!*, ENDGADGET (Jan. 9, 2016) [hereinafter Exhibit J], https://www.engadget.com/2016-01-08-presenting-the-best-of-ces-2016-winners.html (last visited July 18, 2021).

[13] John Voelcker, *Bolt EV Powertrain: How Did GM And LG Collaborate On Design, Production?*, GREEN CAR REPORTS (Feb. 3, 2016) [hereinafter Exhibit K], https://www.greencarreports.com/news/1102176_bolt-ev-powertrain-how-did-gm-and-lg-collaborate-on-design-production (last visited July 18, 2021).

[14] Kevin Kelly, *Chevrolet Develops Bolt EV Using Strategic Partnership*, CHEVROLET: PRESSROOM (Oct. 20, 2015) [hereinafter Exhibit L], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.print.html/content/Pages/news/us/en/2015/oct/1020-bolt.html (last visited July 18, 2021).

developing the battery.[15] LG Chem also maintains a wholly-owned EV battery manufacturing subsidiary located in Holland, Michigan, called LG Chem Michigan, and a research and development entity called LG Chem Power located in Troy.

**A.    Defendant's Marketing to Class Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt**

199.   Range is critical to the success of an all-electric vehicle. Car and Driver Magazine describes range as "*the* all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel," and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station," increased range is one of the primary considerations for purchasers or lessees of electric vehicles.[16] Because battery charging takes more time than refilling a gasoline tank, an all-electric vehicle's usefulness is directly related to the distance the automobile can travel before needing a recharge. Therefore, electric car buyers particularly rely on manufacturer representations regarding how far the automobile can travel on a single charge.

200.   Automobile manufacturers are required by law to prominently affix a label called a "Monroney sticker" to each new vehicle sold. The Monroney sticker sets forth

---

[15] Sam Abuelsamid, *New GM-LG Partnership On Chevy Bolt EV Shows Why Barra Is Resisting Fiat Merger*, FORBES (Oct. 21, 2015) [hereinafter Exhibit M], https://www.forbes.com/sites/samabuelsamid/2015/10/21/general-motors-and-lg-team-up-to-jointly-develop-2017-chevrolet-bolt-ev/?sh=3b73c2cd380d (last visited July 18, 2021).

[16] Rich Ceppos, *Electric Vehicle FAQs*, CAR AND DRIVER (May 27, 2020) [hereinafter Exhibit N], https://www.caranddriver.com/shopping-advice/a32668797/ev-faqs/ (last visited July 18, 2021).

the vehicle's fuel economy (expressed in MPGe for electric vehicles), the driving range, estimated annual fuel costs, the fuel economy range of similar vehicles, and a statement that a booklet is available at the dealership to assist in comparing the fuel economy of vehicles from all manufacturers for that model year, along with pricing and other information. Included in this information for electric vehicles is a vehicle's miles-per-gallon ("MPG") equivalent estimate, which converts the range of the vehicle's battery into an equivalent mileage as measured by miles per gallon. These ratings have been provided to consumers since the 1970s and are posted for the customers' benefit to help them make valid comparisons between vehicles' MPGs when shopping for a new vehicle. This is particularly important for electric vehicles, as consumers generally pay a premium for electric vehicles as compared to gasoline-powered vehicles, and one reason for that premium is the accrued savings over time of driving an electric over a gasoline-powered vehicle.

201.   Electric vehicles like the Bolt have important environmental and financial advantages over conventional vehicles with internal combustion engines. Significantly, all-electric vehicles do not produce any of the tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that are produced by vehicles with internal combustion engines.[17] The lack of tailpipe emissions means that

---

[17] *Emissions from Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit O], https://afdc.energy.gov/vehicles/electric_emissions.html (last visited July 18, 2021).

electric vehicles theoretically help improve air quality, improve public health, and reduce the overall ecological damage caused by driving personal vehicles.[18] This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants.[19] In addition to the environmental benefits, in general, the cost of electricity to charge an electric vehicle is considerably less than would be the cost of fueling with gasoline or diesel, and vehicle maintenance costs typically are lower as well.[20]

202.   Price and range are two primary considerations of consumers when deciding to purchase an electric vehicle. For example, the 2017, 2018, and 2019 Bolt EV Owner's Manuals state that charging the Battery from a standard 120-volt AC electrical outlet for an hour would yield about 4–6 miles of driving range. If the Battery were completely depleted, it would take more than 50 hours to fully recharge at that rate. For this reason, many Bolt owners and lessees install "Level Two" 240-volt charging stations at their residences. Although faster, 240-volt chargers still provide only about 25 miles of driving range per hour of charging, which would take nearly 10

---

[18] *Id.*

[19] *Id.* (state-by-state calculator showing that charging an all-electric vehicle in Oregon produces less than 17% of the carbon dioxide equivalent of that produced by gasoline-powered vehicles).

[20] Brooke Crothers, *Rising Gas Prices Driving You To An Electric Car? Cost To Charge A Tesla Model 3 Vs Gas*, FORBES (May 22, 2021) [hereinafter Exhibit P], https://www.forbes.com/sites/brookecrothers/2021/05/22/rising-gas-prices-driving-you-to-an-electric-car-cost-to-charge-a-tesla-model-3-vs-gas/?sh=6902fcf57192 (last visited July 18, 2021); Roberto Baldwin, *EV vs. Gas: Which Cars Are Cheaper to Own?*, CAR AND DRIVER (May 22, 2020) [hereinafter Exhibit Q], https://www.caranddriver.com/shopping-advice/a32494027/ev-vs-gas-cheaper-to-own/ (last visited July 18, 2021).

hours to fully charge from fully depleted.[21] Necessarily, then, the distance one can drive on a fully-charged battery without stopping to recharge the battery (the "battery range" or "range") is one of the most critical factors to consider in purchasing any all-electric vehicle.

203.   GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging.[22] Defendant has made that same representation since it started marketing the Bolt to the general public. GM went to great lengths to prove that range, including taking a Car and Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."[23]

204.   This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric vehicle—the Tesla Model 3.[24] Both vehicles advertised a range of over 200 miles on a

---

[21] The only way to charge the Bolt more quickly is to find a "DC Fast Charging" station, which can provide a Bolt with about 90 miles of range in about 30 minutes for those Bolts with the fast-charging capability installed. These chargers are not available for home installation, *Living Electric*, CHEVROLET [hereinafter Exhibit R], https://www. chevrolet.com/electric/living-electric (last visited July 18, 2021), and are nowhere near as prevalent as gas stations.

[22] *Chevrolet Bolt EV – 2017*, CHEVROLET: PRESSROOM [hereinafter Exhibit S], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.html (last visited July 18, 2021).

[23] Joey Capparella, *2017 Chevrolet Bolt EV First Drive*, CAR AND DRIVER (Sept. 13, 2016) [hereinafter Exhibit T], https://www.caranddriver.com/reviews/a15099295/2017 -chevrolet-bolt-ev-first-drive-review/ (last visited July 18, 2021).

[24] Bradley Berman, *EV Comparison: Tesla Model 3 Vs. Chevy Bolt*, INSIDEEVS (Oct. 25, 2018) [hereinafter Exhibit U], https://insideevs.com/reviews/340642/ev-

single charge, making them some of the "first [electric vehicles] that could conceivably function as a family's lone car."[25] The Model 3, however, advertised a significantly faster charging time than the Bolt—the Bolt's fastest charging option, the direct-current fast-charging capability, does not come standard with the Bolt and costs consumers an extra $750, and the Bolt takes about twice as long to fast-charge as the Model 3 (approximately 3 miles of added range per minute of charging for the Bolt).[26]

205.   The slower charging time, combined with limited access to charging stations, meant that consumers would not be able to make longer trips with the Bolt without significant planning. For example, a driver wouldn't make "the 600-mile drive from Kansas City to Denver in a Chevrolet Bolt unless [they didn't] mind charging for upwards of 30 hours on 110-volt outlets along the way."[27] The inconvenience of charging combined with the slower charging time of the Bolt when compared to its direct competitors made every additional mile of the Bolt's range critically important to GM's marketing and to consumers.

---

comparison-tesla-model-3-vs-chevy-bolt/ (last visited July 18, 2021) (describing the Tesla Model 3 and the Chevy Bolt as the "two leading compact electric vehicles").

[25] Christian Seabaugh, *2017 Chevrolet Bolt EV vs. 2016 Tesla Model S 60: High-Voltage*, MOTORTREND (Oct. 31, 2016) [hereinafter Exhibit V], https://www.motortrend.com/cars/chevrolet/bolt-ev/2017/2017-chevrolet-bolt-ev-vs-2016-tesla-model-s-60/ (last visited July 18, 2021) (comparing the Bolt to the Tesla Model S 60, a discontinued model that cost almost twice the price of the Bolt and the Tesla Model 3, in anticipation of the release of the Model 3, which the article notes is a more appropriate comparison).

[26] Eric Tingwall, *Tested: 2017 Chevrolet Bolt EV*, CAR AND DRIVER (Oct. 28, 2016) [hereinafter Exhibit W], https://www.caranddriver.com/reviews/a15099446/2017-chevrolet-bolt-ev-test-review/ (last visited July 18, 2021).

[27] *Id.*

206.   GM repeatedly emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV . . . .[28]

At the time of the 2017 Chevy Bolt's release, GM published a specifications sheet disclosing that the vehicle was able to maintain a driving range of an "EPA-estimated 238 miles."[29] The accompanying "product information" fact sheet regarding the 2017 Bolt confirmed that it "offers an EPA-estimated 238 miles of range."[30] The same was true for the 2018 Chevy Bolt's release, in which GM published the same specifications sheet disclosing the vehicle's alleged EPA-estimated 238-mile battery range,[31] and further reiterated the 238-mile range on its product information fact sheet.[32]

---

[28] Liz Winter, *Bolt EV Offers 238 Miles of Range*, CHEVROLET: PRESSROOM (Sept. 13, 2016) [hereinafter Exhibit X], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/sep/0913-boltev.html (last visited July 18, 2021).

[29] *See* Exhibit S.

[30] *Id.*

[31] *2018 Chevrolet Bolt EV*, CHEVROLET: PRESSROOM [hereinafter Exhibit Y], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.html (last visited July 19, 2021).

[32] *Id.*

207.   GM further emphasized the range of the Bolt in a number of
advertisements, like this ad from The Washington Post in June 2017, which prominently
asks consumers to "begin a long-distance relationship, now"[33]:



---

[33] John Voelcker, *Yes, ads for the Chevy Bolt EV electric car do actually exist; here's one*, GREEN CAR REPORTS (June 19, 2017) [hereinafter Exhibit Z], https://www.green carreports.com/news/1111082_yes-ads-for-the-chevy-bolt-ev-electric-car-do-actually-exist-heres-one (last visited July 17, 2021).

208.   GM touted the Chevy Bolt's Battery as being "where it all starts," and advertised an energy capacity of 60 kWh, which GM said allowed drivers to travel an EPA-estimated 238 miles on a single full charge.[34] An example of one such advertisement touting the Bolt's battery capabilities appears below.



209.   GM also displayed the range in this commercial from 2017[35]:

---

[34] *Introducing the All-Electric 2017 Chevrolet Bolt EV*, DUBLIN CHEVROLET [hereinafter Exhibit AA], https://www.dublinchevrolet.com/Chevrolet-Bolt-EV (last visited Feb. 24, 2021); *see also 2017 Bolt EV: All-Electric Vehicle*, CHEVROLET [hereinafter Exhibit BB], https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Feb. 24, 2021).

[35] *The All Electric Chevrolet Bolt EV - 238 Miles Per Full Charge | Chevrolet Bolt EV - Commercial TVC*, YOUTUBE (Jan. 11, 2017) [hereinafter Exhibit CC], https://www.youtube.com/watch?v=uVIedKsm-Kg (last visited Dec. 10, 2020) (screen captured at 1:32).



238 miles EPA-estimated range
per full charge

Your actual range may vary based on several factors including temperature, terrain, and driving technique.

210.   One of the Bolt's first three customers stated in a GM press release that it was "the range and technology" that attracted him to the Bolt.[36] After making its initial deliveries of the 2017 Bolt to its very first customers at the end of 2016, GM issued a press release that quoted a California customer who replaced a competing electric car model: "The range and technology attracted me to the Bolt. . . . I look forward to the longer drives I can make compared to the [BMW] i3 that I owned."[37]

211.   For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements.[38]

---

[36] *Chevrolet Delivers First Bolt EVs to Customers*, CHEVROLET: PRESSROOM (Dec. 13, 2016) [hereinafter Exhibit DD], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/dec/1213-boltev.html (last visited July 17, 2021).

[37] *Id.*

[38] *See, e.g.*, Exhibit Y; *Chevrolet Bolt EV – 2019*, CHEVROLET: PRESSROOM [hereinafter Exhibit EE], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.html (last visited July 17, 2021).

212.   Despite GM's representations, the most critical aspect of the Bolt's much-lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without risking a catastrophic fire.

**B.   The Defective Battery Poses a Significant Safety Risk to Class Vehicle Owners and Lessees**

213.   Lithium ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge."[39] However, these batteries also have a well-documented history of fire issues.[40] Safety concerns related to unexpected fires have been well documented—including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked in 2019—and are known to GM.

214.   Significantly, the documented fires in the Chevy Bolt vehicles have not been the result of external abuse, but rather, have resulted from an internal failure while

---

[39] *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit FF], https://afdc.energy.gov/vehicles/electric_batteries.html (last visited July 17, 2021).

[40] *See* Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020) [hereinafter Exhibit GG], https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited July 18, 2021); *see also* Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020) [hereinafter Exhibit HH], https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited July 17, 2021).

the cars are parked. This type of spontaneous ignition caused by thermal runaway has been reported to cause as many as 80% of lithium-ion battery fires.[41]

215.   Unfortunately, GM ignored safety concerns in order to market the vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in the spontaneous ignition.

### 1.   The Bolt Lithium-Ion Battery Is Defective

216.   Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells."[42] Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.[43]

217.   In order to develop a battery that would deliver the advertised range, Defendant developed a battery with "new cell design and chemistry."[44] The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved

---

[41] Laura Bravo Diaz et al., *Review—Meta-Review of Fire Safety of Lithium-Ion Batteries: Industry Challenges and Research Contributions*, 167 J. Electrochemical Soc'y 9, 090559 (2020) [hereinafter Exhibit II].

[42] Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020) [hereinafter Exhibit JJ], https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited July 17, 2021).

[43] *Id.*

[44] *See* Exhibit F.

thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging."[45]

218.   According to GM, the Bolt uses "active thermal conditioning . . . to keep the battery operating at its optimum temperature, which results in solid battery life performance."[46]

219.   The lithium-ion Batteries in the Class Vehicles were produced at an LG Chem facility in Ochang, South Korea. An image of the Bolt's battery pack is displayed below[47]:



---

[45] *Id.*

[46] *Id.*

[47] Christopher Arcus, *Tesla Model 3 & Chevy Bolt Battery Packs Examined*, CLEANTECHNICA (July 8, 2018) [hereinafter Exhibit KK], https://cleantechnica.com/2018/07/08/tesla-model-3-chevy-bolt-battery-packs-examined/ (last visited July 17, 2021). For a more in-depth explanation of the Bolt's battery, see WeberAuto,

220.   The Bolt's battery is structured with the cells[48] arranged "like books on a bookshelf, in groups."[49] Each group of pouch cells is "stacked to make modules," which are "held together at the ends by long bolts."[50] "The [battery] pack thermal management is regulated by sensing temperature via thermistors located at the ends of the modules" and the liquid coolant is distributed via channels at the base of the cell packs.[51]

221.   GM repeatedly advertised this cell design and chemistry as delivering "a battery system with 160 kilowatts of peak power and 60 kilowatts hours of energy."[52] However, GM and its supplier, LG Chem, were unable to achieve this without endangering Class Members and other drivers. The thermal management system is inadequate to prevent thermal runaway during charging.

222.   According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor

---

*Chevrolet Bolt EV Battery Disassembly*, YOUTUBE (Feb. 19, 2018) [hereinafter Exhibit LL], https://www.youtube.com/watch?v=ssU2mjiNi_Q&feature=emb_title (last visited July 17, 2021).

[48] The battery uses LG Chem pouch cells. For additional detail on pouch cells, see for example, *Pouch Cell – Small but not Trouble Free*, BATTERY UNIVERSITY [hereinafter Exhibit MM], https://batteryuniversity.com/article/pouch-cell-small-but-not-trouble-free (last visited July 17, 2021).

[49] *See* Exhibit KK.

[50] *Id.*

[51] *Id.*

[52] *See* Exhibit F.

charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

## 2.    GM Knew About the Battery Defect

223.    After the release of the 2017 Bolt, drivers quickly began to experience issues with the Bolt's lithium-ion battery. Drivers experienced losses of propulsion power while driving the vehicles—including experiencing a sudden inability to accelerate the vehicle while driving.[53]

224.    Multiple drivers experienced sudden drops in battery levels and loss of power to their vehicles, some while driving in dangerous conditions.[54]

225.    GM has been aware of Battery-related problems in the Bolt since at least late 2016.

226.    In December 2016, shortly after launching the Bolt, GM issued Service Bulletin PIC6239 informing dealers of a "Bolt EV (BEV2) High Voltage Battery Exchange and internal Parts Process" that might require them to replace the Bolt's "Rechargeable Energy Storage System (RESS)" (*i.e.*, the Battery) or certain related

---

[53] *See, e.g.*, *infra* ¶ 215 *et seq.*

[54] *See, e.g.*, *id.*

components.[55] This quality improvement program listed steps to determine whether

components of the high voltage battery pack needed replacement.[56]

227.   GM addressed the loss of propulsion issue caused by the Defective Battery

in a November 2017 customer satisfaction program bulletin:

> Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition
> in which the cells within the battery pack have low voltage. This condition
> is related to the state of charge of the cell group. Eventually, the difference
> in the state of charge of the cell groups (average vs. minimum) may exceed
> a threshold.[57]

When this condition occurs, the "high voltage battery pack" must be replaced.[58]

228.   A display screen in the Bolt informs drivers of the vehicle's estimated

driving range on its current charge and warns them when the Battery is at an especially

low state of charge. Drivers rely on this information to calculate how far they can drive

without having to recharge, and when they need to charge immediately to avoid losing

propulsion. If propulsion is completely lost, the car must be towed to a charging station

or electric outlet and recharged. One cannot merely add a gallon of gas to a tank, or

jump start the Battery.

---

[55] NHTSA Bulletin No.: PIC6239 (Dec. 2016) [hereinafter Exhibit NN],
https://static.nhtsa.gov/odi/tsbs/2016/MC-10111727-9999.pdf (last visited July 18,
2021).

[56] *See* NHTSA Bulletin No.: PIC6239H (May 25, 2018) [hereinafter Exhibit OO],
https://static.nhtsa.gov/odi/tsbs/2018/MC-10141375-9999.pdf (last visited July 18,
2021).

[57] GM Customer Satisfaction Program, 17297 High Voltage Battery Pack Low Cell
(Nov. 2017) [hereinafter Exhibit PP], https://static.nhtsa.gov/odi/tsbs/2017/MC-
10135136-9999.pdf (last visited July 18, 2021).

[58] *Id.*

229.   On April 3, 2018, GM issued a customer satisfaction notice instructing certain owners and lessees of the 2017 Chevy Bolt to get a dealer-installed software update because otherwise the vehicle "may experience 'loss of propulsion' and stop suddenly without warning due to low charge despite the battery indicator showing charge."[59]

230.   This problem indicates that GM's battery management system is or was unable to accurately sense the actual state of the cells within the battery.

231.   On or about April 19, 2018, GM published a manufacturer communication entitled "Vehicle No Start Due to Dead Battery."[60] The advisory notes limit an investigation of this issue only to customers who comment about a dead battery and whose affected part is included in GM's Global Warranty Management/Investigate History link. If a customer met the above two conditions, then the investigation performed would be used "to determine the root cause of the above condition."

232.   On May 11, 2018, GM released "Customer Satisfaction Program 18125 Loss of Propulsion High Voltage Battery Without Notification" regarding *all* Bolt EVs, including 2017 models that had already received the software update released little more than a month earlier. The May notice disclosed that "[c]ertain 2017-2018 model year

---

[59] *See* Jim Fallston, *Saw new recall #N172127150 on mychevrolet today*, ChevyBolt.org (Apr. 5, 2018) [hereinafter Exhibit QQ], https://www.chevybolt.org/threads/saw-new-recall-n172127150-on-mychevrolet-today.26938/ (last visited July 17, 2021).

[60] *2017 Chevrolet Bolt Ev Technical Service Bulletins*, OBD CODES [hereinafter Exhibit RR], https://www.obd-codes.com/tsb/2017/chevrolet/bolt-ev/ (last visited July 17, 2021).

Bolt EV vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion." GM explained that all Bolt EVs needed the software update to "increase[] the accuracy of the range estimation" and "provid[e] more warning at low states of charge."[61] GM updated its service procedure for this problem in August 2018.[62]

233.  In August 2018, GM issued another Customer Satisfaction Program, stating:

> Certain 2017-2018 model year Bolt EV vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion. Only certain vehicles will experience the battery low voltage cell condition.[63]

234.  In a 2019 interview with InsideEVs, Tim Grewe, GM's chief engineer of electric propulsion systems, publicly acknowledged that LG Chem's manufacturing

---

[61] GM Customer Satisfaction Program, 18125 Loss of Propulsion High Voltage Battery Without Notification (May 2018) [hereinafter Exhibit SS] https://static.nhtsa.gov/odi/tsbs/2018/MC-10143682-9999.pdf (last visited July 18, 2021); Eric Loveday, *UPDATE – Possible Chevy Bolt Battery Cell Failure Prompts GM Statement / Recall*, INSIDE EVs (May 11, 2018) [hereinafter Exhibit TT], https://insideevs.com/news/337521/update-possible-chevy-bolt-battery-cell-failure-prompts-gm-statement-recall/ (last visited July 17, 2021).

[62] GM Customer Satisfaction Program, 18125 Loss of Propulsion High Voltage Battery Without Notification (Aug. 2018) [hereinafter Exhibit UU], https://static.nhtsa.gov/odi/tsbs/2018/MC-10145176-9999.pdf (last visited July 18, 2021).

[63] *Id.*

practices had caused Battery issues, including "reduced range and early capacity fade" in some Bolt EVs and the loss of propulsion problems stemmed from the Bolt's battery imbalance problems.[64]

235.    GM's proposed solution was to replace the high voltage battery pack in some affected vehicles.[65] However, it did not provide any notice to consumers that the Bolt's batteries were defective, nor did GM ever address the issues in the 2018 or 2019 Class Vehicles. GM did not address any possible widespread issue with the Defective Battery, and treated affected vehicles as individualized manufacturing errors or defects. However, there was a more insidious and widespread problem.

236.    By 2019, the issues with the lithium ion batteries began to escalate.[66] Class Members were experiencing vehicle fires when charging their vehicles to a full or near-full charge.[67] On information and belief, the same issue that causes the low-voltage condition in certain cell groups can cause high-voltage conditions in certain cell groups in the Defective Battery. This issue can cause dangerous overheating of the battery while charging, resulting in fires in the Class Vehicles.

237.    NHTSA maintains a database of motor-vehicle consumer complaints submitted since January 2000. GM, like other large automakers, regularly reviews these

---

[64] Bradley Berman, *My Chevy Bolt Is On Third Battery Pack: Here's Why*, INSIDEEVS (Feb. 6, 2019) [hereinafter Exhibit VV], https://insideevs.com/news/342671/my-chevy-bolt-is-on-third-battery-pack-heres-why/ (last visited July 18, 2021)

[65] *Id.*

[66] *See* Exhibit A (stating that the first fire incident appears to have occurred on March 17, 2019).

[67] *See, e.g.*, *infra* ¶ 215 *et seq.*

complaints and communicates directly with NHTSA. NHTSA has "[r]egular

engagements with Original Equipment Manufacturers (OEMs), including weekly calls

with large manufacturers" like GM.[68]

238.   Consumers are able to submit Vehicle Owner Questionnaires in which they

provide information that includes the make, model, and model year of the vehicle, the

approximate incident date, the mileage at which the incident occurred, whether the

incident involved a crash or fire, whether any people were injured or killed, the speed of

the vehicle at the time of the incident, and a description of the incident. A number of

NHTSA complaints concerning the Defective Battery have been submitted to the

database.

239.   NHTSA warns that the "affected vehicles' [battery] cell packs have the

potential to smoke and ignite internally, which could spread to the rest of the vehicle

and cause a structure fire if parked inside a garage or near a house" and that the vehicles

"can catch fire even if they are turned off, parked, and disconnected from a charging

unit."[69]

240.   From July 20, 2020, to August 26, 2020, GM received at least four claims

alleging that the Class Vehicles' battery pack had caused a fire. Indeed, GM has now

---

[68] *Advancing Safety by Addressing Defects and Raising Awareness*, U.S. DEP'T OF TRANSP.: NHTSA [hereinafter Exhibit WW], https://www.nhtsa.gov/advancing-safety-addressing-defects-and-raising-awareness (last visited July 17, 2021).

[69] NHTSA Consumer Alert: Important Chevrolet Bolt Recall for Fire Risk, U.S. DEP'T OF TRANSP.: NHTSA (Nov. 13, 2020) [hereinafter Exhibit XX], https://www.nhtsa.gov/press-releases/nhtsa-consumer-alert-important-chevrolet-bolt-recall-fire-risk (last visited July 18, 2021).

identified at least a dozen battery-related allegations of fire involving 2017-2019 Bolt

vehicles, and its internal investigations (spanning from August-November 2020,

according to GM) have revealed that in at least five of those cases the fire was related to

the battery. In four such cases, the fire occurred when the battery was highly charged

just before the fire occurred.

241.    These NHTSA complaints illustrate the significance of the notice of the

Defective Battery that GM received from NHTSA and customers. Below are examples

of consumer complaints submitted to NHTSA regarding loss of propulsion or dead

battery issues with the Class Vehicles[70]:

> NHTSA ID Number: 11031387
> NHTSA Posting Date: Sept. 16, 2017
>
> DRIVING ON THE FREEWAY (60-70MPH) WITH THE BATTERY AT
> OR SLIGHTLY ABOVE 50%, AN ALERT SOUNDED, AND THE
> BATTERY LEVEL IMMEDIATELY WENT DOWN TO NEARLY
> ZERO. IT ESTIMATED 10 MILES LEFT, BUT SPEED IMMEDIATELY
> DECREASED, AND THE ACCELERATOR STOPPED WORKING.
> AFTER RAPIDLY COASTING OVER TO THE SHOULDER, AND
> WITHIN SECONDS, THE CAR MADE A SERIES OF LOUD NOISES
> AND COMPLETELY STOPPED.
>
> NHTSA ID Number: 11062432
> NHTSA Posting Date: Jan. 4, 2018
>
> TL* THE CONTACT OWNS A 2017 CHEVROLET BOLT EV. WHILE
> DRIVING APPROXIMATELY 35 MPH, THE VEHICLE SHUT DOWN
> IN THE MIDDLE OF THE ROAD. THE "PROPULSION" WARNING
> INDICATOR ILLUMINATED. THE VEHICLE WAS TOWED TO
> CAPITOL CHEVROLET (905 CAPITOL EXPRESSWAY AUTO MALL,

---

[70] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited July 18, 2021);
NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited July 18, 2021);
NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited July 18, 2021).

SAN JOSE, CA 95136) WHERE IT WAS DIAGNOSED THAT THE
BATTERY NEEDED TO BE REPLACED. THE BATTERY WAS
REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE
FAILURE AND REFERRED THE CONTACT BACK TO THE
DEALER. THE FAILURE MILEAGE WAS 4,193.

NHTSA ID Number: 11071886
NHTSA Posting Date: Feb. 8, 2018

THIS VEHICLE HAS ABRUPTLY GONE TO ZERO RANGE AND
ENTERED A REDUCED POWER MODE EVEN THOUGH THE
BATTERY SHOWED SUFFICENT RANGE SECONDS EARLIER.
AFTER STOPPING, GETTING OUT AND KEYING UP AGAIN, THE
CAR STAYED AT ZERO RANGE AND DISPLAYED A CHARGE
NOW MESSAGE.

THE FIRST INCIDENT HAPPENED ON JANUARY 11, 2018. IN THAT
CASE THE RANGE METER SHOWED ABOUT 30 MILES
REMAINING. AS I UNDERSTAND IT, THERE ARE TWO
PRELINIARY WARNINGS BEFORE THE THIRD MORE INSISTENT
ONE. THE CAR WAS DRIVEN BY ANOTHER COLLEAGUE WHO
HADN'T DRIVEN IT BEFORE, AND HE WASN'T SURE IF HE
MISSED THE FIRST TWO WARNINGS OR NOT. HE WAS
TRAVELING AT 70 MPH ON THE FREEWAY AT THE TIME THE
VEHICLE "STALLED" FOR LACK OF A BETTER WORD. THE
RANGE WENT TO NOTHING, THE VEHICLE DROPPED IN SPEED
SIGNIFICANTLY (NOT A PURE STALL) AND HE HAD TO MOVE
THROUGH LANES TO THE SIDE OF THE ROAD AMID FASTER
TRAFFIC. BECAUSE OF THE UNCERTAINTY ABOUT WARNINGS
HE MAY HAVE MISSED (I DON'T THINK THEY'RE SUBTLE
ENOUGH TO MISS, SO IT IS MY VIEW THEY NEVER HAPPENED)
WE TALKED OURSELVES OUT OF A DEALER VISIT. WE TOWED
IT TO A NEARBY LEVEL 3 FAST CHARGER INSTEAD, AFTER
WHICH IT PERFORMED NORMALLY.

SUBSEQUENT ONSTAR E-MAIL HEALTH REPORTS HAVE
DESCRIBED THE BATTERY AS IN GOOD CONDITION. THE MOST
RECENT OF THESE WAS FEBRUARY 7TH, WHICH IS
INTERESTING BECAUSE ...

THEN, ON FEBRUARY 8, 2018, IT HAPPENED AGAIN. THIS TIME
THE VEHICLE WENT FROM 60 MILES TO NOTHING. SAME ISSUE:

DRASTICALLY REDUCED POWER WITH NO ADVANCED
WARNING, MANEUVERING THROUGH FASTER TRAFFIC TO A
FREEWAY EXIT RAMP. THE CAR CAME TO A HALT ON THE
LONG EXIT RAMP. IT WAS TOWED TO A DEALER, WHERE IT
NOW SITS.

I HAVE NEVER RECEIVED A SERIVICE BULLETIN OR RECALL
NOTICE FOR ANYTHING, AND AS FAR AS I KNOW THE CAR IS
UP TO DATE IN THIS REGARD.

THERE MAY BE TWO PROBLEMS: 1) THE BATTERY HAS A
DEFECT AND 2) ON STAR HEALTH BATTERY CHECKS REPORTS
ARE MEANINGLESS.

NHTSA ID Number: 11091674
NHTSA Posting Date: Apr. 26, 2018

DESPITE HAVING A FULLY CHARGED BATTERY, WHEN WE
PARKED OUR VEHICLE, IT WOULD NOT START. THE ENTIRE
ELECTRICAL SYSTEM WAS DOWN. WE JUMPED THE STARTER
BATTERY AND THAT PROVIDED ENOUGH POWER TO ALLOW
US TO SHIFT INTO NEUTRAL SO THAT WE COULD HAVE THE
CAR TOWED. AFTER A WEEK, AND MULTIPLE CALLS TO THE
ENGINEERS IN DETROIT, THE DEALER HAS STILL NOT BEEN
ABLE TO DETERMINE THE PROBLEM.MY CONCERN IS THAT
THEY ARE ATTEMPTING TO REPAIR AN ISSUE WITHOUT
HAVING A FULL UNDERSTANDING OF THE PROBLEM. IF THIS
ISSUE WERE TO RE-OCCUR WHILE DRIVING AT HIGH SPEED,
THE CONSEQUENCES COULD BE CATASTROPHIC, AS THE CAR
WOULD IMMEDIATELY COME TO A STOP AND ALL CONTROL
MIGHT BE LOST. I DON'T GET THE SENSE THAT GM IS TAKING
THIS ISSUE SERIOUSLY ENOUGH. THEY SEEM TO BE TREATING
THIS LIKE A TECH COMPANY DEALS WITH SOFTWARE ISSUES.
THEY ARE SIMPLY WAITING FOR THE PROBLEMS TO OCCUR
AND THEN HAVING THEIR ENGINEERS RUN DIAGNOSTICS.
UNFORTUNATELY, GIVEN THE SEVERITY OF THE ISSUE, THEY
MAY BE PUTTING LIVES AT STAKE WHILE THEY "DE-BUG"
THEIR DESIGN. THIS IS NOT A COMPUTER APP. IT IS A VEHICLE
CARRYING HUMANS AT HIGH SPEED. GM NEEDS TO BE MORE
PROACTIVE AND TAKE THESE CARS OFF THE ROAD UNTIL
THEY FULLY UNDERSTAND THE ISSUE AND HAVE A
PERMANENT RESOLUTION.

NHTSA ID Number: 11113064
NHTSA Posting Date: July 20, 2018

THE BOLT STOPPED PROVIDING POWER WHEN I WAS DRIVING
DOWN A 4 LANE FREEWAY. IT HAS ALREADY FAILED 3 TIMES
IN THE PAST, THIS IS THE 4TH TIME.

NHTSA ID Number: 11114062
NHTSA Posting Date: July 26, 2018

ON 2018-07-26 AT APPROXIMATELY 2325H, VEHICLE WAS BEING
DRIVEN AT ~70MPH NORTHBOUND ON I-95, THE MAINE
TURNPIKE. LOCATION WAS APPROXIMATELY 1/2 MILE NORTH
OF EXIT-32 (BIDDEFORD, ME). ROAD CONDITIONS WERE GOOD,
TEMPERATURES IN THE MID-70F, HUMID. THE OWNER'S WIFE
WAS DRIVING, WITH HER HUSBAND IN THE PASSENGER SEAT.

AT THE TIME LISTED, THE VEHICLE SOUNDED A WARNING
CHIME, AND RAPIDLY LOST POWER FROM HIGHWAY SPEEDS
(70 MI/HR). VEHICLE, WITH THE EXCEPTION OF SPEED, WAS IN
CONTROL WITH BRAKES AND STEERING, EMERGENCY
FLASHERS, AND LIGHTS OPERATING.

. . . .

NHTSA ID Number: 11115206
NHTSA Posting Date: July 27, 2018

BOLT EV CHIMED, ICON APPEARED AND THE TRAVEL MILEAGE
FROM THE EVENING'S CHARGE DROPPED FROM ABOUT 240 MI
TO LO AND I HAD TO PULL OVER AND PARK. MESSAGE ON
DISPLAY WAS PROPULSION POWER IS REDUCED. I THEN HAD
TO BE TOWED TO CHEVY DEALER TO HAVE THE RECALL
#18097 REPROGRAMMED. PROBLEM REOCCURRED 3 DAYS
LATER. HAD TO BE TOWED AGAIN. CAR IS UNSAFE. I LIVE IN
VERY RURAL AREA...WAS LUCKY IT WAS DAYLIGHT.

NHTSA ID Number: 1115887
NHTSA Posting Date: Aug. 3, 2018

CAR SUDDENLY LOST POWER ON THE HIGHWAY. I HAD TO COAST TO A STOP.

THE HIGH-VOLTAGE BATTERY WHICH HAD BEEN 3/4 FULL WENT DOWN TO ZERO.

AFTER THE INCIDENT, THE CAR COULD NO LONGER BE DRIVE.

I'D ALREADY HAD GM'S RECALL INSTALLED N172127150

NHTSA ID Number: 11127952
NHTSA Posting Date: Sept. 2, 2018

DRIVING AT 65 MPH WITH 100+ MILE RANGE, CAR HAD A SUDDEN AND COMPLETE LACK OF PROPULSION. ELECTRONICS IN THE CAR CONTINUED TO WORK, BUT ABSOLUTELY NO PROPULSION. COULD SHIFT CAR TO NEUTRAL. CAR EVENTUALLY TOWED TO DEALER.

NHTSA ID Number: 11165022
NHTSA Posting Date: Dec. 13, 2018

CHEVROLET BOLT 2017 WITH ABOUT 55% OF BATTERY CHARGE BRIEFLY DISPLAYED A MESSAGE 'PROPULSION MAY BE REDUCED' AND A FEW MINUTES LATER IT STOPPED IN THE MIDDLE OF THE FREEWAY AND HAD TO BE TOWED AWAY. THE BATTERY INDICATOR SWITCHED MOMENTARILY FROM 125 MILES TO 40 MILES AND THEN IMMEDIATELY TO 10 MILES AND THE CAR COULD NOT BE SHIFTED TO DRIVE, DISPLAYING MESSAGE 'CONDITION NOT CORRECT TO SHIFT.' BEWARE, AS GLITCH LIKE THAT WITH BOLT CAN REALLY ENDANGER YOUR LIFE, AS IT ENDANGERED MINE. I WAS FORTUNATE TO BE ALONE IN THE CAR WITHOUT MY FAMILY, STUCK ON THE FREEWAY AFTER DARK AS CARS AROUND WERE GOING FULL SPEED. THE DEALERSHIP REPLACED THE BATTERY, BUT AFTER THE REPLACEMENT THE CAPACITY AT FULL CHARGE SHOWS ONLY 154 MILES IN LIEU OF OVER 220 MILES BOLT SUPPOSED TO HAVE.

NHTSA ID Number: 11204280
NHTSA Posting Date: Apr. 9, 2019

THE BATTERY FOR 2017 CHEVY BOLT HAS PROBLEM AND MY CAR STOPPED IN THE MIDDLE OF THE ROAD. I WAS VERY LUCKY THAT I WAS IN THE CITY AND THIS HAPPENED AT A TRAFFIC LIGHT. THE BATTERY WAS SHOWING IT HAS 70 MILES LEFT, IT DROPPED TO 30 AND THEN ZERO RIGHT AWAY AND I COULD NOT MOVE THE CAR AND HAD TO TOW THE CAR TO DEALERSHIP. I HAVE ONLY 17,000 MILES ON THE CAR. I TOOK THE CAR TO DEALERSHIP, AT FIRST THEY TOLD ME THAT THERE IS A RECALL ON BATTERY THAT WAS ISSUED APRIL 1ST AND I SHOULD BE GETTING A LETTER IN THE MAIL, LATER CHEVY CUSTOMER SERVICE AND DEALERSHIP CHANGED THEIR STORY AND NOW THEY ARE TELLING ME THERE IS NO RECALL AND IT IS ONLY FOR CUSTOMER SATISFACTION THAT THEY NEED TO REPLACE THE BATTERY! I DO NOT WANT TO IMAGINE IF THE CAR WOULD HAVE STOPPED IN THE MIDDLE OF THE HIGHWAY. IF YOU OWN A CHEVY BOLT BE VERY CAREFUL AND I WOULD NOT TRUST THE SAFETY OF THE VEHICLE AS CHEVY IS NOT EVEN ISSUING A RECALL TO FIX THIS PROBLEM.

NHTSA ID Number: 11204814
NHTSA Posting Date: Mar. 2, 2019

ON THE NIGHT OF MARCH 2, 2019 I WAS DRIVING AT ABOUT 50 MPH ON A STATE HIGHWAY WHEN I SUDDENLY, WITHOUT WARNING, LOST PROPULSION. A NOTE CAME ON THE DASH INDICATING THAT I NEEDED TO PULL OVER AND PUT THE CAR INTO PARK. HAPPILY THERE WAS NO TRAFFIC SO THAT I WAS ABLE TO DO SO WITHOUT AN ACCIDENT. I WAS UNABLE TO RESTART THE CAR AND PUT IT INTO DRIVE AFTER THAT, SO I CALLED A TOW TRUCK. IT WAS VERY COLD WAITING FOR THE TOW TRUCK AS THE CAR HAD NO HEAT. THE CAR REPORTED APPROXIMATELY 50% BATTERY CAPACITY THE ENTIRE TIME. A SUDDEN UNEXPECTED LOSS OF PROPULSION IS A DANGEROUS EVENT. THE CAR HAD ONLY 11,000 MILES ON IT. AFTER SITTING FOR SOME TIME, THE CAR HAS 'FIXED' ITSELF. HOWEVER, THIS WILL PROBABLY HAPPEN AGAIN. I HAVE BROUGHT IT TO A CERTIFIED CHEVROLET SERVICE CENTER AND CALLED CHEVROLET TO REPORT THE ISSUE. BECAUSE THE PROBLEM IS INTERMITTENT, THEY ARE UNABLE TO DIAGNOSE THE PROBLEM.

NHTSA ID Number: 11243074
NHTSA Posting Date: Aug. 8, 2019

MY 2017 CHEVY BOLT LOST PROPULSION WHILE IN MOTION ON
CITY STREETS IN LOS ANGELES IN TRAFFIC WITHOUT
WARNING FROM EITHER ON STAR OR THE VEHICLE. THE
BATTERY INDICATED APPROXIMATELY AN 60% CHARGE.

NHTSA ID Number: 11218778
NHTSA Posting Date: June 9, 2019

ON SATURDAY JUNE 1, 2019 I WAS DRIVING DOWN THE
FREEWAY AT APPROXIMATELY 65MPH. AS I PULLED OFF THE
FREEWAY ONTO A SIDE ROAD, THE "LOW PROPULSION" LIGHT
CAME ON. I IMMEDIATELY LOST ALL PROPULSION AND
COASTED INTO A PARKING LOT. I HAD THE CAR TOWED TO
THE CHEVY DEALER. THE TECHNICIAN WAS ABLE TO START
THE CAR ON MONDAY BUT AS HE DROVE IT INTO THE
GARAGE, THE SAME THING HAPPENED, SUDDEN LOSS OF
COMPULSION. THE DEALER DIAGNOSED MY CAR WITH
CHEVROLET ENGINEERING AND HAD TO ORDER A
TRANSMISSION, POWER HARNESS AND A 3RD MAJOR PART.
THE SERVICE PERSON SAID THIS HAD HAPPENED TO SEVERAL
OTHER 2019 BOLTS. THIS SUDDEN LOSS OF PROPULSION WAS A
DANGEROUS SITUATION AND COULD HAVE BEEN MUCH
WORSE HAD WE LOST PROPULSION ON THE FREEWAY, JUST 5
MINUTES BEFORE WE EXITED THE FREEWAY.

NHTSA ID Number: 11268291
NHTSA Posting Date: Sept. 19, 2019

VEHICLE WAS DOING HIGHWAY SPEEDS ON INTERSTATE 81 IN
PENNSYLVANIA IN THE LEFT LANE. SUDDENLY, THE VEHICLE
MADE A LOUD THUD, FOLLOWED BY RAPID DECELERATION.
MANAGED TO BARELY MAKE IT TO THE RIGHT SHOULDER,
AND AT THAT POINT THE VEHICLE PUT ITSELF INTO PARK AND
REFUSED TO SHIFT INTO DRIVE OR REVERSE. WARNING
MESSAGES AND INDICATORS LIT UP ON THE DASHBOARD, AND
AN ONSTAR NOTIFICATION EMAIL WAS RECEIVED ON MY
PHONE. WAS FORTUNATE TO MAKE IT TO THE SHOULDER,

OTHERWISE THE VEHICLE WOULD HAVE BEEN STRANDED IN THE MIDDLE OF THE HIGHWAY WITH NO WAY TO MOVE IT OFF THE ACTIVE ROADWAY.

NHTSA ID Number: 11329136
NHTSA Posting Date: June 15, 2020

VEHICLE UNEXPECTEDLY & WITHOUT WARNING LOST POWER WHILE TRAVELING ON HIGHWAY. VEHICLE WAS UNABLE TO ACCELERATE AND ALL POWER FROM THE HIGH VOLTAGE SYSTEM WAS LOST.

NHTSA ID Number: 11363890
NHTSA Posting Date: Oct. 8, 2020

I WAS DRIVING MY CHEVY BOLT AT APPROXIMATELY 40-45 MPH WHEN IT WAS AT ABOUT 50% CHARGE CAPACITY WHEN ALL OF A SUDDEN THE CAR SHARPLY DECELERATED AND WARNING LIGHTS CAME ON SAYING THE CHARGE WAS DOWN TO 0 AND THAT IT NEEDED TO BE RECHARGED IMMEDIATELY. I PULLED OVER TO THE SIDE OF THE ROAD AND CALLED FOR HELP. THERE'S NO WAY THE CAR SHOULD HAVE LOST 50% OF IT'S CHARGE OUT OF NOWHERE LIKE THAT. I WAS NOT ABLE TO RESTART THE CAR OR REGAIN POWER. IT HAS TO BE TOWED TO THE DEALER.

242. Below are examples of consumer complaints submitted to NHTSA regarding fires from the Class Vehicles. Each of these complaints cites fire or smoke coming from the Class Vehicles while or shortly after being charged[71]:

NHTSA ID Number: 11365622
NHTSA Posting Date: Oct. 21, 2020

I BROUGHT THE CAR TO THE DEALER ON 2 SEPARATE OCCASIONS WITH CONCERNS OF A FAULTY BATTERY. THE

---

[71] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited July 18, 2021);NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited July 18, 2021); NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited July 18, 2021).

BATTERY SUDDENLY STOPPED CHARGING FULLY. HOWEVER, I WAS TOLD BY THE DEALER TWICE THAT THE BATTERY WAS FUNCTIONING PROPERLY AND THERE WAS NOTHING THEY COULD DO. I OPENED A CLAIM WITH GM REGARDING THIS INCIDENT, ASKING THEM TO REPLACE THE BATTERY, SINCE IT WAS STILL UNDER WARRANTY, AND THERE WAS CLEARLY AN ISSUE. AFTER MONTHS OF BACK-AND-FORTH, GM CLOSED MY CASE STATING IT WAS NORMAL DEPRECIATION OF THE BATTERY. ONE WEEK AFTER THEY CLOSED MY CASE, **THE BATTERY SPONTANEOUSLY CAUGHT FIRE WHILE CHARGING IN MY GARAGE OVERNIGHT**. IT TOTALED 2 VEHICLES, CHARRED EVERYTHING IN MY GARAGE, AND CAUSED SUCH SEVERE SMOKE DAMAGE THAT ALMOST EVERYTHING IN MY HOME WAS A TOTAL LOSS. THE FIRE DEPARTMENT DETERMINED THE FIRE ORIGINATED FROM THE TRUNK AREA, WHERE THE BATTERY IS. MY FAMILY IS DISPLACED WHILE REPAIRS ARE BEING DONE TO MY HOME, AT A TUNE OF APPROXIMATELY $200,000 AT THIS POINT. WE LOST APPROXIMATELY $105,000 IN CONTENTS, AS WELL AS THE 2 TOTALED VEHICLES ($75,000).

NHTSA ID Number: 11372429
NHTSA Posting Date: Oct. 30, 2020

IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, **WE WERE WOKEN UP BY SMOKE/FIRE ALARMS**. WE STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF SEARCHING INSIDE THE HOME AND FINDING NOTHING, WE REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING FROM THE GARAGE AND WHEN THE MUDROOM DOOR WHICH LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT **THE CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE IN THE GARAGE**. THE CHEVY BOLT WAS PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE

BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE
CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT, AS HAS
BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN
FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON
AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES
ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD
WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE
GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP
OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM
ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE
OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8
MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND
HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION,
EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING
ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE
FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE
BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND
SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE
CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP
FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE
SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE
INVESTIGATION.

NHTSA ID Number: 11364692
NHTSA Posting Date: Oct. 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED TO
SMOKE FROM UNDER THE CAR. THE SOUND OF POPPING
NOISES WERE HEARD AND THEN **10 MINUTES LATER THE CAR
WAS ENGULFED IN FLAMES**. THE CARS BATTERY PACK
STARTING POPPING THEN EXPLODED IN FLAMES.

NHTSA ID Number: 11374956
NHTSA Posting Date: Nov. 17, 2020

2017 BOLT EV WAS PARKED NOSE INTO GARAGE PLUGGED
INTO WALL CHARGER CHARGING UNATTENDED WITH MY
PHONE SET TO ALERT ME WHEN ESTIMATED TO BE FULLY
CHARGED. WHEN I CAME OUT OF THE HOUSE TO UNPLUG
CHARGER THERE WAS FIRE VISIBLE UNDER BACK SEAT IN

PASSENGER COMPARTMENT OF VEHICLE. CALLED 911 AND BY THE TIME POLICE AND FIRE RESPONDED WITHIN A FEW MINUTES **ENTIRE BATTERY UNDER VEHICLE ENGULFED CAR IN FLAMES** CAUSING GARAGE FIRE WHICH DESTROYED GARAGE AND ALL IT CONTENTS.JUST LEARNED FROM CARFAX THAT GM ISSUED RECALL NOVEMBER 15 FOR POTENTIAL BATTERY FIRES WHEN AT OR NEAR FULL CHARGE.

NHTSA ID Number: 11339878
NHTSA Posting Date: July 17, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND DRIVEN FOR 12 MILES TO OUR DESTINATION, A TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT THE BACK OF THE CAR. I CALLED 911 AND FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN HOUR AFTER SMASHING THE REAR WINDOW TO GET ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE RESTARTED. SMOLDERING WAS SO HOT IT PARTLY BURNED THE BACKSEAT. ONCE THE CAR WAS COOL ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE SMOKE WAS SMALL AND STARTED ON THE AREA WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED; MINUTES LATER THE SAME HEAVY SMOKE CAME OUT FAST FROM UNDERNEATH THE FRONT PASSENGER SIDE. THE POLICE WERE THERE TO WITNESS THAT INCIDENT. IT WAS AROUND MIDNIGHT THEN.

**3 SPONTANEOUS COMBUSTIONS IN 4 HOURS**; DOOR CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE

PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING AND PEOPLE GETTING HURT? **HOW MANY WILL IT TAKE FOR GM TO CARE?**

243.   The first complaint of spontaneous fire from the Class Vehicles was

submitted to NHTSA on July 8, 2019:

NHTSA ID Number: 11230072
NHTSA Posting Date: July 8, 2019

ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2) CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE FUMES FROM THE BURNING MATERIALS WAS SO THICK AND NOXIOUS IT PERMEATED OUR HOME, REQUIRING PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE COMPANY**.

244.   GM was also on notice of the serious problems with the Defective Battery because consumers presented vehicles (or records of destroyed vehicles) for warranty claims through GM authorized dealers. GM reviews this information and makes warranty determinations.

245.   Despite evidence of fires resulting from charging the Bolt's batteries to 100%—and despite GM's apparent purchase of an affected vehicle for investigative purposes and knowledge of the fires—a GM engineer gave an interview months after the first NHTSA complaints, saying that "[w]e engineered the battery system so that you can charge to 100% and maximize range. If you want maximum range, charge to 100%."[72] GM actually encouraged Chevy Bolt owners and lessees to "top off your battery as much or as little as you like."[73]

246.   As the numerous NHTSA complaints show, and GM has admitted via its public statements about the recalls, this is untrue. The Defective Battery is at risk of catching fire at full or near full charge unless the Class Vehicles are modified to deplete full battery capacity by at least 10%, reducing the vehicle range well below the advertised 238-mile range that consumers were promised when they purchased or leased the Class Vehicles.

---

[72] Steve Birkett, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, TORQUENEWS (Oct. 31, 2019) [hereinafter Exhibit YY], https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last visited July 17, 2021).

[73] *See* Exhibit AA.

247.   The reduced range produced by the software change increases the "range anxiety" that many EV drivers already have: the fear that their vehicle will not have sufficient battery capacity to safely get them from point A to point B.[74] The software change also requires Plaintiffs and Class Members to spend more time charging their Bolt EVs, and imposes additional expense and inconvenience for maintenance and potentially for using other vehicles to reach destinations that would be accessible if the Bolt's range had not been significantly reduced.

248.   On information and belief, GM is aware of similar incidents involving Bolt vehicles that postdate those included in the recalls to date, including later 2019 and 2020 production vehicles. These vehicles may be equipped with a different and newer battery pack, but they also appear to suffer from a similar and potentially dangerous defect.

## C.   The Proposed Recalls are Insufficient to Remedy the Harm to Class Vehicle Owners and Lessees

249.   On November 13, 2020, more than a year after the first known incident of fire in the Class Vehicles, and more than four years after GM began manufacturing and distributing Class Vehicles, GM announced its intent to recall over 50,000 vehicles with high voltage batteries that "may pose a risk of fire when charged to full, or very close to full, capacity."[75] GM informed its authorized retailers of its intent to recall 68,667 Chevy Bolt EV vehicles. Instead of completely recalling the Class Vehicles to replace

---

[74] *See* Allen Brooks, *EV "Range Anxiety": Real World Issues*, MASTERRESOURCE (July 10, 2017) [hereinafter Exhibit ZZ], https://www.masterresource.org/electric-vehicles/ev-batteries/ (last visited July 18, 2021).

[75] *See* Exhibit A.

the dangerous batteries, or buying them back to prevent future incidents, GM's recall initially proposed an "interim remedy" for Class Vehicles that would limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module[76]:



250.   GM mailed recall notices to Bolt owners and lessees in November 2020. Below is a copy of a follow-up notice received by Plaintiffs.

---

[76] *See* Exhibit A.



251.   GM also emailed a notice entitled "Important safety information regarding your Chevrolet Bolt EV" to Bolt owners and lessees in November 2020:



For more information, visit
**Chevy.com/boltevrecall ›**



For instructions on how to activate these settings, please view the video at our website: **Chevy.com/boltevrecall ›**

If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

We recommend scheduling a service appointment with your dealership beginning November 17th to update the vehicle's battery software to automatically limit the maximum state of charge to 90%. Our engineers are working around the clock to identify a permanent fix and we intend to deploy a final remedy to remove the 90% limitation as quickly as possible after the first of the year, 2021.

**For More Information:**
1. Visit us online at **www.chevy.com/boltevrecall ›**
2. Contact our dedicated customer support team, Chevrolet EV Concierge, at 1-833-EVCHEVY — available Monday through Friday from 8:00 a.m. – 7:00 p.m. EST
3. Contact your preferred Chevrolet EV dealer

We apologize for this inconvenience and are committed to finding a final solution to this issue as soon as possible.

As you may be aware, the National Highway Traffic Safety Administration (NHTSA) launched an investigation into a few reports the agency received from Chevrolet Bolt EV owners about potential fires. GM had already been investigating these reports prior to that announcement, in cooperation with NHTSA.

We wanted you to hear directly from Chevrolet about your vehicle and what you can expect from us. General Motors and Chevrolet have decided to voluntarily recall select 2017 – 2019 model-year Chevrolet Bolt EVs with high voltage batteries produced at LG Chem's Ochang, South Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity.

The safety of our products is the highest priority for the entire GM and Chevrolet teams. We are working around the clock on our continued investigation.

We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90%, and reduce the risk of fire.

**For your 2017 model-year Bolt EV:**
- Change the vehicle charge settings to use the Hill Top Reserve option

Steve Hill
U.S. Vice President, Chevrolet

252.   GM notified consumers that dealerships would offer a software update to implement the interim remedy on November 17, 2020, and also instructed consumers how to reduce the vehicle change settings themselves in order to limit the charging capacity.[77] GM also instructed consumers not to park their vehicles in their garages or carports until after they had implemented the software changes:

---

[77] *See* E-mail from Steve Hill, U.S. Vice President, Chevrolet, to 2017 Bolt Owners (Nov. 2020) [hereinafter Exhibit AAA], https://static.nhtsa.gov/odi/rcl/2020/RMISC-20V701-4450.pdf (last visited July 17, 2021)

We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90% and reduce the risk of fire.

**For your 2017 model-year Bolt EV:**
- Change the vehicle charge settings to use the Hill Top Reserve option

For instructions on how to activate these settings, please view the video at our website:
Chevy.com/boltevrecall ›

If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

253. Because the relationship between a lithium ion battery's state of charge and its output voltage is not linear, decreasing the state of charge by 10%, as GM's recall did, does not reduce the output voltage by exactly 10%.[78] "Therefore, the available energy after the software update is less than 90% of the available energy before the software update. The mileage [of the Class Vehicles has been] reduced by more than 10%, making customers charge the [Vehicles] more frequently and increase[ing] the range anxiety."[79]

---

[78] Ryan Aalund, et al., *Understanding the Non-Collision Related Battery Safety Risks in Electric Vehicles a Case Study in Electric Vehicle Recalls and the LG Chem Battery*, 9 IEEE ACCESS 89527, 89530 (2021) [hereinafter Exhibit BBB].

[79] *Id.*

254.   Thus, this "fix" leaves consumers with a vehicle with considerably less range than advertised—an issue that Class Vehicle owners and lessees quickly raised via NHTSA complaints. Examples of such complaints are below[80]:

NHTSA ID Number: 11376229
NHTSA Posting Date: Nov. 25, 2020

TODAY I RECEIVED RECALL NOTIFICATION GM N202311730 ABOUT DEFECTIVE BATTERIES THAT CAN CAUSE A FIRE WHEN CHARGED TO 100%. GM'S SOLUTION IS TO CHANGE SOFTWARE TO LIMIT MY VEHICLE'S CHARGE TO 90%. THIS IS NOT A SOLUTION. IT IS A BAND AID. THE BATTERIES ARE DEFECTIVE AND SHOULD BE REPLACED. WHY SHOULD I SUFFER THE CONSEQUENCE OF THIS AND HAVE TO DEAL WITH REDUCED VEHICLE RANGE AND MORE FREQUENT CHARGING. IF THE BATTERIES ARE A FIRE HAZARD, THEY SHOULD BE REPLACED WITH SAFE BATTERIES AT NO-COST TO THE OWNER.

NHTSA ID Number: 11376136
NHTSA Posting Date: Nov. 24, 2020

GM RECALL DUE TO BATTERY FIRES AFFECTS THIS CAR. THE RECALL SOLUTION TO SIMPLY LIMIT MY DRIVING TO 90% OF THE RANGE IS ABHORRENT. MY CAR IS NOW LESS THAN 90% EFFECTIVE--THERE ARE DESTINATIONS I CAN NO LONGER REACH IN A SINGLE CHARGE, AND RECHARGING IS NOWHERE NEAR AS FAST OR UBIQUITOUS AS GAS. GM NEEDS A SOLUTION THAT RESTORES THE FULL DISTANCE ABILITY OF THIS CAR, OTHERWISE IT'S OUTRIGHT FRAUD.

255.   GM's interim remedy not only substantially limits the range of Class Vehicles but has failed to prevent at least one battery fire. For example, one 2018 Chevy Bolt owner had the interim remedy applied to his vehicle on March 25, 2021.[81] On May

---

[80] NHTSA Complaint Database for 2017 Chevrolet Bolt (last visited Dec. 10, 2020).
[81] Sean Graham, *Exclusive: The latest Chevy Bolt fire reveals troubling pattern that owners should be aware of*, ELECTREK (May 7, 2021) [hereinafter Exhibit CCC],

1, 2021, his vehicle experienced a battery fire at approximately 11:00 am while his car was parked inside the garage of his home, resulting in an estimated $235,000 worth of damage to his vehicle and property.[82] The vehicle was not charging at the time, and prior to the battery fire it was "rarely used" and "[t]he owner did not charge to full often, if ever."[83]

256.   On April 29, 2021, GM announced a purported permanent "remedy" for the Defective Batteries in the Class Vehicles (hereinafter the "recall fix"). GM's remedy consists of a GM dealer tool to "identify potential battery anomalies and replace battery module assemblies as necessary" coupled with the installation of "advanced onboard diagnostic software into these [Class] vehicles that … has the ability to detect potential issues related to changes in battery module performance before problems can develop"[84]:

---

https://electrek.co/2021/05/07/exclusive-the-latest-chevy-bolt-fire-reveals-troubling-pattern-that-owners-should-be-aware-of/ (last visited July 18, 2021).

[82] *Id.*

[83] *Id.*

[84] *See Bolt EV Recall*, CHEVROLET [hereinafter Exhibit DDD], https://my.chevrolet.com/how-to-support/safety/boltevrecall (last visited July 17, 2021).

General Motors is notifying owners of select 2017-2019 model year Chevrolet Bolt EVs that it has developed a remedy to complete the previously announced safety recall.

As part of the service procedure, dealers will utilize GM-developed diagnostic tools to identify potential battery anomalies and replace battery module assemblies as necessary. The remedy will also include the installation of advanced onboard diagnostic software into these vehicles that, among other things, has the ability to detect potential issues related to changes in battery module performance before problems can develop.

Customers will need to visit their nearest participating Chevrolet Bolt EV dealer to have the remedy service procedure performed.  When the vehicle is updated with the new software, the 90% state of charge limitation is removed, so that the battery is returned to its previous maximum charging capacity.

Customers of 2019 model year Chevrolet Bolt EVs were able to have this remedy performed starting on April 29 and customers who own 2017 and 2018 model year Bolt EVs will be eligible to have the remedy performed starting May 26 at their preferred Chevrolet Bolt EV Dealer.  We will also be making the advanced diagnostic software available to all other Bolt EV owners in the coming months.  Additionally, we will be making this diagnostic software standard in the 2022 Bolt EV and EUV, as well as future GM electric vehicles.

257.   The new diagnostic software is "supposed to monitor the [battery] cells for voltage variations much more closely and often than before. The idea is to proactively look for the conditions or indications that could lead to a fire. This way they can either avoid them, or get the battery replaced before a fire occurs."[85] If the new software detects an abnormality, it advises the operator to take the vehicle in for a battery swap. This amounts to an admission that the existing software was completely inadequate to

---

[85] Sean Graham, *Chevy Bolt EV catches on fire after receiving both of GM's 'software fixes,'* ELECTREK (Jul. 8, 2021) [hereinafter Exhibit EEE], https://electrek.co/2021/07/08/chevy-bolt-ev-catches-on-fire-after-receiving-both-of-gm-software-fixes/ (last visited July 17, 2021).

prevent the manifestation of the battery defect. But this recall has not solved the problem, as fires continue to occur.

258. In addition, the software "also monitors the battery after the charge completes to look for abnormalities" and "if the car detects a 'thermal runaway' event (aka impending fire), it will blare the horn and flash the lights."[86] Crucially, like GM's interim remedy, the most recent recall fix does not cure the Defective Battery in the Class Vehicles: rather, it alerts operators of the Class Vehicles that a battery fire may still occur or is occurring.

259. The warning does nothing to *prevent* a runaway event, and in practical terms it is next to worthless as a warning of an impending fire: when such a runaway event occurs, a vehicle occupant—or an occupant of a nearby structure—may have only seconds before a catastrophic fire breaks out. In short, by the time the software detects that a runaway event is underway, the event is underway and a fire—notoriously difficult to extinguish in lithium-ion batteries—is, if not already ignited, inevitable within seconds.

260. Like the interim remedy, GM's most recent "fix" does not prevent battery fires. On July 1, 2021, Tim Briglin, a Vermont state legislator and owner of a 2019 Chevy Bolt, experienced a battery fire despite having GM's new diagnostic software installed on June 9, 2021.

---

[86] *Id.*



261.   Prior to receiving the purportedly permanent recall fix, Briglin followed GM's instructions and limited the charge of his vehicle to 80% capacity and reported no other issues with his vehicle. At the time he received the recall fix his vehicle had only 38,264 miles on the odometer. After receiving the recall fix, he resumed charging his battery to 100% (post-recall, likely only 90%, at most, of the advertised capacity), as instructed by GM.

262.   The morning of the fire, Briglin was awake and briefly heard "what could only be described as a very loud sucking noise."[87] He went outside to find smoke billowing from the rear of his vehicle. Within ten minutes his vehicle "burst into flames."[88]

263.   As an elected official, Briglin has advocated and supported electric vehicles for years but is rightfully concerned by his experience, stating: "My primary

---

[87] *Id.*

[88] *Id.*

concern is for the safety of my constituents. I have dozens of them who drive Bolts, and I've probably heard from more than a dozen of them who are concerned. I'm not sure what to tell them, I'm worried for their safety."[89]

264.   Since July 1, 2021, at least two more vehicles have spontaneously caught fire after receiving the newest "fix." On July 14, 2021, GM released a new recommendation to Plaintiffs and Class Members: park the vehicles outside, "away from homes and other structures," immediately after charging, and do not charge the vehicles overnight.[90] GM recommends this *regardless* of whether the vehicle has had the interim or final recall remedy completed.[91]

265.   GM has been aware of the Defective Battery in the Class Vehicles since at least July 2019, when it received the first complaint of a spontaneous fire when charging a Chevy Bolt and when GM purchased the vehicle at issue, purportedly to determine the cause of the fire. But GM knew or should have known of the risk long before that— before putting the Class Vehicles on sale in the first place. For more than a year after the first fire, GM operated with a cynical "business-as-usual" attitude, going so far as to reiterate to Class Members that they could and should charge their Vehicles to 100%,[92] before opening a formal investigation into the fires in August 2020.[93] After opening this investigation, it took months for GM to communicate to Plaintiff and Class Members

---

[89] *Id.*
[90] *See* Exhibit B.
[91] *Id.*
[92] *See* Exhibit YY.
[93] *See* Exhibit A.

that the danger from the Class Vehicles was so high that the Vehicles should be parked outside.

266.   There is no justifiable reason for this delay, particularly since GM has still done little more than warn consumers not to park their vehicles inside their garage lest the Defective Battery burn their home down. There is a possible financial motive, though: the delay allowed GM to continue selling its remaining inventory of Class Vehicles before switching over to a new battery design in advance of the 2020 model year.

267.   Despite knowledge of the fires no later than the summer of 2019, GM has sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that they contain defective and dangerous batteries that pose a risk to consumers. Instead, GM first proposed a "fix" that resulted in reduced vehicle range and the need for more frequent charging by Class Vehicle owners and lessees, and that has been shown to be ineffective. "GM said it understands owners could be upset about their cars not being fully functional," it will only "address complaints on a case-by-case basis."[94] GM next purported to complete the recall by identifying battery anomalies and install advanced onboard diagnostic software to detect potential issues; however, that recall has again been shown to be ineffective, and GM continues to recommend that Plaintiffs and Class

---

[94] Tom Krisher, *GM recalling nearly 69K Bolt electric cars due to fire risk,* ABC NEWS (Nov. 13, 2020) [hereinafter Exhibit FFF], https://abcnews.go.com/Technology/wireStory/gm-recalling-69k-bolt-electric-cars-due-fire-74194714 (last visited July 18, 2021).

Members park their vehicles outdoors and not charge the vehicles overnight. Plaintiffs are not aware of GM having addressed owner complaints other than by recommending limiting the Battery's charging capacity.

268.   Upon information and belief, GM has not agreed to replace the defective Batteries or provide any other remedial measures that will provide Plaintiffs and Class Members with a permanent remedy for the Battery Defect and restore the EPA-estimated driving range of 238 miles on a full charge.

269.   While GM has said since November 2020 in public forums and to Bolt owners and lessees that it was looking to introduce a more permanent fix, GM waited until April 29, 2021 to announce a remedy that, as of this filing, has already been shown to be deficient.

270.   More frequent charging is a significant issue for owners of EVs like the Bolt, because charging an EV battery takes much longer than simply refilling the fuel tank in an internal-combustion vehicle. This is why range is such a significant point of emphasis in EV advertising and such an important part of the bargain consumers strike when they choose to buy one EV over another. GM's ineffective remedies to date provide no assurances to consumers that such individuals are able to charge their vehicles to 100% capacity and are protected from a potentially deadly battery fire.

271.   Further, GM's newest recommendations make charging even more difficult for Plaintiffs and Class Members, many of whom rely upon reduced energy prices at night to charge their vehicles overnight. Plaintiffs and Class Members must now oversee

their vehicle while it charges and are afraid to use the charging stations that they have paid to install in their houses for fear of fire.

272.    Had GM disclosed the defect to Class Members, reasonable consumers would have been aware of it. Instead, Defendant remained silent until more than a year after the first incident of a Bolt catching fire while charging.

273.    GM's knowledge of the Battery Defect, and its subsequent inaction, has resulted in harm to Plaintiff and Class Members.

## D.    GM's Express and Implied Warranties

274.    For each Class Vehicle sold by GM, an express written warranty was issued which covered the vehicle, including but not limited to, the battery, and GM warranted the vehicle to be free of defects in materials and workmanship at the time of purchase or lease.

275.    Pursuant to its express and written warranties, GM warranted the Class Vehicles' high voltage battery pack to be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship which occurred during the first 8 years or 100,000 miles, whichever came first.

## V.    CLASS ACTION ALLEGATIONS

276.    Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

277.   Class Vehicles are defined as follows:

2017, 2018, and 2019 model year Chevrolet Bolt.

278.   In addition, state subclasses are defined as follows:

**Arizona Subclass:** All persons in the state of Arizona who bought or leased, other than for resale, a Class Vehicle.

**California Subclass:** All persons in the state of California who bought or leased, other than for resale, a Class Vehicle.

**Florida Subclass:** All persons in the state of Florida who bought or leased, other than for resale, a Class Vehicle.

**Illinois Subclass:** All persons in the state of Illinois who bought or leased, other than for resale, a Class Vehicle.

**Kansas Subclass:** All persons in the state of Kansas who bought or leased, other than for resale, a Class Vehicle.

**Massachusetts Subclass:** All persons in the state of Massachusetts who bought or leased, other than for resale, a Class Vehicle.

**New York Subclass:** All persons in the state of New York who bought or leased, other than for resale, a Class Vehicle.

**Oregon Subclass:** All persons in the state of Oregon who bought or leased, other than for resale, a Class Vehicle.

**Texas Subclass:** All persons in the state of Texas who bought or leased, other than for resale, a Class Vehicle.

**Washington Subclass:** All persons in the state of Washington who bought or leased, other than for resale, a Class Vehicle.

**Wisconsin Subclass:** All persons in the state of Wisconsin who bought or leased, other than for resale, a Class Vehicle.

279.   The Class and these Subclasses satisfy the prerequisites of Federal Rule of

Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

280.   **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses tens of thousands of individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendant.

281.   **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

    i.    whether Defendant engaged in the conduct alleged herein;

    ii.    whether Defendant had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

    iii.    whether Defendant should have had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

    iv.    when Defendant became aware of the Battery Defect in the Class Vehicles;

    v.    whether Defendant knowingly failed to disclose the existence and cause of this defect in the Class Vehicles;

vi.    whether Defendant knowingly concealed the defect in the Class
       Vehicles;

vii.   whether Defendant knowingly introduced a deceptively inadequate
       series of recalls;

viii.  whether Defendant's conduct as alleged herein violates consumer
       protection laws;

ix.    whether Defendant's conduct as alleged herein violates warranty laws;

x.     whether Defendant's conduct as alleged herein violates other laws
       asserted herein;

xi.    whether Plaintiff and Class Members overpaid for their Class Vehicles
       as a result of the defect;

xii.   whether Plaintiffs and Class Members have suffered an ascertainable
       loss as a result of the defect;

xiii.  and whether Plaintiffs and Class Members are entitled to damages and
       equitable relief.

282.  **Typicality:** Plaintiffs' claims are typical of the other Class Members'
claims because all Class Members were comparably injured through Defendant's
substantially uniform misconduct as described above. The Plaintiffs representing the
Class are advancing the same claims and legal theories on behalf of themselves and all
other members of the Class that they represent, and there are no defenses that are unique

to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

283.  **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiffs and their counsel.

284.  **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

## A.     Discovery Rule

285.    The tolling doctrine was made for cases of concealment like this one. Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to overheat when fully charged.

286.    Plaintiffs and Class Members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles spontaneously exploded or caught on fire, and would have had no reason to individually believe that the problems with their vehicles were the result of a widespread design and/or manufacturing defect. Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

## B.     Equitable Estoppel

287.    Even if Plaintiffs' claims accrued before July 19, 2021, Defendant are equitably estopped from asserting the statutes of limitations. GM misrepresented that the Class Vehicles were safe and free from defects, including by issuing two separate recalls that failed to prevent the Vehicles from spontaneously igniting. GM knew that the Class Vehicles were unsafe and unable to perform as advertised without risking thermal runaway events that can result in catastrophic and dangerous fires.

288.    Plaintiffs and Class Members were, until at least November 2020, unaware of the fact or nature of GM's misrepresentations. In fact, the full scope of GM's

misrepresentations remained concealed until at least July 14, 2021, because GM represented that its recalls could make the Class Vehicles safe, but then reversed course and instructed consumers to park the Class Vehicles outside and far from structures, and to avoid charging them overnight. GM intended for Plaintiffs and Class Members to rely upon the false advertisements and recall notices. Plaintiffs and Class Members did rely upon GM's false advertisements and claims to "fix" the Class Vehicles. Plaintiffs and Class Members will be prejudiced if Defendant is not estopped.

## VI.   CLAIMS FOR RELIEF

### A.   Claims Brought on Behalf of the Nationwide Class

### COUNT ONE — COMMON LAW FRAUD – AFFIRMATIVE MISREPRESENTATION

289.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

290.   Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses.

291.   In its advertisements, Defendant claimed that the Chevrolet Bolt had a range of 238 miles, supporting its claim that it would meet consumers' need for a vehicle to take drivers "beyond their average daily driving needs—with plenty of range to spare." Defendant communicated through these advertisements that the Class Vehicles were safe, durable, and would travel farther on a single charge than comparable vehicles.

292.   Defendant further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged. Defendant knew that these representations were false when made.

293.   But the Class Vehicles purchased or leased by Plaintiffs and Class Members were, in fact, defective, unsafe, and unreliable, because the vehicle's batteries were susceptible to bursting into flame when fully or nearly fully charged.

294.   Defendant has known at least since mid-2019 that its representations regarding the Class Vehicles' range and safety were false. Even now, Defendant advertises the Bolt to have a driving range of 238 miles. Defendant broadcasts these advertisements with the intent that members of the general public rely on Defendant's representations in making their purchases.

295.   A reasonable consumer would have done just that, expecting that the Class Vehicles would not be defective or pose a serious safety risk, and that GM's representations about the Bolt's range would be accurate.

296.   Plaintiffs and Class Members relied on Defendant's affirmative misrepresentations regarding the safety, durability, and range of the Class Vehicles when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class Members were therefore

fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

297.   To the extent that Defendant's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

## COUNT TWO — COMMON LAW FRAUD – FRAUDULENT CONCEALMENT/FRAUD BY OMISSION

298.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

299.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant.

300.   The Class Vehicles that Plaintiffs and Class Members purchased or leased were defective and unsafe because they were subject to spontaneous combustion when being charged to a full or almost-full battery level due to the Defective Battery.

301.   Defendant intentionally concealed the Defective Battery and acted with reckless disregard for the truth when Defendant failed to disclose to consumers for over a year that charging the Class Vehicles to 100% capacity could cause combustion and fire. Further, even after Defendant became aware of the risk of fire when charging the Class Vehicles, Defendant continued representing to consumers that the Class Vehicles could be safely charged to 100%, with the intent that consumers rely on such representations.

302.   Defendant had a duty to disclose this material safety information to Plaintiffs and Class Members because Defendant knew about the safety hazards posed by the Defective Battery, and instead concealed the defect from the general public.

303.   Plaintiffs and Class Members did not know about the Defective Battery and could not have discovered it through reasonably diligent investigation before GM disclosed it—or until their vehicles exploded or caught fire without warning, causing significant damage.

304.   But for Defendant's fraudulent omissions of material information, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class Members have sustained damage because they purchased or leased vehicles that were not as represented, and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, Defendant is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles

305.   Defendant's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class Members, and to enrich themselves. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT THREE — VIOLATIONS OF
## THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *ET SEQ.*)

306.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

307.  Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the State Subclasses.

308.  Plaintiffs and the Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

309.  Defendant is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

310.  The Class Vehicles, including Plaintiffs' vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

311.  Defendant's 3-year/36,000-mile "bumper to bumper" new vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

312.  Defendant's 5-year/60,000-mile powertrain new vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

313.  Defendant's 8-year/100,000-mile electric vehicle component new vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

314.  Defendant breached its express warranties by:

A.     Selling and leasing Class Vehicles with a battery that was defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

B.     Refusing and/or failing to honor the express warranties by repairing or replacing the battery without leaving the Class Vehicles with the same capability as advertised to the purchasers.

315.   Plaintiffs and the other Class members relied on the existence and length of the express warranties in deciding to purchase or lease the Class Vehicles.

316.   Defendant's breach of its express warranties has deprived Plaintiffs and the other Class members of the benefit of their bargain.

317.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.00. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

318.   Defendant has been given reasonable opportunity to cure its breach of the written warranties. Alternatively, Plaintiffs and the other Class members are not required to do so because affording Defendant a reasonable opportunity to cure its breach of written warranties was, and is, futile.

319.   As a direct and proximate cause of Defendant's breach of the written warranties, Plaintiffs and the other Class members sustained damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and the

other Class members, who are entitled to recover actual damages, consequential

damages, specific performance, diminution in value, costs, including statutory attorney

fees and/or other relief as deemed appropriate.

## COUNT FOUR — UNJUST ENRICHMENT

320.    Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

321.    Plaintiffs bring this claim on behalf of themselves and on behalf of the

Nationwide Class or, alternatively, on behalf of the State Subclasses.

322.    Plaintiffs and Class Members paid Defendant the value of non-defective,

fully operational Class Vehicles with a driving range of 238 miles. In exchange,

Defendant provided Plaintiffs and Class Members with defective vehicles that are not

fully operational and cannot be operated with a driving range of 238 miles unless

Plaintiffs and Class Members take on the additional risk of having their automobiles

combust during the charging process.

323.    Further, Defendant provided Plaintiffs and Class Members with Class

Vehicles that are in need of significantly more charging time than advertised, even as

they produce a travel range lower than the advertised range. Plaintiffs provided

Defendant GM with the value of vehicles beset by none of these defects.

324.    As such, Plaintiffs conferred value upon GM which would be unjust for

GM to retain.

325.   As a direct and proximate result of GM's unjust enrichment, Plaintiffs and Class Members have suffered and continue to suffer various injuries. As such, they are entitled to damages, including but not limited to restitution of all amounts by which GM was enriched through its misconduct.

**B.    Claims Brought on Behalf of the Arizona Subclass**

### COUNT FIVE — VIOLATIONS OF THE
### ARIZONA CONSUMER FRAUD ACT
### (ARIZ. REV. STAT. ANN. § 44-1522)

326.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

327.   Plaintiffs Altobelli, Poletti, Kuchar, and Walker (for purposes of this section, "Arizona Plaintiffs") bring this claim on behalf of themselves and on behalf of the Arizona Subclass.

328.   Arizona Plaintiffs and Defendant are "persons" within the meaning of Section 44-1522 of the Arizona Consumer Fraud Act. Ariz. Rev. Stat. Ann. § 44-1522.

329.   Arizona prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. Ann. § 44-1522(A).

330.   In the course of doing business, Defendant misrepresented materials facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that Class Vehicles' batteries could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

331.   In the course of doing business, Defendant knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and associated safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiffs and the Arizona Class members. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

332.   Defendant thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

333.   Defendant knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Arizona Plaintiffs and the Arizona Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

334.    Arizona Plaintiffs and members of the Arizona Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

335.    Defendant had the duty to Arizona Plaintiffs and the Arizona Subclass members to disclose the Battery Defect and the defective nature of the Class Vehicles because:

> A.      Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Battery Defect;
>
> B.      Arizona Plaintiffs and the Arizona Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;
>
> C.      Defendant knew that Arizona Plaintiffs and the Arizona Subclass members could not reasonably have been expected to learn about or discover the Battery Defect and the effect it would have on the Class Vehicles' range and energy efficiency.

336.    In failing to disclose the Battery Defect and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

337.    The facts Defendant concealed or did not disclose to Arizona Plaintiffs and the Arizona Subclass members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiffs and the Arizona Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

338.   Defendant's violations present a continuing risk to Arizona Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

339.   The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Arizona Plaintiffs or the Arizona Subclass the battery range promised to them when they purchased the vehicles.

## COUNT SIX — BREACH OF EXPRESS WARRANTY
## (ARIZ. REV. STAT § 47-2313)

340.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

341.   Arizona Plaintiffs bring this claim on behalf of themselves and the members of the Arizona Subclass.

342.   Arizona Plaintiffs and members of the Arizona Subclass were at all times relevant "buyers" with respect to the Class Vehicles. Ariz. Rev. Stat. Ann. § 47-2313.

343.   Defendant was a "merchant" at all times relevant with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and a "seller" of motor vehicles under § 47-2103(A)(4).

344.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

345.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

346.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

347.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

348.   Defendant distributed the defective parts causing the Battery Defect in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

349.   Defendant breached these warranties by selling and leasing Class Vehicles with the Battery Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

350.   Arizona Plaintiffs each notified Defendant of its breach within a reasonable time, and/or were not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

351.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Battery Defect to Arizona Plaintiffs or the Arizona Subclass.

352. The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Arizona Plaintiffs and Arizona Subclass members. Among other things, Arizona Plaintiffs and the Arizona Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

353. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs and the other Arizona Subclass members whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

354. Arizona Plaintiffs and the Arizona Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

355. As a direct and proximate cause of Defendant's breach, Arizona Plaintiffs and the other Arizona Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT SEVEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (ARIZ. REV. STAT. ANN. § 47-2314)

356.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

357.   Arizona Plaintiffs bring this claim on behalf of themselves and on behalf of the Arizona Subclass.

358.   Defendant is a "seller" and "merchant" with respect to the Class Vehicles. Ariz. Rev. Stat. Ann. § 47-2314(A).

359.   When Defendant sold its Class Vehicles to Arizona Plaintiffs and sold or leased Class Vehicles to members of the Arizona Subclass, Defendant warranted that the Class Vehicles were merchantable – i.e., that they would "[p]ass without objection in the trade . . ." and were "fit for the ordinary purposes for which such goods are used[.]" Ariz. Rev. Stat. Ann. § 47-2314(B)

360.   The Class Vehicles have a Battery Defect which puts them at risk of spontaneous combustion when charged to full or almost-full battery levels, which Defendant had represented to Arizona Plaintiffs and Class Members was a charging practice that was appropriate and safe. The Class Vehicles are thus not fit for their ordinary purpose of transporting vehicle occupants in a reasonably safe manner during normal operation.

361.   The Defective Battery existed at the time the Class Vehicles left Defendant's manufacturing facilities and at the time the Class Vehicles were sold to Arizona Plaintiffs and sold or leased to members of the Arizona Subclass.

362.   Defendant breached the implied warranty that the Class Vehicles were appropriate and safe for ordinary use by marketing, distributing, selling, and leasing Class Vehicles that contained the Battery Defect.

363.   As a direct and proximate result of this breach of implied warranty, Arizona Plaintiffs and the members of the Arizona Subclass have suffered various injuries, including but not limited to having overpaid for the Class Vehicles, and having the Class Vehicles diminish in value as a result of the Defective Battery.

## COUNT EIGHT — FRAUD BY CONCEALMENT

364.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

365.   Arizona Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Arizona Subclass.

366.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

367.   Arizona Plaintiffs bring this cause of action on behalf of themselves and the Arizona Subclass.

368.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers

the true nature of the Defective Battery, which often was not readily discoverable until years after they purchased or leased the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

369.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

370.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Arizona Plaintiffs and the members of the Arizona Subclass. The facts Defendants omitted from their representations were material because they directly impacted the Class Vehicles' safety and reliability.

371.   Defendant was in exclusive control of the material facts and such facts were not known to the public, the Arizona Plaintiffs, or the Arizona Subclass members. Defendant also possessed exclusive knowledge of the Defective Battery.

372.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Arizona Plaintiffs and the Arizona Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

373.    Arizona Plaintiffs and the Arizona Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Arizona Plaintiffs and the Arizona Subclass members were justified.

374.    Arizona Plaintiffs and the Arizona Subclass members reasonably relied on these omissions and suffered damages as a result.

375.    As a result of these omissions and concealments, Arizona Plaintiffs and the Arizona Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

376.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs and the Arizona Subclass members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT NINE — UNJUST ENRICHMENT

377.    Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

378.    Arizona Plaintiffs bring this cause of action on behalf of themselves and the Arizona Subclass.

379.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, Defendant charged a higher price for their vehicles than the Class Vehicles' true value and Defendant thus obtained monies rightfully belonging to Arizona Plaintiffs and the Arizona Subclass members.

380.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Arizona Plaintiffs and the Arizona Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

381.   Arizona Plaintiffs, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

**C.    Claims Brought on Behalf of the California Subclass**

**COUNT TEN — VIOLATION OF THE
CONSUMER LEGAL REMEDIES ACT ("CLRA")
(CAL. CIV. CODE § 1750, *ET SEQ.*)**

382.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

383.   Plaintiffs Cannon, Sterba, Khorey, Kuchar, and Chitra (for purposes of this section, "California Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

384.   Defendant is a "person" as that term is defined in California Civil Code § 1761(c).

385.    California Plaintiffs and the California Subclass members are "consumers" as that term is defined in California Civil Code §1761(d).

386.    Defendant engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from California Plaintiffs and Class members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). Defendant acts and practices violated the CLRA by: (1) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have; (2) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (3) Advertising goods and services with the intent not to sell them as advertised; and (4) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

387.    Defendant's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

388.    Defendant knew that the Defective Batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

389.   Defendant had the duty to California Plaintiffs and the California Subclass members to disclose the Defective Battery and the defective nature of the Class Vehicles because:

      A.    Defendant was in a superior position to know the true state of facts about the Defective Batteries and their associated costs;

      B.    California Plaintiffs and the California Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

      C.    Defendant knew that California Plaintiffs and the California Subclass members could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

390.   In failing to disclose the Defective Battery with its safety risks and inefficiency, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

391.   The facts Defendant concealed or did not disclose to California Plaintiffs and the California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had California Plaintiffs and the California Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

392.    Defendant has long been on notice of California Plaintiffs' CLRA claims in this consolidated action because numerous plaintiffs in underlying actions provided notice of their individual CLRA claims pursuant to California Civil Code § 1782(a) in November and December 2020. California Plaintiffs named above provided Defendant with notice of its CLRA violations on July 19, 2021, and currently seek injunctive relief. Plaintiffs hereby reserve their right to amend this complaint to seek monetary damages under the CLRA after the 30-day notice period expires.

393.    Defendant's fraudulent and deceptive business practices proximately caused injuries to California Plaintiffs and the members of the California Subclass.

394.    Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek injunctive and declaratory relief and reasonable attorneys' fees and costs.

## COUNT ELEVEN — VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200)

395.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

396.    California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

397.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

398. Defendant has engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from California Plaintiffs and other California Subclass members that the Class Vehicles use the Defective Batteries (and thus suffer from the loss of efficiency, safety risks, and diminished value resulting from the defect). Defendant should have disclosed this information because it was in a superior position to know the true facts related to the defect, and California Plaintiffs and California Subclass members could not have been reasonably expected to learn or discover these true facts.

399. The Defective Battery constitutes a safety issue for automobile owners, drivers, and passengers, thus requiring GM to disclose its existence to past and future owners and lessees.

400. By its acts and practices, Defendant has deceived California Plaintiffs and is likely to have deceived the public. In failing to disclose the Defective Battery and suppressing other material facts, Defendant breached its duty to disclose these facts, violated the UCL, and caused injuries to California Plaintiffs and the Class members. Defendant's omissions and acts of concealment pertained to information material to Plaintiffs and other California Subclass members, as it would have been to all reasonable consumers.

401. The injuries California Plaintiffs and the California Subclass members suffered greatly outweigh any potential countervailing benefit to consumers or to

competition, and they are not injuries that California Plaintiffs and the California

Subclass members could or should have reasonably avoided.

402.   Defendant's acts and practices are unlawful because they violate California

Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code

§ 2313.

403.   California Plaintiffs seek to enjoin Defendant from further unlawful, unfair,

and/or fraudulent acts or practices, to obtain restitutionary disgorgement of all monies

and revenues GM has generated as a result of such practices, and all other relief allowed

under California Business & Professions Code § 17200.

## COUNT TWELVE — VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)

404.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

405.   California Plaintiffs bring this claim on behalf of themselves and on behalf

of the members of the California Subclass.

406.   California Business & Professions Code § 17500 states: "It is unlawful for

any . . . corporation . . . with intent directly or indirectly to dispose of real or personal

property . . . to induce the public to enter into any obligation relating thereto, to make or

disseminate or cause to be made or disseminated . . . from this state before the public in

any state, in any newspaper or other publication, or any advertising device, . . . or in any

other manner or means whatever, including over the Internet, any statement . . . which is

untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

407.   Defendant caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Defendant should have known to be untrue and misleading to consumers, including California Plaintiffs and other California Subclass members.

408.   Defendant has violated section 17500 because its misrepresentations and omissions regarding the safety, reliability, functionality, and energy efficiencies of the Class Vehicles were material and likely to deceive a reasonable consumer.

409.   California Plaintiffs and the other California Subclass members have suffered injuries in fact, including the loss of money or property, resulting from Defendant's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, California Plaintiffs and the other California Subclass members relied on Defendant's misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendant's representations were untrue because it distributed the Class Vehicles with the Battery Defect. Had California Plaintiffs and the other California Subclass members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, California Plaintiffs and the California Subclass members did not receive the benefit of their bargain.

410.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

411.   California Plaintiffs, individually and on behalf of the other California Subclass members, request that the Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices, and restore to California Plaintiffs and the other California Subclass members any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT THIRTEEN — BREACH OF EXPRESS WARRANTY
### (CAL. COM. CODE § § 2313 AND 10210)

412.   California Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

413.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

414.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

415.   The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

416.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

417.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

418.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

419.   Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

122            CONSOLIDATED CLASS ACTION
                                                                   COMPLAINT

420. Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

421. California Plaintiffs each notified Defendant of its breach within a reasonable time, and/or were not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

422. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product to California Plaintiffs or the Class.

423. The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect California Plaintiffs and California Subclass members. Among other things, California Plaintiffs and the California Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed

between Defendant and the Class members because Defendant knew or should have

known that the Class Vehicles were defective at the time of sale and would fail well

before their useful lives.

424.   Furthermore, the limited warranty promising to repair and/or correct a

manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make California Plaintiffs and the other California Subclass members

whole and because Defendant has failed and/or have refused to adequately provide the

promised remedies within a reasonable time.

425.   California Plaintiffs and the California Subclass members have complied

with all obligations under the warranty, or otherwise have been excused from

performance of said obligations as a result of Defendant's conduct.

426.   As a direct and proximate cause of Defendant's breach, California

Plaintiffs and the other California Subclass members bought or leased Class Vehicles

they otherwise would not have, overpaid for their vehicles, did not receive the benefit of

their bargain, and their Class Vehicles suffered a diminution in value.

### COUNT FOURTEEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. COM. CODE §§ 2314 AND 10212)

427.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

428.   California Plaintiffs bring this claim on behalf of themselves and the

California Subclass.

429. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

430. With respect to leases, Defendant is and was at all relevant times relevant a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

431. The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

432. Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

433. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to California Commercial Code §§ 2314 and 10212.

434. Defendant provided California Plaintiffs and the members of the California Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and

catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

435.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

436.   Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

437.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

438.   California Plaintiffs each notified Defendant of its breach within a reasonable time, and/or were not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous

complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

439.   California Plaintiffs and the California Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because California Plaintiffs and the California Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

440.   As a direct and proximate result of the breach of said implied warranty, California Plaintiffs and the California Subclass sustained the damages herein set forth.

441.   California Plaintiffs and the California Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

### COUNT FIFTEEN — VIOLATIONS OF THE SONG-BEVERLY ACT – BREACH OF EXPRESS WARRANTY (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))

442.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

443.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

444.   California Plaintiffs and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

445.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

446.   Defendant is a "manufacturer" of the Class Vehicles within the

447.   meaning of Cal. Civ. Code § 1791(j).

448.   California Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by Defendant. Defendant made express warranties to California Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above. These warranties became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

449.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet

Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

450. Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

451. California Plaintiffs and California Subclass members experienced defects within the warranty period. Despite the existence of warranties, Defendant failed or refused to fix the Defective Batteries.

452. California Plaintiffs and California Subclass members gave the Defendant or their authorized repair facilities opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because Defendant or their authorized repair facility refused to attempt the repair. Defendant did not promptly replace or buy back the Class Vehicles of California Plaintiffs and the other Class members.

453. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, California Plaintiffs and the other California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

## COUNT SIXTEEN — VIOLATIONS OF THE SONG-BEVERLY ACT – BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*)

454.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

455.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

456.   At all relevant times hereto, Defendant was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or should have known of the specific use for which the Class Vehicles were purchased.

457.   Defendant provided California Plaintiffs and the California Subclass members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, inter alia, the Class Vehicles suffered from an inherent Battery Defect at the time of sale.

458.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

459.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class

Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

460. Contrary to the applicable implied warranties, the Class Vehicles were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the suspension and steering linkage defect.

461. Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## COUNT SEVENTEEN — FRAUD BY CONCEALMENT

462. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

463. Plaintiffs and the California Class bring this claim on behalf of themselves and on behalf of the members of the California Subclass.

464. Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

465. Plaintiffs bring this cause of action on behalf of themselves and the California Class.

466. Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was not readily discoverable by the California Plaintiffs or California Subclass members until years after purchase or lease

of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

467.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

468.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by California Plaintiffs and the California Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

469.   Defendant was in exclusive control of the material facts and such facts were not known to the public or the California Subclass members. Defendant also possessed exclusive knowledge of the Defective Batteries and the fact that they rendered the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

470.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce California Plaintiffs and the California Subclass members to purchase the Class Vehicles at a price higher than their true value.

471.    Plaintiffs and the California Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of California Plaintiffs and the California Subclass members were justified.

472.    California Plaintiffs and the California Subclass members reasonably relied on Defendant's omissions and suffered damages as a result.

473.    As a result of these omissions and concealments, California Plaintiffs and the California Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

474.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of California Plaintiffs and the California Class members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D.    Claims Brought on Behalf of the Florida Subclass**

## COUNT EIGHTEEN — VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201. *ET SEQ.*)

475.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

476.   Plaintiff Schulz brings this claim on behalf of herself and the Florida Subclass.

477.   Plaintiff and the Florida Class members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

478.   Defendant engaged in "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

479.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

480.   In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

481.   In the course of doing business, Defendant also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Florida Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

482.   Defendant thus violated the FUDPTA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

483.   Defendant knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff and the members of the Florida Class Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

484.   Plaintiff and members of the Florida Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

485.   Defendant had the duty to Plaintiff and the members of the Florida Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

A.      Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

B.      Plaintiff and the members of the Florida Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.      Defendant knew that Plaintiff and the members of the Florida Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

486.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

487.   The facts Defendant concealed or did not disclose to Plaintiff and the members of the Florida Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the members of the Florida Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

488.    Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

489.    The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff or the Florida Subclass the battery range promised to them when they purchased the vehicles.

490.    Plaintiff and members of the Florida Subclass suffered ascertainable loss directly and proximately resulting from Defendant's FUDPTA violations. Plaintiff and members of the Florida Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

491.    Plaintiff and members of the Florida Subclass seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the FUDTPA. Plaintiff and members of the Florida Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the FUDTPA.

492.    Pursuant to Florida Statute § 501.201, Plaintiff will serve the Florida Attorney General with a copy of this complaint because they seek injunctive relief.

## COUNT NINETEEN — BREACH OF EXPRESS WARRANTY
## (F.S.A. §§ 672.313 AND 680.21)

493. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

494. Plaintiff Schulz brings this claim on behalf of herself and the Florida Subclass.

495. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Florida Statutes Annotated §§ 672.104(1) and 680.1031(3)(k), and is a "seller" of motor vehicles under section 672.103(1)(d).

496. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

497. The Class Vehicles are and were at all relevant times "goods" within the meaning of Florida Statutes Annotated §§ 672.105(1) and 680.1031(1)(h).

498. Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

499. Specifically, the Class Vehicles are covered by Defendant's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the

warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, Defendant's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

500.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

501.   Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

502.   Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

503.   Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty

obligations. Moreover, Defendant was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

504.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product to Plaintiff or the members of the Florida Subclass.

505.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and the members of the Florida Subclass. Among other things, Plaintiff and the members of the Florida Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

506.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Florida Subclass whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

507.    Plaintiff and the members of the Florida Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

508.    As a direct and proximate cause of Defendant's breach, Plaintiff and the other Florida Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT TWENTY — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (F.S.A. §§ 672.314 AND 680.212)

509.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

510.    Plaintiff Schulz brings this claim on behalf of herself and the Florida Subclass.

511.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Florida Statutes Annotated §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under section 672.103(1)(d).

512.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

513.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Florida Statutes Annotated §§ 672.105(1) and 680.1031(1)(h).

514.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Florida Statutes Annotated §§ 672.314 and 680.212.

515.   Defendant provided Plaintiff and the members of the Florida Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

516.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

517.   Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its

warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

518.   Plaintiff and the Florida Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Florida Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

519.   As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Florida Subclass sustained the damages herein set forth.

520.   Plaintiff and the Florida Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT TWENTY-ONE — FRAUD BY CONCEALMENT

521.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

522.   Plaintiff Schulz brings this claim on behalf of herself and the Florida Subclass.

523.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Battery, which often was not readily discoverable until years after they purchased or leased the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

524.   Defendant was under a duty to disclose these omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

525.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff and the members of the Florida Subclass. The facts Defendant omitted from its representations were material because they directly impacted the Class Vehicles' safety and reliability.

526.   Defendant was in exclusive control of the material facts and such facts were not known to the public, the Plaintiff, or the Florida Subclass members. Defendant also possessed exclusive knowledge of the Defective Battery.

527.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Florida

Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

528.   Plaintiff and the Florida Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the Florida Subclass members were justified.

529.   Plaintiff and the members of the Florida Subclass reasonably relied on these omissions and suffered damages as a result.

530.   As a result of these omissions and concealments, Plaintiff and the members of the Florida Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

531.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the members of the Florida Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-TWO — UNJUST ENRICHMENT

532.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

533.    Plaintiff Schulz brings this claim on behalf of herself and the Florida Subclass.

534.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff and the members of the Florida Subclass.

535.    Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the members of the Florida Subclass, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

536.    Plaintiff, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

**E.    Claims Brought on Behalf of the Georgia Subclass**

**COUNT TWENTY-THREE — VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT**
**(GA. CODE ANN. § 10-1-390, *ET SEQ.*)**

537.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

538.    Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass.

539.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

540.   In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

541.   In the course of doing business, Defendant also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Strong and the members of the Georgia Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

542.   Defendant thus violated the Georgia FBPA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities

which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

543. Defendant had the duty to Plaintiff Strong and the members of the Georgia Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A.      Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

> B.      Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

> C.      Defendant knew that Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

544. In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

545. The facts Defendant concealed or did not disclose to Plaintiff Strong and the members of the Georgia Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Strong and the members of the Georgia Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

546. Defendant knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff Strong and the members of the Georgia Class Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

547. Plaintiff Strong and members of the Georgia Subclass justifiably relied on Defendant's material misrepresentations.

548. Defendant's violations present a continuing risk to Plaintiff Strong as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

549. The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff

Strong or the Georgia Subclass the battery range promised to them when they purchased the vehicles.

550.   Plaintiff Strong and members of the Georgia Subclass suffered ascertainable loss directly and proximately resulting from Defendant's Georgia FBPA violations. Plaintiff Strong and members of the Georgia Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

551.   Plaintiff Strong and members of the Georgia Subclass seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Georgia FBPA. Plaintiff Strong and members of the Georgia Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia FBPA.

## COUNT TWENTY-FOUR — VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE
## TRADE PRACTICES ACT
## (GA. CODE ANN. § 10-1-370, *ET SEQ.*)

552.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

553.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass.

554.   Defendant, Plaintiff Strong, and the Georgia Subclass are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1- 371(5).

555.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

556.   In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

557.   In the course of doing business, Defendant also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Strong and the members of the Georgia Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

558.   Defendant thus violated the Georgia UDTPA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular

standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

559.   Defendant had the duty to Plaintiff Strong and the members of the Georgia Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

A.     Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

B.     Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.     Defendant knew that Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

560.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

561.   The facts Defendant concealed or did not disclose to Plaintiff Strong and the members of the Georgia Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Strong and the members of the Georgia Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

562.   Defendant knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff Strong and the members of the Georgia Class Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

563.   Plaintiff Strong and members of the Georgia Subclass justifiably relied on Defendant's material misrepresentations.

564.   Defendant's violations present a continuing risk to Plaintiff Strong as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

565.   The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff

Strong or the Georgia Subclass the battery range promised to them when they purchased the vehicles.

566.   Plaintiff Strong and members of the Georgia Subclass suffered ascertainable loss directly and proximately resulting from Defendant's Georgia UDTPA violations. Plaintiff Strong and members of the Georgia Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

567.   Plaintiff Strong and members of the Georgia Subclass seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Georgia UDTPA. Plaintiff Strong and members of the Georgia Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia UDTPA.

## COUNT TWENTY-FIVE — BREACH OF EXPRESS WARRANTY (GA. CODE. ANN. §§ 11-2-313 AND 11-2A-210)

568.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

569.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass.

570.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

571.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

572.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

573.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

574.   Specifically, the Class Vehicles are covered by Defendant's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge."  Furthermore, Defendant's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any

subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

575.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

576.   Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

577.   Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

578.   Plaintiff Strong notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

579.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product to Plaintiff Strong or the members of the Georgia Subclass.

580.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff Strong and the members of the Georgia Subclass. Among other things, Plaintiff Strong and the members of the Georgia Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and members of the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

581.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Strong and the members of the Georgia Subclass whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

582.   Due to the breach of warranties set forth herein, Plaintiff Strong and the Georgia Subclass members assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Plaintiff Strong and the

Georgia Subclass members of the purchase price of all vehicles currently owned and for

such other incidental and consequential damages as allowed.

583.    Plaintiff Strong and the members of the Georgia Subclass have complied

with all obligations under the warranty, or otherwise have been excused from

performance of said obligations as a result of Defendant's conduct.

584.    As a direct and proximate cause of Defendant's breach, Plaintiff Strong and

the other Georgia Subclass members bought or leased Class Vehicles they otherwise

would not have, overpaid for their vehicles, did not receive the benefit of their bargain,

and their Class Vehicles suffered a diminution in value.

585.    As a direct and proximate result of the Defendant's breach, Plaintiff Strong

and the Georgia Subclass members have been damaged in an amount to be determined

at trial.

## COUNT TWENTY-SIX — BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY
### (GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212)

586.    Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

587.    Plaintiff Strong brings this claim on behalf of herself and the Georgia

Subclass.

588.    Defendant is and was at all relevant times a "merchant" with respect to

motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller"

of motor vehicles under § 11-2-103(1)(d).

589.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

590.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

591.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

592.   Defendant provided Plaintiff Strong and the members of the Georgia Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

593.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

594.   Plaintiff Strong notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

595.   Plaintiff Strong and the Georgia Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff Strong and the Georgia Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

596.   As a direct and proximate result of the breach of said implied warranty, Plaintiff Strong and the Georgia Subclass sustained the damages herein set forth.

597.   Plaintiff Strong and the Georgia Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT TWENTY-SEVEN — FRAUDULENT CONCEALMENT

598.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

599.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass.

600.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

601.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

602.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff Strong and the members of the Georgia Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

603.   Defendant was in exclusive control of the material facts and such facts were not known to Plaintiff Strong and members of the Georgia Subclass, or the public. Defendant also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

604.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Strong and the members of the Georgia Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

605.   Plaintiff Strong and the members of the Georgia Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff Strong and the members of the Georgia Subclass were justified.

606.   Plaintiff Strong and the members of the Georgia Subclass reasonably relied on these omissions and suffered damages as a result.

607.   As a result of these omissions and concealments, Plaintiff Strong and the members of the Georgia Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

608.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff Strong and the

members of the Georgia Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-EIGHT — UNJUST ENRICHMENT

609.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

610.   Plaintiff Strong brings this claim on behalf of herself and the Subclass.

611.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff Strong and the members of the Georgia Subclass.

612.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff Strong and the members of the Georgia Subclass, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

613.   Plaintiff Strong, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

### F.   Claims Brought on Behalf of the Illinois Subclass

### COUNT TWENTY-NINE — VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### (815 ILL. COMP. STAT. 505/1, *ET SEQ*. AND 720 ILL. COMP. STAT. 295/1A)

614.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

615.   Plaintiffs Torres, Whittaker, and Hickey (for purposes of this section, "Illinois Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

616.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce. Specifically, the Act prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

617.   Defendant is a "person" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(c).

618.   Illinois Plaintiffs are each a "consumer" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(e).

619.   Defendant's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

620.   Defendant knew that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

621.   Defendant had the duty to Illinois Plaintiffs and the Illinois Subclass members to disclose the Defective Battery and the defective nature of the Class Vehicles because:

>A.   Defendant was in a superior position to know the true state of facts about the Defective Battery and its associated costs;

>B.   Plaintiffs and the Illinois Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

>C.   Defendant knew that Plaintiffs and the Illinois Subclass members could not reasonably have been expected to learn about or discover the battery defect and the effect it would have on the Class Vehicles' range and energy efficiency.

622.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

623.   The facts Defendant concealed or did not disclose to Illinois Plaintiffs and the Illinois Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or

pay a lesser price. Had Illinois Plaintiffs and the Illinois Subclass members known the

Class Vehicles were defective, they would not have purchased the Class Vehicles or

would have paid less for them.

624.   Defendant's conduct caused the damages suffered by the Illinois Plaintiffs

and the Illinois Subclass, as alleged.

625.   As a result of Defendant's wrongful conduct, Illinois Plaintiffs and the

Illinois Subclass have been damaged in an amount to be proven at trial, including, but

not limited to, actual damages, court costs, and reasonable attorneys' fees pursuant to

815 Ill. Comp. Stat. 505/1, *et seq.*

## COUNT THIRTY — VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT (815 ILL. COMP. STAT. 510/1, *ET. SEQ*. AND 720 ILL. COMP. STAT. 295/1A)

626.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

627.   Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of

the members of the Illinois Subclass.

628.   815 Ill. Comp. Stat. 510/2 provides that a "person engages in a deceptive

trade practice when, in the course of his or her business, vocation, or occupation," the

person does any of the following: "(2) causes likelihood of confusion or of

misunderstanding as to the source, sponsorship, approval, or certification of goods or

services; . . . (5) represents that goods or services have sponsorship, approval,

characteristics ingredients, uses, benefits, or quantities that they do not have or that a

person has a sponsorship, approval, status, affiliation, or connection that he or she does

not have; . . . (7) represents that goods or services are of a particular standard, quality, or

grade or that goods are a particular style or model, if they are of another; . . .

(9) advertises goods or services with intent not to sell them as advertised; . . . [and]

(12) engages in any other conduct which similarly creates a likelihood of confusion or

misunderstanding."

629.    Defendant is a "person" within the meaning of 815 Ill. Comp. Stat.

510/1(5).

630.    The vehicles sold to Illinois Plaintiffs and the Illinois Subclass members

were not of the particular sponsorship, approval, characteristics, ingredients, uses

benefits, or qualities represented by Defendant.

631.    Defendant caused to be made or disseminated through Illinois and the

United States, through advertising, marketing, and other publications, statements that

were untrue or misleading, and which were known, or which by the exercise of

reasonable care Defendant should have known to be untrue and misleading to

consumers, including Illinois Plaintiffs and other Illinois Subclass members.

632.    Defendant has violated section 17500 because its misrepresentations and

omissions regarding the safety, reliability, functionality, and energy efficiencies of the

Class Vehicles were material and likely to deceive a reasonable consumer.

633.    Illinois Plaintiffs and the Illinois Subclass members have suffered injuries

in fact, including the loss of money or property, resulting from Defendant's unfair,

unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Illinois Plaintiffs and the other Illinois Subclass members relied on Defendant's misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendant's representations were untrue because it distributed the Class Vehicles with the Defective Batteries. Had Illinois Plaintiffs and the Illinois Subclass members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, Plaintiffs and the other Illinois Subclass members did not receive the benefit of their bargain.

634.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a perpetuated and repeated pattern or generalized course of conduct, both in the state of Illinois and nationwide.

635.    Defendant's conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Illinois Plaintiffs and the Illinois Subclass.

636.    As a result of Defendant's wrongful conduct, Illinois Plaintiffs and the Illinois Subclass members have been damaged in an amount to proven at trial, including, but not limited to actual and punitive damages, equitable relief and reasonable attorneys' fees.

## COUNT THIRTY-ONE — BREACH OF EXPRESS WARRANTIES
## (810 ILL. COMP. STAT. 5/2-313)

637. Illinois Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

638. Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

639. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under 810 ICS §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under section 5/2-103(1)(d).

640. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ICS §§ 5/2-105(1) and 5/2A-103(1)(h).

641. Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

642. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n

addition to the initial owner of the vehicle, the coverage described in this Chevrolet

Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent

person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles

term."

643.   Furthermore, Defendant expressly warranted—through statements and

advertisements—that the vehicles were of high quality, and at a minimum, would work

properly and safely.

644.   Defendant distributed the defective parts causing the Battery Defect in the

Class Vehicles, and said parts are covered by Defendant's warranties granted to all

Class Vehicle purchasers and lessors.

645.   Defendant breached these warranties by selling and leasing Class Vehicles

with the Defective Batteries, requiring repair or replacement within the applicable

warranty periods, and refusing to honor the warranties by providing free repairs or

replacements during the applicable warranty periods sufficient for the Class Vehicles to

be restored to their advertised qualities within a reasonable time.

646.   Illinois Plaintiffs each notified Defendant of the breach within a reasonable

time, and/or were not required to do so because affording Defendant a reasonable

opportunity to cure its breaches would have been futile. In any event, Defendant knows

about the Defective Batteries but instead chose to conceal the defect until just recently

as a means of avoiding compliance with its warranty obligations. Moreover, Defendant

was provided notice of these issues within a reasonable amount of time by the numerous

complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

647.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiffs or the Class notice of the Defective Batteries.

648.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Illinois Plaintiffs and the Illinois Subclass members. Among other things, Illinois Plaintiffs and the Illinois Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Subclass members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

649.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiffs and the other Illinois Subclass members whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

650.    Illinois Plaintiffs and the Illinois Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

651.    As a direct and proximate cause of Defendant's breach, Illinois Plaintiffs and the other Illinois Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT THIRTY-TWO — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (810 ILL. COMP. STAT. 5/2-314 AND 810 ILL. COMP. STAT. 5/2A-212)

652.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

653.    Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

654.    Defendant impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

655.    Defendant breached the implied warranty that the vehicle was merchantable and safe for use as safe and reliable transportation by marketing, advertising, distributing and selling vehicles with the Defective Batteries.

656.   These defects existed at the time the vehicles left Defendant's manufacturing facilities and at the time they were sold to Illinois Plaintiffs.

657.   These defects were the direct and proximate cause of damages to Illinois Plaintiffs and the Illinois Subclass.

## COUNT THIRTY-THREE — FRAUD BY CONCEALMENT

658.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

659.   Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass.

660.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

661.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

662.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior

knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Illinois Plaintiffs and the Illinois Class members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

663.   Defendant was in exclusive control of the material facts and such facts were not known to the public or the Illinois Subclass members. Defendant also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

664.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Illinois Plaintiffs and the Illinois Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

665.   Illinois Plaintiffs and the Illinois Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Illinois Plaintiffs and the Illinois Subclass members were justified.

666.   Illinois Plaintiffs and the Illinois Subclass members reasonably relied on these omissions and suffered damages as a result.

667.   As a result of these omissions and concealments, Illinois Plaintiffs and the Illinois Subclass members incurred damages including, but not limited to, their lost

benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

668. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Illinois Plaintiffs and the Illinois Subclass members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY-FOUR — UNJUST ENRICHMENT

669. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

670. Illinois Plaintiffs bring this cause of action on behalf of themselves and the Illinois Subclass.

671. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, Defendant charged a higher price for their vehicles than the Class Vehicles' true value and Defendant obtained monies which rightfully belong to Illinois Plaintiffs and the Illinois Subclass members.

672. Defendant enjoyed the benefit of increased financial gains, to the detriment of Illinois Plaintiffs and the Illinois Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

673.   Illinois Plaintiffs, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## G.   Claims Brought on Behalf of the Kansas Subclass

### COUNT THIRTY-FIVE — VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACTION
### (KAN. STAT. ANN. § 50-623, *ET SEQ.*)

674.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

675.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass.

676.   Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

677.   Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

678.   The sale of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

679.   The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are

of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

680.   In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

681.   In the course of doing business, Defendant also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Kansas Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

682.   Defendant thus violated the Kansas CPA by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as

advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

683.   Defendant had the duty to Plaintiff and the Kansas Subclass members to disclose the Defective Batteries and the defective nature of the Class Vehicles because:

A.   Defendant was in a superior position to know the true state of facts about the Defective Batteries and their associated costs;

B.   Plaintiff and the members of the Kansas Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.   Defendant knew that Plaintiff and the members of the Kansas Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

684.   In failing to disclose the Defective Batteries and its resulting safety risks and inefficiencies, Defendant has knowingly and intentionally concealed material facts and breached its duty to disclose.

685.   The facts Defendant concealed or did not disclose to Plaintiff and the members of the Kansas Subclass are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the members of the Kansas Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

686.   Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

687.   The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff or the Kansas Subclass the battery range promised to them when they purchased the vehicles.

688.   Plaintiff and members of the Kansas Subclass suffered ascertainable loss directly and proximately resulting from Defendant's Kansas CPA violations. Plaintiff and members of the Kansas Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

689.    Plaintiff and members of the Kansas Subclass seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Kansas CPA. Plaintiff and members of the Kansas Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and

awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Kansas CPA.

## COUNT THIRTY-SIX — BREACH OF EXPRESS WARRANTY
### (KAN. STAT. §§ 84-2-314 AND 84-2A-210)

690.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

691.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass.

692.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

693.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

694.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

695.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

696.   Specifically, the Class Vehicles are covered by Defendant's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty

covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, Defendant's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

697.    Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

698.    Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

699.    Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

700.    Plaintiff notified Defendant of the breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure

its breaches would have been futile. In any event, Defendant knows about the Defective

Batteries but instead chose to conceal the defect until just recently as a means of

avoiding compliance with its warranty obligations. Moreover, Defendant was provided

notice of these issues within a reasonable amount of time by the numerous complaints it

received from various sources, including through the NHTSA database, other online

sources, and directly from consumers.

701.   Any attempt to disclaim or limit these express warranties vis-à-vis

consumers is unconscionable and unenforceable under the circumstances here.

Specifically, Defendant's warranty limitations are unenforceable because it knowingly

sold a defective product without giving Plaintiff or the Class notice of the Defective

Batteries.

702.   The time limits contained in Defendant's warranty period were also

unconscionable and inadequate to protect Plaintiff and the members of the Kansas

Subclass. Among other things, Plaintiff and the members of the Kansas Subclass had no

meaningful choice in determining these time limitations, the terms of which

unreasonably favored Defendant. A gross disparity in bargaining power existed between

Defendant and the members of the Class members because Defendant knew or should

have known that the Class Vehicles were defective at the time of sale and would fail

well before their useful lives expired.

703.   Furthermore, the limited warranty promising to repair and/or correct a

manufacturing defect fails in its essential purpose because the contractual remedy is

insufficient to make Plaintiff and the members of the Kansas Subclass whole, and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

704. Plaintiff and the members of the Kansas Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

705. As a direct and proximate cause of Defendant's breach, Plaintiff and the members of the Kansas Subclass bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT THIRTY-SEVEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (KY. REV. STAT. §§ 335.2-314 AND 355.2A-212)

706. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

707. Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass.

708. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

709. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

710.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

711.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

712.   Defendant provided Plaintiff and the members of the Kansas Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

713.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

714.   Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure

its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

715.   Plaintiff and the Kansas Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Kansas Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

716.   As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Kansas Subclass sustained the damages herein set forth.

717.   Plaintiff and the Kansas Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT THIRTY-EIGHT — FRAUD BY CONCEALMENT

718.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

719.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass.

720.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

721.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

722.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff and the members of the Kansas Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

723.   Defendant was in exclusive control of the material facts and such facts were not known to Plaintiff and members of the Kansas Subclass, or the public. Defendant also possessed exclusive knowledge of the Defective Batteries and their

tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

724.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Kansas Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

725.   Plaintiff and the members of the Kansas Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the members of the Kansas Subclass were justified.

726.   Plaintiff and the members of the Kansas Subclass reasonably relied on these omissions and suffered damages as a result.

727.   As a result of these omissions and concealments, Plaintiff and the members of the Kansas Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

728.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the members of the Kansas Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY-NINE — UNJUST ENRICHMENT

729.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

730.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass.

731.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, Defendant charged a higher price for their vehicles than the Class Vehicles' true value, and thus Defendant obtained monies rightfully belonging to Plaintiff and the members of the Kansas Subclass.

732.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Kansas Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

733.   Plaintiff, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## H.   Claims Brought on Behalf of the Massachusetts Subclass

## COUNT FORTY — DECEPTIVE ACTS OR PRACTICES PHOHIBITED BY MASSACTUSETTS LAW
## (MASS. GEN. LAWS CH. 93A, § 1, ET SEQ.)

734.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

735.   Plaintiffs Harris and Duprez bring this cause of action on behalf of themselves and the Massachusetts Subclass.

736.   Defendant, Plaintiffs, and the Massachusetts Subclass are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

737.   Defendant is engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

738.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendant participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

739.   In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

740.   In the course of doing business, Defendant knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Massachusetts Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

741.   Defendant thus violated the Massachusetts Act by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

742.   Plaintiff members of the Massachusetts Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

743.   Defendant had the duty to Plaintiff and the members of the Massachusetts Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

A.   Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

B.   Plaintiff and the members of the Massachusetts Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

   C. Defendant knew that Plaintiff and the members of the

Massachusetts Subclass could not reasonably have been expected to learn

about or discover the Defective Battery and the effect it would have on the

Class Vehicles' range and energy efficiency.

744. In failing to disclose the Defective Battery and its resulting safety risks and

efficiency decreases, Defendant has knowingly and intentionally concealed and omitted

material facts and breached its duty to disclose.

745. The facts Defendant concealed or did not disclose to Plaintiff and the

members of the Massachusetts Subclass are material in that a reasonable consumer

would have considered them to be important in deciding whether to purchase the Class

Vehicles or pay a lesser price. Had Plaintiff and the members of the Massachusetts

Subclass known the Class Vehicles were defective, they would not have purchased the

Class Vehicles or would have paid less for them.

746. Defendant's violations present a continuing risk to Plaintiff as well as to

the general public. Defendant's unlawful acts and practices complained of herein affect

the public interest.

747. The recall and modifications Defendant claims to have instituted to address

the Defective Battery have not been adequate, in that they do not restore to Plaintiff or

the Massachusetts Subclass the battery range promised to them when they purchased the

vehicles.

748.   As a direct and proximate result of Defendant's violations of the Massachusetts Act, Plaintiff and the Massachusetts Subclass have suffered injury-in-fact and/or actual damage.

749.   Plaintiffs and members of the Massachusetts Subclass suffered ascertainable loss directly and proximately resulting from Defendant's violations of the Massachusetts Act. Plaintiff and members of the Massachusetts Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

750.   On July 19, 2021, Plaintiff sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3). If Defendant fails to fully remedy its unlawful conduct within the requisite notice period, Plaintiffs will amend this Complaint to seek all damages and relief to which Plaintiffs and the Massachusetts Subclass are entitled, include actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Massachusetts Act. Plaintiffs and members of the Massachusetts Subclass will also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Massachusetts Act

## COUNT FORTY-ONE — BREACH OF EXPRESS WARRANTY
## (MASS. GEN. LAWS C. 106 §§ 2-313 AND 2A-210)

751. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

752. Plaintiffs Harris and Duprez bring this cause of action on behalf of themselves and the Massachusetts Subclass.

753. Defendant is and was all at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

754. With respect to leases, Defendant is and was at all relevant times a "lessors" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

755. The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

756. Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

757. Specifically, the Class Vehicles are covered by Defendant's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the

warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, Defendant's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

758. Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

759. Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

760. Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

761. Plaintiffs notified Defendant of the breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of

avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

762.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiffs or the Class notice of the Defective Batteries.

763.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiffs and the members of the Massachusetts Subclass. Among other things, Plaintiffs and the members of the Massachusetts Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

764.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Massachusetts Subclass whole,

and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

765.   Plaintiffs and the members of the Massachusetts Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

766.   As a direct and proximate cause of Defendant's breach, Plaintiffs and the members of the Massachusetts Subclass bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT FORTY-TWO — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (MASS. GEN. LAWS C. 106 §§ 2-314 AND 2A-212)

767.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

768.   Plaintiffs Harris and Duprez bring this cause of action on behalf of themselves and the Massachusetts Subclass.

769.   Defendant is and was all at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

770.   With respect to leases, Defendant is and was at all relevant times a "lessors" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

771. The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

772. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212

773. Defendant impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use: transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

774. Defendant provided Plaintiffs and the members of the Massachusetts Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

775. However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can

manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

776.   Plaintiffs notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

777.   Plaintiffs and the Massachusetts Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiffs and the Massachusetts Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

778.   As a direct and proximate result of the breach of said implied warranty, Plaintiffs and the Massachusetts Subclass sustained the damages herein set forth.

779.   Plaintiffs and the Massachusetts Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial

## COUNT FORTY-THREE — FRAUDULENT CONCEALMENT

780.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

781.   Plaintiffs Harris and Duprez bring this cause of action on behalf of themselves and the Massachusetts Subclass.

782.   As set forth above, Defendant concealed and/or suppressed material facts concerning the Class Vehicles' safety.

783.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

784.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

785.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiffs and the members of the Massachusetts Subclass.

These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

786.   Defendant was in exclusive control of the material facts and such facts were not known to Plaintiffs and members of the Massachusetts Subclass, or the public. Defendant also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

787.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the members of the Massachusetts Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

788.   Plaintiffs and the members of the Massachusetts Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiffs and the members of the Massachusetts Subclass were justified.

789.   Plaintiffs and the members of the Massachusetts Subclass reasonably relied on these omissions and suffered damages as a result.

790.   As a result of these omissions and concealments, Plaintiffs and the members of the Massachusetts Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

791.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiffs and the members of the Massachusetts Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FORTY-FOUR — UNJUST ENRICHMENT

792.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

793.   Plaintiffs Harris and Duprez bring this cause of action on behalf of themselves and the Massachusetts Subclass.

794.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, Defendant charged a higher price for their vehicles than the Class Vehicles' true value, and thus Defendant obtained monies rightfully belonging to Plaintiffs and the members of the Massachusetts Subclass.

795.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Massachusetts Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

796.   Plaintiffs, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## I.   Claims Brought on Behalf of the New York Subclass

### COUNT FORTY-FIVE — VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. GEN. BUS. LAW § 349)

797.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

798.   Plaintiff Kotchmar (for purposes of this section, "Plaintiff") brings this claim on behalf of himself and on behalf of the New York Subclass.

799.   Plaintiff and Defendant are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. Gen. Bus. Law § 349(h).

800.   Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful. N.Y. Gen. Bus. Law § 349.

801.   In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defective Batteries with the intent that consumers rely on that concealment in deciding whether to purchase a Class Vehicle.

802.   By concealing the Defective Batteries while advertising the Class Vehicles as capable, reliable and safe, Defendant engaged in deceptive acts or practices in violation of GBL section 349.

803.   Defendant's deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including

Plaintiff and members of the New York Subclass, about the Class Vehicles' true performance and value.

804.   Plaintiff and members of the New York Subclass were unaware of, and lacked a reasonable means of discovering, the material facts Defendant suppressed.

805.   Defendant's misleading conduct concerns the safety of widely purchased consumer products and affects the public interest.

806.   Defendant's actions set forth above occurred in the conduct of its business, trade, or commerce.

807.   Plaintiff and members of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations. Plaintiff and members of the New York Subclass overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value resulting from the Defective Batteries. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

808.   Plaintiff and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair and deceptive practices. Under the GBL, Plaintiff and members of the New York Subclass are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendant acted willfully or knowingly, Plaintiff and members of the New York Subclass are entitled to recover three times their actual

damages. Plaintiff and is also entitled to reasonable attorneys' fees. N.Y. Gen. Bus. Law

§ 349(h).

## COUNT FORTY-SIX — VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
## (N.Y. GEN. BUS. LAW § 350)

809.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

810.   Plaintiff brings this claim on behalf of himself and on behalf of the New

York Subclass.

811.   GBL section 350 makes unlawful "[f]alse advertising in the conduct of any

business, trade or commerce…." N.Y. Gen. Bus. Law § 350. False advertising includes

"advertising, including labeling, of a commodity…if such advertising is misleading in a

material respect," taking into account "not only representations made by statement,

word, design, device, sound or any combination thereof, but also the extent to which the

advertising fails to reveal facts material in the light of such representations with respect

to the commodity…to which the advertising relates under the conditions prescribed in

said advertisement, or under such conditions as are customary or usual." N.Y. Gen. Bus.

Law § 350-a.

812.   Defendant caused or made to be disseminated through New York, through

advertising, marketing, and other publications, statements that were untrue or

misleading, and which were known, or which by the exercise of reasonable care should

have been known to Defendant, to be untrue and misleading to consumers, including Plaintiff and other members of the New York Subclass.

813.   Defendant has violated GBL section 350 because the misrepresentations and omissions regarding the Defective Batteries were material and deceived reasonable consumers, including Plaintiff and members of the New York Subclass, about the true performance and value of the Class Vehicles.

814.   Plaintiff and members of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendant's violations. In purchasing or leasing their Class Vehicles, Plaintiff and members of the New York Subclass relied on Defendant's representations and omissions with respect to safety, performance, reliability, and value of the Class Vehicles. Defendant's representations turned out to be untrue because the Class Vehicles utilize the Defective Batteries. Had Plaintiff or members of the New York Subclass known this, they would not have purchased or leased their Class Vehicles or would have paid less money for them.

815.    Plaintiff and members of the New York Subclass overpaid for their Class Vehicles and their Class Vehicles suffered a diminution in value resulting from the Defective Batteries. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

816.   Plaintiff and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and deceptive practices of false advertising. Under the

GBL, Plaintiff and members of the New York Subclass are entitled to recover their

actual damages or $500, whichever is greater. Additionally, because Defendant acted

willfully or knowingly, Plaintiff and members of the New York Subclass are entitled to

recover three times their actual damages, up to $10,000. Plaintiff is also entitled to

reasonable attorneys' fees. N.Y. Gen. Bus. Law § 350-e.

### COUNT FORTY-SEVEN — BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. LAW § § 2-313 AND 2A-210)

817.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

818.   Plaintiff brings this claim on behalf of himself and on behalf of the

members of the New York Subclass.

819.   Defendant is, and was, at all relevant times a "merchant" with respect to

motor vehicles under N.Y. UCC Law § 2-104(1) and "seller" of motor vehicles under§

2-103(1)(d).

820.   The Class Vehicles are and were at all relevant times "goods" within the

meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

821.   Defendant provided all purchasers and lessees of the Class Vehicles with

the express warranties described herein, which became part of the basis of the parties'

bargain. Accordingly, Defendant's warranties are express warranties under state law.

822.   Specifically, the Class Vehicles are covered by GM's new vehicle limited

warranty, in part comprised of the 8-year/100,000 new vehicle limited warranty on

electric propulsion components, including the Class Vehicles' battery components,

thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

823.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

824.   Defendant distributed the Defective Batteries in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

825.   Defendant breached these warranties by selling and leasing Class Vehicles using the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

826.    Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the Defective Batteries but instead chose to conceal their existence until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

827.    Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Defective Batteries to Plaintiff or members of the New York Subclass.

828.    The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff or New York Subclass members. Among other things, neither Plaintiff nor members of the New York Subclass had a meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

829.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other New York Subclass members whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

830.   Plaintiff and the New York Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

831.   As a direct and proximate cause of Defendant's breach, Plaintiff and the other New York Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT FORTY-EIGHT — BREACH OF THE IMPLIED  WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. LAW § § 2-314 AND 2A-212)

832.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

833.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the New York Subclass.

834.   Defendant is, and was, at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under

835.   § 2-103(1)(d).

836.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

837.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

838.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation—while the Class Vehicles were being operated.

839.   Defendant breached the implied warranty of merchantability in that the Class Vehicles were not in merchantable condition when they were sold to Plaintiff and New York Subclass members and said vehicles were and are unfit for the ordinary purposes for which such vehicles are used because they pose a serious safety risk to the occupants and are an unreliable means of transportation.

840.   Defendant has been provided notice of these issues by numerous complaints, as alleged herein.

841.   As a direct and proximate result of breaches of the implied warranty of merchantability, Plaintiff and the New York Subclass members have suffered damages, including but not limited to incidental and consequential damages.

## COUNT FORTY-NINE — FRAUD BY CONCEALMENT

842.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

843.   Plaintiff brings this claim on behalf of himself and on behalf of the members of the New York Subclass.

844.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which in many cases could not be discovered until years after the Class Vehicles were purchased or leased. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

845.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

846.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant, who had superior knowledge and access to the facts and Defendant knew that those facts were not known

to or reasonably discoverable by Plaintiff and the New York Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

847.   Defendant was in exclusive control of the material facts and such facts were not known to the public or the New York Subclass members. Defendant also possessed exclusive knowledge of the Battery Defect rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

848.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the New York Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

849.   Plaintiff and the New York Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the New York Subclass members were justified.

850.   Plaintiff and the New York Subclass members reasonably relied on these omissions and suffered damages as a result.

851.   As a result of these omissions and concealments, Plaintiff and the New York Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

852.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the New York Subclass members. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY — UNJUST ENRICHMENT

853.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

854.   Plaintiff brings this cause of action on behalf of himself and the New York Subclass.

855.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Battery Defect described herein, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff and the New York Subclass members.

856.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the New York Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

857.   Plaintiff, therefore, seeks an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

**J. Claims Brought on Behalf of the Oregon Subclass**

## COUNT FIFTY-ONE — VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605 THROUGH 646.656)

858. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

859. Plaintiffs Taylor, Carr, and Wyers (for purposes for this section, "Oregon Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Oregon Class.

860. Defendant and Plaintiffs are "persons" under the Oregon Unlawful Trade Practices Act, ORS § 646.605(4).

861. Plaintiffs purchased their Class Vehicles primarily for personal, family or household purposes and thus their Class Vehicle are "goods" under ORS § 646.605(6)(a).

862. Defendant is and was engaged in "trade" and "commerce" as defined by ORS § 646.605(8).

863. ORS § 646.607 provides, in relevant part, that a "person engages in an unlawful trade practice if in the course of the person's business, vocation or occupation the person . . . [e]mploys any unconscionable tactic in connection with selling . . . goods or services."

864.   Defendant knew or should have known that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

865.   Defendant employed unconscionable tactics in selling the Class Vehicles by not giving Plaintiffs and the Oregon Subclass members sufficient notice or warning regarding the Defective Batteries, intending that Plaintiffs and the Class rely upon GM's omissions when purchasing the Class Vehicles. Plaintiffs and the Oregon Subclass members were deceived by Defendant concealing the Defective Batteries.

866.   Defendant also engaged in unlawful and deceptive practices in violation of ORS § 646.608 by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Class Vehicles (ORS § 646.608(b)); representing that the Class Vehicles have characteristics, uses, benefits, quantities and qualities that they do not have (ORS § 646.608(e)); representing that the Class Vehicles are of a particular standard, quality or grade when they are of another (ORS § 646.608(g)); concurrently with tender or delivery of the Class Vehicles, failing to disclose known material defects or material nonconformities (ORS § 646.608(t)); and engaging in other unfair or deceptive conduct (ORS § 646.608(u)).

867.   Defendant also engaged in unlawful and deceptive practices in violation of ORS §§ 646.607 and 646.608 by failing to provide Plaintiffs and Oregon Subclass members the full cost to repair the Class Vehicles and replace the Defective Batteries.

868.   Defendant knew or should have known that its conduct was a violation of the Oregon Unfair Trade Practices Act, ORS § 646.605 - .656, and therefore its conduct was willful. ORS § 646.605(10).

869.   Oregon Plaintiffs and the Oregon Subclass members have suffered an ascertainable loss of money or property as a direct and proximate result of Defendant's willful use or employment of unlawful methods, acts or practices.

870.   Pursuant to ORS § 646.638, Oregon Plaintiffs and the Oregon Subclass members seek an order enjoining Defendant's unfair and/or deceptive practices, actual damages, punitive damages, attorney's fees and costs, and any other just and proper relief available under the Oregon UTPA.

871.   Pursuant to ORS § 646.638(2), Plaintiffs will serve the Oregon Attorney General with a copy of this Complaint.

## COUNT FIFTY-TWO — BREACH OF EXPRESS WARRANTY
### (OR. REV. STAT.  §  § 72.3130 AND 72A.2100)

872.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

873.   Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass.

874.   Defendant was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

875.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

876.   Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

877.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

878.   Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

879.   Defendant distributed the Defective Batteries in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

880.   Defendant breached these warranties by selling and leasing Class Vehicles using the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

881.   Oregon Plaintiffs each notified Defendant of its breach within a reasonable time, and/or were not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

882.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Defective Batteries to Plaintiffs or the Class.

883.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Oregon Plaintiffs and Oregon Subclass members. Among other things, Oregon Plaintiffs and the Oregon Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

884.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oregon Plaintiffs and the other Oregon Subclass members whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

885.   Oregon Plaintiffs and the Oregon Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

886.   As a direct and proximate cause of Defendant's breach, Oregon Plaintiffs and the other Oregon Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT FIFTY-THREE — BREACH OF THE IMPLIED  WARRANTY OF MERCHANTABILITY
### (OR. REV. STAT.  § 72.8020 *ET SEQ.*)

887.   Oregon Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

888.   Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass.

889.   The Class Vehicles are "consumer goods" as defined in ORS § 72.8010(1).

890.   Oregon Plaintiffs and the Oregon Class members are "buyers" and "retail buyers" as defined in ORS § 72.8010(2).

891.   Defendant is and was at all relevant times a "manufacturer" as defined in ORS § 72.8010(3) with respect to the Class Vehicles.

892.   Pursuant to ORS § 72.8020, Defendant impliedly warranted that the Class Vehicles are fit for the ordinary purposes for which they are used: transporting the driver and passengers in reasonable safety during normal operation, without unduly endangering them or members of the public.

893.   By marketing, advertising, distributing, and selling Class Vehicles with the Defective Batteries, Defendant breached the implied warranty that the Class Vehicles were merchantable and safe for use as personal transportation.

894.   The Defective Batteries were installed in the Class Vehicles at the time they left Defendant's manufacturing facilities and at the time they were sold or leased to Oregon Plaintiffs and the Oregon Subclass.

895.   Plaintiffs and the Oregon Subclass members have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by Defendant's conduct or by operation of law in light of Defendant's unconscionable conduct.

896.   Defendant received timely notice about the Defective Batteries but has failed to rectify the problem and refused to offer an effective remedy.

897.   Oregon Plaintiffs and the Oregon Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Oregon Plaintiffs and the Oregon Subclass Members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

898.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Oregon Plaintiffs and the Oregon Subclass members suffered economic damage, including loss attributable to the diminished value of the Class Vehicles.

## COUNT FIFTY-FOUR — FRAUD BY CONCEALMENT

899.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

900.    Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass.

901.    As set forth above, Defendant concealed and/or suppressed material facts concerning the Class Vehicles' safety.

902.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Oregon Plaintiffs and the Oregon Subclass members to purchase the Class Vehicles at a higher price than their true value.

903.    Defendant still have not made full and adequate disclosure and continues to defraud Oregon Plaintiffs and the Oregon Subclass members.

904.    Oregon Plaintiffs and the Oregon Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Oregon Plaintiffs and the Oregon Subclass's actions were justified. Defendant had exclusive control of the material facts and such facts were not known to the public, the Oregon Plaintiffs, or the Oregon Subclass.

905.    As a result of the concealment and/or suppression of the facts, Oregon Plaintiffs and the Oregon Subclass members sustained damage. For those of Oregon Plaintiffs and the Oregon Subclass who elect to affirm the sale, these damages, include the difference between the actual value of that which Oregon Plaintiffs and the Oregon Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits.

For any Oregon Plaintiffs or member of the Oregon Subclass who want to rescind their purchases, then such Plaintiffs and the Oregon Subclass members are entitled to restitution and consequential damages.

906. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Oregon Plaintiffs' and the Oregon Subclass's rights and well-being. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY-FIVE — UNJUST ENRICHMENT

907. Oregon Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

908. Oregon Plaintiffs bring this cause of action on behalf of themselves and the Oregon Subclass.

909. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Batteries, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Oregon Plaintiffs and the Oregon Subclass members.

910. Defendant enjoyed the benefit of increased financial gains, to the detriment of Oregon Plaintiffs and the Oregon Subclass members, who paid a higher price for

vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

911.   Oregon Plaintiffs, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## K.   Claims Brought on Behalf of the Texas Subclass

### COUNT FIFTY-SIX — VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT - CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § § 17.41, *ET SEQ.*)

912.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

913.   Plaintiff Vaaler (for purposes of this section, "Plaintiff") brings this cause of action on behalf of himself and the members of the Texas Subclass.

914.   Plaintiff and the Texas Subclass members are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers," pursuant to Texas Business and Commercial Code § 17.45(4). Defendant is a "person" within the meaning of Texas Business and Commercial Code § 17.45(3).

915.   Defendant is engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Texas Business and Commercial Code § 17.46(a).

916.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any

trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means an act or practice which, to a consumers detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

917. In the course of their business, Defendant knew that the Defective Batteries would fail prematurely, and were not suitable for their intended use. Yet, Defendant concealed and suppressed material facts concerning the Class Vehicles, the Defective Batteries, and their propensity to cause vehicle fires. Defendant accomplished this by denying for over a year the existence of the Defective Batteries.

918. At a minimum, Defendant violated the Texas DTPA by representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

919. Defendant engaged in misleading, false, unfair, and deceptive acts or practices that violated the Texas DTPA by failing to disclose and actively concealing the existence of the Defective Batteries.

920. Defendant owed Plaintiff and the Texas Subclass members a duty to disclose the existence of the Defective Batteries because:

A.     Defendant was in a superior position to know the true state of facts about the Defective Batteries and associated repair costs in the Class Vehicles;

B.     Plaintiff and the Texas Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous defects until manifestation of the Defective Batteries; and

C.     Defendant knew that Plaintiff and the Texas Subclass members could not reasonably have been expected to learn about or discover the Defective Batteries and their associated repair costs.

921.   The facts Defendant concealed or did not disclose to Plaintiff and the Texas Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the Texas Subclass members known the Class Vehicles utilized the Defective Batteries, they would not have purchased the Class Vehicles or would have paid less for them.

922.    Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the safety and reliability of the Class Vehicles.

923.   The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiff and the Texas Subclass members, as it would have been to all reasonable consumers

924.   Defendant had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.

925.   Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

926.   Plaintiff and members of the Texas Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information.

927.   Plaintiff and the Texas Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated or would have paid significantly less for them. Plaintiff and the Texas Subclass members also suffered diminished value of their vehicles, as well as lost or diminished use.

928.   Pursuant to Texas Business and Commercial Code § 17.50, Plaintiff and the Texas Subclass seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

929.   Pursuant to Texas Business and Commercial Code § 17.50, Plaintiff and the Texas Subclass seeks an order enjoining Defendant's unfair and/or deceptive acts or

practices, attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

930.    On July 19, 2021, Plaintiff sent notice letters complying with Texas Business and Commerce Code § 17.505(a) and 17.501(a).

931.    After 60 days, if Defendant has not tendered complete relief to Plaintiff, Plaintiff will amend this complaint to seek damages, multiple damages for knowing and intentional violations pursuant to § 17.50(b)(1), and punitive damages.

## COUNT FIFTY-SEVEN — BREACH OF EXPRESS WARRANTY
## (TEX. BUS. & COM. CODE  § 2.313)

932.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

933.    Plaintiff brings this cause of action on behalf of himself and the Texas Subclass.

934.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

935.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

936.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

937.    In connection with the sale of the defective Class Vehicles to the Plaintiff and the Texas Subclass, Defendant provided a new vehicle warranty, under which it

agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

938.   Defendant's express warranties were part of the basis of the bargain respecting the purchase and/or lease of the defective Class Vehicles. In addition to written warranties, Defendant warranted several attributes, characteristics, and qualities of the subject vehicles, as alleged above.

939.   Defendant distributed the Class Vehicles with the Defective Batteries, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessees.

940.   Defendant breached these warranties by selling and leasing Class Vehicles utilizing the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods.

941.   Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

942.   Plaintiff submitted their vehicles for warranty repairs as referenced herein. Defendant failed to comply with the terms of the express written warranty provided to

Plaintiff, by failing and/or refusing to repair the Defective Batteries under the Class

Vehicles' applicable warranties as described herein.

943.   Plaintiff has given Defendant a reasonable opportunity to cure the

Defective Batteries, but Defendant has been unable and/or has refused to do so within a

reasonable time.

944.   As a result of said nonconformities, Plaintiff cannot reasonably rely on the

subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation.

945.   Plaintiff could not reasonably have discovered said nonconformities with

the subject vehicles prior to Plaintiff's acceptance of the subject vehicle.

946.   Plaintiff and the members of the Texas Subclass would not have purchased

their vehicles, or would have paid less for their vehicles, had they known, prior to their

respective time of purchase or lease, that their vehicles utilized the Defective Batteries.

947.   As a direct and proximate result of Defendant's willful failure to comply

with its obligations under the express warranties, Plaintiff and the Texas Subclass

members have suffered actual and consequential damages. Such damages include, but

are not limited to, a diminution in the value of the subject vehicles containing the

defects identified herein.

948.   As a direct and proximate cause of Defendant's breach, Plaintiff and the

Texas Subclass members bought or leased Class Vehicles they otherwise would not

have, overpaid for their vehicles, did not receive the benefit of their bargain, and their

Class Vehicles.

949.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice to Plaintiff or the Texas Subclass members.

950.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and the Texas Subclass members. Among other things, Plaintiff and the Texas Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and Plaintiff and the Texas Subclass members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

951.   Plaintiff and the Texas Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

952.   Also, as alleged in more detail herein, at the time that Defendant warranted and sold the vehicles, it knew that the vehicles did not conform to the warranties and were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Plaintiff and the Texas

Subclass members were therefore induced to purchase the defective Class Vehicles under false and/or fraudulent pretenses.

953.   Defendant been provided notice of these issues by numerous complaints as described herein.

954.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and the Texas Subclass members have been damaged in an amount to be determined at trial.

## COUNT FIFTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (TEX. BUS. & COM. CODE § 2.314)

955.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

956.   Plaintiff brings this cause of action on behalf of himself and the Texas Subclass.

957.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

958.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

232          CONSOLIDATED CLASS ACTION
                                              COMPLAINT

959.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law, pursuant to Texas Business and Commercial Code §§ 2.314 and 2A.212.

960.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendant were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation—while the Class Vehicles were being operated.

961.   Defendant breached the implied warranty of merchantability in that the defective Class Vehicles were not in merchantable condition when they were sold to Plaintiffs and Texas Class members and said vehicles were and are unfit for the ordinary purposes for which such vehicle is used because they pose a serious safety risk to the occupants and are an unreliable means of transportation.

962.   Plaintiff notified Defendant of the Defective Battery in his vehicle a reasonable time after Plaintiff learned about it.

963.   As a direct and proximate result of breaches of the implied warranty of merchantability, Plaintiffs and the Texas Class members have suffered damages, including but not limited to incidental and consequential damages.

## COUNT FIFTY-NINE — FRAUD BY CONCEALMENT

964.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

965.   Plaintiff brings this cause of action on behalf of himself and the Texas Subclass.

966.   Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was not readily discoverable in many cases until years after they purchased or leased the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

967.   Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

968.   In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff and the Texas Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

969. Defendant was in exclusive control of the material facts and such facts were not known to the public or the Texas Subclass members. Defendant also possessed exclusive knowledge of the Defective Batteries and their tendency to make the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

970. Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Texas Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

971. Plaintiff and the Texas Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiffs and the Texas Subclass members were justified.

972. Plaintiff and the Texas Subclass members reasonably relied on these omissions and suffered damages as a result.

973. As a result of these omissions and concealments, Plaintiffs and the Texas Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

974. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the Texas Subclass members. Defendant's conduct warrants an assessment of punitive damages in

an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SIXTY — UNJUST ENRICHMENT

975.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

976.   Plaintiff brings this cause of action on behalf of himself and the Texas Subclass.

977.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Batteries as described herein, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff and the Texas Subclass members.

978.   Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Texas Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

979.   Plaintiff, therefore, seeks an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

**L.    Claims Brought on Behalf of the Washington Subclass**

**COUNT SIXTY-ONE — VIOLATIONS OF THE
CONSUMER PROTECTION ACT
(REV. CODE WASH. ANN. § § 19.86.010, *ET SEQ.*)**

980.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

981.    Plaintiffs Andersen and DeRosa (for purposes of this section, "Washington Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass.

982.    Defendant's conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Defendant's manufacture, sale, and use of the Defective Batteries, which Defendant failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety, reliability, and range of the Class Vehicles.

983.    Defendant's actions as set forth above occurred in the conduct of trade or commerce.

984.    Defendant's actions impact the public interest because Plaintiffs were injured in the same way as tens of thousands of others purchasing and/or leasing Defendant's vehicles as a result of Defendant's generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.

985.   Plaintiffs and the Washington Subclass members were injured as a result of Defendant's conduct. Plaintiffs and the Washington Subclass overpaid for the Class Vehicles and did not receive the benefit of their bargain, and thus the Class Vehicles have suffered a diminution in value.

986.   Defendant's conduct proximately caused the injuries to Plaintiffs and the Washington Subclass members.

987.   Defendant is liable to Plaintiffs and the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

988.   Pursuant to Wash. Rev. Code. Ann. § 19.86.095, Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Plaintiffs seek injunctive relief.

## COUNT SIXTY-TWO — BREACH OF EXPRESS WARRANTY
### (REV. CODE WASH. § 62A.2-313 AND 62A.2A-210)

989.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

990.   Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass.

991.   Defendant is and was at all relevant times a merchant with respect to motor vehicles.

992.   In the course of selling its vehicles, Defendant expressly warranted in writing that the Class Vehicles were covered by a new vehicle limited warranty.

993.    Plaintiffs each notified Defendant of its breach within a reasonable time, and/or were not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

994.    In addition to this new vehicle limited warranty, Defendant expressly warranted several attributes, characteristics and qualities, as set forth above.

995.    Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the Class whole and because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

996.    Accordingly, Plaintiffs' recovery is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff seeks all remedies as allowed by law.

997.    Also, at the time Defendant warranted and sold the Class Vehicles, Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Class Vehicles. Washington Plaintiffs and the Class were therefore induced to purchase the Class Vehicles under false and/or fraudulent pretenses.

998.   The damages flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," and any limitation on available remedies would be insufficient to make Washington Plaintiffs and the Washington Subclass whole.

999.   Finally, as a result of Defendant's breach of warranties as set forth herein, Plaintiff and the Washington Subclass assert as an additional and/or alternative remedy, as set forth in Rev. Code Wash. § 62A.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the Washington Subclass the purchase price of all Class Vehicles currently owned.

1000. As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs and the Washington Subclass have been damaged in an amount to be determined at trial.

## COUNT SIXTY-THREE — BREACH OF THE IMPLIED  WARRANTY OF MERCHANTABILITY (REV. CODE WASH.  §  62A.2-314/315)

1001. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1002. Washington Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass.

1003. Defendant is and was at all relevant times a merchant with respect to motor vehicles.

1004. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

1005. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Batteries cannot be charged safely without the risk of catastrophic failure causing fire and potential explosion.

1006. Privity is not required in this case because Washington Plaintiffs and the Washington Subclass are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

1007. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiffs and the Washington Subclass members have been damaged in an amount to be proven at trial.

## COUNT SIXTY-FOUR — FRAUD BY CONCEALMENT

1008. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1009. Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass.

1010. As set forth above, Defendant concealed and/or suppressed material facts concerning the safety of the Class Vehicles.

1011. Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the Washington Subclass members to purchase the Class Vehicles at a higher price, which did not match their true value.

1012. Defendant still have not made full and adequate disclosure and continues to defraud Plaintiffs and the Washington Subclass members.

1013. Plaintiffs and the Washington Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs and the Washington Subclass' actions were justified. Defendant had exclusive control of the material facts and such facts were not known to the public or the Washington Subclass.

1014. As a result of the concealment and/or suppression of the facts, Plaintiffs and the Washington Subclass members sustained damage. For those Plaintiffs and the Washington Subclass who elect to affirm the sale, these damages, include the difference between the actual value of that which Plaintiffs and the Washington Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation

for loss of use and enjoyment of the property, and/or lost profits. For any Plaintiffs or member of the Washington Subclass who want to rescind their purchases, then such Plaintiffs and the Washington Subclass members are entitled to restitution and consequential damages.

1015. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Washington Subclass' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SIXTY-FIVE — UNJUST ENRICHMENT

1016. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1017. Plaintiffs bring this cause of action on behalf of themselves and the Washington Subclass.

1018. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the concealing the Defective Batteries as described herein, Defendant charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies rightfully belonging to Plaintiffs and the Washington Subclass members.

1019. Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and the Washington Subclass members, who paid a higher price for

vehicles which actually had lower values. It would be inequitable and unjust for

Defendant retain these wrongfully obtained profits.

1020. Plaintiffs, therefore, seek an order establishing Defendant as a constructive

trustee of the profits unjustly obtained, plus interest.

## M.   Claims Brought on Behalf of the Wisconsin Subclass

### COUNT SIXTY-SIX — VIOLATIONS OF THE WISCONSIN DECEPTIVE
### TRADE PRACTICES ACT
### (WIS. STAT. § 100.18)

1021. Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

1022. Plaintiff Smith brings this cause of action on behalf of himself and the

Wisconsin Subclass.

1023. Plaintiff and the Wisconsin Class members are members of "the public"

within the meaning of Wis. Stat. § 100.18(1). Plaintiff and Wisconsin Class members

purchased or leased one or more Class Vehicles.

1024. Plaintiff and Wisconsin Class members are "persons" under the Wisconsin

1025. Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. §

100.18(1). Defendant is engaged in "trade" or "commerce" within the meaning of S.C.

1026. Code § 39-5-10(b).

1027. Defendant is a "person, firm, corporation or association" within the

meaning of Wis. Stat. § 100.18(1).

1028. The Wisconsin UTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Wis. Stat. § 100.18(1).

1029. In the course of doing business, Defendant misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

1030. In the course of doing business, Defendant knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Wisconsin Subclass. Moreover, Defendant actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

1031. Defendant thus violated the Wisconsin DTPA by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or

omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

1032. Plaintiff members of the Wisconsin Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

1033. Defendant had the duty to Plaintiff and the members of the Wisconsin Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A.    Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;
>
> B.    Plaintiff and the members of the Wisconsin Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;
>
> C.    Defendant knew that Plaintiff and the members of the Wisconsin Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

1034. In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendant has knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

1035. The facts Defendant concealed or did not disclose to Plaintiff and the members of the Wisconsin Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the members of the Wisconsin Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

1036. Defendant's violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1037. The recall and modifications Defendant claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff or the Wisconsin Subclass the battery range promised to them when they purchased the vehicles.

1038. As a direct and proximate result of Defendant's violations of the Wisconsin DTPA, Plaintiff and the Wisconsin Subclass have suffered injury-in-fact and/or actual damage.

1039. Plaintiff and the Wisconsin Class seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

## COUNT SIXTY-SEVEN — BREACH OF EXPRESS WARRANTY
## (WIS. STAT. §§ 402.313 AND 411.210)

1040. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1041. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass.

1042. Defendant is and was all at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

1043. Defendant is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1044. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1045. Defendant provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

1046. Specifically, the Class Vehicles are covered by Defendant's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the

warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, Defendant's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

1047. Furthermore, Defendant expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

1048. Defendant distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by Defendant's warranties granted to all Class Vehicle purchasers and lessors.

1049. Defendant breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

1050. Plaintiff notified Defendant of the breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of

avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1051. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiff or the Class notice of the Defective Batteries.

1052. The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and the members of the Wisconsin Subclass. Among other things, Plaintiff and the members of the Wisconsin Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class members because Defendant knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

1053. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Wisconsin Subclass whole, and

because Defendant has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1054. Plaintiff and the members of the Wisconsin Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct.

1055. As a direct and proximate cause of Defendant's breach, Plaintiff and the members of the Wisconsin Subclass bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

### COUNT SIXTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (WIS. STAT. §§ 402.314 AND 411.212)

1056. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1057. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass.

1058. 929.   Defendant is and was all at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

1059. 930.   Defendant is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1060. 931.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h)

1061. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to is. Stat. §§ 402.314 and 411.212.

1062. Defendant impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1063. Defendant provided Plaintiff and the members of the Wisconsin Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles Defendant manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

1064. However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can

manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

1065. Plaintiff notified Defendant of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, Defendant knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendant was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1066. Plaintiff and the Wisconsin Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Wisconsin Subclass members are intended third-party beneficiaries of contracts between Defendant and its authorized dealers and are intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

1067. As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Wisconsin Subclass sustained the damages herein set forth.

1068. Plaintiff and the Wisconsin Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial

## COUNT SIXTY-NINE — FRAUDULENT CONCEALMENT

1069. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1070. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass.

1071. Defendant made material omissions concerning a presently existing or past fact in that, for example, Defendant did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1072. Defendant was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1073. In addition, Defendant had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendant who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Plaintiff and the members of the Wisconsin Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

1074. Defendant was in exclusive control of the material facts and such facts were not known to Plaintiff and members of the Wisconsin Subclass, or the public. Defendant also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

1075. Defendant actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Wisconsin Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1076. Plaintiff and the members of the Wisconsin Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the members of the Wisconsin Subclass were justified.

1077. Plaintiff and the members of the Wisconsin Subclass reasonably relied on these omissions and suffered damages as a result.

1078. As a result of these omissions and concealments, Plaintiff and the members of the Wisconsin Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

1079. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the members of

the Wisconsin Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SEVENTY — UNJUST ENRICHMENT

1080. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1081. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass.

1082. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, Defendant charged a higher price for their vehicles than the Class Vehicles' true value, and thus Defendant obtained monies rightfully belonging to Plaintiff and the members of the Wisconsin Subclass.

1083. Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Wisconsin Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

1084. Plaintiff, therefore, seek an order establishing Defendant as a constructive trustee of the profits unjustly obtained, plus interest.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.      Appoint Plaintiffs as representative of the Nationwide Class and applicable State Classes and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiff and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief, including an order requiring Defendant to permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that GM is financially responsible for all Class notice and administration of Class relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

DATED this 19th day of July, 2021.

KELLER ROHRBACK L.L.P.


By: *s/ Ryan P. McDevitt*
  Ryan McDevitt (P84389)
  Gretchen Freeman Cappio (P84390)
  Lynn Lincoln Sarko
  Emma Wright
  KELLER ROHRBACK L.L.P.
  1201 Third Avenue, Suite 3200
  Seattle, WA 98101
  (206) 623-1900
  Fax (206) 623-3384
  gcappio@kellerrohrback.com
  lsarko@kellerrohrback.com
  rmcdevitt@kellerrohrback.com
  ewright@kellerrohrback.com

  E. Powell Miller (P39487)
  Sharon S. Almonrode (P33938)
  Melvin B. Hollowell (P37834)
  Dennis A. Lienhardt (P81118)
  THE MILLER LAW FIRM
  950 West University Dr., Suite 300
  Rochester, MI 48307
  (248) 841-2200
  Fax (248) 652-2852
  epm@millerlawpc.com
  ssa@millerlawpc.com
  mbh@millerlawpc.com
  dal@millerlawpc.com

  ***Co-Lead Counsel***

  David C. Wright
  Mark I. Richards
  Richard D. McCune
  Steven A. Haskins
  MCCUNE WRIGHT ARAVELO, LLP
  3281 East Guasti Road, Suite 100
  Ontario, CA 91761
  (909) 557-1250
  Fax (909) 557-1275
  dcw@mccunewright.com
  mir@mccunewright.com
  rdm@mccunewright.com
  sah@mccunewright.com

  Roberta Liebenberg
  Gerard A. Dever
  Mary L. Russell
  FINE, KAPLAN AND BLACK, RPC
  1 South Broad St., Suite 2300

Philadelphia, PA 19107
(215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

Nicholas A. Migliaccio (P29077)
Jason S. Rathod (P18424)
MIGLIACCIO & RATHOD LLP
412 H St. NE, Suite 302
Washington D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Todd Friedman
David B. Levin
LAW OFFICES OF TODD M.
FRIEDMAN, PC
21550 Oxnard Street Suite 780
Woodland Hills, CA 91367
(224) 218-0882
Fax (866) 633-0228
dlevin@toddflaw.com
tfriedman@toddflaw.com

Benjamin F. Johns
Beena M. McDonald
Samantha E. Holbrook
Alex M. Kashurba
CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP
361 West Lancaster Ave
One Haverford Centre
Haverford, PA 19041
(610) 642-8500
bmm@chimicles.com
bfj@chimicles.com
seh@chimicles.com

***Plaintiffs' Steering Committee***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 19, 2021, I electronically filed the foregoing using the ECF system which will send electronic notices of same to all counsel of record.

Respectfully submitted,

By: *<u>/s/ Ryan P. McDevitt</u>*
    Ryan McDevitt (P84389)
    Keller Rohrback L.L.P.
    1201 Third Ave., Suite 3200
    Seattle, WA 98101