# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| *In re Chevrolet Bolt EV Battery Litigation* | Case No. 2:20-13256-TGB-CI |
|  | Honorable Terrence G. Berg |
|  | **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
|  | **DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    Plaintiffs Robin Altobelli, F. Dayle Andersen, Andrew Barrett, Bruce James Cannon, Mary Carr and Jan G. Wyers, Yohanes Chitra, Christine Chung, Linda Connelly, Daniel Corry, Vincent Corry, John DeRosa, William Dornetto and Russell Ives, Kevin Harris and Pamela Duprez, Michael Hickey, Michael and Denise Holbrook, Fred Kass, Keith Khorey, James Kotchmar, Robert Kuchar, Joseph Poletti, Edward and Janet Rock, Evi Schulz, Michael Smith, Jeanne Sterba, Ashley Strong, Alucard Taylor, Jason Vaaler, Tony Verzura, Shawn Walker, and Thomas and Carol Whittaker (collectively, "Plaintiffs"), by and through their counsel, bring this action on behalf of themselves and all others similarly situated against Defendants GENERAL MOTORS LLC (hereinafter "General Motors" or "GM"), and LG CHEM, LTD., LG ENERGY SOLUTION, LTD., LG ENERGY SOLUTION MICHIGAN INC., LG ELECTRONICS, INC., and LG ELECTRONICS USA, INC. (collectively, "LG")

(together with GM, "Defendants"). All allegations made in this complaint are based on investigation of counsel, except those allegations that pertain to Plaintiffs' vehicles, which are based on personal knowledge.

2.      This putative class action arises out of General Motors's and LG's failure to disclose and then adequately repair a uniform and widespread defect in the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery") that has led to three safety recalls to date alongside guidance from GM that imposes highly restrictive limitations on consumers' use of the Class Vehicles, greatly reducing—if not obliterating—the value of the vehicles to consumers. To date, the recalls have done nothing to actually repair the root cause of the defect. The defect causes the high voltage battery to overheat when charged to full or nearly full capacity, which can result in catastrophic and destructive fires, resulting in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. These vehicles (hereinafter "Class Vehicles" or "Vehicles") are the 2017–22 model year Chevrolet Bolt (hereinafter "Chevy Bolt" or "Bolt"). GM has issued increasingly restrictive recalls and guidance to consumers, but has failed to provide a timeline for repair for the Class Vehicles.

3.      The most recent recall, issued on August 17, 2021, greatly expands the number of affected vehicles. Consumers had already been instructed at various times over the preceding nine months to limit the Class Vehicles' charge to 90%, to avoid depleting the battery below 70 miles of range, to charge the Vehicles more frequently,

to not leave the Vehicles charging overnight, and to park the Vehicles outside. Most recently, GM has begun advising consumers not to park Class Vehicles within 50 feet of other vehicles or buildings, lest the Bolt spontaneously combust and destroy neighboring property. Needless to say, it's difficult, if not impossible in some areas, to find parking places so far removed from other vehicles or other flammable objects or buildings.

4.      It is hard to overstate the devastating effect of the recall on the value of the Vehicles in the eyes of consumers, not to mention the safety hazards the Vehicles clearly pose to consumers and their communities.

5.      Despite the seriousness of the recalls, GM has offered no timeline for replacement of the Class Vehicle batteries or compensation for the significant limitations it has placed on the Vehicles—in fact, it is unclear whether Defendants' purported "fix" will even resolve the issues with the Class Vehicles.

6.      The Defective Battery contains one or more serious defects that cause the battery system to overheat when the battery is charged to full or nearly full capacity, putting the battery at risk of exploding and/or catching fire. This can result in catastrophic damage to the Class Vehicles, as seen below, and it also causes an immediate safety risk to the Vehicles' occupants and the people and property surrounding the Vehicles.



7.     GM initially issued Recall No. 20V-701 on November 13, 2020, after receiving numerous complaints regarding the Defective Battery. This initial recall was limited to 2017–19 model year Chevy Bolt vehicles equipped with design-level N2.1 batteries produced at LG Chem's Ochang, Korea plant. This recall limited the range of the Class Vehicles to approximately 214 miles on a single battery charge, as compared to the 238-mile range advertised by GM.

8.     Despite this recall, the Class Vehicles continued to experience fires, and on April 29, 2021, GM announced a revised and purportedly final "fix" that consisted of a dealer-implemented service procedure to identify potential battery anomalies in conjunction with the installation of software that, according to GM, had the ability to detect potential issues before problems can develop. However, GM quickly reversed course, and on July 14, 2021, it instructed owners and lessees of the Class Vehicles to

"park their vehicles outside away from homes and other structures immediately after charging and … not leave their vehicles charging overnight," even if the vehicles had already had the interim or "final" recall remedies performed.[1]

9.     On July 23, 2021, four days after the filing of the Consolidated Class Action Complaint in this litigation, GM announced a new and "FINAL" recall for 2017–19 Chevrolet Bolt vehicles, regardless of whether they had already had the previous recall(s) performed. GM announced that it will replace "defective battery modules in the recall population," but provided no timeline for when replacement battery parts would be ready. In the indeterminate meantime, GM imposed stringent restrictions on the charging and use of the 2017–19 Class Vehicles: customers were to limit charging capacity to 90%, charge their vehicle after every single use, avoid depleting their battery below "approximately 70 miles of remaining range," and "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight."[2]

---

[1] *Consumer Alert: Important Chevrolet Bolt Recall for Fire Risk*, NHTSA (July 14, 2021) [hereinafter Exhibit A], https://www.nhtsa.gov/press-releases/consumer-alert-important-chevrolet-bolt-recall-fire-risk (last visited July 15, 2021).

[2] Sean Graham, *[UPDATED] GM announces recall after a dozen Bolt EV Fires; 6 key questions with answers from GM*, ELECTREK (July 23, 2021) [hereinafter Exhibit B], https://electrek.co/2021/07/23/gm-announces-recall-after-a-dozen-bolt-ev-fires-6-key-questions-we-need-answers-to/ (last visited Sept. 16, 2021); *Consumer Alert: GM Issues New Recall, Safety Instructions for 2017-19 Chevrolet Bolt Vehicles*, NHTSA (July 23, 2021) [hereinafter Exhibit C], https://www.nhtsa.gov/press-releases/new-recall-safety-instructions-2017-19-chevrolet-bolt (last visited Sept. 16, 2021); *Bolt EV and Bolt EUV Recall Information*, CHEVROLET [hereinafter Exhibit D], https://www.chevrolet.com/electric/bolt-recall (last visited Sept. 3, 2021).

10.     Thus, after eight months, GM conceded that its initial recall had done little or nothing to mitigate the fire risk, and that *additional* restrictions on the total range, usability, charging, and even parking of Class Vehicles were required to avoid catastrophic fires. Range—the primary competitive selling point of electric vehicles ("EVs") as battery technology catches up to the range afforded by gasoline vehicles— was thus effectively reduced from an advertised 238 miles to 144 miles, a reduction of *40%*. Meanwhile, the limitation on charging vehicles—after every drive and not overnight—considerably restricts the usability of the vehicles, as the Bolt takes hours to reach a full charge.

11.     When it announced these additional instructions, GM told the press and concerned consumers that 2020 Bolts were not affected because they were built with different battery technology and increased range.[3] But on August 17, 2021, despite that representation, GM announced an expansion of the recall to include the previously excluded 2020–22 model year Chevrolet Bolts. GM's announcement lacks any meaningful information with respect to the timing of a purported fix, and merely states that "We are working aggressively with LG to adjust production to have replacement modules available as soon as possible."[4]

---

[3] Hannah Lutz, *GM recalls Bolts, will replace battery modules*, Automotive News (July 23, 2021) [hereinafter Exhibit E], https://www.autonews.com/manufacturing/gm-recalls-bolts-will-replace-battery-modules (last visited Sept. 16, 2021).
[4] Exhibit B.

12.     On September 15, 2021, GM began advising owners of Class Vehicles to park and store their Class Vehicles "at least 50 feet away from other cars to reduce the risk that spontaneous fires could spread."[5] This is merely the latest in the string of increasingly restrictive conditions that render the Class Vehicles nearly impossible to drive or charge normally, and it further renders the Class Vehicles nearly impossible to park safely on any city street, in any residential garage, or in any parking lot or structure.

13.     Despite GM's multiple recalls, Plaintiffs and Class members are now left with vehicles that cannot reach the advertised range, that they cannot charge at convenient times or locations, and that may spontaneously burst into flame, causing serious harm to the vehicle, its owners or lessees themselves along with their passengers, and to their neighbors, co-workers, and property.

14.     Due to the undisclosed Defective Battery, Plaintiffs and Class members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles; further, Plaintiffs and Class members suffered an ascertainable loss of money, property, and/or value and resale value of their Class Vehicles. Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Class Vehicles. Plaintiffs seek monetary damages and injunctive and other equitable

---

[5] David Welch & Dana Hull, *GM Tells Bolt Owners to Park 50 Feet Away From Other Cars*, BLOOMBERG (Sept. 15, 2021) [hereinafter Exhibit F], https://www.bloomberg.com/news/articles/2021-09-15/gm-tells-some-bolt-owners-to-park-50-feet-away-from-other-cars (last visited Sept. 16, 2021).

relief for Defendants' misconduct related to the design, manufacture, marketing, sale, and lease of the Class Vehicles as alleged in this Complaint, and their material omissions and conduct in conducting misleading and inadequate recall campaigns that have rendered the Class Vehicles nearly useless and seriously diminished in value.

15.     Despite their knowledge, Defendants failed to notify Plaintiffs and the Class members of the problems with the Defective Battery and associated hazards at the time of purchasing their Vehicles. As detailed herein, GM's purported remedies fail to alleviate the risk of a battery fire. The time has come for Defendants to do what GM has already started doing on a very limited basis: buy back all of the Class Vehicles.

16.     Defendants have been unable to develop, implement, and deliver a repair that relieves consumers from their current unsafe and unacceptable circumstances. Even if they could do so tomorrow, Class members would still have suffered economic harm. Had Defendants disclosed the Vehicles' true characteristics, consumers would have paid much less for the Vehicles, if they would have bought or leased them at all. This means that Class Vehicles were at the point of purchase and still are less valuable than bargained for and reasonably expected because of the defect. Consumers paid for reasonably expected value during this time period that the defects prevented them from receiving.

17.     Consumers who drove their Vehicles less frequently because of range anxiety, range limitations, inconvenient charging, or other reasons related to the defects,

lost benefits of use and the option for use, while their Vehicles still depreciated as they aged.

18.    Consumers unwittingly acquired life-threatening risk when acquiring their Class Vehicles, which they would not have voluntarily assumed either at all or without compensation. As evidence of this risk, Defendants now tell consumers to incur cost and inconvenience to avoid this risk at Class members' expense, not Defendants' expense, even though the undisclosed safety defect is Defendants' responsibility.

19.    Lower performance, inferior performance capability, such as range limits, safety hazards, mitigation costs, and reduced value are all attributable to the defect and diminish the value of Class members' ownership experience, for reasons attributable to the unreasonable and undisclosed Battery Defects. As a result, Class members have suffered economic harm. Even a full and complete repair today, were one possible, would only terminate some of those injuries. It would not remedy harm that Class members have already suffered and will suffer in the future.

## II.    JURISDICTION AND VENUE

20.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and there are 100 or more class members who are citizens of different states from Defendants.

21.     **Personal Jurisdiction.** This Court has personal jurisdiction over GM because GM is headquartered in this District, and because a substantial part of the events, omissions, or misrepresentations giving rise to these claims occurred in and emanated from this District.

22.     This Court has personal jurisdiction over LG Chem Ltd. because it carried on a continuous and systemic part of its general business within the state of Michigan by working with GM to develop and supply the Defective Battery. LG Chem further purposefully availed itself of Michigan by closely working with GM in Michigan to design and build the Chevrolet Bolt.

23.     This Court has personal jurisdiction over LG Energy Solution, Ltd. and LG Energy Solution Michigan Inc. because these companies have continuous and systemic business within the state through LG Energy Solution's production base in Holland, Michigan and components facility in Hazel Park, Michigan, and LG Energy Solution Michigan's research and development center in Troy, Michigan.

24.     This Court has personal jurisdiction over LG Electronics, Inc. and LG Electronics USA, Inc. because these companies carried on a continuous and systemic part of their general business within the state of Michigan by working with GM to build the Defective Battery components, supply core parts of the battery systems and/or EV motors, and, on information and belief, are working directly with GM to investigate the battery defect.

25.     The batteries, battery cells, and/or battery packs that LG Chem and LG Electronics supplied to GM, are among those that end up in Bolt EVs for purchase by consumers within the Eastern District of Michigan and nationwide. Moreover, there are direct contacts in this district through the subsidiary LG Electronics Michigan which designs, produces, and "manufactures the large lithium-ion polymer battery cells and packs for electric vehicles" through its R&D arm in Troy, Michigan, and its electric vehicle components facility in Hazel Park, Michigan, both of which are located in the Eastern District of Michigan. Finally, these LG entities are directly involved in the investigation of the battery defect and the inadequate and misleading recalls complained of herein.

26.     **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, transactions, and conduct giving rise to the claims occurred in and emanated from this District. Further, GM is headquartered and transacts business in this District and LG Energy Solution Michigan Inc. has its principal place of business in this District.

### III.    PARTIES

**A.    Plaintiffs**

**1.     Plaintiff Robin Altobelli**

27.     Plaintiff Robin Altobelli is a citizen and resident of Tucson, Arizona.

28.     On or about April 15, 2019, Robin Altobelli purchased a new 2019 Chevy Bolt from O'Reilly Chevrolet in Tucson, Arizona (for purposes of this section, "the Vehicle").

29.     Plaintiff Altobelli made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

30.     Prior to her purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Altobelli of the Defective Battery. Plaintiff Altobelli reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

31.     Plaintiff Altobelli purchased the Vehicle for personal, family, or household use. Plaintiff Altobelli has always attempted to use the Vehicle in the normal and expected manner.

32.     Plaintiff Altobelli learned of the recall from an email from General Motors and various news reports. After modifying the Vehicle to reduce the current charging allowance, the estimated range on Plaintiff Altobelli's car fell to far less than the range that Plaintiff Altobelli expected she would be getting when she purchased her Vehicle. Her Vehicle's range after the recall was even lower than the amount represented by the recall notice. Plaintiff Altobelli is concerned of reports of additional vehicle fires and GM's July 2021 guidance to avoid parking the Vehicle indoors. Plaintiff Altobelli must now choose between damaging her Vehicle by regularly parking it outdoors during the heat of an Arizona summer, during which the Vehicle can heat up to over 140 degrees, or endangering her property if she parks it in her garage.

33.     As a result, Plaintiff Altobelli has been left with a Vehicle with reduced range. Plaintiff Altobelli has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Altobelli known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, or that it would be unsafe to park her Vehicle in her garage, she would not have purchased her Bolt.

### 2.     Plaintiff F. Dayle Andersen

34.     Plaintiff F. Dayle Andersen is a citizen and resident of Spokane, Washington.

35.     On or about September 2, 2018, Mr. Andersen and his wife, Anita Andersen-Sather, purchased a new 2018 Chevy Bolt from Bill Pierre Chevrolet in Seattle, Washington (for purposes of this section, "the Vehicle").

36.     Plaintiff Andersen made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

37.     Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Andersen of the Defective Battery. Plaintiff

Andersen reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

38.     Plaintiff Andersen purchased the Vehicle for personal, family, or household use. Plaintiff Andersen has always attempted to use the Vehicle in the normal and expected manner.

39.     Plaintiff Andersen learned of the recall from a postcard in May 2021. He was previously aware of news reports of fires in 2019 and 2020.

40.     After installing the software modification, the estimated range on Plaintiff Andersen's car fell to far less than the range of 238 miles that Plaintiff Andersen expected he would be getting when he purchased his Vehicle. His Vehicle's battery capacity was even lower than the amount represented by the recall notice, with range falling as low as 110 miles on a full charge during the winter.

41.     As a result, Plaintiff Andersen has been left with a Vehicle with reduced range. Plaintiff Andersen has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Andersen known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**3.     Plaintiff Andrew Barrett**

42.     Plaintiff Andrew Barrett is a citizen and resident of Wimberley, Texas.

43.     On or about July 1, 2021 Plaintiff Barrett purchased a new 2020 Chevy Bolt from Northside Chevrolet in San Antonio, Texas (for purposes of this section, "the Vehicle") for approximately $32,415.

44.     Plaintiff Barrett made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 259-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

45.     Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Barrett of the Defective Battery. Plaintiff Barrett reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

46.     Plaintiff Barrett purchased the Vehicle for personal, family, or household use. Plaintiff has always attempted to use the Vehicle in the normal and expected manner.

47.     Plaintiff Barrett learned of the recall from news reports. After learning of the recall, he contacted the Chevrolet telephone helpline and informed them that he owned a Vehicle that was affected by the recall. Plaintiff Barrett subsequently received a general recall notice from GM.

48.     With the recommended battery charge limitations suggested by GM, the estimated range on Plaintiff Barrett's car fell to far less than the range of 259 miles that Plaintiff Barrett expected he would be getting when he purchased his Vehicle. Plaintiff

Barrett's normal commute is now affected by the diminished range of the Vehicle. Additionally, Plaintiff Barrett does not have a location to safely park and charge the Vehicle outdoors as recommended by GM.

49.     As a result, Plaintiff Barrett has been left with a Vehicle with reduced range. Plaintiff Barrett has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Barrett known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 4.     Plaintiff Bruce James Cannon

50.     Plaintiff Bruce James Cannon is a citizen and resident of Monrovia, California.

51.     On or about December 1, 2018, Plaintiff Cannon purchased a new 2019 Chevy Bolt from Penske Chevrolet in Cerritos, California (for purposes of this section, "the Vehicle").

52.     Plaintiff Cannon made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

53.     Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Cannon of the Defective Battery. Plaintiff Cannon reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

54.     Plaintiff Cannon purchased the Vehicle for personal, family, or household use. Plaintiff Cannon has always attempted to use the Vehicle in the normal and expected manner.

55.     Plaintiff Cannon learned of the recall through online news publications and a letter from General Motors.

56.     Due Plaintiff Cannon's ongoing fear of fire resulting from charging the battery to its full capacity, Plaintiff Cannon has essentially been forced to adopt a regular practice of setting the vehicle's internal battery charging limiter to 80 percent. As a result, the estimated range of Plaintiff Cannon's Vehicle after being charged to its 80 percent capacity can fall as low as 130 miles—far less than the 238 mile range that he expected to receive from when he purchased the Vehicle.

57.     As a result, Plaintiff Cannon has been left with a Vehicle with reduced range. Plaintiff Cannon has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Cannon known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 5.     Plaintiffs Mary Carr and Jan G. Wyers

58.     Plaintiffs Mary Carr and Jan G. Wyers are citizens and residents of Portland, Oregon.

59.     On or about November 27, 2018, Plaintiffs Carr and Wyers purchased a new 2019 Chevy Bolt from Carr Auto Group in Beaverton, Oregon (for purposes of this section, "the Vehicle").

60.     Plaintiffs Carr and Wyers made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. They purchased an all-electric vehicle for environmental reasons and selected the Bolt over other electric vehicles because the represented range would allow them to visit family in Seattle and take other customary trips on a single charge. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

61.     Prior to their purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs Carr and Wyers of the Defective Battery. Plaintiffs Carr and Wyers reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

62.     Plaintiffs Carr and Wyers purchased the Vehicle for personal, family, or household use. Plaintiffs Carr and Wyers have always attempted to use the Vehicle in the normal and expected manner.

63.     After receiving notice of the recall, Plaintiffs Carr and Wyers had a local dealership inspect the Vehicle's battery and perform the service order. They were then able to charge the Vehicle to approximately 80% to 90% of battery capacity. The range often was even less than they should have had at that reduced battery charge. Plaintiffs Carr and Wyers experienced significant range anxiety, and limited the trips they normally would have taken.

64.     On May 20, 2021, Plaintiffs Carr and Wyers had a local dealership inspect the Vehicle again and perform the updated recall service order. The dealership did not replace their Vehicle's battery. Since the second recall service order, Plaintiffs Carr and Wyers have been unable to charge the Vehicle to more than 80% capacity at certain fast chargers and at times have experienced less than 230 miles of range. They continue to experience significant range anxiety.

65.     Plaintiffs Carr and Wyers are further inconvenienced by the newest recall because they charge their Vehicle in their garage and do not have a fast charger. They are now unable to charge their Vehicle overnight in their garage and must park it outdoors where it is more vulnerable to weather and theft or vandalism. They no longer fully charge the Vehicle for fear that doing so will cause a fire, and so continue to suffer range anxiety and be limited in the distances they travel.

66.     As a result of Defendants' actions and inaction, Plaintiffs Carr and Wyers have been left with an unsafe Vehicle with reduced range. Plaintiffs Carr and Wyers have suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs Carr and Wyers known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased their Bolt.

### 6.     Plaintiff Yohanes Chitra

67.     Plaintiff Yohanes Chitra is a citizen and resident of Diamond Bar, California.

68.     In or around December 31, 2018, Plaintiff Chitra purchased a new 2019 Chevrolet Bolt from Premier Chevrolet in Buena Park, California (for purposes of this section, "the Vehicle").

69.     Plaintiff Chitra made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

70.     Prior to buying his Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Chitra of the Battery Defect. Plaintiff

Chitra reasonably anticipated that the Bolt, including its reported 238-mile range, would operate consistent with Defendants' representations.

71.     Plaintiff Chitra regularly charged his Vehicle, up until the Vehicle caught fire while charging. It is now in unusable condition, and Plaintiff Chitra did not receive the full value of the Vehicle from his insurance company.

72.     When Plaintiff Chitra purchased his Chevrolet Bolt, he was not aware of the Battery Defect.

73.     As a result, Plaintiff Chitra has been left with an unusable Vehicle. Plaintiff Chitra has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Chitra known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 7.     Plaintiff Christine Chung

74.     Plaintiff Christine Chung is a citizen and resident of Ranchos Palos Verdes, California.

75.     On or around September 10, 2020, Plaintiff Chung leased a new 2019 Chevrolet Bolt from GM Carlsbad, in Carlsbad, California, through GM Financial (for purposes of this section, "the Vehicle").

76.     Plaintiff Chung made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 259-mile range. She chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

77.     Prior to buying her Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Chung of the Battery Defect. Plaintiff Chung reasonably anticipated that the Bolt, including its reported 259-mile range, would operate consistent with Defendants' representations. Plaintiff also specifically asked the GM sales representative if she could charge the battery to its maximum capacity, and was told by the sales representative that it was not only okay, but that she *should* charge it to its maximum capacity.

78.     Plaintiff Chung regularly charged her Vehicle up until the Vehicle caught fire while charging in the driveway of her home on January 28, 2021. The Vehicle was completely consumed by the fire, which also damaged another vehicle owned by Plaintiff Chung and caused damage to her driveway. It is now in unusable condition, and Plaintiff Chung did not receive the full value of the Vehicle from her insurance company.





79.     As a result, Plaintiff Chung has been left with an unusable Vehicle.

Plaintiff Chung has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not

receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Chung

known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

### 8. Plaintiff Linda Connelly

80. Plaintiff Linda Connelly is a citizen and resident of San Francisco, California.

81. On or about January 13, 2020, Linda Connelly leased a new 2020 Chevy Bolt from Team Chevrolet Cadillac Mazda Hyundai in Vallejo, CA (for purposes of this section, "the Vehicle").

82. Plaintiff Connelly made the decision to lease the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

83. Prior to her lease, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Connelly of the Defective Battery. Plaintiff Connelly reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

84. Plaintiff Connelly leased the Vehicle for personal and business use. Plaintiff Connelly has always attempted to use the Vehicle in the normal and expected manner.

85. Plaintiff Connelly did not receive information about the recalls from either GM or from her dealership. Plaintiff Connelly was forced to reach out to GM when she

read a newspaper article on The New York Times detailing the recall. As a result,

Plaintiff Connelly was not aware that she needed to reduce her battery's capacity to

90% through Hilltop Assist, pursuant to the November 2020 recall, or that a software

update was available that would lower the battery capacity for her, pursuant to the April

2021 recall. The Home Owners Association that regulates her condominium forbid her

from continuing to park her Chevy Bolt in the high rise's parking garage, for fear that

the Vehicle would catch fire.

86.     On August 21, 2021, Plaintiff Connelly called GM's customer service line

who advised her to drop off her car at Stewart Chevrolet in Daly City, since she could

not keep the vehicle parked in the high rise and street parking was unavailable. When

she arrived at Stewart Chevrolet, however, the dealership would not let her keep the

vehicle on their lot unless she paid $150 per day. Plaintiff Connelly was given a rental

reimbursement of $55 a day but left her Vehicle at Stewart Chevrolet. She felt she had

no choice but to leave the car.

87.     As a result, Plaintiff Connelly continues to make lease payments of $218 a

month for a Vehicle she is not currently driving and cannot park in her high rise's

parking garage. Plaintiff Connelly has suffered an ascertainable loss resulting from

Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery

and did not receive the benefit of her bargain when she leased the Vehicle. Had Plaintiff

Connelly known that the vehicle's range was achieved only at the risk of a catastrophic

fire, or that the range would be decreased in order to mitigate the fire risk, or that it would be unsafe to park her vehicle in her garage, she would not have leased her Bolt.

### 9. Plaintiff Daniel Corry

88. Plaintiff Daniel Corry is a citizen and resident of Santa Barbara, California.

89. On or about October 14, 2020, Plaintiff Corry leased a new 2020 Chevy Bolt from Rio Vista Chevrolet in Buellton, California (for purposes of this section, "the Vehicle"). The gross capitalized cost of the vehicle was approximately $34,986.

90. Plaintiff Corry made the decision to lease the Chevrolet Bolt after considering GM's representations about the vehicle, including the reported 259-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

91. Prior to his lease, neither GM nor any of its agents, dealers, or other representatives informed Plaintiff Corry of the Defective Battery. Plaintiff Corry reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

92. Plaintiff Corry leased the Vehicle for personal, family, or household use. Plaintiff Corry has always attempted to use the Vehicle in the normal and expected manner.

93. Plaintiff Corry learned of the recall from General Motors. He has yet to receive a notice from GM about a date of repair for the Vehicle.

94.     After installing the software modification, the estimated range on Plaintiff

Corry's car fell to far less than the range of 259 miles that Plaintiff Corry expected he

would be getting when he leased his Vehicle. His vehicle's battery capacity was even

lower than the amount represented by the recall notice. The range capacity was lessened

to approximately 80%.

95.     As a result, Plaintiff Corry has been left with a vehicle with reduced range.

Plaintiff Corry has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not

receive the benefit of his bargain when he leased the Vehicle. Had Plaintiff Corry

known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, he would not have

leased his Bolt.

**10.    Plaintiff Vincent Corry**

96.     Plaintiff Vincent Corry is a citizen and resident of Torrance, California.

97.     On or about November 18, 2018, Plaintiff Corry purchased a new 2019

Chevy Bolt from Glendora Chevrolet in Glendora, California (for purposes of this

section, "the 2019 Vehicle").

98.     Plaintiff Corry made the decision to purchase the Chevrolet Bolt after

considering GM's representations about the vehicle, including the reported 259-mile

range. He chose the Chevy Bolt based primarily on its represented range, and also based

on GM's reputation for manufacturing quality vehicles.

99.    Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Corry of the Defective Battery. Plaintiff Corry reasonably expected that the 2019 Vehicle, including its range, would function normally in accordance with Defendant's specifications and representations.

100.   Plaintiff Corry purchased the 2019 Vehicle for personal, family, or household use. Plaintiff Corry has always attempted to use the 2019 Vehicle in the normal and expected manner.

101.   Plaintiff Corry learned of the recall from General Motors.

102.   After installing the software modification, the estimated range on Plaintiff Corry's 2019 Vehicle fell to far less than the range of 259 miles that Plaintiff Corry expected he would be getting when he purchased his Vehicle. His 2019 Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%.

103.   In May 2021, Plaintiff Corry reached out to GM to negotiate a buyback of the 2019 Vehicle. He paid GM approximately $5,000 to exchange the 2019 Vehicle for a 2021 Chevy Bolt, which he purchased at Martin Chevrolet in Torrance, California (for purposes of this section, the "2021 Vehicle").

104.   Plaintiff Corry purchased the 2021 Vehicle with the expectation that the reported 259-mile range would be restored to him.

105.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Corry of the Defective Battery. Plaintiff Corry

reasonably expected that the 2021 Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

106.   Plaintiff Corry purchased the 2021 Vehicle for personal, family, or household use. Plaintiff Corry has always attempted to use the Vehicle in the normal and expected manner.

107.   Plaintiff Corry learned of the recall from General Motors. He has yet to receive a notice from GM about a date of repair for the 2021 Vehicle.

108.   After installing the software modification, the estimated range on Plaintiff Corry's 2019 Vehicle fell to far less than the range of 259 miles that Plaintiff Corry expected he would be getting when he purchased his vehicle. His 2021 Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%.

109.   As a result, Plaintiff Corry has been left with a vehicle with reduced range. Plaintiff Corry has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the 2019 or 2021 Vehicles. Had Plaintiff Corry known that the 2021 Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**11.   Plaintiff John DeRosa**

110.   Plaintiff John DeRosa is a citizen and resident of Seattle, Washington.

111.    On or about December 30, 2018, Plaintiff DeRosa purchased a new 2019 Chevy Bolt from Bill Pierre Chevrolet in Seattle, Washington (for purposes of this section, "the Vehicle").

112.    Plaintiff DeRosa made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

113.    Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff DeRosa of the Defective Battery. Plaintiff DeRosa reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

114.    Plaintiff DeRosa purchased the Vehicle for personal, family, or household use. Plaintiff DeRosa has always attempted to use the Vehicle in the normal and expected manner.

115.    Plaintiff DeRosa learned of the recall from a letter from General Motors.

116.    After installing the software modification, the estimated range on Plaintiff DeRosa's car fell to far less than the range of 238 miles that Plaintiff DeRosa expected he would be getting when he purchased his Vehicle. His Vehicle's battery range was approximately 210 miles on a full charge after the modification

117.    As a result, Plaintiff DeRosa has been left with a Vehicle with reduced range. Plaintiff DeRosa has suffered an ascertainable loss resulting from Defendants'

Case 2:20-cv-13256-TGB-CI   ECF No. 27, PageID.1194   Filed 09/17/21   Page 31 of 323

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff DeRosa known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 12.   Plaintiffs William Dornetto and Russell Ives

118.   Plaintiffs William Dornetto and Russell Ives are both citizens and residents of Manassas, Virginia.

119.   On November 28, 2017, Plaintiffs Dornetto and Ives purchased a new 2017 Chevy Bolt from Manassas Chevrolet located in Manassas, Virginia. On June 4, 2021, they also purchased the new 2022 Chevy Bolt from Lindsay Chevrolet located in Woodbridge, Virginia (for purposes of this section, "the Vehicles").

120.   Plaintiffs Dornetto and Ives made the decision to purchase the Chevrolet Bolts after considering Defendants' representations about the Vehicles, including the reported 238-mile range. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

121.   Prior to their purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs Dornetto and Ives of the Defective Battery. Plaintiffs Dornetto and Ives reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

122.   Plaintiffs Dornetto and Ives purchased the Vehicles for personal, family, or household use. Plaintiffs Dornetto and Ives have always attempted to use the Vehicles in the normal and expected manner.

123.   Plaintiffs Dornetto and Ives learned of the recall from a notice GM sent by mail and email. They were informed that the car should not be charged more than 90% of capacity. Plaintiffs Dornetto and Ives took the Vehicle to the dealer for them to limit the maximum charge level as recommended by GM. Later the same year, Plaintiffs Dornetto and Ives were also informed that they needed to return the 2017 Bolt to a local dealership to have a software update applied to the Vehicle that would detect any issues with the batteries. The recall service was scheduled but the car was traded a few days before the scheduled recall service as GM announced the proposed software fix did not eliminate the potential fire hazard.

124.   After installing the charge level limit modification, the estimated range on the Vehicle fell to far less than the range of 238 miles that Plaintiffs Dornetto and Ives expected they would be getting when they purchased their Vehicle.

125.   On June 3, 2021, they reached out to GM's concierge line to inquire about a possible buyback of the Vehicle. GM offered them a customer loyalty discount on a new Chevrolet. Plaintiffs Dornetto and Ives advised GM that they would like to purchase a 2022 Bolt if the battery issue had been resolved. GM reassured Plaintiffs Dornetto and Ives that the newest fleet of Bolt Vehicles were unaffected by the Defect. Plaintiffs Dornetto and Ives agreed to the offer and made a deposit of $7,484 towards

32

the purchase of the 2022 Chevy Bolt after trading in their 2017 model for $14,500, an amount lower than they had anticipated.

126.   On August 21, 2021, Plaintiffs Dornetto and Ives received an email from GM and a message in the car's infotainment center, informing them that the recall had been extended to include all Chevy Bolt Vehicles, including the 2022 Chevy Bolt model. They were advised as part of this recall to park their Vehicle outside of their garage, to disconnect the charger after car had been charged to 90% power, and to monitor the battery level ensuring it never goes below 40% power.

127.   On or around August 21, 2021, they reached out initially to the GM concierge line, who informed them that the procedure of possible buyback for his Vehicle could take as long as a whole year. GM suggested asking for a MSRP Exchange from the Chevy dealer. They went to the dealership and were refused the MSRP Exchange and were told that the dealership could not assist with any MSRP Exchange or buyback, and that their only option was to trade in the 2022 Chevy Bolt on a different car.

128.   Due to the car's unreliable safety in light of the recall, Plaintiffs Dornetto and Ives ended up getting rid of the Vehicle entirely on August 27, 2021. They incurred additional financial loss after having to put down $4,872 on a new vehicle, in addition to getting rid of two Chevy Bolt Vehicles of diminished value. Also based on GM's specifications, Plaintiffs Dornetto and Ives incurred the additional cost of approximately $500.00 for the installation of a garage charger for the Bolt.

129.    As a result, Plaintiffs Dornetto and Ives have suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicles. Had Plaintiffs Dornetto and Ives known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased the Vehicles.

### 13.    Plaintiffs Kevin Harris and Pamela Duprez

130.    Plaintiffs Kevin Harris and Pamela Duprez are citizens and residents of Weymouth, Massachusetts.

131.    On or about June 26, 2017, Plaintiffs Harris and Duprez purchased a new 2017 Chevy Bolt from Best Chevrolet in Hingham, Massachusetts (for purposes of this section, "the Vehicle").

132.    Plaintiffs Harris and Duprez made the decision to purchase the Chevrolet Bolt after considering Defendants' representations about the Vehicle, including the reported 238-mile range. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

133.    Prior to their purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs Harris and Duprez of the Defective Battery. Plaintiffs Harris and Duprez reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

134.   Plaintiffs Harris and Duprez purchased the Vehicle for personal, family, or household use as well as business. Plaintiffs Harris and Duprez have always attempted to use the Vehicle in the normal and expected manner.

135.   After receiving notice of the recall, Plaintiffs Harris and Duprez set the maximum charge of their Vehicle to 90% and no longer parked it in their garage. They frequently stopped charging the Vehicle at 80% charge. The range capacity was lessened to approximately 80%, and in the winter months the range was as low as 180 miles on a full charge. This caused Plaintiff Duprez to alter her driving and commuting habits, often going as far as driving without heat in a Northeast winter in order to conserve range.

136.   As a result, Plaintiffs Harris and Duprez have been left with a Vehicle with reduced range. Plaintiffs Harris and Duprez have suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs Harris and Duprez known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased their Bolt.

**14.   Plaintiff Michael Hickey**

137.   Plaintiff Michael Hickey is a citizen and resident of Gorham, Illinois.

35

138.   On or about September 21, 2020, Plaintiff Hickey purchased a used 2017 Chevy Bolt from Holm Automotive Center in Abilene, Kansas (for purposes of this section, "the Vehicle").

139.   Plaintiff Hickey made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

140.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Hickey of the Defective Battery. Plaintiff Hickey reasonably expected that the Vehicle, including its range, would function normally and in accordance with Defendants' specifications and representations.

141.   Plaintiff Hickey purchased the Vehicle for personal, family, or household use. Plaintiff Hickey has always attempted to use the Vehicle in the normal and expected manner.

142.   Plaintiff Hickey learned of the recall from a letter from General Motors.

143.   After installing the software modification, the estimated range on Plaintiff Hickey's car fell to far less than the range of 238 miles that Plaintiff Hickey expected he would be getting when he purchased his Vehicle. His Vehicle's battery range was approximately 110–50 miles on a full charge after the modification.

144.   As a result, Plaintiff Hickey has been left with a Vehicle with reduced range. Plaintiff Hickey has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not

receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Hickey

known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or

that the range would be decreased in order to mitigate the fire risk, he would not have

purchased his Bolt.

### 15.   Plaintiffs Michael and Denise Holbrook

145.   Plaintiffs Denise and Michael Holbrook (for purposes of this section, the

"Holbrook Plaintiffs") are citizens and residents of Grand Blanc, Michigan.

146.   On or about March 12, 2020, the Holbrook Plaintiffs leased a new 2020

Chevy Bolt from Al Sierra Chevrolet in Grand Blanc, Michigan. (for purposes of this

section, "the Vehicle"). The gross capitalized cost of the vehicle was approximately

$38,756.

147.   The Holbrook Plaintiffs made the decision to lease the Chevrolet Bolt after

considering GM's representations about the vehicle, including the reported 259-mile

range. They chose the Chevy Bolt based primarily on its represented range, and also

based on GM's reputation for manufacturing quality vehicles. Plaintiffs own another

non-Bolt Chevrolet vehicle, and have owned many Chevrolet and GM products over the

years.

148.   Prior to their lease, neither Defendants nor any of their agents, dealers, or

other representatives informed the Holbrook Plaintiffs of the Defective Battery. The

Holbrook Plaintiffs reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

149.   The Holbrook Plaintiffs purchased the Vehicle for personal, family, or household use. The Holbrook Plaintiffs have always attempted to use the Vehicle in the normal and expected manner.

150.   The Holbrook Plaintiffs learned of the recall via an email from General Motors. They then visited the dealership who leased them the Vehicle, who told them to call GM's Bolt Recall Line for more information. GM employees were unable or unwilling to provide a date for battery replacement.

151.   After limiting the charge of the Vehicle to 90%, the estimated range on the Holbrook Plaintiffs' car fell to far less than the range of 259 miles that the Holbrook Plaintiffs expected they would be getting when they purchased the Vehicle. This lack of range has impacted the Holbrook Plaintiffs' normal routine, as certain errands and family obligations are not possible without the advertised range of the Vehicle. Additionally, as the Holbrook Plaintiffs live in a condo building with shared parking and attached units, they no longer feel safe parking their Vehicle in their garage, for fear of fire damage to their and their neighbor's home.

152.   As a result, the Holbrook Plaintiffs have been left with a Vehicle with reduced range and nowhere to safely park the Vehicle. The Holbrook Plaintiffs have suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of

their bargain when they purchased the Vehicle. Had the Holbrook Plaintiffs known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased their Bolt.

### 16.   Plaintiff Fred Kass

153.   Plaintiff Fred Kass, MD is a citizen and resident of Santa Barbara, California.

154.   On or about April 13, 2020, Dr. Kass leased a 2020 Chevrolet Bolt from Bunnin Chevrolet in Santa Barbara, California. Previously, on or about July 21, 2017, Dr. Kass leased a 2017 Chevrolet Bolt (for purposes of this section, "the Vehicle").

155.   Dr. Kass made the decision to lease the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

156.   Prior to his lease, neither Defendants nor any of their agents, dealers, or other representatives informed Dr. Kass of the Defective Battery. Dr. Kass reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

157.   Dr. Kass leased the Vehicle for personal, family, or household use. Dr. Kass has always attempted to use the Vehicle in the normal and expected manner.

158.   Dr. Kass learned of the recall from media reports. He first received an email notice from GM about a battery recall for the Vehicle in September of 2021, but was not provided with a date or deadline for the recall work to occur.

159.   After installing the software modification, the estimated range on Dr. Kass's car fell to far less than the range of 238 miles that Dr. Kass expected he would be getting when he leased his Vehicle. His Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%.

160.   Dr. Kass contacted GM regarding the reduced range and expressed his wish to terminate the lease on the Vehicle, particularly due to his location of residence, which has a high risk of wildfires. GM refused to refund Dr. Kass for the lease, which Dr. Kass had already paid in full, or offer him any compensation for the reduced range.

161.   As a result, Dr. Kass has been left with a Vehicle with reduced range. Dr. Kass has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Dr. Kass known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have leased his Bolt.

**17.   Plaintiff Keith Khorey**

162.   Plaintiff Keith Khorey is a citizen and resident of Rolling Hills Estates, California.

163.   On or about March 17, 2017, Plaintiff Khorey purchased a new 2017 Chevy Bolt from Martin Chevrolet in Torrance, California (for purposes of this section, "the Vehicle").

164.   Plaintiff Khorey made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

165.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Khorey of the Defective Battery. Plaintiff Khorey reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

166.   Plaintiff Khorey purchased the Vehicle for personal, family, or household use, including for his daily commute. Plaintiff Khorey has always attempted to use the Vehicle in the normal and expected manner.

167.   Plaintiff Khorey learned of the recall from a letter from General Motors.

168.   After installing the software modification, the estimated range on Plaintiff Khorey's car fell to far less than the range of 238 miles that Plaintiff Khorey expected he would be getting when he purchased his Vehicle. His Vehicle's battery capacity was lessened to approximately 215–20 miles on a full charge.

169.   As a result, Plaintiff Khorey has been left with a Vehicle with reduced range. Plaintiff Khorey has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Khorey known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 18. Plaintiff James Kotchmar

170.   Plaintiff James Kotchmar is a citizen and resident of Thiells, New York.

171.   In or around September 2017, Plaintiff Kotchmar purchased a new 2017 Chevrolet Bolt from an authorized dealership in Naunet, New York (for purposes of this section, "the Vehicle").

172.   Plaintiff Kotchmar purchased his Chevrolet Bolt for economic reasons. He has solar panels installed on his property, allowing him to easily recharge his Vehicle daily before his commute to work or running errands. There is no added cost involved for him to refuel his Vehicle in this manner.

173.   Plaintiff Kotchmar made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range.

174.   Prior to buying his Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Kotchmar of the Battery Defect. Plaintiff Kotchmar reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with Defendants' representations.

175.   After Plaintiff Kotchmar was notified about the recall in November 2020, he took his Vehicle into his local authorized dealership on or about November 10, 2020 to have the update installed.

176.   After installing the software modification, the estimated range of Plaintiff Kotchmar's car fell well below the range of 238 miles that Plaintiff Kotchmar expected he would be getting when he purchased his Vehicle. Plaintiff Kotchmar now has range anxiety whenever he drives the car due to the reduced range, a major concern.

177.   When Plaintiff Kotchmar purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his Vehicle's range and battery capacity.

178.   As a result, Plaintiff Kotchmar has been left with a Vehicle with reduced range. Plaintiff Kotchmar has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Kotchmar known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 19.   Plaintiff Robert Kuchar

179.   Plaintiff Robert Kuchar is a citizen and resident of New River, Arizona.

180.   On or about July 27, 2018, Plaintiff Kuchar purchased a new 2018 Chevy Bolt from Harbor Chevrolet in Long Beach, California (for purposes of this section, "the Vehicle").

181.   Plaintiff Kuchar made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

182.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Kuchar of the Defective Battery. Plaintiff Kuchar reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

183.   Plaintiff Kuchar purchased the Vehicle for personal, family, or household use. Plaintiff Kuchar has always attempted to use the Vehicle in the normal and expected manner.

184.   Plaintiff Kuchar learned of the recall from a letter from General Motors.

185.   After installing the software modification, the estimated range on Plaintiff Kuchar's car fell to far less than the range of 238 miles that Plaintiff Kuchar expected he would be getting when he purchased his Vehicle. His Vehicle's battery capacity was lessened to approximately 70–75% of full charge.

186.   As a result, Plaintiff Kuchar has been left with a Vehicle with reduced range. Plaintiff Kuchar has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Kuchar known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 20.   Plaintiff Joseph Poletti

187.   Plaintiff Joseph Poletti is a citizen and resident of Chandler, Arizona.

188.   In or around June 2, 2018, Plaintiff Poletti purchased a new 2018 Chevrolet Bolt from an authorized dealership in Gilbert, Arizona (for purposes of this section, "the Vehicle").

189.   Plaintiff Poletti made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and GM's reputation for manufacturing quality cars.

190.   Prior to buying his Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Poletti of the Battery Defect. Plaintiff Poletti reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with Defendants' representations.

191.   After Plaintiff Poletti was notified about the recall on or around December 1, 2020, he took his Vehicle into his local authorized dealership on December 7, 2020 to have the update installed.

192.    After installing the software modification, the estimated range on Plaintiff Poletti's car fell well below the range of 238 miles that Plaintiff Poletti expected he would be getting when he purchased his Vehicle. His Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 80%. Plaintiff Poletti's Vehicle is also now taking two to three times longer to charge.

193.    Plaintiff Poletti now has range anxiety on his commute to work due to the reduced range after the software update, which is a major concern for him.

194.    When Plaintiff Poletti purchased his Chevrolet Bolt, he was not aware of the Battery Defect, or that the purported "remedy" to prevent a battery fire would greatly reduce his Vehicle's range and battery capacity.

195.    As a result, Plaintiff Poletti has been left with a Vehicle with reduced range. Plaintiff Poletti has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Poletti known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

**21.    Plaintiffs Edward and Janet Rock**

196.    Plaintiffs Janet and Edward Rock are citizens and residents of Kerrville, Texas.

46

197.   On or about April 8, 2021, Plaintiffs Rock purchased a new 2021 Chevy Bolt from Cecil Atkission Motors in Kerrville, Texas (for purposes of this section, "the Vehicle").

198.   Plaintiffs Rock made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 259-mile range. They chose the Chevy Bolt based primarily on its represented range, and assurances from Chevrolet and their dealership that the batteries in the 2021 Bolt were different from the batteries produced in South Korea which were previously recalled.

199.   Prior to their purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs Rock of the Defective Battery. In fact, Plaintiffs Rock were specifically assured that the batteries in their Bolt were NOT affected by the recall covering 2017–19 Bolts. Plaintiffs Rock reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

200.   Plaintiffs Rock purchased the Vehicle for personal, family, or household use. Plaintiffs Rock have always attempted to use the Vehicle in the normal and expected manner.

201.   Plaintiffs Rock learned of the expanded recall covering 2021 Bolts from an article online. Plaintiffs Rock have altered the Target Charge Level and monitor the Vehicle during charging. As a result of the Target Charge Level change, their Vehicle range is now approximately 50 miles. Plaintiffs Rock have altered their driving habits,

47

including not driving the Vehicle in excess heat—a difficult task in Texas. Given the constantly changing advice and recalls, Plaintiffs Rock do not have faith in GM's recommended charge level.

202.    As a result, Plaintiffs Rock have been left with a Vehicle with reduced range. Plaintiffs Rock have suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs Rock known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased his Bolt.

### 22.    Plaintiff Evi Schulz

203.    Plaintiff Evi Schulz is a resident of Orlando, Florida.

204.    On or about October 6, 2018, Evi Schulz purchased a new 2019 Chevy Bolt from Autonation Chevrolet West Colonial in Orlando, Florida (for purposes of this section, "the Vehicle").

205.    Plaintiff Schulz made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

206.    Prior to her purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Schulz of the Defective Battery. Plaintiff

Schulz reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

207.   Plaintiff Schulz purchased the Vehicle for personal, family, or household use. Plaintiff Schulz has always attempted to use the Vehicle in the normal and expected manner.

208.   Plaintiff Schulz learned of the recall from an email from General Motors and a Recall Notice from Autonation Chevrolet West Colonial.

209.   After installing the software modification, the estimated range on Plaintiff Schulz's car fell to far less than the range of 238 miles that Plaintiff Schulz expected she would be getting when she purchased her Vehicle. Her Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 210 miles of range on a full charge.

210.   As a result, Plaintiff Schulz has been left with a Vehicle with reduced range. Plaintiff Schulz has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Schulz known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

**23.   Plaintiff Michael Smith**

211.   Plaintiff Michael Smith is a citizen and resident of Trevor, Wisconsin.

212.   On or about September 14, 2017, Plaintiff Smith purchased a new 2017 Chevy Bolt from Currie Motors in Forest Park, Illinois (for purposes of this section, "the Vehicle").

213.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Smith of the Defective Battery. Plaintiff Smith reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

214.   Plaintiff Smith purchased the Vehicle for personal, family, or household use. Plaintiff Smith has always attempted to use the Vehicle in the normal and expected manner.

215.   After receiving notice of the recall on November 13, 2020, Plaintiff Smith brought his Vehicle to a local dealership in December 2020 and February 2021 to have the battery inspected and the service order performed.

216.   Plaintiff Smith's Vehicle had a substantially reduced range after the November 13, 2020 recall was performed. During the winter months, his Vehicle was limited to approximately 160–70 miles per "full" charge. Plaintiff Smith was occasionally forced to modify his typical commute and experienced fear that he would not have sufficient charge to complete a drive safely. On multiple occasions during his typical commute Plaintiff Smith experienced a warning that his Vehicle had a low charge.

217.   Plaintiff Smith received notice of GM's April 2021 recall update and took his Vehicle to a dealership to have the procedure performed in May 2021. At this time, onboard diagnostic software was installed in his Vehicle but the battery was not replaced.

218.   As a result of the foregoing, Plaintiff Smith has been left with a Vehicle with reduced range and/or that is still at risk of a battery fire. Plaintiff Smith has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Smith known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 24.   Plaintiff Jeanne Sterba

219.   Plaintiff Jeanne Sterba is a citizen and resident of San Clemente, California.

220.   On or about July 15, 2018, Plaintiff Sterba purchased a new 2018 Chevy Bolt from Mark Cristopher Chevrolet in Ontario, California (for purposes of this section, "the Vehicle").

221.   Plaintiff Sterba made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile

range. She chose the Chevy Bolt based primarily on its represented range, and also

based on GM's reputation for manufacturing quality vehicles.

222.   Prior to her purchase, neither Defendants nor any of their agents, dealers,

or other representatives informed Plaintiff Sterba of the Defective Battery. Plaintiff

Sterba reasonably expected that the Vehicle, including its range, would function

normally in accordance with Defendants' specifications and representations.

223.   Plaintiff Sterba purchased the Vehicle for personal, family, or household

use. Plaintiff Sterba has always attempted to use the Vehicle in the normal and expected

manner.

224.   Plaintiff Sterba learned of the recall from a letter from General Motors.

Prior to receiving notice of the recall, she had reviewed reports of multiple Vehicle

fires.

225.   After installing the software modification, the estimated range on Plaintiff

Sterba's car fell to far less than the range of 238 miles that Plaintiff Sterba expected she

would be getting when she purchased her Vehicle. Her Vehicle's battery capacity was

lessened to approximately 75% of full charge.

226.   Plaintiff Sterba now has range anxiety on her commute to work due to the

reduced range after the software update, which is a major concern for her.

227.   As a result, Plaintiff Sterba has been left with a Vehicle with reduced

range. Plaintiff Sterba has suffered an ascertainable loss resulting from Defendants'

concealment, fraud, omissions, and refusal to correct the Defective Battery and did not

receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Sterba known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

### 25.   Plaintiff Ashley Strong

228.   Plaintiff Ashley Strong is a citizen and resident of Grovetown, Georgia.

229.   On or around March 11, 2019, Plaintiff Strong purchased a used 2017 Chevrolet Bolt through Carvana (for purposes of this section, "the Vehicle").

230.   Plaintiff Strong made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. She chose the Chevy Bolt based primarily on its represented range, particularly the thermo-regulated battery.

231.   Prior to buying her Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Strong of the Battery Defect. Plaintiff Strong reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with Defendants' representations.

232.   After Plaintiff Strong was notified about the recall by GM, she went to a local dealership to have the recall performed, reducing the charge of the Vehicle to 90%.

233.   After installing the software modification, the estimated range on Plaintiff Strong's car declined to far less than the range of 238 miles that Plaintiff Strong expected she would be getting when she purchased her Vehicle. Her Vehicle's battery

capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 70%. Plaintiff Strong was unable to use the Vehicle due to the reduced range, and used a long-term rental Vehicle for approximately six months.

234.    As result of significant range reduction caused by GM's software modification, Plaintiff Strong now suffers from anxiety when driving the Vehicle longer distances—fearing that a full charge will not provide enough range to reach her intended destination.

235.    As a further result of the software modification, Plaintiff Strong has been limited in her ability to drive to certain locations, thereby significantly diminishing her use and enjoyment of the Vehicle.

236.    When Plaintiff Strong purchased her Chevrolet Bolt, she was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce her Vehicle's range and battery capacity.

237.    As a result, Plaintiff Strong has been left with a Vehicle with reduced range. Plaintiff Strong has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of her bargain when she purchased the Vehicle. Had Plaintiff Strong known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, she would not have purchased her Bolt.

### 26.     Plaintiff Alucard Taylor

238.    Plaintiff Alucard Taylor is a citizen and resident of Portland, Oregon.

239.    On or about July 27, 2020, Plaintiff Taylor purchased a used 2017 Chevy Bolt from Ron Tonkin Chevrolet in Portland, Oregon (for purposes of this section, "the Vehicle").

240.    Plaintiff Taylor made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

241.    Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Taylor of the Defective Battery. Plaintiff Taylor reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

242.    Plaintiff Taylor purchased the Vehicle for personal, family, or household use. Plaintiff Taylor has always attempted to use the Vehicle in the normal and expected manner.

243.    Plaintiff Taylor learned of the recall through a letter from General Motors.

244.    Due to needing the Vehicle to occasionally reach the advertised range, Plaintiff Taylor did not receive the Fall 2020 software update. Rather, per instructions from GM's letter, he set his car to Hilltop Reserve, stopped charging the Vehicle overnight, and unplugged the Vehicle once the battery charged to 90%.

245.   As a result, Plaintiff Taylor has been left with a Vehicle with reduced range. Plaintiff Taylor has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Taylor known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 27.   Plaintiff Jason Vaaler

246.   Plaintiff Jason Vaaler is a citizen and resident of College Station, Texas.

247.   On June 30, 2020, Plaintiff Vaaler purchased a used 2019 Chevrolet Bolt from an authorized dealership in Beaumont, Texas (for purposes of this section, "the Vehicle").

248.   Plaintiff Vaaler made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the approximate 238-mile range. He chose the Chevy Bolt based primarily on its represented range, which is one of the best in its class for electric vehicles.

249.   Prior to buying his Bolt, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Vaaler of the Battery Defect. Plaintiff Vaaler reasonably anticipated that the Bolt, including its reported 238-mile range, would operate in a manner consistent with Defendants' representations.

250.    After Plaintiff Vaaler was notified about the recall on or around November 13, 2020, he took his Vehicle into his local authorized dealership in that same month to have the update installed.

251.    After installing the software modification, the estimated range on Plaintiff Dickinson's car declined to far less than the range of 238 miles that Plaintiff Vaaler expected he would be getting when he purchased his Vehicle.

252.    Plaintiff Vaaler now has range anxiety on long drives due to the reduced range after the software update, which is a concern for him.

253.    Because GM was unable to provide a more definitive timeframe for a permanent solution to remedy the Battery Defect, Plaintiff Vaaler traded in his 2019 Chevy Bolt for a 2020 Chevy Bolt model on July 26, 2021. This was prior to GM's announcement extending the recall to all Bolt models.

254.    Following GM's notice about the recall having been extended to all Chevy Bolt models, Plaintiff Vaaler reduced his car's battery range to the recommended 90% and monitored the charge left making sure it never went below 40% capacity. His 2020 Chevy Bolt's range has diminished to only a 120-mile range, and the value of his Vehicle has decreased after only owning the 2020 model for approximately two months.

255.    When Plaintiff Vaaler purchased his Chevrolet Bolt Vehicles, he was not aware of the Battery Defect, or that the only purported "remedy" to prevent a battery fire would greatly reduce his Vehicles' range and battery capacity.

256.   As a result, Plaintiff Vaaler has been left with a Vehicle with reduced range. Plaintiff Vaaler has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Vaaler known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased the Bolt.

### 28.   Plaintiff Tony Verzura

257.   Plaintiff Tony Verzura is a citizen and resident of Boca Raton, Florida.

258.   On or about July 2020, Tony Verzura purchased a new 2020 Chevy Bolt from Maher Chevrolet, Inc. in St. Petersburg, FL (for purposes of this section, "the Vehicle").

259.   Plaintiff Verzura made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range and price, and based on GM's reputation for manufacturing quality vehicles as he had owned Chevy vehicles before.

260.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Verzura of the Defective Battery. Plaintiff Verzura reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

261.   Plaintiff Verzura purchased the Vehicle for personal and business use. Plaintiff Verzura has always attempted to use the Vehicle in the normal and expected manner.

262.   Plaintiff Verzura did not receive information about the recalls from either GM or from his dealership. Plaintiff Verzura only learned of the recall when a Goodyear employee informed him about it, when Plaintiff Verzura brought his car in to examine a ticking noise in his Vehicle. On September 10, 2021, Plaintff Verzura took his Vehicle to the dealership, where the battery's charging capacity was lowered to 90% and the "onboard diagnostic software" was installed. Plaintiff Verzura, rather than charging to 90%, now only charges his Vehicle up to the number of miles that he anticipates needing for the day, to prevent the battery from getting too hot. Additionally, Plaintiff Verzura no longer parks his Vehicle in his garage, as his son's room is located above it. Plaintiff Verzura parks his car on the street as far away from other Vehicles as possible, so that they are not damaged in case a fire starts in his Vehicle.

263.   As a result, Plaintiff Verzura continues to make payments for a Vehicle he is not comfortable owning. Plaintiff Verzura has suffered an ascertainable loss resulting from Defendant's concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Verzura known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk,

or that it would be unsafe to park his Vehicle in his garage, he would not have purchased his Bolt.

### 29.   Plaintiff Shawn Walker

264.   Plaintiff Shawn Walker is a citizen and resident of Phoenix, Arizona.

265.   On or about August 5, 2020, Plaintiff Walker purchased a used 2019 Chevy Bolt from Carvana in Tolleson, Arizona (for purposes of this section, "the Vehicle").

266.   Plaintiff Walker made the decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. He chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

267.   Prior to his purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiff Walker of the Defective Battery. Plaintiff Walker reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

268.   Plaintiff Walker purchased the Vehicle for personal, family, or household use. Plaintiff Walker has always attempted to use the Vehicle in the normal and expected manner.

269.   Plaintiff Walker learned of the recall from a Bolt owners' group on Facebook, which prompted him to contact GM via the EV Concierge Line to inquire about driving his Vehicle on a long-distance trip. He was informed that he should not make any drive that required him to charge his car beyond 90%, and GM insisted that

Plaintiff Walker rent a car for his trip. Plaintiff Walker was also informed that he needed to return to a local dealership in order to have the software update applied to his Vehicle, which he did on December 8, 2020.

270.   After installing the software modification, the estimated range on Plaintiff Walker's car fell to far less than the range of 238 miles that Plaintiff Walker expected he would be getting when he purchased his Vehicle. His Vehicle's battery capacity was even lower than the amount represented by the recall notice. The range capacity was lessened to approximately 90%.

271.   As a result, Plaintiff Walker has been left with a Vehicle with reduced range. Plaintiff Walker has suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of his bargain when he purchased the Vehicle. Had Plaintiff Walker known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, he would not have purchased his Bolt.

### 30.   Plaintiffs Thomas and Carol Whittaker

272.   Plaintiffs Thomas and Carol Whittaker are citizens and residents of Illinois.

273.   On or about June 22, 2017, Plaintiffs Whittaker purchased a new 2017 Chevy Bolt from a Chevrolet dealership in Lake Forest, Illinois (for purposes of this section, "the Vehicle").

274.   Plaintiffs Whittaker made their decision to purchase the Chevrolet Bolt after considering GM's representations about the Vehicle, including the reported 238-mile range. They chose the Chevy Bolt based primarily on its represented range, and also based on GM's reputation for manufacturing quality vehicles.

275.   Prior to this purchase, neither Defendants nor any of their agents, dealers, or other representatives informed Plaintiffs Whittaker of the Defective Battery. Plaintiffs Whittaker reasonably expected that the Vehicle, including its range, would function normally in accordance with Defendants' specifications and representations.

276.   Plaintiffs Whittaker purchased the Vehicle for personal, family, or household use. Plaintiffs Whittaker have always attempted to use the Vehicle in the normal and expected manner.

277.   After learning of the recall, Plaintiffs Whittaker brought their Vehicle to a local dealership in order to have the software update applied to the Vehicle, which they did in or around December 2020.

278.   After installing the software modification, the estimated range on the Vehicle fell to far less than the range of 238 miles that Plaintiffs Whittaker expected they would be getting when purchasing their Vehicle.

279.   As a result, Plaintiffs Whittaker were left with a Vehicle with reduced range. Plaintiffs Whittaker suffered an ascertainable loss resulting from Defendants' concealment, fraud, omissions, and refusal to correct the Defective Battery and did not receive the benefit of their bargain when they purchased the Vehicle. Had Plaintiffs

Whittaker known that the Vehicle's range was achieved only at the risk of a catastrophic fire, or that the range would be decreased in order to mitigate the fire risk, they would not have purchased the Vehicle.

## B.   Defendants

### 1.   Defendant General Motors LLC

280.   Defendant General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Ctr., Detroit, Michigan.

281.   General Motors is a motor vehicle manufacturer and a licensed distributer of new, previously untitled motor vehicles. GM is one of the "Big Three" American automakers. GM engages in commerce by distributing and selling new motor vehicles under the Chevrolet, Buick, GMC, and Cadillac brands throughout the United States.

282.   GM has designed, manufactured, imported, distributed, marketed, and leased a number of vehicles that feature the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery").

283.   From its headquarters in Detroit, Michigan, General Motors designed, developed, marketed, and distributed the Class Vehicles with the Defective Battery. Furthermore, General Motors made determinations as to warranty coverage at its headquarters in this District and developed and disseminated its various inadequate recalls and communications to Class members at and from its headquarters.

2. **LG Defendants**

a. **Defendant LG Chem, Ltd.**

284.   Defendant LG Chem, Ltd. is a Korean corporation with its principal place of business at 128 Yorui-daero, Yeongduengpo-gu, Seoul, South Korea.

285.   LG Chem is also a parent company, comprised of 51 worldwide subsidiaries, through which it is engaged in various chemicals, energy solutions, advanced materials, and life sciences businesses. LG Chem is publicly traded on the Korean Stock Exchange under the ticker "051910."

286.   As outlined below, LG Chem, Ltd. worked with its wholly-owned subsidiaries LG Energy Solution, Ltd. and LG Energy Solution Michigan Inc. to design, produce, and manufacture the Defective Batteries.

b. **Defendant LG Energy Solution, Ltd.**

287.   Defendant LG Energy Solution, Ltd. is a Korean corporation with its principal place of business at 108 Yorui-daero, Yeongduengpo-gu, Seoul, South Korea.

288.   LG Energy Solution is also a parent company, and through its subsidiaries is engaged in developing and manufacturing lithium-ion batteries and other products for automobiles, lithium-ion batteries for energy storage systems (ESS), and mobility and IT batteries.

289.   As outlined below, LG Energy Solution, Ltd. worked with LG Chem, Ltd. and LG Energy Solution Michigan Inc. to design, produce, and manufacture the Defective Batteries.

### c.     Defendant LG Energy Solution Michigan Inc.

290.   Defendant LG Energy Solution Michigan Inc. (hereinafter "LG Michigan") is a Delaware corporation with its principal place of business at 1 LG Way, Holland, Michigan.

291.   LG Michigan is a wholly-owned subsidiary of LG Energy Solution, Ltd., which is a wholly-owned subsidiary of LG Chem, Inc. LG Michigan was formerly known as LG Chem Michigan, Ltd.

292.   LG Michigan has multiple Michigan facilities: a Troy, Michigan facility was established in 2000 that conducts research, development, testing, engineering, manufacturing, sales and marketing; an electric vehicle manufacturing plant was built in 2012 in Holland, Michigan, that also conducts research, development, testing and engineering; and an electric vehicle components facility was built in 2017 in Hazel Park, Michigan.

293.   LG Michigan, in connection with LG Energy Solution, Ltd. and LG Chem, Inc. (collectively, LG Chem), designs, produces, and "manufactures the large lithium-ion polymer battery cells and packs for electric vehicles."[6]

294.   LG Chem admitted in a 2019 complaint that it "develops and manufactures lithium-ion batteries at its facilities in Holland, Michigan, including individual battery

---

[6] *LG Energy Solution Michigan, Inc.* [hereinafter Exhibit G], https://lgenergymi.com/ (last visited Sept. 7, 2021).

cells as well as fully-assembled battery packs for customer applications."[7] It claimed to be "an industry leader and pioneering innovator in connection with lithium-ion batteries for use in U.S.-made electric vehicles ("EV"), including vehicles made by Chevrolet."[8]

295.   LG Chem's Holland, Michigan factory manufactures the Defective Batteries.[9] Further, LG Chem conducts research and development, testing, engineering, manufacturing, and sales activities from its Holland, Michigan location.[10]

### d.    Defendant LG Electronics, Inc.

296.   Defendant LG Electronics, Inc. (hereinafter "LG Electronics") is a South Korean limited company with its principal place of business at Yeoui-daero Yeongduengpo-gu Seoul, South Korea.

297.   LG Electronics operates in six major business segments worldwide, including a Vehicle Component Solutions segment that designs and manufactures automobile parts. LG Electronics is publicly traded on the Korean Stock Exchange under the ticker "066570."

---

[7] Complaint of LG Chem, Ltd. and LG Chem Michigan Inc. Under Section 337 of the Tariff Act of 1930, As Amended at 1, *In the Matter of Certain Lithium Ion Batteries, Battery Cells, Battery Modules, Battery Packs, Components Thereof, and Production and Testing Systems and Processes Therefor* (Int'l Trade Comm'n) (No. 337-TA).
[8] *Id.* at 5.
[9] *Id.*
[10] *Id.* at 9.

298.   LG Electronics, by and through its wholly-owned subsidiary LG Electronics USA, Inc., manufactures and supplies core parts of the Defective Battery to GM.[11]

299.   LG Electronics is listed at the component manufacturer of the involved components of the Defective Battery.[12]

### e.   Defendant LG Electronics USA, Inc.

300.   Defendant LG Electronics USA, Inc. is a Delaware corporation with its principal place of business at 111 Sylvan Ave., Englewood Cliffs, New Jersey.

301.   LG Electronics USA, Inc. is a wholly-owned subsidiary of LG Electronics, Inc. and together with LG Electronics manufactures and supplies core parts of the Defective Battery to GM.[13]

302.   LG Electronics is listed at the component manufacturer of the involved components of the Defective Battery.[14]

## IV.   FACTUAL ALLEGATIONS

303.   GM markets and sells the Chevrolet Bolt. It is a front-motor, five-door, all-electric, plug-in hatchback. A picture of the 2017 Chevy Bolt is below:

---

[11] *See* Lee Min-hyung, *LG gears up for new era in auto parts industry*, THE KOREA TIMES (Aug. 17, 2016) [hereinafter Exhibit H], http://m.koreatimes.co.kr/phone/news/view.jsp?req_newsidx=212120 (last visited Sept. 7, 2021).

[12] Part 573 Safety Recall Report, 21V-650 (Aug. 20, 2021) [hereinafter Exhibit I], https://static.nhtsa.gov/odi/rcl/2021/RCLRPT-21V650-2919.PDF (last visited Sept. 7, 2021).

[13] *See* Exhibit H.

[14] Exhibit I.



304.    Since its release, approximately 140,000 Bolts have been sold in the United States and Canada, and they remain available for purchase in the United States, South Korea, Mexico, and Canada.[15]

## A.    Development and Production of the Class Vehicles

305.    GM introduced the Chevy Bolt EV concept in the 2015 Detroit Auto Show and presented it as "a vision for an affordable, long-range all-electric vehicle designed to offer more than 200 miles of range starting around $30,000."[16]

306.    On January 6, 2016, General Motors Chair and CEO Mary Barra formally unveiled the 2017 Chevy Bolt and touted the Vehicle's 200+ mile range and

---

[15] *See* Michael Wayland, *GM to spend $1 billion to expand Chevy Bolt EV recall due to fires*, CNBC (Aug. 20, 2021) [hereinafter Exhibit J], https://www.cnbc.com/2021/08/20/gm-to-spend-1-billion-to-expand-chevy-bolt-ev-recall-due-to-fires.html (last visited Sept. 16, 2021).

[16] Mircea Panait, *Chevrolet Bolt Concept EV Looks Premium at 2015 Detroit Auto Show*, AUTOEVOLUTION (Jan. 12, 2015) [hereinafter Exhibit K], https://www.autoevolution.com/news/chevrolet-bolt-concept-vehicle-looks-unfinished-at-2015-detroit-auto-show-live-photos-90958.html#press (last visited July 18, 2021).

comparatively low charging time required to reach 80 percent capacity, noting that "the Bolt EV can actually give you time back."[17] Highlighting their EV experience derived from the similarly named Chevy Volt, GM partnered with Korean supplier LG Corporation and its Korean and American subsidiaries (together, hereinafter "LG") to develop and manufacture "an all-new cell and battery pack to offer more than an estimated 200 miles of range."[18]

307. The Bolt was GM's version of an all-electric vehicle, competing with emerging all-electric vehicle lines promoted by new market entrants like Tesla, Nissan, and BMW. It quickly garnered a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, 2017 Green Car of the Year, and Automobile Magazine 2017 All Star awards.[19] These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]."[20] *Green Car Reports* stated that the "most

---

[17] *GM Chairman and CEO Addresses CES*, CHEVROLET: PRESSROOM (Jan. 6, 2016) [hereinafter Exhibit L], https://media.gm.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.detail.html/content/Pages/news/us/en/2016/Jan/boltev/0106-barra-ces.html (last visited July 18, 2021).

[18] *Drive Unit and Battery at the Heart of Chevrolet Bolt EV*, CHEVROLET: PRESSROOM (Jan. 11, 2016) [hereinafter Exhibit M], https://media.gm.com/media/us/en/chevrolet/vehicles/bolt-ev/2021.detail.html/content/Pages/news/us/en/2016/Jan/naias/chevy/0111-bolt-du.html (last visited July 18, 2021).

[19] *See, e.g.*, Jeff Cobb, *2017 Chevy Bolt's Trophy Case Is Filling Up*, GM INSIDE NEWS (Nov. 28, 2016) [hereinafter Exhibit N], https://www.gminsidenews.com/threads/2017-chevy-bolt%E2%80%99s-trophy-case-is-filling-up.300285/ (last visited July 19, 2021); Sebastian Blanco, *Chevy Bolt Wins 2017 Green Car of the Year*, AUTOBLOG (Nov. 17, 2016) [hereinafter Exhibit O], https://www.autoblog.com/2016/11/17/chevy-bolt-wins-2017-green-car-of-the-year/ (last visited July 18, 2021).

[20] *See* Exhibit K.

important thing about the Bolt EV" was "how far you can go on a single charge," noting that the 2017 Bolt offered "the range of a Tesla, for roughly half the price."[21] The Bolt was lauded as "the 200-mile-range EV with cool connectivity that people can actually afford."[22]

308.   Range is a key consideration for purchasers and lessees of electric vehicles. It takes substantially longer to charge an electric vehicle than it does to fill up a tank of gas, and a fully charged electric vehicle cannot travel as far on a single charge as most gas-powered vehicles can travel on a full tank of gas. The impressive range of the Bolt was advertised as being the result of an "unprecedented" partnership between Defendant GM and LG.[23] In late 2015, GM explained that:

> Offering consumers the first long-range, affordable EV, required an unprecedented supplier relationship combining expertise in infotainment, battery systems and component development with GM's proven in-house capabilities in electric motor design, battery control, system validation and vehicle body/system integration.

---

[21] John Voelcker, *Chevrolet Bolt EV: Green Car Reports' Best Car to Buy 2017*, GREEN CAR REPORTS (Nov. 14, 2016) [hereinafter Exhibit P], https://www.greencar reports.com/news/1106584_chevrolet-bolt-ev-green-car-reports-best-car-to-buy-2017#:~:text=The%20most%20important%20thing%20about,much%20faster%20than%20other%20uses (last visited July 18, 2021).

[22] Nicole Lee, *Presenting the Best of CES 2016 winners!*, ENDGADGET (Jan. 9, 2016) [hereinafter Exhibit Q], https://www.engadget.com/2016-01-08-presenting-the-best-of-ces-2016-winners.html (last visited July 18, 2021).

[23] John Voelcker, *Bolt EV Powertrain: How Did GM And LG Collaborate On Design, Production?*, GREEN CAR REPORTS (Feb. 3, 2016) [hereinafter Exhibit R], https://www.greencarreports.com/news/1102176_bolt-ev-powertrain-how-did-gm-and-lg-collaborate-on-design-production (last visited July 18, 2021).

Following joint planning and research, GM and LG Corp. brought the Chevy Bolt EV to reality.[24]

309.   The statement described GM and LG's "partner[ship] on critical components" and the "joint planning and research" that "brought the Chevrolet Bolt EV to reality."[25] With the "blend [of] expertise" the "[e]ngineers considered different architectures, electric driving ranges and performance options" before settling on the final specifications for the Bolt.[26]

310.   LG also supplied more than 10 components for the Bolt EV, including the electric battery cells and pack—LG was touted as helping to achieve "the key element in driving down costs" be developing the battery.[27] The LG and GM partnership "encompassed supplying components for the Bolt EV and marked the first time that GM integrated a full EV component supplier so early in vehicle development. … GM will partner with [LG] to leverage its own engineering with [LG] to develop unique strategic systems and components."[28]

---

[24] Kevin Kelly, *Chevrolet Develops Bolt EV Using Strategic Partnership*, CHEVROLET: PRESSROOM (Oct. 20, 2015) [hereinafter Exhibit S], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.print.html/content/Pages/news/us/en/2015/oct/1020-bolt.html (last visited July 18, 2021).

[25] *Id.*

[26] *Id.*

[27] Sam Abuelsamid, *New GM-LG Partnership On Chevy Bolt EV Shows Why Barra Is Resisting Fiat Merger*, FORBES (Oct. 21, 2015) [hereinafter Exhibit T], https://www.forbes.com/sites/samabuelsamid/2015/10/21/general-motors-and-lg-team-up-to-jointly-develop-2017-chevrolet-bolt-ev/?sh=3b73c2cd380d (last visited July 18, 2021).

[28] Exhibit O.

311.   Both GM and LG executives boasted about the partnership. GM's Executive Vice President of Global Development, Purchasing and Supply Chain, Mark Reuss, lauded the combined experience of GM and the LG Group (including the LG Electronics Vehicle Components team of LG companies) to help develop the Bolt EV. President and CEO of the LG Electronics Vehicle Components Co., Woo-jong Lee, also referred to its selection as "GM's EV technology partner" as "indicative of exactly the type of contributions that traditional tech companies can make in the automotive space."[29]

## B.  Defendants' Marketing to Class Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt

312.   Range is critical to the success of an all-electric vehicle. Car and Driver Magazine describes range as "*the* all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel," and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station," increased range is one of the primary considerations for purchasers or lessees of electric vehicles.[30] Because battery charging takes more time than refilling a gasoline tank, an all-electric vehicle's usefulness is directly related

---

[29] Matt Burns, *LG To Supply Key Parts For Chevy's Affordable Electric Vehicle*, TECHCRUNCH (Oct. 20, 2015) [hereinafter Exhibit U], https://techcrunch.com/2015/10/20/lg-to-supply-key-parts-for-chevys-affordable-electric-vehicle/ (last visited Sept. 14, 2021).

[30] Rich Ceppos, *Electric Vehicle FAQs*, CAR AND DRIVER (May 27, 2020) [hereinafter Exhibit V], https://www.caranddriver.com/shopping-advice/a32668797/ev-faqs/ (last visited July 18, 2021).

to the distance the automobile can travel before needing a recharge. Therefore, electric car buyers particularly rely on manufacturer representations regarding how far the automobile can travel on a single charge.

313.   Automobile manufacturers are required by law to prominently affix a label called a "Monroney sticker" to each new vehicle sold. The Monroney sticker sets forth the vehicle's fuel economy (expressed in MPGe for electric vehicles), the driving range, estimated annual fuel costs, the fuel economy range of similar vehicles, and a statement that a booklet is available at the dealership to assist in comparing the fuel economy of vehicles from all manufacturers for that model year, along with pricing and other information. Included in this information for electric vehicles is a vehicle's miles-per-gallon ("MPG") equivalent estimate, which converts the range of the vehicle's battery into an equivalent mileage as measured by miles per gallon. These ratings have been provided to consumers since the 1970s and are posted for the customers' benefit to help them make valid comparisons between vehicles' MPGs when shopping for a new vehicle. This is particularly important for electric vehicles, as consumers generally pay a premium for electric vehicles as compared to gasoline-powered vehicles, and one reason for that premium is the accrued savings over time of driving an electric over a gasoline-powered vehicle.

314.   Electric vehicles like the Bolt have important environmental and financial advantages over conventional vehicles with internal combustion engines. Significantly, all-electric vehicles do not produce any of the tailpipe emissions—such as nitrogen

oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that are produced by vehicles with internal combustion engines.[31] The lack of tailpipe emissions means that electric vehicles theoretically help improve air quality, improve public health, and reduce the overall ecological damage caused by driving personal vehicles.[32] This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants.[33] In addition to the environmental benefits, in general, the cost of electricity to charge an electric vehicle is considerably less than would be the cost of fueling with gasoline or diesel, and vehicle maintenance costs typically are lower as well.[34]

315. Price and range are two primary considerations of consumers that decide to purchase an electric vehicle. For example, the 2017, 2018, and 2019 Bolt EV Owner's Manuals state that charging the Battery from a standard 120-volt AC electrical outlet for

---

[31] *Emissions from Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit W], https://afdc.energy.gov/vehicles/electric_emissions.html (last visited July 18, 2021).

[32] *Id.*

[33] *Id.* (state-by-state calculator showing that charging an all-electric vehicle in Oregon produces less than 17% of the carbon dioxide equivalent of that produced by gasoline-powered vehicles).

[34] Brooke Crothers, *Rising Gas Prices Driving You To An Electric Car? Cost To Charge A Tesla Model 3 Vs Gas*, FORBES (May 22, 2021) [hereinafter Exhibit X], https://www.forbes.com/sites/brookecrothers/2021/05/22/rising-gas-prices-driving-you-to-an-electric-car-cost-to-charge-a-tesla-model-3-vs-gas/?sh=6902fcf57192 (last visited July 18, 2021); Roberto Baldwin, *EV vs. Gas: Which Cars Are Cheaper to Own?*, CAR AND DRIVER (May 22, 2020) [hereinafter Exhibit Y], https://www.caranddriver.com/shopping-advice/a32494027/ev-vs-gas-cheaper-to-own/ (last visited July 18, 2021).

an hour would yield about 4–6 miles of driving range. If the Battery were completely depleted, it would take more than 50 hours to fully recharge at that rate. For this reason, many Bolt owners and lessees install "Level Two" 240-volt charging stations at their residences. Although faster, 240-volt chargers still provide only about 25 miles of driving range per hour of charging, which would take nearly 10 hours to fully charge from fully depleted.[35] Necessarily, then, the distance one can drive on a fully-charged battery without stopping to recharge the battery (the "battery range" or "range") is one of the most critical factors to consider in purchasing any all-electric vehicle.

316.   GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging.[36] Defendants have consistently made that same representation to consumers since they started marketing the Bolt to the general public. GM went to great lengths in its attempt to demonstrate a 238-mile range, including taking a Car and

---

[35] The only way to charge the Bolt more quickly is to find a "DC Fast Charging" station, which can provide a Bolt with about 90 miles of range in about 30 minutes for those Bolts with the fast-charging capability installed. These chargers are not available for home installation, *Living Electric*, CHEVROLET [hereinafter Exhibit Z], https://www.chevrolet.com/electric/living-electric (last visited July 18, 2021), and are nowhere near as prevalent as gas stations.

[36] *Chevrolet Bolt EV – 2017*, CHEVROLET: PRESSROOM [hereinafter Exhibit AA], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2017.html (last visited July 18, 2021).

Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."[37]

317.   This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric vehicle—the Tesla Model 3.[38] Both vehicles advertised a range of over 200 miles on a single charge, making them some of the "first [electric vehicles] that could conceivably function as a family's lone car."[39] The Model 3, however, advertised a significantly faster charging time than the Bolt—the Bolt's fastest charging option, the direct-current fast-charging capability, does not come standard with the Bolt and costs consumers an extra $750, and the Bolt takes about twice as long to fast-charge as the Model 3 (approximately 3 miles of added range per minute of charging for the Bolt).[40]

---

[37] Joey Capparella, *2017 Chevrolet Bolt EV First Drive*, CAR AND DRIVER (Sept. 13, 2016) [hereinafter Exhibit AB], https://www.caranddriver.com/reviews/a15099295/2017-chevrolet-bolt-ev-first-drive-review/ (last visited July 18, 2021).

[38] Bradley Berman, *EV Comparison: Tesla Model 3 Vs. Chevy Bolt*, INSIDEEVS (Oct. 25, 2018) [hereinafter Exhibit AC], https://insideevs.com/reviews/340642/ev-comparison-tesla-model-3-vs-chevy-bolt/ (last visited July 18, 2021) (describing the Tesla Model 3 and the Chevy Bolt as the "two leading compact electric vehicles").

[39] Christian Seabaugh, *2017 Chevrolet Bolt EV vs. 2016 Tesla Model S 60: High-Voltage*, MOTORTREND (Oct. 31, 2016) [hereinafter Exhibit AD], https://www.motortrend.com/cars/chevrolet/bolt-ev/2017/2017-chevrolet-bolt-ev-vs-2016-tesla-model-s-60/ (last visited July 18, 2021) (comparing the Bolt to the Tesla Model S 60, a discontinued model that cost almost twice the price of the Bolt and the Tesla Model 3, in anticipation of the release of the Model 3, which the article notes is a more appropriate comparison).

[40] Eric Tingwall, *Tested: 2017 Chevrolet Bolt EV*, CAR AND DRIVER (Oct. 28, 2016) [hereinafter Exhibit AE], https://www.caranddriver.com/reviews/a15099446/2017-chevrolet-bolt-ev-test-review/ (last visited July 18, 2021).

318.   The slower charging time, combined with limited access to charging stations, meant that consumers would not be able to make longer trips with the Bolt without significant planning. For example, a driver wouldn't make "the 600-mile drive from Kansas City to Denver in a Chevrolet Bolt unless [they didn't] mind charging for upwards of 30 hours on 110-volt outlets along the way."[41] The inconvenience of charging combined with the slower charging time of the Bolt when compared to its direct competitors made every additional mile of the Bolt's range critically important to GM's marketing and to consumers.

319.   GM repeatedly emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV . . . .[42]

At the time of the 2017 Chevy Bolt's release, GM published a specifications sheet disclosing that the Vehicle was able to maintain a driving range of an "EPA-estimated 238 miles."[43] The accompanying "product information" fact sheet regarding the 2017

---

[41] *Id.*

[42] Liz Winter, *Bolt EV Offers 238 Miles of Range*, Chevrolet: Pressroom (Sept. 13, 2016) [hereinafter Exhibit AF], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/sep/0913-boltev.html (last visited July 18, 2021).

[43] *See* Exhibit AA.

Bolt confirmed that it "offers an EPA-estimated 238 miles of range."[44] The same was true for the 2018 Chevy Bolt's release, in which GM published the same specifications sheet disclosing the Vehicle's alleged EPA-estimated 238-mile battery range,[45] and further reiterated the 238-mile range on its product information fact sheet.[46]

320.   GM further emphasized the range of the Bolt in a number of advertisements, like this ad from The Washington Post in June 2017, which prominently asks consumers to "begin a long-distance relationship, now"[47]:

---

[44] *Id.*

[45] *2018 Chevrolet Bolt EV*, CHEVROLET: PRESSROOM [hereinafter Exhibit AG], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2018.html (last visited July 19, 2021).

[46] *Id.*

[47] John Voelcker, *Yes, ads for the Chevy Bolt EV electric car do actually exist; here's one*, GREEN CAR REPORTS (June 19, 2017) [hereinafter Exhibit AH], https://www.greencarreports.com/news/1111082_yes-ads-for-the-chevy-bolt-ev-electric-car-do-actually-exist-heres-one (last visited July 17, 2021).



321.   GM touted the Chevy Bolt's Battery as being "where it all starts," and advertised an energy capacity of 60 kWh, which GM said allowed drivers to travel an EPA-estimated 238 miles on a single full charge.[48] An example of one such advertisement touting the Bolt's battery capabilities appears below:

---

[48] *Introducing the All-Electric 2017 Chevrolet Bolt EV*, DUBLIN CHEVROLET [hereinafter Exhibit AI], https://www.dublinchevrolet.com/Chevrolet-Bolt-EV (last visited Feb. 24, 2021); *see also 2017 Bolt EV: All-Electric Vehicle*, CHEVROLET [hereinafter Exhibit AJ], https://web.archive.org/web/20171011012928/http://www.chevrolet.com/bolt-ev-electric-vehicle (last visited Feb. 24, 2021).



322.   GM also displayed the range in a commercial from 2017[49]:



323.   One of the Bolt's first three customers stated in a GM press release that it

was "the range and technology" that attracted him to the Bolt.[50] After making its initial

deliveries of the 2017 Bolt to its very first customers at the end of 2016, GM issued a

---

[49] *The All Electric Chevrolet Bolt EV - 238 Miles Per Full Charge | Chevrolet Bolt EV - Commercial TVC*, YOUTUBE (Jan. 11, 2017) [hereinafter Exhibit AK], https://www.youtube.com/watch?v=uVIedKsm-Kg (last visited Dec. 10, 2020) (screen captured at 1:32).
[50] *Chevrolet Delivers First Bolt EVs to Customers*, CHEVROLET: PRESSROOM (Dec. 13, 2016) [hereinafter Exhibit AL], https://media.chevrolet.com/media/us/en/chevrolet/home.detail.html/content/Pages/news/us/en/2016/dec/1213-boltev.html (last visited July 17, 2021).

press release that quoted a California customer who replaced a competing electric car model: "The range and technology attracted me to the Bolt. . . . I look forward to the longer drives I can make compared to the [BMW] i3 that I owned."[51]

324.   For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements and press materials that it intended to be disseminated to consumers.[52]

325.   Despite GM's representations, the most critical aspect of the Bolt's much-lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without risking a catastrophic fire.

## C.   The Defective Battery Poses a Significant Safety Risk to Class Vehicle Owners and Lessees

326.   Lithium ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good high-temperature performance, and low self-discharge."[53] However, these batteries also have a well-documented history of fire issues.[54] Safety concerns

---

[51] *Id.*

[52] *See, e.g.*, Exhibit AG; *Chevrolet Bolt EV – 2019*, CHEVROLET: PRESSROOM [hereinafter Exhibit AM], https://media.chevrolet.com/media/us/en/chevrolet/vehicles/bolt-ev/2019.html (last visited July 17, 2021).

[53] *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY [hereinafter Exhibit AN], https://afdc.energy.gov/vehicles/electric_batteries.html (last visited July 17, 2021).

[54] *See* Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020) [hereinafter Exhibit AO], https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited July 18, 2021); *see also* Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020)

related to unexpected fires have been well documented—including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked in 2019—and are known to GM.

327.   Significantly, the documented fires in the Chevy Bolt Vehicles have not been the result of external abuse, but rather, have resulted from an internal failure while the cars are parked. This type of spontaneous ignition caused by thermal runaway has been reported to cause as many as 80% of lithium-ion battery fires.[55]

328.   Unfortunately, GM ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in a spontaneous ignition.

**1.      The Bolt Lithium-Ion Battery Is Defective**

329.   Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells."[56] Each cell contains the basic

---

[hereinafter Exhibit AP], https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited July 17, 2021).

[55] Laura Bravo Diaz et al., *Review—Meta-Review of Fire Safety of Lithium-Ion Batteries: Industry Challenges and Research Contributions*, 167 J. Electrochemical Soc'y 9, 090559 (2020) [hereinafter Exhibit AQ].

[56] Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020) [hereinafter Exhibit AR], https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited July 17, 2021).

functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.[57]

330.   In order to develop a battery that would deliver the advertised range, Defendants developed a battery with "new cell design and chemistry."[58] The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging."[59]

331.   According to Defendants, the Bolt uses "active thermal conditioning . . . to keep the battery operating at its optimum temperature, which results in solid battery life performance."[60]

332.   The lithium-ion Batteries in the Class Vehicles were produced at an LG Chem facility in Ochang, South Korea. An image of the Bolt's battery pack is displayed below[61]:

---

[57] *Id.*

[58] *See* Exhibit M.

[59] *Id.*

[60] *Id.*

[61] Christopher Arcus, *Tesla Model 3 & Chevy Bolt Battery Packs Examined*, CLEANTECHNICA (July 8, 2018) [hereinafter Exhibit AS], https://cleantechnica.com/2018/07/08/tesla-model-3-chevy-bolt-battery-packs-examined/ (last visited July 17, 2021). For a more in-depth explanation of the Bolt's battery, see WeberAuto, *Chevrolet Bolt EV Battery Disassembly*, YOUTUBE (Feb. 19, 2018) [hereinafter Exhibit AT], https://www.youtube.com/watch?v=ssU2mjiNi_Q&feature=emb_title (last visited July 17, 2021).



333.    The Bolt's battery is structured with the cells[62] arranged "like books on a bookshelf, in groups."[63] Each group of pouch cells is "stacked to make modules," which are "held together at the ends by long bolts."[64] "The [battery] pack thermal management is regulated by sensing temperature via thermistors located at the ends of the modules" and the liquid coolant is distributed via channels at the base of the cell packs.[65]

334.    Defendants repeatedly advertised this cell design and chemistry as delivering "a battery system with 160 kilowatts of peak power and 60 kilowatts hours of energy."[66] However, Defendants were unable to achieve this without endangering Class

---

[62] The battery uses LG Chem pouch cells. For additional detail on pouch cells, see for example, *Pouch Cell – Small but not Trouble Free*, BATTERY UNIVERSITY [hereinafter Exhibit AU], https://batteryuniversity.com/article/pouch-cell-small-but-not-trouble-free (last visited July 17, 2021).

[63] *See* Exhibit AS.

[64] *Id.*

[65] *Id.*

[66] *See* Exhibit M.

members and other drivers. The thermal management system is inadequate to prevent thermal runaway during charging.

335.   According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

## 2.      Defendants Knew About the Battery Defect

336.   GM has been aware of Battery-related problems in the Bolt since at least late 2016.

337.   After the release of the 2017 Bolt, drivers quickly began to experience issues stemming from the Bolt's lithium-ion battery. Drivers experienced losses of propulsion power while driving the Vehicles—including experiencing a sudden inability to accelerate the Vehicle while driving.[67]

338.   Multiple drivers experienced sudden drops in battery levels and loss of power to their Vehicles, some while driving in dangerous conditions.[68]

---

[67] *See, e.g.*, *infra* ¶ 215 *et seq.*
[68] *See, e.g.*, *id.*

339.   In December 2016, shortly after launching the Bolt, GM issued Service Bulletin PIC6239 informing dealers of a "Bolt EV (BEV2) High Voltage Battery Exchange and internal Parts Process" that might require dealers to replace the Bolt's "Rechargeable Energy Storage System (RESS)" (*i.e.*, the Battery) or certain related components.[69] This quality improvement program listed steps to determine whether components of the high voltage battery pack needed replacement.[70]

340.   GM addressed the loss of propulsion issue caused by the Defective Battery in a November 2017 customer satisfaction program bulletin:

> Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition in which the cells within the battery pack have low voltage. This condition is related to the state of charge of the cell group. Eventually, the difference in the state of charge of the cell groups (average vs. minimum) may exceed a threshold.[71]

When this condition occurs, the "high voltage battery pack" must be replaced.[72]

341.   A display screen in the Bolt informs drivers of the Vehicle's estimated driving range on its current charge and warns them when the Battery is at an especially low state of charge. Drivers rely on this information to calculate how far they can drive

---

[69] NHTSA Bulletin No.: PIC6239 (Dec. 2016) [hereinafter Exhibit AV], https://static.nhtsa.gov/odi/tsbs/2016/MC-10111727-9999.pdf (last visited July 18, 2021).

[70] *See* NHTSA Bulletin No.: PIC6239H (May 25, 2018) [hereinafter Exhibit AW], https://static.nhtsa.gov/odi/tsbs/2018/MC-10141375-9999.pdf (last visited July 18, 2021).

[71] GM Customer Satisfaction Program, 17297 High Voltage Battery Pack Low Cell (Nov. 2017) [hereinafter Exhibit AX], https://static.nhtsa.gov/odi/tsbs/2017/MC-10135136-9999.pdf (last visited July 18, 2021).

[72] *Id.*

without having to recharge, and when they need to charge immediately to avoid losing propulsion. If propulsion is completely lost, the car must be towed to a charging station or electric outlet and recharged. One cannot merely add a gallon of gas to a tank, or jump start the Battery.

342.   On April 3, 2018, GM issued a customer satisfaction notice instructing certain owners and lessees of the 2017 Chevy Bolt to get a dealer-installed software update because otherwise the Vehicle "may experience 'loss of propulsion' and stop suddenly without warning due to low charge despite the battery indicator showing charge."[73]

343.   This problem reveals that the Vehicle's battery management system is or was unable to accurately sense the actual state of the cells within the battery. This would not be LG's first experience with that type of defect; in October 2020, LG batteries in Hyundai vehicles experienced a risk of fire due to, in part, a software management system, and LG claimed 70% of the cost of the recall.[74]

---

[73] *See* Jim Fallston, *Saw new recall #N172127150 on mychevrolet today*, CHEVYBOLT.ORG (Apr. 5, 2018) [hereinafter Exhibit AY], https://www.chevybolt.org/threads/saw-new-recall-n172127150-on-mychevrolet-today.26938/ (last visited July 17, 2021).

[74] Heekyong Yang & Joyce Lee, *Hyundai profit hit after electric car recall, but LG Chem seen bearing bulk of costs*, REUTERS (Mar. 3, 2021) [hereinafter Exhibit AZ], https://www.reuters.com/article/us-hyundai-motor-electric-recall/hyundai-profit-hit-after-electric-car-recall-but-lg-chem-seen-bearing-bulk-of-costs-idUSKBN2AW0OY (last visited Sept. 14, 2021).

344.   On or about April 19, 2018, GM published a manufacturer communication entitled "Vehicle No Start Due to Dead Battery."[75] The advisory notes limit an investigation of this issue only to customers who comment about a dead battery and whose affected part is included in GM's Global Warranty Management/Investigate History link. If a customer met the above two conditions, then the investigation performed would be used "to determine the root cause of the above condition."

345.   On May 11, 2018, GM released "Customer Satisfaction Program 18125 Loss of Propulsion High Voltage Battery Without Notification" regarding *all* Bolt EVs, including 2017 models that had already received the software update released little more than a month earlier. The May notice disclosed that "[c]ertain 2017-2018 model year Bolt EV Vehicles may have a condition where the software will not detect the difference in the state of charge between the cell groups of the battery and over predict the indicated battery range. The current software may not provide sufficient warning prior to a battery cell low range condition, which may result in a loss of propulsion." GM explained that all Bolt EVs needed the software update to "increase[] the accuracy

---

[75] *2017 Chevrolet Bolt EV Technical Service Bulletins*, OBD CODES [hereinafter Exhibit BA], https://www.obd-codes.com/tsb/2017/chevrolet/bolt-ev/ (last visited July 17, 2021).

of the range estimation" and "provid[e] more warning at low states of charge."[76] GM

updated its service procedure for this problem in August 2018.[77]

346. In August 2018, GM issued another Customer Satisfaction Program,

stating:

> Certain 2017-2018 model year Bolt EV vehicles may have a condition
> where the software will not detect the difference in the state of charge
> between the cell groups of the battery and over predict the indicated battery
> range. The current software may not provide sufficient warning prior to a
> battery cell low range condition, which may result in a loss of propulsion.
> Only certain vehicles will experience the battery low voltage cell
> condition.[78]

347. In a 2019 interview with InsideEVs, Tim Grewe, GM's chief engineer of

electric propulsion systems, publicly acknowledged that LG Chem's manufacturing

practices had caused Battery issues, including "reduced range and early capacity fade"

in some Bolt EVs and the loss of propulsion problems stemmed from the Bolt's battery

imbalance problems.[79]

---

[76] GM Customer Satisfaction Program, 18125 Loss of Propulsion High Voltage Battery
Without Notification (May 2018) [hereinafter Exhibit BB] https://static.nhtsa.gov/
odi/tsbs/2018/MC-10143682-9999.pdf (last visited July 18, 2021); Eric Loveday,
*\*UPDATE – Possible Chevy Bolt Battery Cell Failure Prompts GM Statement / Recall*,
INSIDE EVS (May 11, 2018) [hereinafter Exhibit BC], https://insideevs.com/news/
337521/update-possible-chevy-bolt-battery-cell-failure-prompts-gm-statement-recall/
(last visited July 17, 2021).

[77] GM Customer Satisfaction Program, 18125 Loss of Propulsion High Voltage Battery
Without Notification (Aug. 2018) [hereinafter Exhibit BD], https://static.nhtsa.gov/
odi/tsbs/2018/MC-10145176-9999.pdf (last visited July 18, 2021).

[78] *Id.*

[79] Bradley Berman, *My Chevy Bolt Is On Third Battery Pack: Here's Why*, INSIDEEVS
(Feb. 6, 2019) [hereinafter Exhibit BE], https://insideevs.com/news/342671/my-chevy-
bolt-is-on-third-battery-pack-heres-why/ (last visited July 18, 2021).

348.    GM's proposed solution was to replace the high voltage battery pack in some affected Vehicles.[80] However, it did not provide any notice to consumers that the Bolt's batteries were defective, nor did GM ever address the issues in the 2018 or 2019 Class Vehicles. GM did not address any possible widespread issue with the Defective Battery, and treated affected Vehicles as individualized manufacturing errors or defects. However, there was a more insidious and widespread problem.

349.    By 2019, the issues with the lithium-ion batteries began to escalate.[81] Class members were experiencing Vehicle fires when charging their Vehicles to a full or near-full charge.[82] On information and belief, the same issue that causes the low-voltage condition in certain cell groups can cause high-voltage conditions in certain cell groups in the Defective Battery. This issue can cause dangerous overheating of the battery while charging, resulting in fires in the Class Vehicles.

350.    NHTSA maintains a database of motor-vehicle consumer complaints submitted since January 2000. GM, like other large automakers, regularly reviews these complaints and communicates directly with NHTSA. NHTSA has "[r]egular

---

[80] *Id.*

[81] *See* NHTSA, Part 573 Safety Recall Report 20V-701 (Nov. 13, 2020) [hereinafter Exhibit BF] (stating that the first fire incident appears to have occurred on March 17, 2019).

[82] *See, e.g., infra* ¶ 215 *et seq.*

engagements with Original Equipment Manufacturers (OEMs), including weekly calls with large manufacturers" like GM.[83]

351.   Consumers are able to submit Vehicle Owner Questionnaires in which they provide information that includes the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, whether the incident involved a crash or fire, whether any people were injured or killed, the speed of the vehicle at the time of the incident, and a description of the incident. A number of NHTSA complaints concerning the Defective Battery have been submitted to the database.

352.   NHTSA warns that the "affected vehicles' [battery] cell packs have the potential to smoke and ignite internally, which could spread to the rest of the vehicle and cause a structure fire if parked inside a garage or near a house" and that the vehicles "can catch fire even if they are turned off, parked, and disconnected from a charging unit."[84]

353.   From July 20, 2020, to August 26, 2020, GM received at least four claims alleging that the Class Vehicles' battery pack had caused a fire. Indeed, GM has now identified at least a dozen battery-related allegations of fire involving 2017–19 Bolt

---

[83] *Advancing Safety by Addressing Defects and Raising Awareness*, U.S. DEP'T OF TRANSP.: NHTSA [hereinafter Exhibit BG], https://www.nhtsa.gov/advancing-safety-addressing-defects-and-raising-awareness (last visited July 17, 2021).

[84] NHTSA Consumer Alert: Important Chevrolet Bolt Recall for Fire Risk, U.S. DEP'T OF TRANSP.: NHTSA (Nov. 13, 2020) [hereinafter Exhibit BH], https://www.nhtsa.gov/press-releases/nhtsa-consumer-alert-important-chevrolet-bolt-recall-fire-risk (last visited July 18, 2021).

vehicles, and its internal investigations (spanning from August-November 2020, according to GM) have revealed that in at least five of those cases the fire was related to the battery. In four such cases, the fire occurred when the battery was highly charged just before the fire occurred.

354. These NHTSA complaints illustrate the significance of the notice of the Defective Battery that GM received from NHTSA and customers. Below are examples of consumer complaints submitted to NHTSA regarding loss of propulsion or dead battery issues with the Class Vehicles[85]:

> NHTSA ID Number: 11031387
> NHTSA Posting Date: Sept. 16, 2017
>
> DRIVING ON THE FREEWAY (60-70MPH) WITH THE BATTERY AT OR SLIGHTLY ABOVE 50%, AN ALERT SOUNDED, AND THE BATTERY LEVEL IMMEDIATELY WENT DOWN TO NEARLY ZERO. IT ESTIMATED 10 MILES LEFT, BUT SPEED IMMEDIATELY DECREASED, AND THE ACCELERATOR STOPPED WORKING. AFTER RAPIDLY COASTING OVER TO THE SHOULDER, AND WITHIN SECONDS, THE CAR MADE A SERIES OF LOUD NOISES AND COMPLETELY STOPPED.
>
> NHTSA ID Number: 11062432
> NHTSA Posting Date: Jan. 4, 2018
>
> TL* THE CONTACT OWNS A 2017 CHEVROLET BOLT EV. WHILE DRIVING APPROXIMATELY 35 MPH, THE VEHICLE SHUT DOWN IN THE MIDDLE OF THE ROAD. THE "PROPULSION" WARNING INDICATOR ILLUMINATED. THE VEHICLE WAS TOWED TO CAPITOL CHEVROLET (905 CAPITOL EXPRESSWAY AUTO MALL, SAN JOSE, CA 95136) WHERE IT WAS DIAGNOSED THAT THE BATTERY NEEDED TO BE REPLACED. THE BATTERY WAS

---

[85] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited July 18, 2021); NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited July 18, 2021); NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited July 18, 2021).

REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE
FAILURE AND REFERRED THE CONTACT BACK TO THE
DEALER. THE FAILURE MILEAGE WAS 4,193.

NHTSA ID Number: 11071886
NHTSA Posting Date: Feb. 8, 2018

THIS VEHICLE HAS ABRUPTLY GONE TO ZERO RANGE AND
ENTERED A REDUCED POWER MODE EVEN THOUGH THE
BATTERY SHOWED SUFFICENT RANGE SECONDS EARLIER.
AFTER STOPPING, GETTING OUT AND KEYING UP AGAIN, THE
CAR STAYED AT ZERO RANGE AND DISPLAYED A CHARGE
NOW MESSAGE.

THE FIRST INCIDENT HAPPENED ON JANUARY 11, 2018. IN THAT
CASE THE RANGE METER SHOWED ABOUT 30 MILES
REMAINING. AS I UNDERSTAND IT, THERE ARE TWO
PRELINIARY WARNINGS BEFORE THE THIRD MORE INSISTENT
ONE. THE CAR WAS DRIVEN BY ANOTHER COLLEAGUE WHO
HADN'T DRIVEN IT BEFORE, AND HE WASN'T SURE IF HE
MISSED THE FIRST TWO WARNINGS OR NOT. HE WAS
TRAVELING AT 70 MPH ON THE FREEWAY AT THE TIME THE
VEHICLE "STALLED" FOR LACK OF A BETTER WORD. THE
RANGE WENT TO NOTHING, THE VEHICLE DROPPED IN SPEED
SIGNIFICANTLY (NOT A PURE STALL) AND HE HAD TO MOVE
THROUGH LANES TO THE SIDE OF THE ROAD AMID FASTER
TRAFFIC. BECAUSE OF THE UNCERTAINTY ABOUT WARNINGS
HE MAY HAVE MISSED (I DON'T THINK THEY'RE SUBTLE
ENOUGH TO MISS, SO IT IS MY VIEW THEY NEVER HAPPENED)
WE TALKED OURSELVES OUT OF A DEALER VISIT. WE TOWED
IT TO A NEARBY LEVEL 3 FAST CHARGER INSTEAD, AFTER
WHICH IT PERFORMED NORMALLY.

SUBSEQUENT ONSTAR E-MAIL HEALTH REPORTS HAVE
DESCRIBED THE BATTERY AS IN GOOD CONDITION. THE MOST
RECENT OF THESE WAS FEBRUARY 7TH, WHICH IS
INTERESTING BECAUSE ...

THEN, ON FEBRUARY 8, 2018, IT HAPPENED AGAIN. THIS TIME
THE VEHICLE WENT FROM 60 MILES TO NOTHING. SAME ISSUE:
DRASTICALLY REDUCED POWER WITH NO ADVANCED
WARNING, MANEUVERING THROUGH FASTER TRAFFIC TO A
FREEWAY EXIT RAMP. THE CAR CAME TO A HALT ON THE

LONG EXIT RAMP. IT WAS TOWED TO A DEALER, WHERE IT NOW SITS.

I HAVE NEVER RECEIVED A SERIVICE BULLETIN OR RECALL NOTICE FOR ANYTHING, AND AS FAR AS I KNOW THE CAR IS UP TO DATE IN THIS REGARD.

THERE MAY BE TWO PROBLEMS: 1) THE BATTERY HAS A DEFECT AND 2) ON STAR HEALTH BATTERY CHECKS REPORTS ARE MEANINGLESS.

NHTSA ID Number: 11091674
NHTSA Posting Date: Apr. 26, 2018

DESPITE HAVING A FULLY CHARGED BATTERY, WHEN WE PARKED OUR VEHICLE, IT WOULD NOT START. THE ENTIRE ELECTRICAL SYSTEM WAS DOWN. WE JUMPED THE STARTER BATTERY AND THAT PROVIDED ENOUGH POWER TO ALLOW US TO SHIFT INTO NEUTRAL SO THAT WE COULD HAVE THE CAR TOWED. AFTER A WEEK, AND MULTIPLE CALLS TO THE ENGINEERS IN DETROIT, THE DEALER HAS STILL NOT BEEN ABLE TO DETERMINE THE PROBLEM.MY CONCERN IS THAT THEY ARE ATTEMPTING TO REPAIR AN ISSUE WITHOUT HAVING A FULL UNDERSTANDING OF THE PROBLEM. IF THIS ISSUE WERE TO RE-OCCUR WHILE DRIVING AT HIGH SPEED, THE CONSEQUENCES COULD BE CATASTROPHIC, AS THE CAR WOULD IMMEDIATELY COME TO A STOP AND ALL CONTROL MIGHT BE LOST. I DON'T GET THE SENSE THAT GM IS TAKING THIS ISSUE SERIOUSLY ENOUGH. THEY SEEM TO BE TREATING THIS LIKE A TECH COMPANY DEALS WITH SOFTWARE ISSUES. THEY ARE SIMPLY WAITING FOR THE PROBLEMS TO OCCUR AND THEN HAVING THEIR ENGINEERS RUN DIAGNOSTICS. UNFORTUNATELY, GIVEN THE SEVERITY OF THE ISSUE, THEY MAY BE PUTTING LIVES AT STAKE WHILE THEY "DE-BUG" THEIR DESIGN. THIS IS NOT A COMPUTER APP. IT IS A VEHICLE CARRYING HUMANS AT HIGH SPEED. GM NEEDS TO BE MORE PROACTIVE AND TAKE THESE CARS OFF THE ROAD UNTIL THEY FULLY UNDERSTAND THE ISSUE AND HAVE A PERMANENT RESOLUTION.

NHTSA ID Number: 11113064
NHTSA Posting Date: July 20, 2018

THE BOLT STOPPED PROVIDING POWER WHEN I WAS DRIVING DOWN A 4 LANE FREEWAY. IT HAS ALREADY FAILED 3 TIMES IN THE PAST, THIS IS THE 4TH TIME.

NHTSA ID Number: 11114062
NHTSA Posting Date: July 26, 2018

ON 2018-07-26 AT APPROXIMATELY 2325H, VEHICLE WAS BEING DRIVEN AT ~70MPH NORTHBOUND ON I-95, THE MAINE TURNPIKE. LOCATION WAS APPROXIMATELY 1/2 MILE NORTH OF EXIT-32 (BIDDEFORD, ME). ROAD CONDITIONS WERE GOOD, TEMPERATURES IN THE MID-70F, HUMID. THE OWNER'S WIFE WAS DRIVING, WITH HER HUSBAND IN THE PASSENGER SEAT.

AT THE TIME LISTED, THE VEHICLE SOUNDED A WARNING CHIME, AND RAPIDLY LOST POWER FROM HIGHWAY SPEEDS (70 MI/HR). VEHICLE, WITH THE EXCEPTION OF SPEED, WAS IN CONTROL WITH BRAKES AND STEERING, EMERGENCY FLASHERS, AND LIGHTS OPERATING.

. . . .

NHTSA ID Number: 11115206
NHTSA Posting Date: July 27, 2018

BOLT EV CHIMED, ICON APPEARED AND THE TRAVEL MILEAGE FROM THE EVENING'S CHARGE DROPPED FROM ABOUT 240 MI TO LO AND I HAD TO PULL OVER AND PARK. MESSAGE ON DISPLAY WAS PROPULSION POWER IS REDUCED. I THEN HAD TO BE TOWED TO CHEVY DEALER TO HAVE THE RECALL #18097 REPROGRAMMED. PROBLEM REOCCURRED 3 DAYS LATER. HAD TO BE TOWED AGAIN. CAR IS UNSAFE. I LIVE IN VERY RURAL AREA...WAS LUCKY IT WAS DAYLIGHT.

NHTSA ID Number: 1115887
NHTSA Posting Date: Aug. 3, 2018

CAR SUDDENLY LOST POWER ON THE HIGHWAY. I HAD TO COAST TO A STOP.

THE HIGH-VOLTAGE BATTERY WHICH HAD BEEN 3/4 FULL WENT DOWN TO ZERO.

AFTER THE INCIDENT, THE CAR COULD NO LONGER BE DRIVE.

I'D ALREADY HAD GM'S RECALL INSTALLED N172127150

NHTSA ID Number: 11127952
NHTSA Posting Date: Sept. 2, 2018

DRIVING AT 65 MPH WITH 100+ MILE RANGE, CAR HAD A
SUDDEN AND COMPLETE LACK OF PROPULSION. ELECTRONICS
IN THE CAR CONTINUED TO WORK, BUT ABSOLUTELY NO
PROPULSION. COULD SHIFT CAR TO NEUTRAL. CAR
EVENTUALLY TOWED TO DEALER.

NHTSA ID Number: 11165022
NHTSA Posting Date: Dec. 13, 2018

CHEVROLET BOLT 2017 WITH ABOUT 55% OF BATTERY
CHARGE BRIEFLY DISPLAYED A MESSAGE 'PROPULSION MAY
BE REDUCED' AND A FEW MINUTES LATER IT STOPPED IN THE
MIDDLE OF THE FREEWAY AND HAD TO BE TOWED AWAY. THE
BATTERY INDICATOR SWITCHED MOMENTARILY FROM 125
MILES TO 40 MILES AND THEN IMMEDIATELY TO 10 MILES AND
THE CAR COULD NOT BE SHIFTED TO DRIVE, DISPLAYING
MESSAGE 'CONDITION NOT CORRECT TO SHIFT.' BEWARE, AS
GLITCH LIKE THAT WITH BOLT CAN REALLY ENDANGER YOUR
LIFE, AS IT ENDANGERED MINE. I WAS FORTUNATE TO BE
ALONE IN THE CAR WITHOUT MY FAMILY, STUCK ON THE
FREEWAY AFTER DARK AS CARS AROUND WERE GOING FULL
SPEED. THE DEALERSHIP REPLACED THE BATTERY, BUT AFTER
THE REPLACEMENT THE CAPACITY AT FULL CHARGE SHOWS
ONLY 154 MILES IN LIEU OF OVER 220 MILES BOLT SUPPOSED
TO HAVE.

NHTSA ID Number: 11204280
NHTSA Posting Date: Apr. 9, 2019

THE BATTERY FOR 2017 CHEVY BOLT HAS PROBLEM AND MY
CAR STOPPED IN THE MIDDLE OF THE ROAD. I WAS VERY
LUCKY THAT I WAS IN THE CITY AND THIS HAPPENED AT A
TRAFFIC LIGHT. THE BATTERY WAS SHOWING IT HAS 70 MILES
LEFT, IT DROPPED TO 30 AND THEN ZERO RIGHT AWAY AND I
COULD NOT MOVE THE CAR AND HAD TO TOW THE CAR TO

DEALERSHIP. I HAVE ONLY 17,000 MILES ON THE CAR. I TOOK THE CAR TO DEALERSHIP, AT FIRST THEY TOLD ME THAT THERE IS A RECALL ON BATTERY THAT WAS ISSUED APRIL 1ST AND I SHOULD BE GETTING A LETTER IN THE MAIL, LATER CHEVY CUSTOMER SERVICE AND DEALERSHIP CHANGED THEIR STORY AND NOW THEY ARE TELLING ME THERE IS NO RECALL AND IT IS ONLY FOR CUSTOMER SATISFACTION THAT THEY NEED TO REPLACE THE BATTERY! I DO NOT WANT TO IMAGINE IF THE CAR WOULD HAVE STOPPED IN THE MIDDLE OF THE HIGHWAY. IF YOU OWN A CHEVY BOLT BE VERY CAREFUL AND I WOULD NOT TRUST THE SAFETY OF THE VEHICLE AS CHEVY IS NOT EVEN ISSUING A RECALL TO FIX THIS PROBLEM.

NHTSA ID Number: 11204814
NHTSA Posting Date: Mar. 2, 2019

ON THE NIGHT OF MARCH 2, 2019 I WAS DRIVING AT ABOUT 50 MPH ON A STATE HIGHWAY WHEN I SUDDENLY, WITHOUT WARNING, LOST PROPULSION. A NOTE CAME ON THE DASH INDICATING THAT I NEEDED TO PULL OVER AND PUT THE CAR INTO PARK. HAPPILY THERE WAS NO TRAFFIC SO THAT I WAS ABLE TO DO SO WITHOUT AN ACCIDENT. I WAS UNABLE TO RESTART THE CAR AND PUT IT INTO DRIVE AFTER THAT, SO I CALLED A TOW TRUCK. IT WAS VERY COLD WAITING FOR THE TOW TRUCK AS THE CAR HAD NO HEAT. THE CAR REPORTED APPROXIMATELY 50% BATTERY CAPACITY THE ENTIRE TIME. A SUDDEN UNEXPECTED LOSS OF PROPULSION IS A DANGEROUS EVENT. THE CAR HAD ONLY 11,000 MILES ON IT. AFTER SITTING FOR SOME TIME, THE CAR HAS 'FIXED' ITSELF. HOWEVER, THIS WILL PROBABLY HAPPEN AGAIN. I HAVE BROUGHT IT TO A CERTIFIED CHEVROLET SERVICE CENTER AND CALLED CHEVROLET TO REPORT THE ISSUE. BECAUSE THE PROBLEM IS INTERMITTENT, THEY ARE UNABLE TO DIAGNOSE THE PROBLEM.

NHTSA ID Number: 11243074
NHTSA Posting Date: Aug. 8, 2019

MY 2017 CHEVY BOLT LOST PROPULSION WHILE IN MOTION ON CITY STREETS IN LOS ANGELES IN TRAFFIC WITHOUT WARNING FROM EITHER ON STAR OR THE VEHICLE. THE

BATTERY INDICATED APPROXIMATELY AN 60% CHARGE.

NHTSA ID Number: 11218778
NHTSA Posting Date: June 9, 2019

ON SATURDAY JUNE 1, 2019 I WAS DRIVING DOWN THE
FREEWAY AT APPROXIMATELY 65MPH. AS I PULLED OFF THE
FREEWAY ONTO A SIDE ROAD, THE "LOW PROPULSION" LIGHT
CAME ON. I IMMEDIATELY LOST ALL PROPULSION AND
COASTED INTO A PARKING LOT. I HAD THE CAR TOWED TO
THE CHEVY DEALER. THE TECHNICIAN WAS ABLE TO START
THE CAR ON MONDAY BUT AS HE DROVE IT INTO THE
GARAGE, THE SAME THING HAPPENED, SUDDEN LOSS OF
COMPULSION. THE DEALER DIAGNOSED MY CAR WITH
CHEVROLET ENGINEERING AND HAD TO ORDER A
TRANSMISSION, POWER HARNESS AND A 3RD MAJOR PART.
THE SERVICE PERSON SAID THIS HAD HAPPENED TO SEVERAL
OTHER 2019 BOLTS. THIS SUDDEN LOSS OF PROPULSION WAS A
DANGEROUS SITUATION AND COULD HAVE BEEN MUCH
WORSE HAD WE LOST PROPULSION ON THE FREEWAY, JUST 5
MINUTES BEFORE WE EXITED THE FREEWAY.

NHTSA ID Number: 11268291
NHTSA Posting Date: Sept. 19, 2019

VEHICLE WAS DOING HIGHWAY SPEEDS ON INTERSTATE 81 IN
PENNSYLVANIA IN THE LEFT LANE. SUDDENLY, THE VEHICLE
MADE A LOUD THUD, FOLLOWED BY RAPID DECELERATION.
MANAGED TO BARELY MAKE IT TO THE RIGHT SHOULDER,
AND AT THAT POINT THE VEHICLE PUT ITSELF INTO PARK AND
REFUSED TO SHIFT INTO DRIVE OR REVERSE. WARNING
MESSAGES AND INDICATORS LIT UP ON THE DASHBOARD, AND
AN ONSTAR NOTIFICATION EMAIL WAS RECEIVED ON MY
PHONE. WAS FORTUNATE TO MAKE IT TO THE SHOULDER,
OTHERWISE THE VEHICLE WOULD HAVE BEEN STRANDED IN
THE MIDDLE OF THE HIGHWAY WITH NO WAY TO MOVE IT OFF
THE ACTIVE ROADWAY.

NHTSA ID Number: 11329136
NHTSA Posting Date: June 15, 2020

VEHICLE UNEXPECTEDLY & WITHOUT WARNING LOST POWER

WHILE TRAVELING ON HIGHWAY. VEHICLE WAS UNABLE TO
ACCELERATE AND ALL POWER FROM THE HIGH VOLTAGE
SYSTEM WAS LOST.

NHTSA ID Number: 11363890
NHTSA Posting Date: Oct. 8, 2020

I WAS DRIVING MY CHEVY BOLT AT APPROXIMATELY 40-45
MPH WHEN IT WAS AT ABOUT 50% CHARGE CAPACITY WHEN
ALL OF A SUDDEN THE CAR SHARPLY DECELERATED AND
WARNING LIGHTS CAME ON SAYING THE CHARGE WAS DOWN
TO 0 AND THAT IT NEEDED TO BE RECHARGED IMMEDIATELY.
I PULLED OVER TO THE SIDE OF THE ROAD AND CALLED FOR
HELP. THERE'S NO WAY THE CAR SHOULD HAVE LOST 50% OF
IT'S CHARGE OUT OF NOWHERE LIKE THAT. I WAS NOT ABLE
TO RESTART THE CAR OR REGAIN POWER. IT HAS TO BE
TOWED TO THE DEALER.

355.   Below are examples of consumer complaints submitted to NHTSA

regarding fires from the Class Vehicles. Each of these complaints cites fire or smoke

coming from the Class Vehicles while or shortly after being charged[86]:

NHTSA ID Number: 11365622
NHTSA Posting Date: Oct. 21, 2020

I BROUGHT THE CAR TO THE DEALER ON 2 SEPARATE
OCCASIONS WITH CONCERNS OF A FAULTY BATTERY. THE
BATTERY SUDDENLY STOPPED CHARGING FULLY. HOWEVER, I
WAS TOLD BY THE DEALER TWICE THAT THE BATTERY WAS
FUNCTIONING PROPERLY AND THERE WAS NOTHING THEY
COULD DO. I OPENED A CLAIM WITH GM REGARDING THIS
INCIDENT, ASKING THEM TO REPLACE THE BATTERY, SINCE IT
WAS STILL UNDER WARRANTY, AND THERE WAS CLEARLY AN
ISSUE. AFTER MONTHS OF BACK-AND-FORTH, GM CLOSED MY
CASE STATING IT WAS NORMAL DEPRECIATION OF THE

---

[86] NHTSA Complaint Database for 2017 Chevrolet Bolt, (last visited July 18,
2021);NHTSA Complaint Database for 2018 Chevrolet Bolt, (last visited July 18,
2021); NHTSA Complaint Database for 2019 Chevrolet Bolt, (last visited July 18,
2021).

BATTERY. ONE WEEK AFTER THEY CLOSED MY CASE, **THE BATTERY SPONTANEOUSLY CAUGHT FIRE WHILE CHARGING IN MY GARAGE OVERNIGHT**. IT TOTALED 2 VEHICLES, CHARRED EVERYTHING IN MY GARAGE, AND CAUSED SUCH SEVERE SMOKE DAMAGE THAT ALMOST EVERYTHING IN MY HOME WAS A TOTAL LOSS. THE FIRE DEPARTMENT DETERMINED THE FIRE ORIGINATED FROM THE TRUNK AREA, WHERE THE BATTERY IS. MY FAMILY IS DISPLACED WHILE REPAIRS ARE BEING DONE TO MY HOME, AT A TUNE OF APPROXIMATELY $200,000 AT THIS POINT. WE LOST APPROXIMATELY $105,000 IN CONTENTS, AS WELL AS THE 2 TOTALED VEHICLES ($75,000).

NHTSA ID Number: 11372429
NHTSA Posting Date: Oct. 30, 2020

IN THE EARLY MORNING HOURS OF OCTOBER 21ST, AROUND 3AM, **WE WERE WOKEN UP BY SMOKE/FIRE ALARMS**. WE STARTED RUNNING AROUND OUR HOME TO IDENTIFY THE CAUSE OF THE ALARM. AFTER ABOUT 5 MINUTES OF SEARCHING INSIDE THE HOME AND FINDING NOTHING, WE REALIZED THAT THERE WAS SOME SMELL OF SMOKE COMING FROM THE GARAGE AND WHEN THE MUDROOM DOOR WHICH LEADS TO THE GARAGE WAS OPENED, WE FOUND THAT **THE CHEVY BOLT WAS ON FIRE AND THERE WAS LOT OF SMOKE IN THE GARAGE**. THE CHEVY BOLT WAS PARKED/STATIONARY IN DOOR 3 SECTION OF THE GARAGE AND OUR OTHER CAR WAS PARKED IN DOOR 1 SECTION OF THE GARAGE. THE DOOR 2 SECTION OF THE GARAGE WAS EMPTY AT THE TIME OF THE INCIDENT. WITH CHEVY BOLT ON FIRE, WE SAW THAT THE DOOR 3 SECTION OF THE GARAGE WAS ENGULFED IN FLAMES AND FILLED WITH SMOKE. WE TRIED TO USE THE FIRE EXTINGUISHER TO PUT-OFF THE FIRE BUT COULD NOT CONTAIN THE SPREAD OF THE FIRE. THE CHEVY BOLT WAS KEPT FOR CHARGING OVERNIGHT, AS HAS BEEN THE GENERAL PRACTICE THAT WE HAVE BEEN FOLLOWING FOR AROUND 2 YEARS. WE CALLED 911 AS SOON AS WE SAW THE GARAGE IN FLAMES AND FIRE ENGINES ARRIVED WITHIN 15 MINUTES BUT THE FIRE HAD SPREAD WIDELY AND CAUSED RAMPANT DAMAGES TO THE ENTIRE GARAGE INCLUDING THE OTHER CAR, BEDROOM ON THE TOP

OF THE GARAGE IN THE SECOND FLOOR AND THE BEDROOM ADJOINING THE GARAGE IN THE FIRST FLOOR. WHILE ALL THE OCCUPANTS OF THE HOME GOT OUT WITHIN AROUND 8 MINUTES OF HEARING THE FIRE ALARM, THE FIRE AND HEAT/SMOKE SPREAD QUICKLY TO WASHER/DRYER SECTION, EAT IN DINING, KITCHEN, FAMILY ROOM AND FORMAL DINING ROOM. THE OTHER SECTIONS OF THE HOME INCLUDING THE FOYER, OFFICE ROOM, SUN ROOM AND ALL OF THE BEDROOMS UPSTAIRS WERE QUICKLY FILLED BY SMOKE AND SOOT. THE HEAT INSIDE THE HOME WAS SO MUCH THAT ONE CAN LITERALLY SEE THE FRAMING STUDS. THE TOWNSHIP FIRE AND POLICE DEPARTMENT ARRIVED PROMPTLY ON THE SCENE AND HAVE BEEN DILIGENTLY FOLLOWING UP ON THE INVESTIGATION.

NHTSA ID Number: 11364692
NHTSA Posting Date: Oct. 16, 2020

CHEVY BOLT FINISHED CHANGING AND THEN STARTED TO SMOKE FROM UNDER THE CAR. THE SOUND OF POPPING NOISES WERE HEARD AND THEN **10 MINUTES LATER THE CAR WAS ENGULFED IN FLAMES**. THE CARS BATTERY PACK STARTING POPPING THEN EXPLODED IN FLAMES.

NHTSA ID Number: 11374956
NHTSA Posting Date: Nov. 17, 2020

2017 BOLT EV WAS PARKED NOSE INTO GARAGE PLUGGED INTO WALL CHARGER CHARGING UNATTENDED WITH MY PHONE SET TO ALERT ME WHEN ESTIMATED TO BE FULLY CHARGED. WHEN I CAME OUT OF THE HOUSE TO UNPLUG CHARGER THERE WAS FIRE VISIBLE UNDER BACK SEAT IN PASSENGER COMPARTMENT OF VEHICLE. CALLED 911 AND BY THE TIME POLICE AND FIRE RESPONDED WITHIN A FEW MINUTES **ENTIRE BATTERY UNDER VEHICLE ENGULFED CAR IN FLAMES** CAUSING GARAGE FIRE WHICH DESTROYED GARAGE AND ALL IT CONTENTS.JUST LEARNED FROM CARFAX THAT GM ISSUED RECALL NOVEMBER 15 FOR POTENTIAL BATTERY FIRES WHEN AT OR NEAR FULL CHARGE.

NHTSA ID Number: 11339878
NHTSA Posting Date: July 17, 2020

MY 2019 CHEVY BOLT WAS FULLY CHARGED AND DRIVEN FOR 12 MILES TO OUR DESTINATION, A TOWNHOUSE DEVELOPMENT WITH PRIVATE OUTDOOR OPEN PARKING. WE ARRIVED AROUND 7:30PM, PARKED IT AND TURNED IT OFF. 20 MINS LATER A NEIGHBOR RANG OUR DOORBELL BECAUSE THERE WAS 20 FOOT HIGH HEAVY WHITE/GRAY SMOKE CLOUD COMING OUT THE BACK OF THE CAR. I CALLED 911 AND FIREFIGHTERS DOUSED THE CAR WITH WATER FOR AN HOUR AFTER SMASHING THE REAR WINDOW TO GET ACCESS TO THE SMOKING AREA.THEY LEFT, LESS THAN AN HOUR LATER I CALLED 911 AGAIN B/C THE SMOKE RESTARTED. SMOLDERING WAS SO HOT IT PARTLY BURNED THE BACKSEAT. ONCE THE CAR WAS COOL ENOUGH IT WAS TOWED TO THE DEALERSHIP WHERE IT WAS ORIGINALLY PURCHASED. THERE IT BEGAN TO SMOKE AGAIN. 911 WAS CALLED AND FIREFIGHTERS PUT OUT THE SMOKE ONCE AGAIN. THIS TIME THE SMOKE WAS SMALL AND STARTED ON THE AREA WHERE THE BACKSEAT WAS PREVIOUSLY LOCATED; MINUTES LATER THE SAME HEAVY SMOKE CAME OUT FAST FROM UNDERNEATH THE FRONT PASSENGER SIDE. THE POLICE WERE THERE TO WITNESS THAT INCIDENT. IT WAS AROUND MIDNIGHT THEN.

**3 SPONTANEOUS COMBUSTIONS IN 4 HOURS**; DOOR CAMERA VIDEOS DIDN'T PICK UP MOVEMENT BETWEEN OUR ARRIVAL AND THE NEIGHBOR RINGING THE BELL; ONSTAR REPORTS DON'T SHOW ANYTHING ELECTRICALLY WRONG WITH THE CAR; NO ALTERATIONS HAD BEEN MADE TO IT; AND THE DASHBOARD DIDN'T SHOW ANY WARNINGS DURING THAT ONE LAST TRIP. BASED ON THE ABOVE, I BELIEVE THE PROBLEM WAS A HIGH VOLTAGE BATTERY RUNAWAY THERMAL EVENT.

EVEN THOUGH THE CAR IS STILL UNDER GM'S WARRANTY, THEY REFUSE TO INVESTIGATE BECAUSE WE CALLED OUR INSURANCE FIRST INSTEAD OF GM (PER GM'S PRODUCT ASSISTANCE CLAIM TEAM). THE CAR IS CURRENTLY AT AIIA AND GM COULD GO INVESTIGATE. BUT THEY WON'T. HOW MANY OTHER BOLTS ARE SPONTANEOUSLY COMBUSTING

AND PEOPLE GETTING HURT? **HOW MANY WILL IT TAKE FOR GM TO CARE?**

356.   The first complaint of spontaneous fire from the Class Vehicles was

submitted to NHTSA on July 8, 2019:

NHTSA ID Number: 11230072
NHTSA Posting Date: July 8, 2019

ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2) CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE FUMES FROM THE BURNING MATERIALS WAS SO THICK AND NOXIOUS IT PERMEATED OUR HOME, REQUIRING PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE COMPANY**.

357.   GM was also on notice of the serious problems with the Defective Battery

because consumers presented Vehicles (or records of destroyed Vehicles) for warranty

claims through GM authorized dealers. GM reviews this information and makes

warranty determinations.

358.   Despite evidence of fires resulting from charging the Bolt's batteries to 100%—and despite GM's apparent purchase of an affected Vehicle for investigative purposes and knowledge of the fires—a GM engineer gave an interview months after the first NHTSA complaints, saying that "[w]e engineered the battery system so that you can charge to 100% and maximize range. If you want maximum range, charge to 100%."[87] GM actually encouraged Chevy Bolt owners and lessees to "top off your battery as much or as little as you like."[88]

359.   As the numerous NHTSA complaints show, and as GM has admitted via its public statements about the recalls, this is untrue. The Defective Battery is at risk of catching fire at full or near full charge unless the Class Vehicles are modified to deplete full battery capacity by at least 10%, reducing the Vehicle range well below the advertised 238-mile range that consumers were promised when they purchased or leased the Class Vehicles.

360.   The reduced range produced by the software change increases the "range anxiety" that many EV drivers already have: the fear that their Vehicle will not have sufficient battery capacity to safely get them from point A to point B.[89] The software change also requires Plaintiffs and Class members to spend more time charging their

---

[87] Steve Birkett, *3 Takeaways from GM's Q&A with a Chevy Bolt EV Battery Expert*, TORQUENEWS (Oct. 31, 2019) [hereinafter Exhibit BI], https://www.torquenews.com/7893/3-takeaways-qa-chevy-bolt-ev-battery-expert (last visited July 17, 2021).
[88] *See* Exhibit AI.
[89] *See* Allen Brooks, *EV "Range Anxiety": Real World Issues*, MASTERRESOURCE (July 10, 2017) [hereinafter Exhibit BJ], https://www.masterresource.org/electric-vehicles/ev-batteries/ (last visited July 18, 2021).

Bolt EVs, and imposes additional expense and inconvenience for maintenance and potentially for using other Vehicles to reach destinations that would be accessible if the Bolt's range had not been significantly reduced.

361.   LG has been GM's partner in developing and manufacturing the Bolt since its inception, and then in discovering and investigating the Battery Defect, failing to disclose it, and rolling out the inadequate and misleading recalls described herein.

362.   As part of a strategy to expand and lead sales in the electric vehicle market, in October 2015, GM stated that it had entered into a "strategic partnership" with LG Electronics for development of the Bolt EV. The statement described their "partner[ship] on critical components" and the "joint planning and research" that "brought the Chevrolet Bolt EV to reality." With the "blend [of] expertise" the "[e]ngineers considered different architectures, electric driving ranges and performance options" before settling on the final specifications. LG also supplied more than 10 components for the Bolt EV including the electric battery cells and pack. "The agreements encompassed supplying components for the Bolt EV and marked the first time that GM integrated a full EV component supplier so early in vehicle development. . . . GM will partner with [LG] to leverage its own engineering with [LG] to develop unique strategic systems and components."

363.   Both GM and LG executives boasted about the partnership. GM's Executive Vice President of Global Development, Purchasing and Supply Chain, Mark Reuss, lauded the combined experience of GM and the LG Group (including the LG

Electronics Vehicle Components team of LG companies, including LG Chem, LG Innotek, LG Display and LG Electronics) to help develop the Bolt EV. President and CEO of the LG Electronics Vehicle Components Co., Woo-jong Lee, also referred to its selection as "GM's EV technology partner" as "indicative of exactly the type of contributions that traditional tech companies can make in the automotive space."

364.  GM has confirmed that it is working with LG to rectify the cause of these defect. Both companies are also working together to increase production for replacement parts. LG, too, has confirmed that it is working with its "client and partner . . . to ensure that the recall measures are carried out smoothly . . . . The reserves and ratio of cost to the recall will be decided depending on the result of the joint investigation looking into the root cause, currently being held by GM, LG Electronics and LG Energy Solution."[90]

365.  In short, at every stage, from development to manufacturing to investigation to recall, the LG Defendants have been GM's knowing partner in the conduct complained of here. GM's failure to disclose the Battery Defect or adequately remedy does not excuse LG's complicity—if anything, it only shows LG's failure to speak or to act in starker relief.

---

[90] Paul Lienert & Heekyong Yang, *Cells in GM, Hyundai EV battery fires linked to several LG plants*, Reuters (Aug. 27, 2021) [hereinafter Exhibit BS], https://www.reuters.com/business/autos-transportation/cells-gm-hyundai-ev-battery-fires-linked-several-lg-plants-2021-08-27/ (last visited Sept. 14, 2021).

**D.    The Proposed Recalls are Insufficient to Remedy the Harm to Class Vehicle Owners and Lessees**

**1.    November 2020 Recall**

366.    On November 13, 2020, more than a year after the first known incident of fire in the Class Vehicles, and more than four years after GM began manufacturing and distributing Class Vehicles, GM announced its intent to recall over 50,000 vehicles with high voltage batteries that "may pose a risk of fire when charged to full, or very close to full, capacity."[91] GM informed its authorized retailers of its intent to recall 68,667 Chevy Bolt EV Vehicles. Instead of completely recalling the Class Vehicles to replace the dangerous batteries, or buying them back to prevent future incidents, GM's recall initially proposed an "interim remedy" for Class Vehicles that would limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module[92]:

---

[91] *See* Exhibit BF.
[92] *See id.*



| GM Recall #: | NHTSA # | | Date Issued: |
|---|---|---|---|
| N202311730 | 20V701 | | Nov 13, 2020 |

**Recall Title:**

High Voltage Battery May Melt or Burn

**Recall Description:**

General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles. A select number of these vehicles were built with high voltage batteries produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity. While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk.

**Safety Risk Description:**

If the batteries in select vehicles within this population are charged to full capacity, or very close to full capacity, the batteries may pose a risk of fire.

**Repair Description:**

As an interim remedy, dealers will reprogram the hybrid propulsion control module 2 (HPCM2) to limit full charge to 90%.

**Customer Action:**

For more information, customers can visit www.chevy.com/boltevrecall or contact the Chevrolet EV Concierge 1-833-EVCHEVY or their preferred dealer.

**Recall Status:** INCOMPLETE

367.   GM mailed recall notices to Bolt owners and lessees in November 2020.

Below is a copy of a follow-up notice received by Plaintiffs.



368.   GM also emailed a notice entitled "Important safety information regarding

your Chevrolet Bolt EV" to Bolt owners and lessees in November 2020:





For more information, visit
**Chevy.com/boltevrecall ›**

For instructions on how to activate these settings, please view the video at our website: **Chevy.com/boltevrecall ›**

If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

We recommend scheduling a service appointment with your dealership beginning November 17th to update the vehicle's battery software to automatically limit the maximum state of charge to 90%. Our engineers are working around the clock to identify a permanent fix and we intend to deploy a final remedy to remove the 90% limitation as quickly as possible after the first of the year, 2021.

**For More Information:**
1. Visit us online at **www.chevy.com/boltevrecall ›**
2. Contact our dedicated customer support team, Chevrolet EV Concierge, at 1-833-EVCHEVY — available Monday through Friday from 8:00 a.m. – 7:00 p.m. EST
3. Contact your preferred Chevrolet EV dealer

We apologize for this inconvenience and are committed to finding a final solution to this issue as soon as possible.

As you may be aware, the National Highway Traffic Safety Administration (NHTSA) launched an investigation into a few reports the agency received from Chevrolet Bolt EV owners about potential fires. GM had already been investigating these reports prior to that announcement, in cooperation with NHTSA.

We wanted you to hear directly from Chevrolet about your vehicle and what you can expect from us. General Motors and Chevrolet have decided to voluntarily recall select 2017 – 2019 model-year Chevrolet Bolt EVs with high voltage batteries produced at LG Chem's Ochang, South Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity.

The safety of our products is the highest priority for the entire GM and Chevrolet teams. We are working around the clock on our continued investigation.

We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90%, and reduce the risk of fire.

**For your 2017 model-year Bolt EV:**
- Change the vehicle charge settings to use the Hill Top Reserve option

Steve Hill
U.S. Vice President, Chevrolet

369.   GM notified consumers that dealerships would offer a software update to implement the interim remedy on November 17, 2020, and also instructed consumers how to reduce the Vehicle change settings themselves in order to limit the charging capacity.[93] GM also instructed consumers not to park their Vehicles in their garages or carports until after they had implemented the software changes:

---

[93] *See* E-mail from Steve Hill, U.S. Vice President, Chevrolet, to 2017 Bolt Owners (Nov. 2020) [hereinafter Exhibit BK], https://static.nhtsa.gov/odi/rcl/2020/RMISC-20V701-4450.pdf (last visited July 17, 2021).

We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90% and reduce the risk of fire.

**For your 2017 model-year Bolt EV:**

- Change the vehicle charge settings to use the Hill Top Reserve option

For instructions on how to activate these settings, please view the video at our website:
Chevy.com/boltevrecall ›

If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

370.   Because the relationship between a lithium-ion battery's state of charge and its output voltage is not linear, decreasing the state of charge by 10%, as GM's recall did not reduce the output voltage by exactly 10%.[94] "Therefore, the available energy after the software update is less than 90% of the available energy before the software update. The mileage [of the Class Vehicles has been] reduced by more than 10%, making customers charge the [Vehicles] more frequently and increas[ing] the range anxiety."[95]

---

[94] Ryan Aalund, et al., *Understanding the Non-Collision Related Battery Safety Risks in Electric Vehicles a Case Study in Electric Vehicle Recalls and the LG Chem Battery*, 9 IEEE ACCESS 89527, 89530 (2021) [hereinafter Exhibit BL].
[95] *Id.*

371.   Thus, this "remedy" left Vehicle owners and lessees with considerably less range than advertised—an issue that consumers quickly raised via NHTSA complaints. Examples of such complaints are below[96]:

NHTSA ID Number: 11376229
NHTSA Posting Date: Nov. 25, 2020

TODAY I RECEIVED RECALL NOTIFICATION GM N202311730 ABOUT DEFECTIVE BATTERIES THAT CAN CAUSE A FIRE WHEN CHARGED TO 100%. GM'S SOLUTION IS TO CHANGE SOFTWARE TO LIMIT MY VEHICLE'S CHARGE TO 90%. THIS IS NOT A SOLUTION. IT IS A BAND AID. THE BATTERIES ARE DEFECTIVE AND SHOULD BE REPLACED. WHY SHOULD I SUFFER THE CONSEQUENCE OF THIS AND HAVE TO DEAL WITH REDUCED VEHICLE RANGE AND MORE FREQUENT CHARGING. IF THE BATTERIES ARE A FIRE HAZARD, THEY SHOULD BE REPLACED WITH SAFE BATTERIES AT NO-COST TO THE OWNER.

NHTSA ID Number: 11376136
NHTSA Posting Date: Nov. 24, 2020

GM RECALL DUE TO BATTERY FIRES AFFECTS THIS CAR. THE RECALL SOLUTION TO SIMPLY LIMIT MY DRIVING TO 90% OF THE RANGE IS ABHORRENT. MY CAR IS NOW LESS THAN 90% EFFECTIVE--THERE ARE DESTINATIONS I CAN NO LONGER REACH IN A SINGLE CHARGE, AND RECHARGING IS NOWHERE NEAR AS FAST OR UBIQUITOUS AS GAS. GM NEEDS A SOLUTION THAT RESTORES THE FULL DISTANCE ABILITY OF THIS CAR, OTHERWISE IT'S OUTRIGHT FRAUD.

372.   GM's interim remedy not only substantially limited the range of Class Vehicles, but has failed to prevent at least one battery fire. For example, one 2018 Chevy Bolt owner had the interim remedy applied to his Vehicle on March 25, 2021.[97]

---

[96] NHTSA Complaint Database for 2017 Chevrolet Bolt (last visited Dec. 10, 2020).
[97] Sean Graham, *Exclusive: The latest Chevy Bolt fire reveals troubling pattern that owners should be aware of*, ELECTREK (May 7, 2021) [hereinafter Exhibit BM],

On May 1, 2021, his Vehicle experienced a battery fire at approximately 11:00 am while his car was parked inside the garage of his home, resulting in an estimated $235,000 worth of damage to his Vehicle and property.[98] The Vehicle was not charging at the time, and prior to the battery fire it was "rarely used" and "[t]he owner did not charge to full often, if ever."[99]

## 2. April 2021 "Permanent Fix"

373. On April 29, 2021, GM announced a purported permanent "remedy" for the Defective Batteries in the Class Vehicles. GM's remedy consisted of a GM dealer tool to "identify potential battery anomalies and replace battery module assemblies as necessary" coupled with the installation of "advanced onboard diagnostic software into these [Class] Vehicles that … has the ability to detect potential issues related to changes in battery module performance before problems can develop"[100]:

---

https://electrek.co/2021/05/07/exclusive-the-latest-chevy-bolt-fire-reveals-troubling-pattern-that-owners-should-be-aware-of/ (last visited July 18, 2021).
[98] *Id.*
[99] *Id.*
[100] *See* Exhibit D.

General Motors is notifying owners of select 2017-2019 model year Chevrolet Bolt EVs that it has developed a remedy to complete the previously announced safety recall.

As part of the service procedure, dealers will utilize GM-developed diagnostic tools to identify potential battery anomalies and replace battery module assemblies as necessary. The remedy will also include the installation of advanced onboard diagnostic software into these vehicles that, among other things, has the ability to detect potential issues related to changes in battery module performance before problems can develop.

Customers will need to visit their nearest participating Chevrolet Bolt EV dealer to have the remedy service procedure performed.  When the vehicle is updated with the new software, the 90% state of charge limitation is removed, so that the battery is returned to its previous maximum charging capacity.

Customers of 2019 model year Chevrolet Bolt EVs were able to have this remedy performed starting on April 29 and customers who own 2017 and 2018 model year Bolt EVs will be eligible to have the remedy performed starting May 26 at their preferred Chevrolet Bolt EV Dealer.  We will also be making the advanced diagnostic software available to all other Bolt EV owners in the coming months.  Additionally, we will be making this diagnostic software standard in the 2022 Bolt EV and EUV, as well as future GM electric vehicles.

374.   The new diagnostic software was "supposed to monitor the [battery] cells for voltage variations much more closely and often than before. The idea is to proactively look for the conditions or indications that could lead to a fire. This way they can either avoid them, or get the battery replaced before a fire occurs."[101] If the software detects an abnormality, it advises the operator to take the Vehicle in for a battery swap. This amounts to an admission that the existing software was completely inadequate to prevent the manifestation of the battery defect.

---

[101] Sean Graham, *Chevy Bolt EV catches on fire after receiving both of GM's 'software fixes,'* ELECTREK (Jul. 8, 2021) [hereinafter Exhibit BN], https://electrek.co/2021/07/08/chevy-bolt-ev-catches-on-fire-after-receiving-both-of-gm-software-fixes/ (last visited July 17, 2021).

375.    In addition, the software "also monitors the battery after the charge completes to look for abnormalities" and "if the car detects a 'thermal runaway' event (aka impending fire), it will blare the horn and flash the lights."[102] Crucially, like GM's interim remedy, the April recall did not cure the Defective Battery in the Class Vehicles. Rather, it alerted operators of the Class Vehicles that a battery fire may still occur or is occurring.

376.    The warning did nothing to *prevent* a runaway event, and in practical terms it was next to worthless as a warning of an impending fire: when such a runaway event occurred, a Vehicle occupant—or an occupant of a nearby structure—may have only seconds before a catastrophic fire breaks out. In short, by the time the software detected that a runaway event is underway, the event is underway and a fire—notoriously difficult to extinguish in lithium-ion batteries—was, if not already ignited, inevitable within seconds.

377.    Like the interim remedy, GM's April purported "fix" did not prevent battery fires. On July 1, 2021, Tim Briglin, a Vermont state legislator and owner of a 2019 Chevy Bolt, experienced a battery fire despite having GM's new diagnostic software installed on June 9, 2021.

---

[102] *Id.*



378.   Prior to receiving the purportedly permanent recall fix, Briglin followed GM's instructions and limited the charge of his Vehicle to 80% capacity and reported no other issues with his Vehicle. At the time he received the recall fix his Vehicle had only 38,264 miles on the odometer. After receiving the recall fix, he resumed charging his battery to 100% (post-recall, likely only 90%, at most, of the advertised capacity), as instructed by GM.

379.   The morning of the fire, Briglin was awake and briefly heard "what could only be described as a very loud sucking noise."[103] He went outside to find smoke billowing from the rear of his Vehicle. Within ten minutes his Vehicle "burst into flames."[104]

380.   As an elected official, Briglin has advocated and supported electric Vehicles for years but is rightfully concerned by his experience, stating: "My primary

---

[103] *Id.*
[104] *Id.*

concern is for the safety of my constituents. I have dozens of them who drive Bolts, and I've probably heard from more than a dozen of them who are concerned. I'm not sure what to tell them, I'm worried for their safety."[105]

381.   At least two more Vehicles spontaneously caught fire after receiving the April "fix." On July 14, 2021, GM released a new recommendation to Plaintiffs and Class members: park the Vehicles outside, "away from homes and other structures," immediately after charging, and do not charge the Vehicles overnight.[106] GM recommended this *regardless* of whether the Vehicle has had the interim or final recall remedy completed.[107]

### 3.   July 2021 Safety Guidance

382.   On July 23, 2021, GM announced a new and "FINAL" recall for 2017–19 Chevrolet Bolt vehicles, regardless of whether they had already had the previous recall(s) performed. GM announce that it will replace "defective battery modules in the recall population," but provided no timeline for when replacement battery parts would be ready. In the meantime, GM imposed stringent restrictions on the charging and use of the 2017–19 Class Vehicles: customers were to limit charging capacity to 90%, charge their vehicle after every single use, avoid depleting their battery below "approximately

---

[105] *Id.*
[106] *See* Exhibit A.
[107] *Id.*

117

70 miles of remaining range," and "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight."[108]

383.   Thus, after eight months, GM conceded that its initial recall had done little or nothing to mitigate the fire risk, and that *additional* restrictions on the range, usability, charging, and even parking of Class Vehicles were required to avoid catastrophic fires, or at least to limit the damage the fires would cause. Range—the primary competitive selling point of EVs as battery technology catches up to the range afforded by gasoline vehicles—was thus effectively reduced from an advertised 238 miles to 144 miles, a roughly *40%* reduction. Meanwhile, the limitation on charging vehicles—after every drive, and not overnight—considerably restricts the usability of the vehicles, in light of the time it takes for an EV to reach a full charge.

384.   In early August, GM announced its quarterly earnings, including a line item for $800 million spent to date on the recall of the Chevrolet Bolt EV.

### 4.   August 2021 Recall

385.   On August 17, 2021, despite affirmatively representing just a few weeks before that 2020 Bolts were not affected,[109] GM announced an expansion of the recall of Class Vehicles to include roughly 9,000 previously excluded 2019 model year Class

---

[108] Exhibit B; Exhibit C; Exhibit D.
[109] Exhibit E.

Vehicles, plus 63,683 2020–22 model year Class Vehicles.[110] Once again, GM asked

customers to:

> Set your vehicle to a 90 percent state of charge limitation using Hilltop
> Reserve mode (for 2017-2018 model years) or Target Charge Level (for
> 2019-2022 model years) mode. Instructions on how to do this are available
> in the videos below. If you unable to successfully make these changes, or
> do not feel comfortable making these changes, GM is asking you to visit
> your dealer to have these adjustments completed.

> Charge your vehicle more frequently *and avoid depleting their battery
> below approximately 70 miles* (113 kilometers) of remaining range, where
> possible.

> Park your vehicle outside immediately after charging and do not leave your
> vehicle charging indoors overnight.[111]

386.    GM admitted that it did not have a fix for the Vehicles at the time, stating

that "we are working on a process to identify which modules are defect-free and which

need to be replaced. Once we have a validated process, we will be able to replace only

those modules that are actually defective."[112]

387.    GM also announced that this recall would cost an additional $1 billion, and

that it would seek reimbursement for at least some of that cost from its partner LG

---

[110] *See* Exhibit I; Neal E. Boudette, *G.M. Expands Chevrolet Bolt Recall Over Battery
Fire Concern*, N.Y. TIMES (Aug. 20, 2021) [hereinafter Exhibit BO],
https://www.nytimes.com/2021/08/20/business/gm-chevrolet-bolt-battery-
recall.html?referringSource=articleShare (last visited Sept.3, 2021).
[111] *See* Exhibit D (emphasis added).
[112] Hannah Lutz, *GM recalls all Chevy Bolt EVs for fire risk*, AUTOMOTIVE NEWS (Aug.
20, 2021) [hereinafter Exhibit BP], https://www.autonews.com/regulation-safety/gm-
recalls-all-chevy-bolt-evs-fire-risk?utm_source=breaking-
news&utm_medium=email&utm_campaign=20210820&utm_content=hero-headline
(last visited Sept. 15, 2021).

Chem.[113] Further, this announcement finally purported to describe the nature of the defect: "two manufacturing defects — a torn anode tab and folded separator — present in the same battery cell, which increases the risk of fire."[114]

388.   GM mailed notices of the updated recall to owners and lessees of the Vehicles in August 2021:

Dear Thomas Whittaker:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017 model year Chevrolet Bolt EV vehicles.  As a result, GM is conducting a safety recall.  We apologize for this inconvenience.  However, we are concerned about your safety and continued satisfaction with our products.

**IMPORTANT**

- Your vehicle is involved in a new GM safety recall N212343880.
- Previously, you were notified that your vehicle is involved in GM recall N202311731. If you have not done so, you should visit your Chevrolet EV dealer to obtain the remedy for the previous recall, which includes an important software update and diagnostic check on the health of your vehicle's battery system.
- This letter contains important interim safety precautions that should be followed until the final recall remedy for new recall number N212343880 is performed on your vehicle.

**Why is your vehicle being recalled?**

Certain vehicles were built with high voltage cells produced at LG Chem's Ochang, Korea facility that pose a risk of fire when charged to full, or very close to full, capacity.  Experts from GM and LG have identified the simultaneous presence of two manufacturing defects in the same battery cell as the root cause of these battery fires.

**What will we do?**

**Parts to repair your vehicle are not currently available,** but when parts are available, your Chevrolet dealer will replace the lithium ion battery modules in your vehicle with new lithium ion battery modules.  This service will be performed for you at **no charge.**

We are working as quickly as possible to correct this condition.  When parts are available, we will send you another letter asking you to take your vehicle to your Chevrolet dealer to have your vehicle serviced.  You can also check the status of this recall at: https://my.gm.com/recalls.

**gm** general motors

---

[113] Jamie LaReau, *GM recalls all Chevy Bolts for fire risk, recall to cost extra $1 billion*, DETROIT FREE PRESS (Aug. 20, 2021) [hereinafter Exhibit BQ], https://www.freep.com/story/money/cars/general-motors/2021/08/20/chevy-bolt-recall-2021-gm-fire-risk/8217053002/ (last visited Sept. 16, 2021).

[114] *Id.*

**What should you do?**

While we prepare to conduct this recall, you should take the following interim steps:

1. You should, whether or not your vehicle received the recall remedy in GM safety recall N202311731, return your vehicle to the 90% state of charge limitation using Hilltop Reserve mode (for 2017-2018 model years) or Target Charge Level (for 2019 model year) mode. If you are unable to successfully make these changes, or do not feel comfortable making these changes, visit your Chevrolet EV dealer to have these adjustments completed, **free of charge.**

2. Charge your vehicle more frequently and avoid depleting your battery below approximately 70 miles (113 KM) of remaining range, where possible.

3. **Continue to park your vehicle outside immediately after charging and do not leave your vehicle charging indoors overnight.**

If you have not visited your dealer to receive the recall remedy in GM safety recall N202311731, you should visit your Chevrolet EV dealer to obtain this important software update, which includes a diagnostic check on the health of your vehicle's battery system. After obtaining the software update, you should still take the interim steps summarized above. When scheduling your appointment, confirm with the dealer that they are an EV certified dealer.

**Do you have questions?**

If you have questions or concerns that your dealer is unable to resolve, please contact the Chevrolet EV Concierge team at 833-EVCHEVY (833-382-4389). Hours of operation are Monday through Friday, 8:00 AM to 12:00 AM ET or Saturday and Sunday, 12:00 PM to 9:00 PM ET.

If after contacting your dealer and the Chevrolet EV Concierge, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 21V560.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

*Regina A. Carto*

Regina A. Carto
Vice President
Global Product Safety and Systems

389.    In September 2021, GM announced further restrictions on owners and

lessees of the Vehicles. In addition to the recall instructions, if owners or lessees need to

park in a parking lot or structure, GM now recommends "parking on the top floor or on

an open-air deck and park[ing] 50 feet or more away from [other] vehicle[s]."[115] GM

repeated this advice to consumers on multiple forums:



https://www.cnbc.com/amp/2021/09/15/gm-advising-some-bolt-ev-owners-to-park-50-feet-away-from-other-cars.html

Is this actually official advice that we should park 50ft away from other vehicle regardless of context?

CNBC.COM
GM advising some Bolt EV owners to park 50 feet away f...

14h   Like   Reply



**Chevrolet**

John White Regarding parking decks, we recommend you park on the top floor of on open air parking structure, and park at least 50 feet away from all other vehicles. We still request that you don't leave your vehicle charging unattended, even if the charging station is located at the parking deck, where you parked.

390.   As of August 8, 2021, GM has confirmed that it is working with LG to

rectify the cause of the defect. Both companies are also working together to increase

---

[115] Michael Wayland, *GM advising some Bolt EV owners to park 50 feet away from other cars in case of fire*, CNBC (Sept. 15, 2021) [hereinafter Exhibit BR], https://www.cnbc.com/2021/09/15/gm-advising-some-bolt-ev-owners-to-park-50-feet-away-from-other-cars.html (last visited Sept. 16, 2021).

production for replacement parts. As of August 27, 2021, LG confirmed that it was

working with its "client and partner [GM] . . . to ensure that the recall measures are

carried our smoothly . . . . The reserves and ratio of cost to the recall will be decided

depending on the result of the joint investigation looking into the root cause, currently

being held by GM, LG Electronics and LG Energy Solution."[116]

391.   On August 30, 2021, GM shifted its narrative of the recall, stating that:

> If we took the battery stock that's in the field right now or at a warehouse,
> we're not confident that it is defect-free . . . . Because we are not confident
> that LG has the capability to build defect-free products, we've put the
> repairs on hold and we are not building new Bolts. We're not going to start
> recall repairs or start building new Bolts until we're confident LG will
> build defect-free products.[117]

392.   GM has been aware of the Defective Battery in the Class Vehicles since at

least July 2019, when it received the first complaint of a spontaneous fire when charging

a Chevy Bolt and when GM purchased the Vehicle at issue, purportedly to determine

the cause of the fire. But GM knew or should have known of the risk long before that—

before putting the Class Vehicles on sale in the first place. For more than a year after the

first fire, GM operated with a cynical "business-as-usual" attitude, going so far as to

reiterate to Class members that they could and should charge their Vehicles to 100%,[118]

---

[116] Exhibit BS.

[117] Jamie LaReau, *GM 'not confident' LG Chem will build defect-free Bolt batteries*, DETROIT FREE PRESS (Aug. 30, 2021) [hereinafter Exhibit BT], https://www.freep.com/story/money/cars/general-motors/2021/08/30/gm-lg-chem-bolt-batteries/5652862001/ (last visited Sept. 14, 2021).

[118] *See* Exhibit BI.

before opening a formal investigation into the fires in August 2020.[119] After opening

this investigation, it took months for GM to communicate to Plaintiff and Class

members that the danger from the Class Vehicles was so high that the Vehicles should

be parked outside, and a year for GM to announce a fulsome recall of the Vehicles—

over a year after the initial investigation began, GM has still not announced a timeline

for fixing the Vehicles.

393.   There is no justifiable reason for this delay, particularly since GM has still

done little more than warn consumers not to park their Vehicles inside their garage lest

the Defective Battery burn their home down. There is a possible financial motive,

though: the delay allowed GM to continue selling its remaining inventory of Class

Vehicles before switching over to a new battery design in advance of the 2020 model

year.

394.   Despite knowledge of the fires no later than the summer of 2019, GM has

sold and leased, and continues to sell and lease, Class Vehicles with the knowledge that

they contain defective and dangerous batteries that pose a risk to consumers. Instead,

GM first proposed a "fix" that resulted in reduced Vehicle range and the need for more

frequent charging by Class Vehicle owners and lessees, and that has been shown to be

ineffective. "GM said it understands owners could be upset about their cars not being

fully functional," it will only "address complaints on a case-by-case basis."[120] GM next

---

[119] *See* Exhibit BF.

[120] Tom Krisher, *GM recalling nearly 69K Bolt electric cars due to fire risk,* ABC NEWS (Nov. 13, 2020) [hereinafter Exhibit BU], https://abcnews.go.com/Technology/wire

purported to complete the recall by identifying battery anomalies and installing advanced onboard diagnostic software to detect potential issues; however, that recall has again been shown to be ineffective, and GM continues to recommend that Plaintiffs and Class members park their Vehicles outdoors and not charge the Vehicles overnight. Plaintiffs are not aware of GM having addressed owner complaints other than by recommending limiting the Battery's charging capacity.

395.   Upon information and belief, GM has not agreed to replace the defective Batteries or provide any other remedial measures that will provide Plaintiffs and Class members with a permanent remedy for the Battery Defect and restore the EPA-estimated driving range of 238 miles on a full charge.

396.   While GM has said since November 2020 in public forums and to Bolt owners and lessees that it was looking to introduce a more permanent fix, GM waited until August 2021 to announce a remedy and, at the time of filing, has still not announced any timeline for that remedy to occur.

397.   More frequent charging is a significant issue for owners of EVs like the Bolt, because charging an EV battery takes much longer than simply refilling the fuel tank in an internal-combustion Vehicle. This is why range is such a significant point of emphasis in EV advertising and such an important part of the bargain consumers strike when they choose to buy one EV over another. GM's ineffective remedies to date

---

Story/gm-recalling-69k-bolt-electric-cars-due-fire-74194714 (last visited July 18, 2021).

provide no assurances to consumers that such individuals are able to charge their

Vehicles to 100% capacity and are protected from a potentially deadly battery fire.

398.   Further, GM's newest recommendations make charging even more difficult

for Plaintiffs and Class members, many of whom rely upon reduced energy prices at

night to charge their Vehicles overnight. Plaintiffs and Class members must now keep a

close eye on their Vehicle while it charges and are afraid to use the charging stations

that they have paid to install in their houses for fear of fire.

399.   Had Defendants disclosed the defect to Class members, reasonable

consumers would have been aware of it. Instead, Defendants remained silent until more

than a year after the first incident of a Bolt catching fire while charging.

400.   Defendants' knowledge of the Battery Defect, and their subsequent

inaction, has resulted in harm to Plaintiff and Class members.

## E.   GM's Express and Implied Warranties

401.   For each Class Vehicle sold by GM, an express written warranty was

issued which covered the Vehicle, including but not limited to, the battery, and GM

warranted the Vehicle to be free of defects in materials and workmanship at the time of

purchase or lease.

402.   Pursuant to its express and written warranties, GM warranted the Class

Vehicles' high voltage battery pack to be free of defects in design, materials, and

workmanship and that repairs and other adjustments would be made by authorized

dealers, without charge, to correct defects in materials or workmanship which occurred during the first 8 years or 100,000 miles, whichever came first.

## V.    CLASS ACTION ALLEGATIONS

403.   Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

404.   Class Vehicles are defined as follows:

2017, 2018, 2019, 2020, 2021, and 2022 model year Chevrolet Bolt.

405.   In addition, state subclasses are defined as follows:

**Arizona Subclass:** All persons in the state of Arizona who bought or leased, other than for resale, a Class Vehicle.

**California Subclass:** All persons in the state of California who bought or leased, other than for resale, a Class Vehicle.

**Florida Subclass:** All persons in the state of Florida who bought or leased, other than for resale, a Class Vehicle.

**Georgia Subclass:** All persons in the state of Georgia who bought or leased, other than for resale, a Class Vehicle.

**Illinois Subclass:** All persons in the state of Illinois who bought or leased, other than for resale, a Class Vehicle.

**Kansas Subclass:** All persons in the state of Kansas who bought or leased, other than for resale, a Class Vehicle.

**Massachusetts Subclass:** All persons in the state of Massachusetts who bought or leased, other than for resale, a Class Vehicle.

**Michigan Subclass:** All persons in the state of Michigan who bought or leased, other than for resale, a Class Vehicle.

**New York Subclass:** All persons in the state of New York who bought or leased, other than for resale, a Class Vehicle.

**Oregon Subclass:** All persons in the state of Oregon who bought or leased, other than for resale, a Class Vehicle.

**Texas Subclass:** All persons in the state of Texas who bought or leased, other than for resale, a Class Vehicle.

**Virginia Subclass:** All persons in the state of Virginia who bought or leased, other than for resale, a Class Vehicle.

**Washington Subclass:** All persons in the state of Washington who bought or leased, other than for resale, a Class Vehicle.

**Wisconsin Subclass:** All persons in the state of Wisconsin who bought or leased, other than for resale, a Class Vehicle.

406.   The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

407.   **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses tens of thousands of individuals dispersed throughout the United States. The number of Class members is so numerous that joinder of all Class members is impracticable. The names, addresses, and phone numbers of Class members are identifiable through documents maintained by GM.

408.   **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class members. These common questions include:

      i.    whether Defendants engaged in the conduct alleged herein;

ii. whether Defendants had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii. whether Defendants should have had knowledge of the Battery Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv. when Defendants became aware of the Battery Defect in the Class Vehicles;

v. whether Defendants knowingly failed to disclose the existence and cause of this defect in the Class Vehicles;

vi. whether Defendants knowingly concealed the defect in the Class Vehicles;

vii. whether the LG Defendants had a duty to disclose the Battery Defect in the Class Vehicles;

viii. whether Defendant GM knowingly introduced a deceptively inadequate series of recalls;

ix. whether Defendants' conduct as alleged herein violates consumer protection laws;

x. whether Defendant GM's conduct as alleged herein violates warranty laws;

xi.  whether Defendants' conduct as alleged herein violates other laws asserted herein;

xii.  whether Plaintiff and Class members overpaid for their Class Vehicles as a result of the defect;

xiii.  whether Plaintiffs and Class members have suffered an ascertainable loss as a result of the defect;

xiv.  and whether Plaintiffs and Class members are entitled to damages and equitable relief.

409.   **Typicality:** Plaintiffs' claims are typical of the other Class members' claims because all Class members were comparably injured through Defendants' substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class members arise from the same operative facts and are based on the same legal theories.

410.   **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiffs and their counsel.

411.   **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be virtually impossible for the Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.   Discovery Rule

412.   The tolling doctrine was made for cases of concealment like this one. Plaintiffs and Class members did not discover, and could not have discovered through the exercise of reasonable diligence, that the Class Vehicles had one or more design and/or manufacturing defects that caused the Class Vehicle batteries to overheat when fully charged.

413.  Plaintiffs and Class members had no realistic ability to discover the extent of the design and/or manufacturing defects until their Class Vehicles spontaneously exploded or caught on fire, and would have had no reason to individually believe that the problems with their Vehicles were the result of a widespread design and/or manufacturing defect. Any statutes of limitation otherwise-applicable to any claims asserted herein have thus been tolled by the discovery rule.

**B.    Equitable Estoppel**

414.  Even if Plaintiffs' claims accrued before July 19, 2021, Defendants are equitably estopped from asserting the statutes of limitations. Defendant GM misrepresented that the Class Vehicles were safe and free from defects, including by issuing two separate recalls that failed to prevent the Vehicles from spontaneously igniting. Defendants knew that the Class Vehicles were unsafe and unable to perform as advertised without risking thermal runaway events that can result in catastrophic and dangerous fires.

415.  Plaintiffs and Class members were, until at least November 2020, unaware of the fact or nature of GM's misrepresentations. In fact, the full scope of GM's misrepresentations remained concealed until at least July 14, 2021, because GM represented that its recalls could make the Class Vehicles safe, but then reversed course and instructed consumers to park the Class Vehicles outside and far from structures, and to avoid charging them overnight. Defendants intended for Plaintiffs and Class members to rely upon the false advertisements and recall notices. Plaintiffs and Class members

did rely upon GM's false advertisements and claims to "fix" the Class Vehicles. Plaintiffs and Class members will be prejudiced if Defendants are not estopped.

## VI.   CLAIMS FOR RELIEF

### A.   Claims Brought on Behalf of the Nationwide Class

### COUNT ONE — COMMON LAW FRAUD – AFFIRMATIVE MISREPRESENTATION

416.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

417.   Plaintiffs assert this affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant GM.

418.   In its advertisements, GM claimed that the Chevrolet Bolt had a range of 238 miles, supporting its claim that it would meet consumers' need for a Vehicle to take drivers "beyond their average daily driving needs—with plenty of range to spare." GM communicated through these advertisements that the Class Vehicles were safe, durable, and would travel farther on a single charge than comparable Vehicles.

419.   GM further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged. GM knew that these representations were false when made.

420.   But the Class Vehicles purchased or leased by Plaintiffs and Class members were, in fact, defective, unsafe, and unreliable, because the Vehicle's batteries were susceptible to bursting into flame when fully or nearly fully charged.

421.   GM has known at least since mid-2019 that its representations regarding the Class Vehicles' range and safety were false. Even now, GM advertises the Bolt to have a driving range of at least 238 miles. GM broadcasts these advertisements with the intent that members of the general public rely on GM's representations in making their purchases.

422.   A reasonable consumer would have done just that, expecting that the Class Vehicles would not be defective or pose a serious safety risk, and that GM's representations about the Bolt's range would be accurate.

423.   Plaintiffs and Class members relied on GM's affirmative misrepresentations regarding the safety, durability, and range of the Class Vehicles when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class members were therefore fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

424.   To the extent that GM's conduct was willful, oppressive, or malicious, Plaintiffs and Class members are entitled to an award of punitive damages.

## COUNT TWO — COMMON LAW FRAUD – FRAUDULENT
## CONCEALMENT/FRAUD BY OMISSION

425.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

426.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant GM.

427.   The Class Vehicles that Plaintiffs and Class members purchased or leased were defective and unsafe because they were subject to spontaneous combustion when being charged to a full or almost-full battery level due to the Defective Battery.

428.   GM intentionally concealed the Defective Battery and acted with reckless disregard for the truth when GM failed to disclose to consumers for over a year that charging the Class Vehicles to 100% capacity could cause combustion and fire. Further, even after GM became aware of the risk of fire when charging the Class Vehicles, GM continued representing to consumers that the Class Vehicles could be safely charged to 100%, with the intent that consumers rely on such representations.

429.   GM had a duty to disclose this material safety information to Plaintiffs and Class members because GM knew about the safety hazards posed by the Defective Battery, and instead concealed the defect from the general public.

430.   Plaintiffs and Class members did not know about the Defective Battery and could not have discovered it through reasonably diligent investigation before GM

disclosed it—or until their Vehicles exploded or caught fire without warning, causing significant damage.

431.   But for GM's fraudulent omissions of material information, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class members have sustained damage because they purchased or leased Vehicles that were not as represented, and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, GM is liable to Plaintiffs and Class members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles

432.   GM's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class members, and to enrich themselves. GM's misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

### COUNT THREE — COMMON LAW FRAUD – FRAUDULENT CONCEALMENT/FRAUD BY OMISSION

433.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

434.   Plaintiffs assert this fraudulent concealment theory on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against the LG Defendants.

435.   As described herein, at all relevant times, the LG Defendants were joint venturers, partners, principals, agents, and/or affiliates of one another, in the design, engineering, manufacture, testing, validation, integration, and assembly of the technology and components central to the Defective Battery including, but not limited to, the Class Vehicles' lithium-ion battery cells and battery pack.

436.   As described herein, at all relevant times, the LG Defendants were acting within the course and scope of their joint venture, partnership, principal-agent, and/or affiliate relationship. The LG Defendants had knowledge of the acts of each other and ratified, approved, joined in, acquiesced, and/or authorized such acts, and retained the benefits of those acts.

437.   The Class Vehicles that Plaintiffs and Class members purchased or leased were defective and unsafe because they were subject to spontaneous combustion when being charged to a full or almost-full battery level due to the Defective Battery.

438.   The LG Defendants intentionally concealed the Defective Battery and acted with reckless disregard for the truth when they failed to disclose to consumers for over a year that charging the Class Vehicles to 100% capacity could cause combustion and fire. As alleged herein, the LG Defendants knew or reasonably should have known of the Defective Battery through joint planning, design, research, engineering, manufacture, testing, validation, integration, and assembly.

439.   The LG Defendants had a duty to disclose this material safety information to Plaintiffs and Class members because they possessed exclusive knowledge of it.

Defendants designed, engineered, manufactured, tested, validated, integrated, and assembled the technology and components central to the defect including, but not limited to, the Class Vehicles' lithium-ion battery cells and battery pack. This process revealed, or reasonably should have revealed, the existence of the defect

440.   Plaintiffs and Class members did not know about the Defective Battery and could not have discovered it through reasonably diligent investigation before Defendants disclosed it—or until their Vehicles exploded or caught fire without warning, causing significant damage.

441.   But for LG's fraudulent omissions of material information, Plaintiffs and Class members would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiffs and Class members have sustained damage because they purchased or leased Vehicles that were not as represented, and because they now own or lease Class Vehicles that are unsafe and never should have been placed in the stream of commerce. Accordingly, the LG Defendants are liable to Plaintiffs and Class members for damages in an amount to be proven at trial for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles

442.   LG's acts were done wantonly, deliberately, with intent to defraud, in reckless disregard of the rights of Plaintiffs and Class members, and to enrich themselves. LG's misconduct warrants an assessment of punitive damages in an amount

sufficient to deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT FOUR — VIOLATIONS OF
## THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *ET SEQ.*)

443. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

444. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the State Subclasses, against Defendant GM.

445. Plaintiffs and the Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

446. GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

447. The Class Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

448. GM's 3-year/36,000-mile "bumper to bumper" new Vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

449. GM's 5-year/60,000-mile powertrain new Vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

450. GM's 8-year/100,000-mile electric Vehicle component new Vehicle limited warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

451.   GM breached its express warranties by:

A.      Selling and leasing Class Vehicles with a battery that was

defective in materials and/or workmanship, requiring repair or replacement

within the warranty period; and

B.      Refusing and/or failing to honor the express warranties by

repairing or replacing the battery without leaving the Class Vehicles with

the same capability as advertised to the purchasers.

452.   Plaintiffs and the other Class members relied on the existence and length of

the express warranties in deciding to purchase or lease the Class Vehicles.

453.   GM's breach of its express warranties has deprived Plaintiffs and the other

Class members of the benefit of their bargain.

454.   The amount in controversy of Plaintiffs' individual claims meets or

exceeds the sum or value of $25.00. In addition, the amount in controversy meets or

exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the

basis of all claims to be determined in this suit.

455.   GM has been given reasonable opportunity to cure its breach of the written

warranties. Alternatively, Plaintiffs and the other Class members are not required to do

so because affording GM a reasonable opportunity to cure its breach of written

warranties was, and is, futile.

456.   As a direct and proximate cause of GM's breach of the written warranties,

Plaintiffs and the other Class members sustained damages and other losses in an amount

140

to be determined at trial. GM's conduct damaged Plaintiffs and the other Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorney fees and/or other relief as deemed appropriate.

## COUNT FIVE — UNJUST ENRICHMENT

457.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

458.   Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the State Subclasses, against Defendant GM.

459.   Plaintiffs and Class members paid GM the value of non-defective, fully operational Class Vehicles with a driving range of 238 miles. In exchange, GM provided Plaintiffs and Class members with defective Vehicles that are not fully operational and cannot be operated with a driving range of 238 miles (or more, for the 2020-2022 model year Class Vehicles) unless Plaintiffs and Class members take on the additional risk of having their automobiles combust during the charging process.

460.   Further, GM provided Plaintiffs and Class members with Class Vehicles that are in need of significantly more charging time than advertised, even as they produce a travel range lower than the advertised range. Plaintiffs provided GM with the value of Vehicles beset by none of these defects.

461.   As such, Plaintiffs conferred value upon GM which would be unjust for GM to retain.

462.   As a direct and proximate result of GM's unjust enrichment, Plaintiffs and Class members have suffered and continue to suffer various injuries. As such, they are entitled to damages, including but not limited to restitution of all amounts by which GM was enriched through its misconduct.

## B.   Claims Brought on Behalf of the Arizona Subclass

### COUNT SIX — VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. ANN.  §  44-1522)

463.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

464.   Plaintiffs Altobelli, Poletti, Kuchar, and Walker (for purposes of this section, "Arizona Plaintiffs") bring this claim on behalf of themselves and on behalf of the Arizona Subclass, against Defendants.

465.   Arizona Plaintiffs and Defendants are "persons" within the meaning of Section 44-1522 of the Arizona Consumer Fraud Act. Ariz. Rev. Stat. Ann. § 44-1522.

466.   Arizona prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with

the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby." Ariz. Rev. Stat. Ann. § 44-1522(A).

467.   In the course of doing business, Defendants misrepresented materials facts concerning the Class Vehicles. As alleged herein, Defendants misrepresented through their advertisements and public statements that the Class Vehicles' batteries could be safely charged to enable the Vehicles to travel for a reported range of 238 miles on a single full charge.

468.   In the course of doing business, Defendants knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and associated safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiffs and the Arizona Class members. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

469.   Defendants thus violated the Act by, at minimum: employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

470.   Defendants knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Arizona Plaintiffs and the Arizona Subclass

to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

471.   Arizona Plaintiffs and members of the Arizona Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

472.   Defendants had the duty to Arizona Plaintiffs and the Arizona Subclass members to disclose the Battery Defect and the defective nature of the Class Vehicles because:

> A.   Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing Vehicles throughout the United States that contained the Battery Defect;
>
> B.   Arizona Plaintiffs and the Arizona Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;
>
> C.   Defendants knew that Arizona Plaintiffs and the Arizona Subclass members could not reasonably have been expected to learn about or discover the Battery Defect and the effect it would have on the Class Vehicles' range and energy efficiency.

473.   In failing to disclose the Battery Defect and its resulting safety risks and efficiency decreases, Defendants have knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

474.   The facts that Defendants concealed or did not disclose to Arizona Plaintiffs and the Arizona Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiffs and the Arizona Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

475.   Defendants' violations present a continuing risk to Arizona Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

476.   The recall and modifications Defendant GM claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Arizona Plaintiffs or the Arizona Subclass the battery range promised to them when they purchased the Vehicles.

## COUNT SEVEN — BREACH OF EXPRESS WARRANTY
### (ARIZ. REV. STAT § 47-2313)

477.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

478.   Arizona Plaintiffs bring this claim on behalf of themselves and the members of the Arizona Subclass against Defendant GM.

479.   Arizona Plaintiffs and members of the Arizona Subclass were at all times relevant "buyers" with respect to the Class Vehicles. Ariz. Rev. Stat. Ann. § 47-2313.

480.   GM was a "merchant" at all times relevant with respect to motor vehicles under Ariz. Rev. Stat. §§ 47-2104(A) and 47-2a103(c), and a "seller" of motor vehicles under § 47-2103(A)(4).

481.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ariz. Rev. Stat. §§ 47-2105(A) and 47-2a103(A)(8).

482.   GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

483.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

484.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

485.   GM distributed the defective parts causing the Battery Defect in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

486.   GM breached these warranties by selling and leasing Class Vehicles with the Battery Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

487.   Arizona Plaintiffs each notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

488.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a

defective product without giving notice of the Battery Defect to Arizona Plaintiffs or the Arizona Subclass.

489.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Arizona Plaintiffs and Arizona Subclass members. Among other things, Arizona Plaintiffs and the Arizona Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

490.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Arizona Plaintiffs and the other Arizona Subclass members whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

491.    Arizona Plaintiffs and the Arizona Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

492.    As a direct and proximate cause of Defendant's breach, Arizona Plaintiffs and the other Arizona Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (ARIZ. REV. STAT. ANN.  §  47-2314)

493.   Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

494.   Arizona Plaintiffs bring this claim on behalf of themselves and on behalf of the Arizona Subclass against Defendant GM.

495.   GM is a "seller" and "merchant" with respect to the Class Vehicles. Ariz. Rev. Stat. Ann. § 47-2314(A).

496.   When GM sold its Class Vehicles to Arizona Plaintiffs and sold or leased Class Vehicles to members of the Arizona Subclass, GM warranted that the Class Vehicles were merchantable – i.e., that they would "[p]ass without objection in the trade . . ." and were "fit for the ordinary purposes for which such goods are used[.]" Ariz. Rev. Stat. Ann. § 47-2314(B)

497.   The Class Vehicles have a Battery Defect which puts them at risk of spontaneous combustion when charged to full or almost-full battery levels, which GM had represented to Arizona Plaintiffs and Class members was a charging practice that was appropriate and safe. The Class Vehicles are thus not fit for their ordinary purpose of transporting vehicle occupants in a reasonably safe manner during normal operation.

498.   The Defective Battery existed at the time the Class Vehicles left GM's manufacturing facilities and at the time the Class Vehicles were sold to Arizona Plaintiffs and sold or leased to members of the Arizona Subclass.

499. GM breached the implied warranty that the Class Vehicles were appropriate and safe for ordinary use by marketing, distributing, selling, and leasing Class Vehicles that contained the Battery Defect.

500. As a direct and proximate result of this breach of implied warranty, Arizona Plaintiffs and the members of the Arizona Subclass have suffered various injuries, including but not limited to having overpaid for the Class Vehicles, and having the Class Vehicles diminish in value as a result of the Defective Battery.

## COUNT NINE — FRAUD BY CONCEALMENT

501. Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

502. Arizona Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Arizona Subclass against Defendants.

503. Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

504. Arizona Plaintiffs bring this cause of action on behalf of themselves and the Arizona Subclass.

505. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to their customers the true nature of the Defective Battery, which often was not readily discoverable until years after they purchased or leased the Class Vehicles. These facts,

and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

506.   Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

507.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants, who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Arizona Plaintiffs and the members of the Arizona Subclass. The facts Defendants omitted from their representations were material because they directly impacted the Class Vehicles' safety and reliability.

508.   Defendants were in exclusive control of the material facts and such facts were not known to the public, the Arizona Plaintiffs, or the Arizona Subclass members. Defendants also possessed exclusive knowledge of the Defective Battery.

509.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Arizona Plaintiffs and the Arizona Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

510.   Arizona Plaintiffs and the Arizona Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of

the concealed and/or suppressed facts. The actions of Arizona Plaintiffs and the Arizona Subclass members were justified.

511. Arizona Plaintiffs and the Arizona Subclass members reasonably relied on these omissions and suffered damages as a result.

512. As a result of these omissions and concealments, Arizona Plaintiffs and the Arizona Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

513. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Arizona Plaintiffs and the Arizona Subclass members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TEN — UNJUST ENRICHMENT

514. Arizona Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

515. Arizona Plaintiffs bring this cause of action on behalf of themselves and the Arizona Subclass against Defendant GM.

516. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, GM charged a higher price for

their vehicles than the Class Vehicles' true value and GM thus obtained monies

rightfully belonging to Arizona Plaintiffs and the Arizona Subclass members.

517.   GM enjoyed the benefit of increased financial gains, to the detriment of

Arizona Plaintiffs and the Arizona Subclass members, who paid a higher price for

vehicles which actually had lower values. It would be inequitable and unjust for GM

retain these wrongfully obtained profits.

518.   Arizona Plaintiffs, therefore, seek an order establishing GM as a

constructive trustee of the profits unjustly obtained, plus interest.

**C.    Claims Brought on Behalf of the California Subclass**

**COUNT ELEVEN — VIOLATION OF THE
CONSUMER LEGAL REMEDIES ACT ("CLRA")
(CAL. CIV. CODE § 1750, *ET SEQ.*)**

519.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

520.   Plaintiffs Cannon, Chitra, Chung, Connelly, Corry, Corry, Kass, Khorey,

Kuchar, and Sterba (for purposes of this section, "California Plaintiffs") bring this claim

on behalf of themselves and on behalf of the members of the California Subclass against

Defendants.

521.   Defendants are each a "person" as that term is defined in California Civil

Code § 1761(c).

522.   California Plaintiffs and the California Subclass members are "consumers"

as that term is defined in California Civil Code §1761(d).

523.   Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from California Plaintiffs and Class members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).

524.   Defendants' acts and practices violated the CLRA by: (1) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have; (2) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (3) Advertising goods and services with the intent not to sell them as advertised; and (4) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

525.   Defendants' unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

526.   Defendants knew that the Defective Batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

527.   Defendants had the duty to California Plaintiffs and the California Subclass members to disclose the Defective Battery and the defective nature of the Class Vehicles because:

  A. Defendants were in a superior position to know the true state of facts about the Defective Batteries and their associated costs;

  B. California Plaintiffs and the California Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

  C. Defendants knew that California Plaintiffs and the California Subclass members could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

528. In failing to disclose the Defective Battery with its safety risks and inefficiency, Defendants have knowingly and intentionally concealed material facts and breached its duty to disclose.

529. The facts Defendants concealed or did not disclose to California Plaintiffs and the California Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had California Plaintiffs and the California Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

530. GM has long been on notice of California Plaintiffs' CLRA claims in this consolidated action because numerous plaintiffs in underlying actions provided notice of their individual CLRA claims pursuant to California Civil Code § 1782(a) in

November and December 2020. Plaintiffs Cannon, Chitra, Khorey, and Sterba provided GM with notice of its CLRA violations on July 19, 2021.

531.    The California Plaintiffs named above provided LG Defendants with notice of its CLRA violations on September 17, 2021, and currently seek injunctive relief. Plaintiffs hereby reserve their right to amend this complaint to seek monetary damages under the CLRA after the 30-day notice period expires.

532.    Defendants' fraudulent and deceptive business practices proximately caused injuries to California Plaintiffs and the members of the California Subclass.

533.    Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek injunctive and declaratory relief and reasonable attorneys' fees and costs against LG Defendants.

534.    Pursuant to Cal. Civ. Code § 1780, Plaintiffs seek injunctive, monetary, and declaratory relief and reasonable attorneys' fees and costs against Defendant GM.

## COUNT TWELVE — VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200)

535.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

536.    California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendants.

537.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

538.   Defendants have engaged in unfair competition and unfair, unlawful, or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from California Plaintiffs and other California Subclass members that the Class Vehicles use the Defective Batteries (and thus suffer from the loss of efficiency, safety risks, and diminished value resulting from the defect). Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and California Plaintiffs and California Subclass members could not have been reasonably expected to learn or discover these true facts.

539.   The Defective Battery constitutes a safety issue for automobile owners, drivers, and passengers, thus requiring Defendants to disclose its existence to past and future owners and lessees.

540.   By its acts and practices, Defendants have deceived California Plaintiffs and is likely to have deceived the public. In failing to disclose the Defective Battery and suppressing other material facts, Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to California Plaintiffs and the Class members. Defendants' omissions and acts of concealment pertained to information material to Plaintiffs and other California Subclass members, as it would have been to all reasonable consumers.

541.   The injuries California Plaintiffs and the California Subclass members suffered greatly outweigh any potential countervailing benefit to consumers or to

competition, and they are not injuries that California Plaintiffs and the California Subclass members could or should have reasonably avoided.

542.   Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

543.   California Plaintiffs seek to enjoin Defendants from further unlawful, unfair, and/or fraudulent acts or practices, to obtain restitutionary disgorgement of all monies and revenues Defendants have generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## COUNT THIRTEEN — VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)

544.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

545.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendant GM.

546.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is

untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

547.   GM caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care GM should have known to be untrue and misleading to consumers, including California Plaintiffs and other California Subclass members.

548.   GM has violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, functionality, and energy efficiencies of the Class Vehicles were material and likely to deceive a reasonable consumer.

549.   California Plaintiffs and the other California Subclass members have suffered injuries in fact, including the loss of money or property, resulting from GM's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, California Plaintiffs and the other California Subclass members relied on GM's misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. GM's representations were untrue because it distributed the Class Vehicles with the Battery Defect. Had California Plaintiffs and the other California Subclass members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, California Plaintiffs and the California Subclass members did not receive the benefit of their bargain.

550.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

551.   California Plaintiffs, individually and on behalf of the other California Subclass members, request that the Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices, and restore to California Plaintiffs and the other California Subclass members any money GM acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

### COUNT FOURTEEN — BREACH OF EXPRESS WARRANTY
### (CAL. COM. CODE § § 2313 AND 10210)

552.   California Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

553.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendant GM.

554.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

555.   The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

160

556.   GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

557.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

558.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

559.   GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

560. GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

561. California Plaintiffs each notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

562. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product to California Plaintiffs or the Class.

563. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect California Plaintiffs and California Subclass members. Among other things, California Plaintiffs and the California Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the

Class Vehicles were defective at the time of sale and would fail well before their useful lives.

564.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make California Plaintiffs and the other California Subclass members whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

565.   California Plaintiffs and the California Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

566.   As a direct and proximate cause of GM's breach, California Plaintiffs and the other California Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

### COUNT FIFTEEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (CAL. COM. CODE §§ 2314 AND 10212)

567.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

568.   California Plaintiffs bring this claim on behalf of themselves and the California Subclass against Defendant GM.

569.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under California Commercial Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

570.   With respect to leases, GM is and was at all relevant times relevant a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

571.   The Class Vehicles are and were at all relevant times "goods" within the meaning of California Commercial Code §§ 2105(1) and 10103(a)(8).

572.   GM was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased.

573.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to California Commercial Code §§ 2314 and 10212.

574.   GM provided California Plaintiffs and the members of the California Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a

warranty that the Class Vehicles would be fit for their intended use while being operated.

575.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

576.   Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

577.   GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

578.   California Plaintiffs each notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various

sources, including through the NHTSA database, other online sources, and directly from consumers.

579.   California Plaintiffs and the California Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because California Plaintiffs and the California Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

580.   As a direct and proximate result of the breach of said implied warranty, California Plaintiffs and the California Subclass sustained the damages herein set forth.

581.   California Plaintiffs and the California Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT SIXTEEN — VIOLATIONS OF THE SONG-BEVERLY ACT – BREACH OF EXPRESS WARRANTY (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))

582.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

583.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendant GM.

584.   California Plaintiffs and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

585.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

586.   GM is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

587.   California Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by GM. GM made express warranties to California Plaintiffs and the other Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above. These warranties became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

588.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

589.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

590.   California Plaintiffs and California Subclass members experienced defects within the warranty period. Despite the existence of warranties, GM failed or refused to fix the Defective Batteries.

591.   California Plaintiffs and California Subclass members gave the GM or their authorized repair facilities opportunities to fix the defects unless only one repair attempt was possible because the vehicle was later destroyed or because GM or their authorized repair facility refused to attempt the repair. GM did not promptly replace or buy back the Class Vehicles of California Plaintiffs and the other Class members.

592.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, California Plaintiffs and the other California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

## COUNT SEVENTEEN — VIOLATIONS OF THE SONG-BEVERLY ACT – BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*)

593.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

594.   California Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendant GM.

595.   At all relevant times hereto, GM was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. GM knew or should have known of the specific use for which the Class Vehicles were purchased.

596.   GM provided California Plaintiffs and the California Subclass members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, inter alia, the Class Vehicles suffered from an inherent Battery Defect at the time of sale.

597.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

598.   GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

599.   Contrary to the applicable implied warranties, the Class Vehicles were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the suspension and steering linkage defect.

600.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## COUNT EIGHTEEN — FRAUD BY CONCEALMENT

601.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

602.   Plaintiffs and the California Class bring this claim on behalf of themselves and on behalf of the members of the California Subclass against Defendants.

603.   Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was not readily discoverable by the California Plaintiffs or California Subclass members until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

604.   Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

605.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior

knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by California Plaintiffs and the California Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

606. Defendants were in exclusive control of the material facts and such facts were not known to the public or the California Subclass members. Defendants also possessed exclusive knowledge of the Defective Batteries and the fact that they rendered the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

607. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce California Plaintiffs and the California Subclass members to purchase the Class Vehicles at a price higher than their true value.

608. Plaintiffs and the California Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of California Plaintiffs and the California Subclass members were justified.

609. California Plaintiffs and the California Subclass members reasonably relied on Defendant's omissions and suffered damages as a result.

610. As a result of these omissions and concealments, California Plaintiffs and the California Subclass members incurred damages including, but not limited to, their

lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

611. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of California Plaintiffs and the California Class members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D. Claims Brought on Behalf of the Florida Subclass**

**COUNT NINETEEN — VIOLATIONS OF THE FLORIDA UNFAIR & DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201. *ET SEQ.*)**

612. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

613. Plaintiffs Schulz and Verzura (for purposes of this section, "Florida Plaintiffs") bring this claim on behalf of themselves and the Florida Subclass against Defendants.

614. Florida Plaintiffs and the Florida Subclass members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

615. Defendants engaged in "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

616.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

617.   In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through their advertisements and public statements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

618.   In the course of doing business, Defendants also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Florida Plaintiffs and the members of the Florida Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

619.   Defendants thus violated the FUDPTA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a

173

material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

620. Defendants knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Florida Plaintiffs and members of the Florida Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendants' competitors.

621. Florida Plaintiffs and members of the Florida Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

622. Defendants had the duty to Florida Plaintiffs and members of the Florida Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A. Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

> B. Florida Plaintiffs and the members of the Florida Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.    Defendants knew that Florida Plaintiffs and the members of

the Florida Subclass could not reasonably have been expected to learn

about or discover the Defective Battery and the effect it would have on the

Class Vehicles' range and energy efficiency.

623.    In failing to disclose the Defective Battery and its resulting safety risks and

efficiency decreases, Defendants have knowingly and intentionally concealed and

omitted material facts and breached its duty to disclose.

624.    The facts Defendants concealed or did not disclose to Florida Plaintiffs and

the members of the Florida Subclass are material in that a reasonable consumer would

have considered them to be important in deciding whether to purchase the Class

Vehicles or pay a lesser price. Had Florida Plaintiffs and the members of the Florida

Subclass known the Class Vehicles were defective, they would not have purchased the

Class Vehicles or would have paid less for them.

625.    Defendants' violations present a continuing risk to Plaintiff as well as to

the general public. Defendants' unlawful acts and practices complained of herein affect

the public interest.

626.    The recall and modifications Defendant GM claims to have instituted to

address the Defective Battery have not been adequate, in that they do not restore to

Florida Plaintiffs or the Florida Subclass the battery range promised to them when they

purchased the vehicles.

627. Florida Plaintiffs and members of the Florida Subclass suffered ascertainable loss directly and proximately resulting from Defendants' FUDPTA violations. Florida Plaintiffs and members of the Florida Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

628. Florida Plaintiffs and members of the Florida Subclass seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the FUDTPA. Florida Plaintiffs and members of the Florida Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the FUDTPA.

629. Pursuant to Florida Statute § 501.201, Florida Plaintiffs will serve the Florida Attorney General with a copy of this complaint because they seek injunctive relief.

### COUNT TWENTY — BREACH OF EXPRESS WARRANTY
### (F.S.A. §§ 672.313 AND 680.21)

630. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

631. Florida Plaintiffs bring this claim on behalf of themselves and the Florida Subclass against Defendant GM.

176

632.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Florida Statutes Annotated §§ 672.104(1) and 680.1031(3)(k), and is a "seller" of motor vehicles under section 672.103(1)(d).

633.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

634.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Florida Statutes Annotated §§ 672.105(1) and 680.1031(1)(h).

635.   GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

636.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent

person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

637.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

638.   GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

639.   GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

640.   Florida Plaintiffs notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

641.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product to Florida Plaintiffs or the members of the Florida Subclass.

642.   The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Florida Plaintiffs and the members of the Florida Subclass. Among other things, Florida Plaintiffs and the members of the Florida Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Florida Plaintiffs and members of the Florida Subclass because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

643.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the members of the Florida Subclass whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

644.   Florida Plaintiffs and the members of the Florida Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

645.   As a direct and proximate cause of GM's breach, Florida Plaintiffs and the other Florida Subclass members bought or leased Class Vehicles they otherwise would

not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT TWENTY-ONE — BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (F.S.A. §§ 672.314 AND 680.212)

646.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

647.   Florida Plaintiffs bring this claim on behalf of themselves and the Florida Subclass against Defendant GM.

648.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Florida Statutes Annotated §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under section 672.103(1)(d).

649.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

650.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Florida Statutes Annotated §§ 672.105(1) and 680.1031(1)(h).

651.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Florida Statutes Annotated §§ 672.314 and 680.212.

652.   GM provided Florida Plaintiffs and the members of the Florida Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. GM impliedly

warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

653. However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

654. Florida Plaintiffs notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

655. Florida Plaintiffs and the Florida Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in

this case, however, because Florida Plaintiffs and the Florida Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

656.   As a direct and proximate result of the breach of said implied warranty, Florida Plaintiffs and the Florida Subclass sustained the damages herein set forth.

657.   Florida Plaintiffs and the Florida Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT TWENTY-TWO — FRAUD BY CONCEALMENT

658.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

659.   Florida Plaintiffs bring this claim on behalf of themselves and the Florida Subclass against Defendants.

660.   Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Battery, which often was not readily discoverable until years after they purchased or leased the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

661.   Defendants were under a duty to disclose these omitted facts, because where one does speak, one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

662.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Florida Plaintiffs and the members of the Florida Subclass. The facts Defendants omitted from its representations were material because they directly impacted the Class Vehicles' safety and reliability.

663.   Defendants were in exclusive control of the material facts and such facts were not known to the public, the Florida Plaintiffs, or the Florida Subclass members. Defendants also possessed exclusive knowledge of the Defective Battery.

664.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Florida Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

665.   Florida Plaintiffs and the Florida Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Florida Plaintiffs and the Florida Subclass members were justified.

666. Florida Plaintiffs and the members of the Florida Subclass reasonably relied on these omissions and suffered damages as a result.

667. As a result of these omissions and concealments, Florida Plaintiffs and the members of the Florida Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

668. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Florida Plaintiffs and the members of the Florida Subclass. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-THREE — UNJUST ENRICHMENT

669. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

670. Florida Plaintiffs bring this claim on behalf of themselves and the Florida Subclass against Defendant GM.

671. As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, GM charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Florida Plaintiffs and the members of the Florida Subclass.

672.   GM enjoyed the benefit of increased financial gains, to the detriment of Florida Plaintiffs and the members of the Florida Subclass, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

673.   Florida Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## E.   Claims Brought on Behalf of the Georgia Subclass

### COUNT TWENTY-FOUR — VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT
### (GA. CODE ANN. § 10-1-390, *ET SEQ.*)

674.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

675.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass against Defendants.

676.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

677.   In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

678.   In the course of doing business, Defendants also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Strong and the members of the Georgia Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

679.   Defendants thus violated the Georgia FBPA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

680.   Defendants had the duty to Plaintiff Strong and the members of the Georgia Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

      A.     Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

      B.     Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

      C.     Defendants knew that Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

681.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants have knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

682.   The facts Defendants concealed or did not disclose to Plaintiff Strong and the members of the Georgia Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Strong and the members of the Georgia

Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

683. Defendants knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff Strong and the members of the Georgia Class Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendants' competitors.

684. Plaintiff Strong and members of the Georgia Subclass justifiably relied on Defendants' material misrepresentations.

685. Defendants' violations present a continuing risk to Plaintiff Strong as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

686. The recall and modifications Defendants claim to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff Strong or the Georgia Subclass the battery range promised to them when they purchased the vehicles.

687. Plaintiff Strong and members of the Georgia Subclass suffered ascertainable loss directly and proximately resulting from Defendants' Georgia FBPA violations. Plaintiff Strong and members of the Georgia Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the

Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

688.   Plaintiff Strong and members of the Georgia Subclass seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Georgia FBPA. Plaintiff Strong and members of the Georgia Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia FBPA.

## COUNT TWENTY-FIVE — VIOLATIONS OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN. § 10-1-370, *ET SEQ.*)

689.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

690.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass against Defendants.

691.   Defendants, Plaintiff Strong, and the Georgia Subclass are "persons' within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code. Ann. § 10-1- 371(5).

692.   The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann. § 10-1-372(a).

189

693. In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, Defendants misrepresented through their advertisements and public statements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

694. In the course of doing business, Defendants also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Strong and the members of the Georgia Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

695. Defendants thus violated the Georgia UDTPA by, at minimum by: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

696.    Defendants had the duty to Plaintiff Strong and the members of the Georgia Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A.    Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;
>
> B.    Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;
>
> C.    Defendants knew that Plaintiff Strong and the members of the Georgia Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

697.    In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants have knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

698.    The facts Defendants concealed or did not disclose to Plaintiff Strong and the members of the Georgia Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Strong and the members of the Georgia

Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

699.   Defendants knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff Strong and the members of the Georgia Class Subclass to rely on these material misrepresentations when choosing to purchase or lease a Class Vehicle instead of vehicles marketed and sold by Defendant's competitors.

700.   Plaintiff Strong and members of the Georgia Subclass justifiably relied on Defendants' material misrepresentations.

701.   Defendants' violations present a continuing risk to Plaintiff Strong as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

702.   The recall and modifications Defendants claim to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff Strong or the Georgia Subclass the battery range promised to them when they purchased the vehicles.

703.   Plaintiff Strong and members of the Georgia Subclass suffered ascertainable loss directly and proximately resulting from Defendants' Georgia UDTPA violations. Plaintiff Strong and members of the Georgia Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the

Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

704.   Plaintiff Strong and members of the Georgia Subclass seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Georgia UDTPA. Plaintiff Strong and members of the Georgia Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia UDTPA.

## COUNT TWENTY-SIX — BREACH OF EXPRESS WARRANTY
## (GA. CODE. ANN. §§ 11-2-313 AND 11-2A-210)

705.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

706.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass against Defendant GM.

707.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

708.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

709.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

710.   GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

711.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

712.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

713.   GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

714.    GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

715.    Plaintiff Strong notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but concealed it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was given notice of these issues within a reasonable amount of time by the numerous complaints it was receiving and became aware of online.

716.    Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product to Plaintiff Strong or the members of the Georgia Subclass.

717.    The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiff Strong and the members of the Georgia Subclass. Among other things, Plaintiff Strong and the members of the Georgia Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and members of the Class members because GM knew or should have

195

known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

718.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff Strong and the members of the Georgia Subclass whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

719.   Due to the breach of warranties set forth herein, Plaintiff Strong and the Georgia Subclass members assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Plaintiff Strong and the Georgia Subclass members of the purchase price of all vehicles currently owned and for such other incidental and consequential damages as allowed.

720.   Plaintiff Strong and the members of the Georgia Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

721.   As a direct and proximate cause of GM's breach, Plaintiff Strong and the other Georgia Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

722. As a direct and proximate result of the GM's breach, Plaintiff Strong and the Georgia Subclass members have been damaged in an amount to be determined at trial.

## COUNT TWENTY-SEVEN — BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY
## (GA. CODE. ANN. §§ 11-2-314 AND 11-2A-212)

723. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

724. Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass against Defendant GM.

725. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Ga. Code Ann. §§ 11-2-104(1) and 11-2A-103(3), and a "seller" of motor vehicles under § 11-2-103(1)(d).

726. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Ga. Code Ann. § 11-2A-103(1)(p).

727. The Class Vehicles are and were at all relevant times "goods" within the meaning of Ga. Code Ann. §§ 11-2-105(1) and 11-2A-103(1)(h).

728. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ga. Code Ann. §§ 11-2-314 and 11-2A-212.

729. GM provided Plaintiff Strong and the members of the Georgia Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are

merchantable and fit for the ordinary purposes for which they were sold. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

730.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

731.   Plaintiff Strong notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

732.   Plaintiff Strong and the Georgia Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff Strong and the Georgia Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

733.   As a direct and proximate result of the breach of said implied warranty, Plaintiff Strong and the Georgia Subclass sustained the damages herein set forth.

734.   Plaintiff Strong and the Georgia Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT TWENTY-EIGHT — FRAUDULENT CONCEALMENT

735.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

736.   Plaintiff Strong brings this claim on behalf of herself and the Georgia Subclass against Defendants.

737.   Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and

other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

738.   Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

739.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff Strong and the members of the Georgia Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

740.   Defendants were in exclusive control of the material facts and such facts were not known to Plaintiff Strong and members of the Georgia Subclass, or the public. Defendants also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

741.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff Strong and the members of the Georgia Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

742.   Plaintiff Strong and the members of the Georgia Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff Strong and the members of the Georgia Subclass were justified.

743.   Plaintiff Strong and the members of the Georgia Subclass reasonably relied on these omissions and suffered damages as a result.

744.   As a result of these omissions and concealments, Plaintiff Strong and the members of the Georgia Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

745.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff Strong and the members of the Georgia Subclass. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT TWENTY-NINE — UNJUST ENRICHMENT

746.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

747.   Plaintiff Strong brings this claim on behalf of herself and the Subclass against Defendant GM.

748.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Battery described herein, GM charged a higher price for their vehicles than the vehicles' true value and GM obtained monies which rightfully belong to Plaintiff Strong and the members of the Georgia Subclass.

749.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiff Strong and the members of the Georgia Subclass, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for Defendant retain these wrongfully obtained profits.

750.   Plaintiff Strong, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**F.    Claims Brought on Behalf of the Illinois Subclass**

**COUNT THIRTY — VIOLATIONS OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILL. COMP. STAT. 505/1, *ET SEQ*. AND 720 ILL. COMP. STAT. 295/1A)**

751.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

752.   Plaintiffs Whittaker and Hickey (for purposes of this section, "Illinois Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass against Defendants.

753.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any

trade or commerce. Specifically, the Act prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

754.   Defendants are each a "person" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(c).

755.   Illinois Plaintiffs are each a "consumer" as that term is defined in the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/1(e).

756.   Defendants' unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

757.   Defendants knew that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

758.   Defendants had the duty to Illinois Plaintiffs and the Illinois Subclass members to disclose the Defective Battery and the defective nature of the Class Vehicles because:

      A.    Defendants were in a superior position to know the true state of facts about the Defective Battery and its associated costs;

      B.    Plaintiffs and the Illinois Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.      Defendants knew that Plaintiffs and the Illinois Subclass members could not reasonably have been expected to learn about or discover the battery defect and the effect it would have on the Class Vehicles' range and energy efficiency.

759.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants knowingly and intentionally concealed material facts and breached its duty to disclose.

760.   The facts Defendants concealed or did not disclose to Illinois Plaintiffs and the Illinois Subclass members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Illinois Plaintiffs and the Illinois Subclass members known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

761.   Defendants' conduct caused the damages suffered by the Illinois Plaintiffs and the Illinois Subclass, as alleged.

762.   As a result of Defendants' wrongful conduct, Illinois Plaintiffs and the Illinois Subclass have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, court costs, and reasonable attorneys' fees pursuant to 815 Ill. Comp. Stat. 505/1, *et seq.*

## COUNT THIRTY-ONE — VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (815 ILL. COMP. STAT. 510/1, *ET. SEQ*. AND 720 ILL. COMP. STAT. 295/1A)

763.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

764.   Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass against Defendants.

765.   815 Ill. Comp. Stat. 510/2 provides that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . (9) advertises goods or services with intent not to sell them as advertised; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

766.   Defendants are each a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

767.   The vehicles sold to Illinois Plaintiffs and the Illinois Subclass members were not of the particular sponsorship, approval, characteristics, ingredients, uses benefits, or qualities represented by Defendants.

768.   Defendants caused to be made or disseminated through Illinois and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care Defendants should have known to be untrue and misleading to consumers, including Illinois Plaintiffs and other Illinois Subclass members.

769.   Defendants violated Section 17500 because their misrepresentations and omissions regarding the safety, reliability, functionality, and energy efficiencies of the Class Vehicles were material and likely to deceive a reasonable consumer.

770.   Illinois Plaintiffs and the Illinois Subclass members have suffered injuries in fact, including the loss of money or property, resulting from Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Illinois Plaintiffs and the other Illinois Subclass members relied on Defendants' misrepresentations and/or omissions with respect to the Class Vehicles' safety and reliability. Defendants' representations were untrue because it distributed the Class Vehicles with the Defective Batteries. Had Illinois Plaintiffs and the Illinois Subclass members known this, they would not have purchased or leased the Class Vehicles or would not have paid as much for them. Accordingly, Plaintiffs and the other Illinois Subclass members did not receive the benefit of their bargain.

771. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a perpetuated and repeated pattern or generalized course of conduct, both in the state of Illinois and nationwide.

772. Defendants' conduct was knowing and/or intentional and/or with malice and/or demonstrated a complete lack of care and/or reckless and/or was in conscious disregard for the rights of Illinois Plaintiffs and the Illinois Subclass.

773. As a result of Defendants' wrongful conduct, Illinois Plaintiffs and the Illinois Subclass members have been damaged in an amount to proven at trial, including, but not limited to actual and punitive damages, equitable relief and reasonable attorneys' fees.

## COUNT THIRTY-TWO — BREACH OF EXPRESS WARRANTIES
### (810 ILL. COMP. STAT. 5/2-313)

774. Illinois Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

775. Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass against Defendant GM.

776. GM is and was at all relevant times a "merchant" with respect to motor vehicles under 810 ICS §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under section 5/2-103(1)(d).

777. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 ICS §§ 5/2-105(1) and 5/2A-103(1)(h).

778.   GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

779.   Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

780.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

781.   GM distributed the defective parts causing the Battery Defect in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

782. GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

783. Illinois Plaintiffs each notified GM of the breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

784. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiffs or the Class notice of the Defective Batteries.

785. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Illinois Plaintiffs and the Illinois Subclass members. Among other things, Illinois Plaintiffs and the Illinois Subclass members had no meaningful choice in determining these time limitations, the terms of which

unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Subclass members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

786.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiffs and the other Illinois Subclass members whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

787.   Illinois Plaintiffs and the Illinois Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

788.   As a direct and proximate cause of GM's breach, Illinois Plaintiffs and the other Illinois Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT THIRTY-THREE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (810 ILL. COMP. STAT. 5/2-314 AND 810 ILL. COMP. STAT. 5/2A-212)

789.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

790.   Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass against Defendant GM.

791.   GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

792.   GM breached the implied warranty that the vehicle was merchantable and safe for use as safe and reliable transportation by marketing, advertising, distributing and selling vehicles with the Defective Batteries.

793.   These defects existed at the time the vehicles left GM's manufacturing facilities and at the time they were sold to Illinois Plaintiffs.

794.   These defects were the direct and proximate cause of damages to Illinois Plaintiffs and the Illinois Subclass.

## COUNT THIRTY-FOUR — FRAUD BY CONCEALMENT

795.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

796.   Illinois Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Illinois Subclass against Defendants.

797.   Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily

211

discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

798.   Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

799.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Illinois Plaintiffs and the Illinois Class members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

800.   Defendants were in exclusive control of the material facts and such facts were not known to the public or the Illinois Subclass members. Defendants also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

801.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Illinois Plaintiffs and the Illinois Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

802.   Illinois Plaintiffs and the Illinois Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Illinois Plaintiffs and the Illinois Subclass members were justified.

803.   Illinois Plaintiffs and the Illinois Subclass members reasonably relied on these omissions and suffered damages as a result.

804.   As a result of these omissions and concealments, Illinois Plaintiffs and the Illinois Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

805.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Illinois Plaintiffs and the Illinois Subclass members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT THIRTY-FIVE — UNJUST ENRICHMENT

806.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

807.   Illinois Plaintiffs bring this cause of action on behalf of themselves and the Illinois Subclass against Defendant GM.

808.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, GM charged a higher price for their vehicles than the Class Vehicles' true value and GM obtained monies which rightfully belong to Illinois Plaintiffs and the Illinois Subclass members.

809.   GM enjoyed the benefit of increased financial gains, to the detriment of Illinois Plaintiffs and the Illinois Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

810.   Illinois Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**G.    Claims Brought on Behalf of the Kansas Subclass**

**COUNT THIRTY-SIX — VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACTION
(KAN. STAT. ANN. § 50-623, *ET SEQ*.)**

811.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

812.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass against Defendants.

813.   Defendants are each a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

814. Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

815. The sale of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

816. The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

817. In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, misrepresented through its advertisements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

818.   In the course of doing business, Defendants also knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Kansas Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

819.   Defendants thus violated the Kansas CPA by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

820.   Defendants had the duty to Plaintiff and the Kansas Subclass members to disclose the Defective Batteries and the defective nature of the Class Vehicles because:

A.     Defendants were in a superior position to know the true state of facts about the Defective Batteries and their associated costs;

216

B.     Plaintiff and the members of the Kansas Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.     Defendants knew that Plaintiff and the members of the Kansas Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

821.   In failing to disclose the Defective Batteries and its resulting safety risks and inefficiencies, Defendants knowingly and intentionally concealed material facts and breached its duty to disclose.

822.   The facts Defendants concealed or did not disclose to Plaintiff and the members of the Kansas Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the members of the Kansas Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

823.   Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

824.   The recall and modifications Defendants claim to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff or

the Kansas Subclass the battery range promised to them when they purchased the vehicles.

825.   Plaintiff and members of the Kansas Subclass suffered ascertainable loss directly and proximately resulting from Defendants' Kansas CPA violations. Plaintiff and members of the Kansas Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

826.   Plaintiff and members of the Kansas Subclass seek actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Kansas CPA. Plaintiff and members of the Kansas Subclass also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Kansas CPA.

### COUNT THIRTY-SEVEN — BREACH OF EXPRESS WARRANTY (KAN. STAT. §§ 84-2-314 AND 84-2A-210)

827.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

828.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass against Defendant GM.

829.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

830. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

831. The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

832. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, Defendant's warranties are express warranties under state law.

833. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

834.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

835.   GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

836.   GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

837.   Plaintiff notified GM of the breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

838.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiff or the Class notice of the Defective Batteries.

839. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiff and the members of the Kansas Subclass. Among other things, Plaintiff and the members of the Kansas Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the members of the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

840. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Kansas Subclass whole, and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

841. Plaintiff and the members of the Kansas Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

842. As a direct and proximate cause of GM's breach, Plaintiff and the members of the Kansas Subclass bought or leased Class Vehicles they otherwise would not have,

overpaid for their vehicles, did not receive the benefit of their bargain, and their Class

Vehicles suffered a diminution in value.

## COUNT THIRTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (KY. REV. STAT. §§ 335.2-314 AND 355.2A-212)

843.   Plaintiffs and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth at length herein.

844.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas

Subclass against Defendant GM.

845.   GM is and was at all relevant times a "merchant" with respect to motor

vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor

vehicles under § 84-2-103(1)(d).

846.   With respect to leases, GM is and was at all relevant times a "lessor" of

motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

847.   The Class Vehicles are and were at all relevant times "goods" within the

meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

848.   A warranty that the Class Vehicles were in merchantable condition and fit

for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan.

Stat. §§ 84-2-314 and 84-2A-212.

849.   GM provided Plaintiff and the members of the Kansas Subclass with an

implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit

for the ordinary purposes for which they were sold. GM impliedly warranted that the

Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

850.   However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

851.   Plaintiff notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

852.   Plaintiff and the Kansas Subclass members have had sufficient dealings with Defendant or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Kansas Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are

intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

853.   As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Kansas Subclass sustained the damages herein set forth.

854.   Plaintiff and the Kansas Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT THIRTY-NINE — FRAUD BY CONCEALMENT

855.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

856.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass against Defendants.

857.   Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

858.   Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which

materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

859.   In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the members of the Kansas Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

860.   Defendants were in exclusive control of the material facts and such facts were not known to Plaintiff and members of the Kansas Subclass, or the public. Defendants also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

861.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Kansas Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

862.   Plaintiff and the members of the Kansas Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the members of the Kansas Subclass were justified.

863.   Plaintiff and the members of the Kansas Subclass reasonably relied on these omissions and suffered damages as a result.

864.   As a result of these omissions and concealments, Plaintiff and the members of the Kansas Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

865.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the members of the Kansas Subclass. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FORTY — UNJUST ENRICHMENT

866.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

867.   Plaintiff Hickey brings this claim on behalf of himself and the Kansas Subclass against Defendant GM.

868.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, GM charged a higher price for their vehicles than the Class Vehicles' true value, and thus GM obtained monies rightfully belonging to Plaintiff and the members of the Kansas Subclass.

869.   GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Kansas Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

870.   Plaintiff, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**H.   Claims Brought on Behalf of the Massachusetts Subclass**

**COUNT FORTY-ONE — DECEPTIVE ACTS OR PRACTICES PHOHIBITED BY MASSACTUSETTS LAW
(MASS. GEN. LAWS CH. 93A, § 1, ET SEQ.)**

871.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

872.   Plaintiffs Harris and Duprez (for purposes of this section, "Massachusetts Plaintiffs") bring this cause of action on behalf of themselves and the Massachusetts Subclass against Defendants.

873.   Defendants, Massachusetts Plaintiffs, and the Massachusetts Subclass are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

874.   Defendants are engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

875.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, §

2. Defendant participated in misleading, false, or deceptive acts that violated the Massachusetts Act.

876.   In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, Defendants misrepresented through their advertisements and public statements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

877.   In the course of doing business, Defendants knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Massachusetts Plaintiffs and the members of the Massachusetts Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

878.   Defendants thus violated the Massachusetts Act by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or

228

omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

879. Massachusetts Plaintiffs and members of the Massachusetts Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

880. Defendants had the duty to Massachusetts Plaintiffs and the members of the Massachusetts Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

    A.    Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

    B.    Massachusetts Plaintiffs and the members of the Massachusetts Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

    C.    Defendants knew that Massachusetts Plaintiffs and the members of the Massachusetts Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

881.   In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

882.   The facts Defendants concealed or did not disclose to Massachusetts Plaintiffs and the members of the Massachusetts Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Massachusetts Plaintiffs and the members of the Massachusetts Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

883.   Defendants' violations present a continuing risk to Massachusetts Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

884.   The recall and modifications Defendants claim to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Massachusetts Plaintiffs or the Massachusetts Subclass the battery range promised to them when they purchased the vehicles.

885.   As a direct and proximate result of Defendants' violations of the Massachusetts Act, Massachusetts Plaintiffs and the Massachusetts Subclass have suffered injury-in-fact and/or actual damage.

886.   Massachusetts Plaintiffs and members of the Massachusetts Subclass suffered ascertainable loss directly and proximately resulting from Defendants'

violations of the Massachusetts Act. Massachusetts Plaintiffs and members of the Massachusetts Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

887. On July 19, 2021, Massachusetts Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3) to Defendant GM. Massachusetts Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Subclass are entitled, including actual damages against Defendants in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Massachusetts Act. Massachusetts Plaintiffs and members of the Massachusetts Subclass will also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Massachusetts Act

## COUNT FORTY-TWO — BREACH OF EXPRESS WARRANTY
### (MASS. GEN. LAWS C. 106 §§ 2-313 AND 2A-210)

888. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

889. Massachusetts Plaintiffs bring this cause of action on behalf of themselves and the Massachusetts Subclass against Defendant GM.

890. GM is and was all at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

891. With respect to leases, GM is and was at all relevant times a "lessors" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

892. The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

893. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

894. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

895.   Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

896.   GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

897.   GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

898.   Massachusetts Plaintiffs notified GM of the breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

899.   Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving Massachusetts Plaintiffs or the Massachusetts Subclass notice of the Defective Batteries.

900.   The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Massachusetts Plaintiffs and the members of the Massachusetts Subclass. Among other things, Massachusetts Plaintiffs and the members of the Massachusetts Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

901.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Massachusetts Plaintiffs and the members of the Massachusetts Subclass whole, and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

902.   Massachusetts Plaintiffs and the members of the Massachusetts Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

903.   As a direct and proximate cause of GM's breach, Massachusetts Plaintiffs and the members of the Massachusetts Subclass bought or leased Class Vehicles they

otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT FORTY-THREE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (MASS. GEN. LAWS C. 106 §§ 2-314 AND 2A-212)

904.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

905.   Massachusetts Plaintiffs bring this cause of action on behalf of themselves and the Massachusetts Subclass against Defendant GM.

906.   GM is and was all at all relevant times a "merchant" with respect to motor vehicles under M.G.L. c. 106 § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

907.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under M.G.L c. 106 § 2A-103(1)(p).

908.   The Class Vehicles are and were at all relevant times "goods" within the meaning of M.G.L. c. 106 §§ 2-105(1) and 2A-103(1)(h).

909.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to M.G.L. c. 106 §§ 2-314 and 2A-212

910.   GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use: transporting the driver and

passengers in reasonable safety during normal operation, and without unduly

endangering them or members of the public.

911. GM provided Massachusetts Plaintiffs and the members of the

Massachusetts Subclass with an implied warranty that the Class Vehicles, and any parts

thereof, are merchantable and fit for the ordinary purposes for which they were sold.

GM impliedly warranted that the Class Vehicles were of merchantable quality and fit

for such use. This implied warranty included, among other things: (i) a warranty that the

vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for

providing transportation, and would not experience premature and catastrophic failure;

and (ii) a warranty that the Class Vehicles would be fit for their intended use while

being operated.

912. However, the Class Vehicles the time of sale and thereafter were and are

not vehicles are not fit for their ordinary purpose of providing reasonably reliable and

safe transportation at the time of sale or thereafter because the Defective Battery can

manifest and result in spontaneous ignition and fire when fully or nearly fully charged

and are not safe to operate at the Class Vehicles' advertised range.

913. Massachusetts Plaintiffs notified GM of its breach within a reasonable

time, and/or was not required to do so because affording GM a reasonable opportunity

to cure its breaches would have been futile. In any event, GM knows about the defect

but instead chose to conceal it until just recently as a means of avoiding compliance

with its warranty obligations. Moreover, GM was provided notice of these issues within

236

a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

914.    Massachusetts Plaintiffs and the Massachusetts Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Massachusetts Plaintiffs and the Massachusetts Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

915.    As a direct and proximate result of the breach of said implied warranty, Massachusetts Plaintiffs and the Massachusetts Subclass sustained the damages herein set forth.

916.    Massachusetts Plaintiffs and the Massachusetts Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial

**COUNT FORTY-FOUR — FRAUDULENT CONCEALMENT**

917.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

918.    Massachusetts Plaintiffs bring this cause of action on behalf of themselves and the Massachusetts Subclass against Defendants.

919. As set forth above, Defendants concealed and/or suppressed material facts concerning the Class Vehicles' safety.

920. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

921. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

922. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Massachusetts Plaintiffs and the members of the Massachusetts Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

923. Defendants were in exclusive control of the material facts and such facts were not known to Massachusetts Plaintiffs and members of the Massachusetts Subclass, or the public. Defendants also possessed exclusive knowledge of the

Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

924.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Massachusetts Plaintiffs and the members of the Massachusetts Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

925.   Massachusetts Plaintiffs and the members of the Massachusetts Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Massachusetts Plaintiffs and the members of the Massachusetts Subclass were justified.

926.   Massachusetts Plaintiffs and the members of the Massachusetts Subclass reasonably relied on these omissions and suffered damages as a result.

927.   As a result of these omissions and concealments, Massachusetts Plaintiffs and the members of the Massachusetts Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

928.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Massachusetts Plaintiffs and the members of the Massachusetts Subclass. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FORTY-FIVE — UNJUST ENRICHMENT

929.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

930.   Massachusetts Plaintiffs bring this cause of action on behalf of themselves and the Massachusetts Subclass against Defendant GM.

931.   As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, GM charged a higher price for their vehicles than the Class Vehicles' true value, and thus GM obtained monies rightfully belonging to Massachusetts Plaintiffs and the members of the Massachusetts Subclass.

932.   GM enjoyed the benefit of increased financial gains, to the detriment of Massachusetts Plaintiffs and the Massachusetts Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

933.   Massachusetts Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## I.    Claims Brought on Behalf of the Michigan Subclass

### COUNT FORTY-SIX — VIOLATIONS OF THE CONSUMER PROTECTION ACT (MICH. COMP. LAWS § 445.903, *ET SEQ.*)

934.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

935.    Plaintiffs Holbrook (for purposes of this section, "Michigan Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Michigan Subclass against Defendants.

936.    The Michigan Plaintiffs and members of the Michigan Subclass are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

937.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).

938.    Defendants' conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Defendants' manufacture, sale, and use of the Defective Batteries, which Defendants failed to adequately investigate, disclose and remedy, and their misrepresentations and omissions regarding the safety, reliability, and range of the Class Vehicles.

939.    Defendants' conduct as alleged above and herein constitutes practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have … characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it

actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

940.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

941.   Defendants intended that the Michigan Plaintiffs and the Michigan Subclass members rely on their misrepresentations and omissions, so that the Michigan Plaintiffs and the Michigan Subclass members would purchase or lease Class Vehicles.

942.   Had Defendants disclosed the omitted material, Michigan Plaintiffs and the members of the Michigan Subclass would not have purchased or leased Class Vehicles or would have paid less for them.

943.   Defendants' violations present a continuing risk to Michigan Plaintiffs and members of the Michigan Subclass as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

944.   Michigan Plaintiffs and the Michigan Subclass members were injured as a result of Defendants' conduct. Michigan Plaintiffs and the Michigan Subclass overpaid for the Class Vehicles and did not receive the benefit of their bargain, and thus the Class Vehicles have suffered a diminution in value.

945.   Defendants' conduct proximately caused the injuries to the Michigan Plaintiff and the Michigan Subclass members.

946.   Defendants are liable to Michigan Plaintiffs and the Michigan Subclass for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

### COUNT FORTY-SEVEN — BREACH OF EXPRESS WARRANTY (MICH. COMP. LAWS ANN. § § 440.2313 AND 440.2860)

947.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

948.   Michigan Plaintiffs bring this claim on behalf of himself and on behalf of the members of the Michigan Subclass against Defendant GM.

949.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Mich. Comp. Laws Ann. § 440.2104(1) and a "seller" of motor vehicles under § 440.2313(1).

950.   With respect to leases, GM is and was at all relevant times a "lessor" with respect to motor vehicles under Mich. Comp. Laws Ann. §§ 440.2803(1)(p), and 440.2860.

951.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws Ann. §§ 440.2105(1) and 440.2803(1)(h).

952.   In the course of selling its vehicles, GM expressly warranted in writing that the Class Vehicles were covered by a new vehicle limited warranty.

953.   GM's warranties formed the basis of the bargain that was reached when Michigan Plaintiffs and Michigan Subclass members purchased or leased their Class Vehicles.

954.   In addition to this new vehicle limited warranty, GM expressly warranted several attributes, characteristics and qualities, as set forth above.

955.   GM was provided notice of the Defective Battery, as alleged herein, by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

956.   Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

957.   Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Michigan Plaintiffs and members of the Michigan Subclass whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

958.   Accordingly, Michigan Plaintiffs' and the Michigan Subclass members' recovery is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Michigan Plaintiffs seek all remedies as allowed by law.

959.   Also, at the time GM warranted and sold the Class Vehicles, GM wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Class Vehicles. Michigan Plaintiffs and the members of the Michigan Subclass were therefore induced to purchase the Class Vehicles under false and/or fraudulent pretenses.

960.   The damages flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," and any limitation on available remedies would be insufficient to make Michigan Plaintiffs and the Michigan Subclass members whole.

961.   Finally, as a result of GM's breach of warranties as set forth herein, Michigan Plaintiffs and the Michigan Subclass assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Michigan Plaintiffs and to the Michigan Subclass members the purchase price of all Class Vehicles currently owned.

962.   As a direct and proximate result of GM's breach of express warranties, Michigan Plaintiffs and the Michigan Subclass members have been damaged in an amount to be determined at trial.

## COUNT FORTY-EIGHT — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (MICH. COMP. LAWS § 440.314)

963.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

964.   Michigan Plaintiffs bring this claim on behalf of himself and on behalf of the members of the Michigan Subclass against Defendant GM.

965.   GM is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

966.   Pursuant to Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

967.   The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Batteries cannot be charged safely without the risk of catastrophic failure causing fire and potential explosion, constituting a significant safety hazard to Michigan Plaintiffs and members of the Michigan Subclass.

968.   Privity is not required in this case because Michigan Plaintiffs and the Michigan Subclass are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

969.   GM was provided notice of the Defective Battery, as alleged herein, by numerous complaints filed against it, including those submitted to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

970.   As a direct and proximate result of GM's breach of the warranties of merchantability, Michigan Plaintiffs and the Michigan Subclass members have been damaged in an amount to be proven at trial.

## COUNT FORTY-NINE — FRAUD BY CONCEALMENT

971.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

972.   Michigan Plaintiffs bring this claim on behalf of himself and on behalf of the members of the Michigan Subclass against Defendants.

973.   As set forth above, Defendants knew and intentionally concealed and/or suppressed material facts concerning the safety of the Class Vehicles.

974.   Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Michigan Plaintiffs and the Michigan Subclass members to purchase the Class Vehicles at a higher price, which did not match their true value.

975.   Defendants still have not made full and adequate disclosure and continues to defraud Michigan Plaintiff and the Michigan Subclass members.

976.   Michigan Plaintiffs and the Michigan Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Michigan Plaintiffs' and the Michigan Subclass members' actions were justified. Defendants had exclusive control of the material facts and such facts were not known to the public, to the Michigan Plaintiffs, or the Michigan Subclass members.

977.   Defendants owed Michigan Plaintiffs and members of the Michigan Subclass a duty to disclose the true safety, performance, and reliability of the Class

Vehicles, because Michigan Plaintiff and the Michigan Subclass members relied on Defendants' material representations that the Class Vehicles they were purchasing were safe and free from defects.

978.   Michigan Plaintiffs and the members of the Michigan Subclass relied on Defendants' failure to disclose the faulty and defective nature of the Defective Batteries in purchasing or leasing the Class Vehicles.

979.   As a result of their reliance, Michigan Plaintiffs and the Michigan Subclass members have been injured in an amount to be proven at trial, including, but not limited to, actual damages, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles.

980.   As a result of the concealment and/or suppression of the facts, Michigan Plaintiffs and the Michigan Subclass members sustained damage. For Michigan Plaintiffs and the Michigan Subclass members who elect to affirm the sale, these damages, include the difference between the actual value of that which Michigan Plaintiffs and the Michigan Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For Michigan Plaintiffs or any member of the Michigan Subclass who want to rescind their purchases, then Michigan Plaintiffs and the Michigan Subclass members are entitled to restitution and consequential damages.

981.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Michigan Plaintiffs' and the Michigan Subclass members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY — UNJUST ENRICHMENT

982.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

983.   Michigan Plaintiffs bring this cause of action on behalf of himself and the Michigan Subclass against Defendant GM.

984.   As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the concealing the Defective Batteries as described herein, GM charged a higher price for their vehicles than the vehicles' true value and GM obtained monies rightfully belonging to Michigan Plaintiffs and the Michigan Subclass members.

985.   GM enjoyed the benefit of increased financial gains, to the detriment of Michigan Plaintiffs and the Michigan Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

986.   Michigan Plaintiffs, therefore, seeks an order establishing GM as constructive trustees of the profits unjustly obtained, plus interest.

**J.      Claims Brought on Behalf of the New York Subclass**

**COUNT FIFTY-ONE — VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(N.Y. GEN. BUS. LAW § 349)**

987.    Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

988.    Plaintiff Kotchmar (for purposes of this section, "Plaintiff") brings this claim on behalf of himself and on behalf of the New York Subclass against Defendants.

989.    Plaintiff and Defendants are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. Gen. Bus. Law § 349(h).

990.    Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful. N.Y. Gen. Bus. Law § 349.

991.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the Defective Batteries with the intent that consumers rely on that concealment in deciding whether to purchase a Class Vehicle.

992.    By concealing the Defective Batteries while advertising the Class Vehicles as capable, reliable and safe, Defendants engaged in deceptive acts or practices in violation of GBL section 349.

993.    Defendants' deceptive acts or practices were materially misleading. Defendants' conduct was likely to and did deceive reasonable consumers, including Plaintiff and members of the New York Subclass, about the Class Vehicles' true performance and value.

994.   Plaintiff and members of the New York Subclass were unaware of, and lacked a reasonable means of discovering, the material facts Defendants suppressed.

995.   Defendants' misleading conduct concerns the safety of widely purchased consumer products and affects the public interest.

996.   Defendants' actions set forth above occurred in the conduct of its business, trade, or commerce.

997.   Plaintiff and members of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendants' GBL violations. Plaintiff and members of the New York Subclass overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value resulting from the Defective Batteries. These injuries are the direct and natural consequence of Defendants' material misrepresentations and omissions.

998.   Plaintiff and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair and deceptive practices. Under the GBL, Plaintiff and members of the New York Subclass are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Defendants acted willfully or knowingly, Plaintiff and members of the New York Subclass are entitled to recover three times their actual damages. Plaintiff and is also entitled to reasonable attorneys' fees. N.Y. Gen. Bus. Law § 349(h).

## COUNT FIFTY-TWO — VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
## (N.Y. GEN. BUS. LAW § 350)

999.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1000. Plaintiff brings this claim on behalf of himself and on behalf of the New York Subclass against Defendants.

1001. GBL section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce…." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, including labeling, of a commodity…if such advertising is misleading in a material respect," taking into account "not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity…to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual." N.Y. Gen. Bus. Law § 350-a.

1002. Defendants caused or made to be disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and other members of the New York Subclass.

1003. Defendants violated GBL Section 350 because the misrepresentations and omissions regarding the Defective Batteries were material and deceived reasonable consumers, including Plaintiff and members of the New York Subclass, about the true performance and value of the Class Vehicles.

1004. Plaintiff and members of the New York Subclass suffered ascertainable loss as a direct and proximate result of Defendants' violations. In purchasing or leasing their Class Vehicles, Plaintiff and members of the New York Subclass relied on Defendants' representations and omissions with respect to safety, performance, reliability, and value of the Class Vehicles. Defendants' representations turned out to be untrue because the Class Vehicles utilize the Defective Batteries. Had Plaintiff or members of the New York Subclass known this, they would not have purchased or leased their Class Vehicles or would have paid less money for them.

1005.  Plaintiff and members of the New York Subclass overpaid for their Class Vehicles and their Class Vehicles suffered a diminution in value resulting from the Defective Batteries. These injuries are the direct and natural consequence of Defendant's material misrepresentations and omissions.

1006. Plaintiff and members of the New York Subclass request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful, and deceptive practices of false advertising. Under the GBL, Plaintiff and members of the New York Subclass are entitled to recover their actual damages or $500, whichever is greater. Additionally, because Defendants acted

willfully or knowingly, Plaintiff and members of the New York Subclass are entitled to recover three times their actual damages, up to $10,000. Plaintiff is also entitled to reasonable attorneys' fees. N.Y. Gen. Bus. Law § 350-e.

### COUNT FIFTY-THREE — BREACH OF EXPRESS WARRANTY
### (N.Y. U.C.C. LAW §§ 2-313 AND 2A-210)

1007. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1008. Plaintiff brings this claim on behalf of himself and on behalf of the members of the New York Subclass against Defendant GM.

1009. GM is, and was, at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "seller" of motor vehicles under§ 2-103(1)(d).

1010. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1011. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

1012. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, in part comprised of the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the Class Vehicles' battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise,

vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

1013. Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

1014. GM distributed the Defective Batteries in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

1015. GM breached these warranties by selling and leasing Class Vehicles using the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

1016. Plaintiff notified GM of its breach within a reasonable time, and/or was not required to do so because affording Defendant a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal their existence until just recently as a means of avoiding

compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1017. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Defective Batteries to Plaintiff or members of the New York Subclass.

1018. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiff or New York Subclass members. Among other things, neither Plaintiff nor members of the New York Subclass had a meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

1019. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other New York Subclass members whole and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1020. Plaintiff and the New York Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

1021. As a direct and proximate cause of GM's breach, Plaintiff and the other New York Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT FIFTY-FOUR — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (N.Y. U.C.C. LAW § § 2-314 AND 2A-212)

1022. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1023. Plaintiff brings this claim on behalf of himself and on behalf of the members of the New York Subclass against Defendant GM.

1024. GM is, and was, at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

1025. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-105(1) and 2A-103(1)(h).

1026. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC Law §§ 2-314 and 2A-212.

1027. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation—while the Class Vehicles were being operated.

1028. GM breached the implied warranty of merchantability in that the Class Vehicles were not in merchantable condition when they were sold to Plaintiff and New York Subclass members and said vehicles were and are unfit for the ordinary purposes for which such vehicles are used because they pose a serious safety risk to the occupants and are an unreliable means of transportation.

1029. GM has been provided notice of these issues by numerous complaints, as alleged herein.

1030. As a direct and proximate result of breaches of the implied warranty of merchantability, Plaintiff and the New York Subclass members have suffered damages, including but not limited to incidental and consequential damages.

## COUNT FIFTY-FIVE — FRAUD BY CONCEALMENT

1031. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1032. Plaintiff brings this claim on behalf of himself and on behalf of the members of the New York Subclass against Defendants.

1033. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which in many cases could not be discovered until years after the Class Vehicles were purchased or leased. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1034. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1035. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants, who had superior knowledge and access to the facts and Defendants knew that those facts were not known to or reasonably discoverable by Plaintiff and the New York Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

1036. Defendants were in exclusive control of the material facts and such facts were not known to the public or the New York Subclass members. Defendants also possessed exclusive knowledge of the Battery Defect rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

1037. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the New York Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1038. Plaintiff and the New York Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the New York Subclass members were justified.

1039. Plaintiff and the New York Subclass members reasonably relied on these omissions and suffered damages as a result.

1040. As a result of these omissions and concealments, Plaintiff and the New York Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

1041. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the New York Subclass members. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT FIFTY-SIX — UNJUST ENRICHMENT

1042. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1043. Plaintiff brings this cause of action on behalf of himself and the New York Subclass against Defendant GM.

1044. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Battery Defect described herein, GM charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Plaintiff and the New York Subclass members.

1045. GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the New York Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

1046. Plaintiff, therefore, seeks an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**K.    Claims Brought on Behalf of the Oregon Subclass**

### COUNT FIFTY-SEVEN — VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. § 646.605 THROUGH 646.656)

1047. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1048. Plaintiffs Taylor, Carr, and Wyers (for purposes for this section, "Oregon Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Oregon Class against Defendants.

1049. Defendants and Plaintiffs are "persons" under the Oregon Unlawful Trade Practices Act, ORS § 646.605(4).

1050. Plaintiffs purchased their Class Vehicles primarily for personal, family or household purposes and thus their Class Vehicle are "goods" under ORS § 646.605(6)(a).

1051. Defendants are and were engaged in "trade" and "commerce" as defined by ORS § 646.605(8).

1052. ORS § 646.607 provides, in relevant part, that a "person engages in an unlawful trade practice if in the course of the person's business, vocation or occupation the person . . . [e]mploys any unconscionable tactic in connection with selling . . . goods or services."

1053. Defendants knew or should have known that the Class Vehicles' batteries were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

1054. Defendants employed unconscionable tactics in selling the Class Vehicles by not giving Plaintiffs and the Oregon Subclass members sufficient notice or warning regarding the Defective Batteries, intending that Plaintiffs and the Class rely upon GM's

omissions when purchasing the Class Vehicles. Plaintiffs and the Oregon Subclass members were deceived by Defendants concealing the Defective Batteries.

1055. Defendants also engaged in unlawful and deceptive practices in violation of ORS § 646.608 by causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Class Vehicles (ORS § 646.608(b)); representing that the Class Vehicles have characteristics, uses, benefits, quantities and qualities that they do not have (ORS § 646.608(e)); representing that the Class Vehicles are of a particular standard, quality or grade when they are of another (ORS § 646.608(g)); concurrently with tender or delivery of the Class Vehicles, failing to disclose known material defects or material nonconformities (ORS § 646.608(t)); and engaging in other unfair or deceptive conduct (ORS § 646.608(u)).

1056. Defendants also engaged in unlawful and deceptive practices in violation of ORS §§ 646.607 and 646.608 by failing to provide Plaintiffs and Oregon Subclass members the full cost to repair the Class Vehicles and replace the Defective Batteries.

1057. Defendants knew or should have known that its conduct was a violation of the Oregon Unfair Trade Practices Act, ORS § 646.605 - .656, and therefore its conduct was willful. ORS § 646.605(10).

1058. Oregon Plaintiffs and the Oregon Subclass members have suffered an ascertainable loss of money or property as a direct and proximate result of Defendants' willful use or employment of unlawful methods, acts or practices.

1059. Pursuant to ORS § 646.638, Oregon Plaintiffs and the Oregon Subclass members seek an order enjoining Defendants' unfair and/or deceptive practices, actual damages, punitive damages, attorney's fees and costs, and any other just and proper relief available under the Oregon UTPA.

1060. Pursuant to ORS § 646.638(2), Plaintiffs will serve the Oregon Attorney General with a copy of this Complaint.

## COUNT FIFTY-EIGHT — BREACH OF EXPRESS WARRANTY
### (OR. REV. STAT. § § 72.3130 AND 72A.2100)

1061. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1062. Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass against Defendant GM.

1063. GM was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and "sellers" of motor vehicles under § 72.1030(1)(d).

1064. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

1065. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

1066. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric

propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

1067. Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

1068. GM distributed the Defective Batteries in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

1069. GM breached these warranties by selling and leasing Class Vehicles using the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

1070. Oregon Plaintiffs each notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1071. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice of the Defective Batteries to Plaintiffs or the Class.

1072. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Oregon Plaintiffs and Oregon Subclass members. Among other things, Oregon Plaintiffs and the Oregon Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

1073. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Oregon Plaintiffs and the other Oregon Subclass members whole

and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1074. Oregon Plaintiffs and the Oregon Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

1075. As a direct and proximate cause of GM's breach, Oregon Plaintiffs and the other Oregon Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

### COUNT FIFTY-NINE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (OR. REV. STAT. § 72.8020 *ET SEQ.*)

1076. Oregon Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1077. Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass against Defendant GM.

1078. The Class Vehicles are "consumer goods" as defined in ORS § 72.8010(1).

1079. Oregon Plaintiffs and the Oregon Class members are "buyers" and "retail buyers" as defined in ORS § 72.8010(2).

1080. GM is and was at all relevant times a "manufacturer" as defined in ORS § 72.8010(3) with respect to the Class Vehicles.

1081. Pursuant to ORS § 72.8020, GM impliedly warranted that the Class Vehicles are fit for the ordinary purposes for which they are used: transporting the driver and passengers in reasonable safety during normal operation, without unduly endangering them or members of the public.

1082. By marketing, advertising, distributing, and selling Class Vehicles with the Defective Batteries, GM breached the implied warranty that the Class Vehicles were merchantable and safe for use as personal transportation.

1083. The Defective Batteries were installed in the Class Vehicles at the time they left GM's manufacturing facilities and at the time they were sold or leased to Oregon Plaintiffs and the Oregon Subclass.

1084. Plaintiffs and the Oregon Subclass members have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by GM's conduct or by operation of law in light of GM's unconscionable conduct.

1085. GM received timely notice about the Defective Batteries but has failed to rectify the problem and refused to offer an effective remedy.

1086. Oregon Plaintiffs and the Oregon Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Oregon Plaintiffs and the Oregon Subclass Members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not

intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

1087. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Oregon Plaintiffs and the Oregon Subclass members suffered economic damage, including loss attributable to the diminished value of the Class Vehicles.

## COUNT SIXTY — FRAUD BY CONCEALMENT

1088. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1089. Oregon Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Oregon Subclass against Defendants.

1090. As set forth above, Defendants concealed and/or suppressed material facts concerning the Class Vehicles' safety.

1091. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Oregon Plaintiffs and the Oregon Subclass members to purchase the Class Vehicles at a higher price than their true value.

1092. Defendants still have not made full and adequate disclosure and continues to defraud Oregon Plaintiffs and the Oregon Subclass members.

1093. Oregon Plaintiffs and the Oregon Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Oregon Plaintiffs and the Oregon Subclass's actions

were justified. Defendants had exclusive control of the material facts and such facts were not known to the public, the Oregon Plaintiffs, or the Oregon Subclass.

1094. As a result of the concealment and/or suppression of the facts, Oregon Plaintiffs and the Oregon Subclass members sustained damage. For those of Oregon Plaintiffs and the Oregon Subclass who elect to affirm the sale, these damages, include the difference between the actual value of that which Oregon Plaintiffs and the Oregon Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Oregon Plaintiffs or member of the Oregon Subclass who want to rescind their purchases, then such Plaintiffs and the Oregon Subclass members are entitled to restitution and consequential damages.

1095. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Oregon Plaintiffs' and the Oregon Subclass's rights and well-being. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SIXTY-ONE — UNJUST ENRICHMENT

1096. Oregon Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1097. Oregon Plaintiffs bring this cause of action on behalf of themselves and the Oregon Subclass against Defendant GM.

1098. As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Batteries, GM charged a higher price for their vehicles than the vehicles' true value and GM obtained monies which rightfully belong to Oregon Plaintiffs and the Oregon Subclass members.

1099. GM enjoyed the benefit of increased financial gains, to the detriment of Oregon Plaintiffs and the Oregon Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

1100. Oregon Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## L.   Claims Brought on Behalf of the Texas Subclass

### COUNT SIXTY-TWO — VIOLATIONS OF THE DECEPTIVE TRADE PRACTICES ACT ‑ CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § § 17.41, *ET SEQ.*)

1101. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1102. Plaintiffs Barrett, Rock, and Vaaler (for purposes of this section, "Texas Plaintiffs") bring this cause of action on behalf of themselves and the members of the Texas Subclass against Defendants.

1103. Texas Plaintiffs and the Texas Subclass members are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers," pursuant to Texas Business and Commercial Code § 17.45(4).

1104. Defendants, Texas Plaintiffs, and the Texas Subclass members are "persons" within the meaning of Texas Business and Commercial Code § 17.45(3).

1105. Defendants are engaged in "trade" or "commerce" or "consumer transactions" within the meaning of Texas Business and Commercial Code § 17.46(a).

1106. The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means an act or practice which, to a consumers detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

1107. In the course of their business, Defendants knew that the Defective Batteries would fail prematurely, and were not suitable for their intended use. Yet, Defendants concealed and suppressed material facts concerning the Class Vehicles, the Defective Batteries, and their propensity to cause vehicle fires. Defendants accomplished this by denying for over a year the existence of the Defective Batteries.

1108. At a minimum, Defendants violated the Texas DTPA by representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and omitting material facts in describing the Class Vehicles.

1109. Defendants engaged in misleading, false, unfair, and deceptive acts or practices that violated the Texas DTPA by failing to disclose and actively concealing the existence of the Defective Batteries.

1110. Defendants owed Texas Plaintiffs and the Texas Subclass members a duty to disclose the existence of the Defective Batteries because:

> A.     Defendants were in a superior position to know the true state of facts about the Defective Batteries and associated repair costs in the Class Vehicles;

> B.     Texas Plaintiffs and the Texas Subclass members could not reasonably have been expected to learn or discover that the Class Vehicles had dangerous defects until manifestation of the Defective Batteries; and

> C.     Defendants knew that Texas Plaintiffs and the Texas Subclass members could not reasonably have been expected to learn about or discover the Defective Batteries and their associated repair costs.

1111. The facts Defendants concealed or did not disclose to Texas Plaintiffs and the Texas Subclass members are material in that a reasonable consumer would have

273

considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Texas Plaintiffs and the Texas Subclass members known the Class Vehicles utilized the Defective Batteries, they would not have purchased the Class Vehicles or would have paid less for them.

1112.  Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Texas Plaintiffs, about the safety and reliability of the Class Vehicles.

1113.  The omissions and acts of concealment by Defendants pertained to information that was material to Texas Plaintiffs and the Texas Subclass members, as it would have been to all reasonable consumers

1114.  Defendants had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Texas DTPA in the course of its business.

1115.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1116.  Texas Plaintiffs and members of the Texas Subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information.

1117.  Texas Plaintiffs and the Texas Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated or would have paid significantly

less for them. Texas Plaintiffs and the Texas Subclass members also suffered diminished value of their vehicles, as well as lost or diminished use.

1118. Pursuant to Texas Business and Commercial Code § 17.50, Texas Plaintiffs and the Texas Subclass seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

1119. Pursuant to Texas Business and Commercial Code § 17.50, Texas Plaintiffs and the Texas Subclass members seek an order enjoining Defendants' unfair and/or deceptive acts or practices, attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

1120. On July 19, 2021, Plaintiff Vaaler sent notice letters complying with Texas Business and Commerce Code § 17.505(a) and 17.501(a) to Defendant GM. Texas Plaintiffs thus seek damages, multiple damages for knowing and intentional violations pursuant to § 17.50(b)(1), and punitive damages.

1121. On September 17, 2021, Plaintiffs Barrett, Rock, and Vaaler sent notice letters complying with Texas Business and Commerce Code § 17.505(a) and 17.501(a) to the LG Defendants, and Plaintiffs Vaaler and Rock provided notice to GM. Plaintiffs reserve the right to amend this complaint to seek damages, multiple damages for knowing and intentional violations pursuant to § 17.50(b)(1), and punitive damages

against all Defendants after 60 days if the Defendants have not tendered complete relief to Plaintiffs.

## COUNT SIXTY-THREE — BREACH OF EXPRESS WARRANTY
### (TEX. BUS. & COM. CODE § 2.313)

1122. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1123. Texas Plaintiffs bring this cause of action on behalf of themselves and the Texas Subclass against Defendant GM.

1124. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

1125. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

1126. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

1127. In connection with the sale of the defective Class Vehicles to Texas Plaintiffs and the Texas Subclass, GM provided a new vehicle warranty, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

1128. GM's express warranties were part of the basis of the bargain respecting the purchase and/or lease of the defective Class Vehicles. In addition to written

warranties, GM warranted several attributes, characteristics, and qualities of the subject vehicles, as alleged above.

1129. GM distributed the Class Vehicles with the Defective Batteries, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessees.

1130. GM breached these warranties by selling and leasing Class Vehicles utilizing the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and failing to honor the warranties by providing adequate repairs or replacements during the applicable warranty periods.

1131. Texas Plaintiffs notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1132. Texas Plaintiffs submitted their vehicles for warranty repairs as referenced herein. GM failed to comply with the terms of the express written warranty provided to Texas Plaintiffs, by failing and/or refusing to repair the Defective Batteries under the Class Vehicles' applicable warranties as described herein.

1133. Texas Plaintiffs have given GM a reasonable opportunity to cure the Defective Batteries, but GM has been unable and/or has refused to do so within a reasonable time.

1134. As a result of said nonconformities, Texas Plaintiffs cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, reliable, and efficient transportation.

1135. Texas Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiff's acceptance of the subject vehicle.

1136. Texas Plaintiffs and the members of the Texas Subclass would not have purchased their vehicles, or would have paid less for their vehicles, had they known, prior to their respective time of purchase or lease, that their vehicles utilized the Defective Batteries.

1137. As a direct and proximate result of GM's willful failure to comply with its obligations under the express warranties, Texas Plaintiffs and the Texas Subclass members have suffered actual and consequential damages. Such damages include, but are not limited to, a diminution in the value of the subject vehicles containing the defects identified herein.

1138. As a direct and proximate cause of GM's breach, Texas Plaintiffs and the Texas Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles.

1139. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving notice to Texas Plaintiffs or the Texas Subclass members.

1140. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Subclass members. Among other things, Texas Plaintiffs and the Texas Subclass members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Texas Plaintiffs and the Texas Subclass members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

1141. Texas Plaintiffs and the Texas Subclass members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

1142. Also, as alleged in more detail herein, at the time that GM warranted and sold the vehicles, it knew that the vehicles did not conform to the warranties and were inherently defective, and GM wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Texas Plaintiffs and the Texas

Subclass members were therefore induced to purchase the defective Class Vehicles under false and/or fraudulent pretenses.

1143. GM been provided notice of these issues by numerous complaints as described herein.

1144. As a direct and proximate result of GM's breach of express warranties, Texas Plaintiffs and the Texas Subclass members have been damaged in an amount to be determined at trial.

## COUNT SIXTY-FOUR — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY (TEX. BUS. & COM. CODE § 2.314)

1145. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1146. Texas Plaintiffs bring this cause of action on behalf of themselves and the Texas Subclass against Defendant GM.

1147. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Business and Commercial Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Business and Commercial Code § 2A.103(a)(16).

1148. The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Business and Commercial Code §§ 2.105(a) and 2A.103(a)(8).

1149. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law, pursuant to Texas Business and Commercial Code §§ 2.314 and 2A.212.

1150. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, inter alia, the following: (i) a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use—providing safe and reliable transportation—while the Class Vehicles were being operated.

1151. GM breached the implied warranty of merchantability in that the defective Class Vehicles were not in merchantable condition when they were sold to Texas Plaintiffs and members of the Texas Subclass and said vehicles were and are unfit for the ordinary purposes for which such vehicle is used because they pose a serious safety risk to the occupants and are an unreliable means of transportation.

1152. Texas Plaintiffs notified GM of the Defective Battery in his vehicle a reasonable time after Texas Plaintiffs learned about it.

1153. As a direct and proximate result of breaches of the implied warranty of merchantability, Texas Plaintiffs and members of the Texas Subclass have suffered damages, including but not limited to incidental and consequential damages.

## COUNT SIXTY-FIVE — FRAUD BY CONCEALMENT

1154. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1155. Texas Plaintiffs bring this cause of action on behalf of himself and the Texas Subclass against Defendants.

1156. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was not readily discoverable in many cases until years after they purchased or leased the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1157. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1158. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendant knew they were not known to or reasonably discoverable by Texas Plaintiffs and the Texas Subclass members. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

1159. Defendants were in exclusive control of the material facts and such facts were not known to the public or the Texas Subclass members. Defendants also possessed exclusive knowledge of the Defective Batteries and their tendency to make the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

1160. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Texas Plaintiffs and the Texas Subclass members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1161. Texas Plaintiffs and the Texas Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Texas Plaintiffs and the Texas Subclass members were justified.

1162. Texas Plaintiffs and the Texas Subclass members reasonably relied on these omissions and suffered damages as a result.

1163. As a result of these omissions and concealments, Texas Plaintiffs and the Texas Subclass members incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

1164. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Texas Plaintiffs and the Texas Subclass members. Defendants' conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SIXTY-SIX — UNJUST ENRICHMENT

1165. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1166. Texas Plaintiffs bring this cause of action on behalf of himself and the Texas Subclass against Defendant GM.

1167. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and the concealment of the Defective Batteries as described herein, GM charged a higher price for their vehicles than the vehicles' true value and Defendant obtained monies which rightfully belong to Texas Plaintiffs and the Texas Subclass members.

1168. GM enjoyed the benefit of increased financial gains, to the detriment of Texas Plaintiffs and the Texas Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

1169. Texas Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**M.   Claims Brought on Behalf of the Virginia Subclass**

## COUNT SIXTY-SEVEN — VIOLATIONS OF THE VIRGINIA CONSUMER PROTECTION ACT
## (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)

1170.  Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1171.  Plaintiffs Dornetto and Ives (for purposes of this section, "Virginia Plaintiffs") bring this claim on behalf of themselves and the Virginia Subclass against Defendants.

1172.  Defendants, Virginia Plaintiffs, and the Virginia Subclass are "persons" within the meaning of Va. Code § 59.1-198.

1173.  Defendants are "supplier[s]" within the meaning of Virginia Code § 59.1-198.

1174.  The Virginia Consumer Protection Act ("Virginia CPA") makes unlawful "fraudulent acts or practices." Va. Code § 59.1-200(A).

1175.  In the course of their business, Defendants concealed and suppressed material facts concerning the Class Vehicles through deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Class Vehicles.

1176.  Defendants violated the Act by misrepresenting material facts concerning the Class Vehicles. As alleged herein, Defendants misrepresented through their

advertisements and public statements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge. Virginia Plaintiffs and Virginia Subclass members did not and could not unravel Defendant's deception on their own.

1177. Defendants engaged in misleading, false, unfair or deceptive acts or practices by failing to disclose and actively concealing the defect.

1178. In the course of doing business, Defendants knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Virginia Plaintiffs and the members of the Virginia Subclass. Moreover, Defendants actively suppressed the fact that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

1179. Defendants knew or should have known that its conduct violated the Virginia CPA.

1180. Defendants had the duty to Virginia Plaintiffs and the members of the Virginia Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A.     Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

B.      Virginia Plaintiffs and the members of the Virginia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest; and

C.      Defendants knew that Virginia Plaintiffs and the members of the Virginia Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

1181. In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants have knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

1182. The facts Defendants concealed or did not disclose to Virginia Plaintiffs and the members of the Virginia Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Virginia Plaintiffs and the members of the Virginia Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

1183. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Virginia Plaintiffs, about the safety of the Class Vehicles and the true value of the Class Vehicles.

1184. Defendants' violations present a continuing risk to Virginia Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1185. The recall and modifications Defendant GM claims to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Virginia Plaintiffs or the Virginia Subclass the battery range promised to them when they purchased the vehicles.

1186. Virginia Plaintiffs and members of the Virginia Subclass suffered ascertainable loss directly and proximately resulting from Defendants' violations. Virginia Plaintiffs and members of the Virginia Subclass have suffered actual damages and/or injury in fact, including, inter alia, the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles utilizing the Defective Batteries.

1187. Pursuant to Va. Code § 59.1-204(A)–(B), Virginia Plaintiffs and the Virginia Subclass are entitled to the greater of actual damages or $500 for each Virginia Subclass member, attorneys' fees, and costs. Because Defendants' actions were willful, Virginia Plaintiffs and the Virginia Subclass should each receive the greater of treble damages or $1,000. *Id.*

## COUNT SIXTY-EIGHT — BREACH OF EXPRESS WARRANTY
### (VA. CODE §§ 8.2-313 AND 8.2A-210)

1188. Plaintiff realleges and incorporate by reference all preceding allegations as though fully set forth herein.

1189. Virginia Plaintiffs bring this claim on behalf of themselves and the Virginia Subclass against Defendant GM.

1190. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Virginia Code § 8.2-104(1) and 8.2A-103(1)(t), and a "seller" of motor vehicles under § 8.2-103(1)(d).

1191. With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Virginia Code § 8.2A-103(1)(p).

1192. The Class Vehicles are and were at all relevant times "goods" within the meaning of Virginia Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1193. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

1194. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet

Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

1195. Furthermore, GM expressly warranted—through statements and advertisements—that the Class Vehicles were of high quality, and at a minimum, would work properly and safely.

1196. GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

1197. GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

1198. Virginia Plaintiffs notified GM of the breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it

received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1199. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving Virginia Plaintiffs or the Virginia Subclass notice of the Defective Batteries.

1200. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Virginia Plaintiffs and the members of the Virginia Subclass. Among other things, Virginia Plaintiffs and the members of the Virginia Subclass had no meaningful choice in determining these time limitations, the terms of which unreasonably favored GM. A gross disparity in bargaining power existed between GM and Virginia Plaintiffs and the Virginia Subclass members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

1201. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Virginia Plaintiffs and the members of the Virginia Subclass whole, and because GM has failed and/or refused to adequately provide the promised remedies within a reasonable time.

1202. Virginia Plaintiffs and the members of the Virginia Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

1203. Also, as alleged in more detail herein, at the time that GM warranted and sold the vehicles it knew that the vehicles did not conform to the warranties and were inherently defective, and GM wrongfully and fraudulently misrepresented and/or concealed material facts regarding their vehicles. Virginia Plaintiffs and the Virginia Subclass members were therefore induced to purchase the vehicles under false and/or fraudulent pretenses. The enforcement under these circumstances of any limitations whatsoever precluding the recovery of incidental and/or consequential damages is unenforceable.

1204. Moreover, many of the damages flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Virginia Plaintiffs' and the Virginia Subclass' remedies would be insufficient to make Virginia Plaintiffs and the Virginia Subclass members whole.

1205. Finally, due to GM's breach of warranties as set forth herein, Virginia Plaintiffs and the Virginia Subclass assert as an additional and/or alternative remedy for a revocation of acceptance of the goods, and for a return to Virginia Plaintiffs and to the

Virginia Subclass of the purchase price of all vehicles currently owned and for such other incidental and consequential damages.

1206. As a direct and proximate cause of GM's breach, Virginia Plaintiffs and the members of the Virginia Subclass bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT SIXTY-NINE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTIBILITY
### (VA. CODE §§ 8.2-314 AND 8.2A-212)

1207. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1208. Virginia Plaintiffs bring this claim on behalf of themselves and the Virginia Subclass against Defendant GM.

1209. GM is and was at all relevant times a "merchant" with respect to motor vehicles under Virginia Code §§ 8.2-104(1) and 8.2A-103(1)(t), and "seller" of motor vehicles and their component parts under § 8.2-103(1)(d).

1210. GM is and was at all relevant times a "lessor" of motor vehicles under Virginia Code § 8.2A-103(1)(p).

1211. The Class Vehicles are and were at all relevant times "goods" within the meaning of Virginia Code §§ 8.2-105(1) and 8.2A-103(1)(h).

1212. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Virginia Code §§ 8.2-313 and 8.2A-210.

1213. GM impliedly warranted that their vehicles and component parts were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1214. GM provided Virginia Plaintiffs and the members of the Virginia Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

1215. However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

1216. Virginia Plaintiffs notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1217. Virginia Plaintiffs and the Virginia Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Virginia Plaintiffs are "person[s] whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods." Va. Code § 9.2-318. Furthermore, Virginia Plaintiffs and the Virginia Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

1218. As a direct and proximate result of the breach of said implied warranty, Virginia Plaintiffs and the Virginia Subclass sustained the damages herein set forth.

1219. Virginia Plaintiffs and the Virginia Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT SEVENTY — FRAUD BY CONCEALMENT

1220. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1221. Virginia Plaintiffs bring this claim on behalf of themselves and the Virginia Subclass against Defendants.

1222. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of the Class Vehicles.

1223. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Virginia Plaintiffs and the Virginia Subclass members to purchase the Class Vehicles at a higher price, which did not match their true value.

1224. Defendants still have not made full and adequate disclosure and continues to defraud Virginia Plaintiffs and the Virginia Subclass members.

1225. Virginia Plaintiffs and the Virginia Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Virginia Plaintiffs and the Virginia Subclass' actions were justified. Defendants had exclusive control of the material facts and such facts were not known to the public or the Virginia Subclass.

1226. As a result of the concealment and/or suppression of the facts, Virginia Plaintiffs and the Virginia Subclass members sustained damage. For those Virginia Plaintiffs and the Virginia Subclass who elect to affirm the sale, these damages, include

the difference between the actual value of that which Virginia Plaintiffs and the Virginia Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Virginia Plaintiffs or member of the Virginia Subclass who want to rescind their purchases, then such Virginia Plaintiffs and the Virginia Subclass members are entitled to restitution and consequential damages.

1227. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Virginia Plaintiffs' and the Virginia Subclass' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SEVENTY-ONE — UNJUST ENRICHMENT

1228. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1229. Virginia Plaintiffs bring this claim on behalf of themselves and the Virginia Subclass against Defendant GM.

1230. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the concealing the Defective Batteries as described herein, GM charged a higher price for their vehicles than the vehicles' true value and Defendant GM

obtained monies rightfully belonging to Virginia Plaintiffs and the Virginia Subclass members.

1231. GM enjoyed the benefit of increased financial gains, to the detriment of Virginia Plaintiffs and the Virginia Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM to retain these wrongfully obtained profits.

1232. Virginia Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## N.    Claims Brought on Behalf of the Washington Subclass

### COUNT SEVENTY-TWO — VIOLATIONS OF THE CONSUMER PROTECTION ACT
### (REV. CODE WASH. ANN. § § 19.86.010, *ET SEQ.*)

1233. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1234. Plaintiffs Andersen and DeRosa (for purposes of this section, "Washington Plaintiffs") bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass against Defendants.

1235. Defendants' conduct as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Defendants' manufacture, sale, and use of the Defective Batteries, which Defendants failed to adequately investigate, disclose and remedy, and its misrepresentations and omissions regarding the safety, reliability, and range of the Class Vehicles.

1236. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1237. Defendants' actions impact the public interest because Washington Plaintiffs were injured in the same way as tens of thousands of others purchasing and/or leasing Defendants' vehicles as a result of Defendants' generalized course of deception. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.

1238. Washington Plaintiffs and the Washington Subclass members were injured as a result of Defendants' conduct. Washington Plaintiffs and the Washington Subclass overpaid for the Class Vehicles and did not receive the benefit of their bargain, and thus the Class Vehicles have suffered a diminution in value.

1239. Defendants' conduct proximately caused the injuries to Plaintiffs and the Washington Subclass members.

1240. Defendants are liable to Washington Plaintiffs and the Washington Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

1241. Pursuant to Wash. Rev. Code. Ann. § 19.86.095, Washington Plaintiffs will serve the Washington Attorney General with a copy of this complaint as Washington Plaintiffs seek injunctive relief.

## COUNT SEVENTY-THREE — BREACH OF EXPRESS WARRANTY
## (REV. CODE WASH. § 62A.2-313 AND 62A.2A-210)

1242. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1243. Washington Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass against Defendant GM.

1244. GM is and was at all relevant times a merchant with respect to motor vehicles.

1245. In the course of selling its vehicles, GM expressly warranted in writing that the Class Vehicles were covered by a new vehicle limited warranty.

1246. Washington Plaintiffs each notified GM of its breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints filed against them.

1247. In addition to this new vehicle limited warranty, GM expressly warranted several attributes, characteristics and qualities, as set forth above.

1248. Furthermore, the limited warranty of repair and/or adjustments to defective parts, fails in its essential purpose because the contractual remedy is insufficient to make the Washington Plaintiffs and members of the Washington Subclass whole and

because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1249. Accordingly, Washington Plaintiffs' recovery is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff seeks all remedies as allowed by law.

1250. Also, at the time GM warranted and sold the Class Vehicles, GM wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Class Vehicles. Washington Plaintiffs and members of the Washington Subclass were therefore induced to purchase the Class Vehicles under false and/or fraudulent pretenses.

1251. The damages flowing from the Class Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," and any limitation on available remedies would be insufficient to make Washington Plaintiffs and the Washington Subclass whole.

1252. Finally, as a result of GM's breach of warranties as set forth herein, Washington Plaintiffs and the Washington Subclass assert as an additional and/or alternative remedy, as set forth in Rev. Code Wash. § 62A.2-608, for a revocation of acceptance of the goods, and for a return to Washington Plaintiffs and to the Washington Subclass the purchase price of all Class Vehicles currently owned.

1253. As a direct and proximate result of GM's breach of express warranties, Washington Plaintiffs and the Washington Subclass have been damaged in an amount to be determined at trial.

## COUNT SEVENTY-FOUR — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (REV. CODE WASH. § 62A.2-314/315)

1254. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1255. Washington Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass against Defendant GM.

1256. GM is and was at all relevant times a merchant with respect to motor vehicles.

1257. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

1258. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that the Defective Batteries cannot be charged safely without the risk of catastrophic failure causing fire and potential explosion.

1259. Privity is not required in this case because Washington Plaintiffs and the Washington Subclass are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's implied

warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

1260. As a direct and proximate result of GM's breach of the warranties of merchantability, Washington Plaintiffs and the Washington Subclass members have been damaged in an amount to be proven at trial.

## COUNT SEVENTY-FIVE — FRAUD BY CONCEALMENT

1261. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1262. Washington Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the Washington Subclass against Defendants.

1263. As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of the Class Vehicles.

1264. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Washington Plaintiffs and the Washington Subclass members to purchase the Class Vehicles at a higher price, which did not match their true value.

1265. Defendants still have not made full and adequate disclosure and continue to defraud Washington Plaintiffs and the Washington Subclass members.

1266. Washington Plaintiffs and the Washington Subclass members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Washington Plaintiffs and the Washington Subclass' actions were justified. Defendants had exclusive control of the material facts and such facts were not known to the public or the Washington Subclass.

1267. As a result of the concealment and/or suppression of the facts, Washington Plaintiffs and the Washington Subclass members sustained damage. For those Plaintiffs and the Washington Subclass who elect to affirm the sale, these damages, include the difference between the actual value of that which Washington Plaintiffs and the Washington Subclass paid and the actual value of that which they received, together with additional damages arising from the sales transaction, amounts expended in reliance upon the fraud, compensation for loss of use and enjoyment of the property, and/or lost profits. For any Washington Plaintiffs or member of the Washington Subclass who want to rescind their purchases, then such Plaintiffs and the Washington Subclass members are entitled to restitution and consequential damages.

1268. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Washington Plaintiffs' and the Washington Subclass' rights and well-being to enrich Defendant. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT SEVENTY-SIX — UNJUST ENRICHMENT

1269. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1270. Washington Plaintiffs bring this cause of action on behalf of themselves and the Washington Subclass against Defendant GM.

1271. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the concealing the Defective Batteries as described herein, GM charged a higher price for their vehicles than the vehicles' true value and GM obtained monies rightfully belonging to Washington Plaintiffs and the Washington Subclass members.

1272. GM enjoyed the benefit of increased financial gains, to the detriment of Washington Plaintiffs and the Washington Subclass members, who paid a higher price for vehicles which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

1273. Washington Plaintiffs, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

**O.     Claims Brought on Behalf of the Wisconsin Subclass**

### COUNT SEVENTY-SEVEN — VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT (WIS. STAT. § 100.18)

1274. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1275. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass against Defendants.

1276. Plaintiff and the Wisconsin Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiff and Wisconsin Class members purchased or leased one or more Class Vehicles.

1277. Plaintiff and Wisconsin Class members are "persons" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"), Wis. Stat. § 100.18(1).

1278. Defendants are each a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

1279. The Wisconsin UTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Wis. Stat. § 100.18(1).

1280. In the course of doing business, Defendants misrepresented material facts concerning the Class Vehicles. As alleged herein, Defendants misrepresented through their advertisements and public statements that the batteries utilized in the Class Vehicles could be safely charged to enable the vehicles to travel for a reported range of 238 miles on a single full charge.

1281. In the course of doing business, Defendants knowingly failed to disclose, suppressed, concealed, suppressed and/or omitted material facts regarding the Defective Battery and the safety hazards associated with it, and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff and the members of the Wisconsin Subclass. Moreover, Defendants actively suppressed the fact

that the batteries were defective and presented a safety hazard because of materials, workmanship and/or manufacturing defects.

1282. Defendants thus violated the Wisconsin DTPA by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

1283. Plaintiff and members of the Wisconsin Subclass justifiably relied on these material misrepresentations and, as a result, are entitled to damages in an amount to be proven at trial.

1284. Defendants had the duty to Plaintiff and the members of the Wisconsin Subclass to disclose the Defective Battery and the defective nature of the Class Vehicles because:

> A.      Defendants possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that contained the Defective Battery;

B.    Plaintiff and the members of the Wisconsin Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

C.    Defendants knew that Plaintiff and the members of the Wisconsin Subclass could not reasonably have been expected to learn about or discover the Defective Battery and the effect it would have on the Class Vehicles' range and energy efficiency.

1285.  In failing to disclose the Defective Battery and its resulting safety risks and efficiency decreases, Defendants have knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

1286.  The facts Defendants concealed or did not disclose to Plaintiff and the members of the Wisconsin Subclass are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff and the members of the Wisconsin Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

1287.  Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

1288.  The recall and modifications Defendants claim to have instituted to address the Defective Battery have not been adequate, in that they do not restore to Plaintiff or

the Wisconsin Subclass the battery range promised to them when they purchased the vehicles.

1289. As a direct and proximate result of Defendants' violations of the Wisconsin DTPA, Plaintiff and the Wisconsin Subclass have suffered injury-in-fact and/or actual damage.

1290. Plaintiff and the Wisconsin Class seek damages, court costs and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

## COUNT SEVENTY-EIGHT — BREACH OF EXPRESS WARRANTY (WIS. STAT. §§ 402.313 AND 411.210)

1291. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1292. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass against Defendant GM.

1293. GM is and was all at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

1294. GM is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1295. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

1296. GM provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the parties' bargain. Accordingly, GM's warranties are express warranties under state law.

1297. Specifically, the Class Vehicles are covered by GM's new vehicle limited warranty, including the 8-year/100,000 new vehicle limited warranty on electric propulsion components, including the battery components, thermal management system, charging system, and electric drive components. The new vehicle limited warranty covers "repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period" and provides that "[w]arranty repairs, including towing, parts, and labor, will be made at no charge." Furthermore, GM's warranty provides that "[i]n addition to the initial owner of the vehicle, the coverage described in this Chevrolet Bolt, Bolt EV, and Malibu Hybrid warranty is transferable at no cost to any subsequent person(s) who assumes ownership of the vehicle within the 8 years or 100,000 miles term."

1298. Furthermore, GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely.

1299. GM distributed the defective parts causing the Defective Battery in the Class Vehicles, and said parts are covered by GM's warranties granted to all Class Vehicle purchasers and lessors.

1300. GM breached these warranties by selling and leasing Class Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Class Vehicles to be restored to their advertised qualities within a reasonable time.

1301. Plaintiff notified GM of the breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the Defective Batteries but instead chose to conceal the defect until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1302. Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, GM's warranty limitations are unenforceable because it knowingly sold a defective product without giving Plaintiff or the Class notice of the Defective Batteries.

1303. The time limits contained in GM's warranty period were also unconscionable and inadequate to protect Plaintiff and the members of the Wisconsin Subclass. Among other things, Plaintiff and the members of the Wisconsin Subclass had no meaningful choice in determining these time limitations, the terms of which

311

unreasonably favored Defendant. A gross disparity in bargaining power existed between GM and the Class members because GM knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives expired.

1304. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Wisconsin Subclass whole, and because GM has failed and/or have refused to adequately provide the promised remedies within a reasonable time.

1305. Plaintiff and the members of the Wisconsin Subclass have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct.

1306. As a direct and proximate cause of GM's breach, Plaintiff and the members of the Wisconsin Subclass bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

## COUNT SEVENTY-NINE — BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
### (WIS. STAT. §§ 402.314 AND 411.212)

1307. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1308. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass against Defendant GM.

1309. GM is and was all at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. § 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

1310. GM is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

1311. The Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h)

1312. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to is. Stat. §§ 402.314 and 411.212.

1313. GM impliedly warranted that its vehicles were of good and merchantable quality and fit, and safe for their ordinary intended use – transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

1314. GM provided Plaintiff and the members of the Wisconsin Subclass with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. GM impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles GM manufactured,

supplied, distributed, and/or sold were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Class Vehicles would be fit for their intended use while being operated.

1315. However, the Class Vehicles the time of sale and thereafter were and are not vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are not safe to operate at the Class Vehicles' advertised range.

1316. Plaintiff notified GM of its breach within a reasonable time, and/or was not required to do so because affording GM a reasonable opportunity to cure its breaches would have been futile. In any event, GM knows about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, GM was provided notice of these issues within a reasonable amount of time by the numerous complaints it received from various sources, including through the NHTSA database, other online sources, and directly from consumers.

1317. Plaintiff and the Wisconsin Subclass members have had sufficient dealings with GM or its agents to establish privity of contract. Privity is not required in this case, however, because Plaintiff and the Wisconsin Subclass members are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The dealers were not intended to be the

ultimate consumers of Class Vehicles, and the warranties were designed for and intended to benefit the ultimate consumers only.

1318. As a direct and proximate result of the breach of said implied warranty, Plaintiff and the Wisconsin Subclass sustained the damages herein set forth.

1319. Plaintiff and the Wisconsin Subclass members are, therefore, entitled to damages in an amount to be proven at the time of trial

## COUNT EIGHTY — FRAUDULENT CONCEALMENT

1320. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1321. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass against Defendants.

1322. Defendants made material omissions concerning a presently existing or past fact in that, for example, Defendants did not fully and truthfully disclose to its customers the true nature of the Defective Batteries, which was in most cases not readily discoverable until years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

1323. Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

1324. In addition, Defendants had a duty to disclose these omitted material facts because they were known and/or accessible only to Defendants who had superior knowledge and access to the facts, and Defendants knew they were not known to or reasonably discoverable by Plaintiff and the members of the Wisconsin Subclass. These omitted facts were material because they directly impact the safety and reliability of the Class Vehicles.

1325. Defendants were in exclusive control of the material facts and such facts were not known to Plaintiff and members of the Wisconsin Subclass, or the public. Defendants also possessed exclusive knowledge of the Defective Batteries and their tendency to render the Class Vehicles more dangerous and unreliable than similar vehicles.

1326. Defendants actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the members of the Wisconsin Subclass to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

1327. Plaintiff and the members of the Wisconsin Subclass were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the members of the Wisconsin Subclass were justified.

1328. Plaintiff and the members of the Wisconsin Subclass reasonably relied on these omissions and suffered damages as a result.

1329. As a result of these omissions and concealments, Plaintiff and the members of the Wisconsin Subclass incurred damages including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished intrinsic value of their Class Vehicles.

1330. Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the members of the Wisconsin Subclass. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT EIGHTY-ONE — UNJUST ENRICHMENT

1331. Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

1332. Plaintiff Smith brings this cause of action on behalf of himself and the Wisconsin Subclass against Defendant GM.

1333. As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design and/or manufacturing defect of their vehicles and concealing the Defective Batteries described herein, GM charged a higher price for their vehicles than the Class Vehicles' true value, and thus GM obtained monies rightfully belonging to Plaintiff and the members of the Wisconsin Subclass.

1334. GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and the Wisconsin Subclass members, who paid a higher price for vehicles

which actually had lower values. It would be inequitable and unjust for GM retain these wrongfully obtained profits.

1335. Plaintiff, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that this Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.      Appoint Plaintiffs as representatives of the Nationwide Class and applicable State Classes and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiff and Class members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief against all Defendants, including an order requiring GM to buy back or permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that Defendants are financially responsible for all Class notice and administration of Class relief;

G.    Award reasonable attorney fees and costs; and

H.    Grant such further relief that this Court deems appropriate.

Dated: September 17, 2021        Respectfully submitted,

By: */s/ E. Powell Miller*
    E. Powell Miller (P39487)
    Sharon S. Almonrode (P33938)
    Melvin B. Hollowell (P37834)
    Dennis A. Lienhardt (P81118)
    William Kalas (P82113)
    **THE MILLER LAW FIRM, P.C.**
    950 West University Dr., Suite 300
    Rochester, MI 48307
    (248) 841-2200
    Fax (248) 652-2852
    epm@millerlawpc.com
    ssa@millerlawpc.com
    mbh@millerlawpc.com
    dal@millerlawpc.com
    wk@millerlawpc.com

    Lynn Lincoln Sarko
    Gretchen Freeman Cappio (P84390)
    Ryan McDevitt (P84389)
    Emma Wright
    **KELLER ROHRBACK L.L.P.**
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    (206) 623-1900
    Fax (206) 623-3384
    lsarko@kellerrohrback.com
    gcappio@kellerrohrback.com
    rmcdevitt@kellerrohrback.com
    ewright@kellerrohrback.com

    *Interim Co-Lead Counsel*

    David C. Wright
    Mark I. Richards
    Richard D. McCune
    Steven A. Haskins
    **MCCUNE WRIGHT ARAVELO, LLP**
    3281 East Guasti Road, Suite 100
    Ontario, CA 91761

(909) 557-1250
Fax (909) 557-1275
dcw@mccunewright.com
mir@mccunewright.com
rdm@mccunewright.com
sah@mccunewright.com

Roberta Liebenberg
Gerard A. Dever
Mary L. Russell
**FINE, KAPLAN AND BLACK, RPC**
1 South Broad St., Suite 2300
Philadelphia, PA 19107
(215) 567-6565
rliebenberg@finekaplan.com
gdever@finekaplan.com
mrussell@finekaplan.com

Nicholas A. Migliaccio (P29077)
Jason S. Rathod (P18424)
**MIGLIACCIO & RATHOD LLP**
412 H St. NE, Suite 302
Washington D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Todd Friedman
David B. Levin
**LAW OFFICES OF TODD M.
FRIEDMAN, PC**
21550 Oxnard Street Suite 780
Woodland Hills, CA 91367
(224) 218-0882
Fax (866) 633-0228
dlevin@toddflaw.com
tfriedman@toddflaw.com

Benjamin F. Johns
Beena M. McDonald
Samantha E. Holbrook
Alex M. Kashurba

321

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
361 West Lancaster Ave
One Haverford Centre
Haverford, PA 19041
(610) 642-8500
bmm@chimicles.com
bfj@chimicles.com
seh@chimicles.com

*Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2021, I electronically filed the foregoing

using the ECF system which will send electronic notices of same to all counsel of

record.

Respectfully submitted,

By: *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Dr., Suite 300
Rochester, MI 48307
(248) 841-2200
Fax (248) 652-2852
epm@millerlawpc.com