UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **IN RE CHEVROLET BOLT EV BATTERY LITIGATION**[1] | **2:20-CV-13256-TGB-CI** <br><br> HON. TERRENCE G. BERG <br><br> **ORDER RESOLVING DEFENDANTS' MULTIPLE PRETRIAL MOTIONS** <br> **(1)  TO STRIKE CLASS ALLEGATIONS;** <br> **(2)  TO COMPEL ARBITRATION; AND** <br> **(3)  TO DISMISS MULTIPLE CLAIMS** |

    This case is a putative class action alleging a defect in the battery system of model-year 2017-2022 Chevrolet Bolt electric vehicles. Allegedly, a problem may arise if a battery has two particular manufacturing defects at the same time and is charged to or near to its full capacity. That condition is believed to cause a "thermal runaway" event—an uncontrolled feedback loop of increasing temperatures that may cause the battery to burst into flames. Fires have occurred in a small number of affected vehicles.

---

[1] This case was consolidated from eight putative class actions under Fed. R. Civ. P. 42(a) and E.D. Mich. Local Rule 42.1. *See* ECF No. 18.

In order to mitigate the risk of fire in Bolts it had already sold, General Motors issued several software updates that prevented the Bolts from being fully charged and notices to customers directing them to manually limit their charging. GM also advised customers to park outdoors and away from other vehicles after charging, not charge overnight, and avoid depleting the battery below a certain level of charge. Plaintiffs, all of whom bought or leased a Bolt, have sued Defendant GM and several companies affiliated with LG, the Korean conglomerate involved in producing components for the Bolt's battery system. Plaintiffs seek to represent a nationwide class and have sued under several theories, including fraud, breach of warranties (both express and implied), unjust enrichment, and under various states' consumer protection laws. Defendants General Motors, LG Energy Solution Michigan ("LG Michigan"), and LG Electronics United States ("LGEUS") have moved to dismiss the Complaint, strike certain class allegations, and compel certain Plaintiffs' claims to arbitration.[2]

To preview the Court's conclusions, Plaintiffs' affirmative fraud claims will be dismissed; Plaintiffs fraudulent concealment claims will not be dismissed for failure to state a claim in general, but most fraudulent concealment claims will be dismissed under specific states'

---

[2] Defendants have also filed notices of joinder in one another's motions. Accordingly, where an argument raised in one Defendant's motion is potentially relevant to another Defendant, the Court will address whether that argument applies to both unless explicitly stated.

laws for several different reasons; most of Plaintiffs' consumer protection claims will proceed; most of Plaintiffs' warranty claims will proceed; and Plaintiffs' unjust enrichment claims will be dismissed.[3] As for the other motions, the Court will not strike Plaintiffs' nationwide class allegations, and several Plaintiffs' claims will be compelled to arbitration.

## TABLE OF CONTENTS

I. BACKGROUND ..................................................................6

  A. Relevant Parties..............................................................6

  B. GM develops the Bolt with the LG Entities' assistance .................7

  C. The Battery's design ........................................................10

  D. GM allegedly markets the Bolt's range .........................................11

  E. Problems emerge with the battery ................................................11

    i. 2016-2018: the "low-voltage condition" causes a loss of propulsion power in some Bolts ...................................................11

  F. Early 2019: the fire-risk defect emerges .......................................12

  G. GM's response to the risk-of-fire defect........................................13

    i. The initial recall of 2017-2019 Bolts: software updates.............13

    ii. The second software update........................................................14

  H. GM expands the recall to all model years .....................................15

  I. Currently pending motions............................................................16

  J. Chart summarizing counts ............................................................16

II. MOTIONS TO STRIKE CLASS ALLEGATIONS ............................20

---

[3] Because Plaintiffs have already had the opportunity to amend their complaint once, unless otherwise noted, these dismissals will be with prejudice.

A.  Whether Defendants have shown that Plaintiffs' proposed nationwide class claims would be fundamentally unworkable ...........21

B.  Whether Plaintiffs' standing to represent certain absent class members is more appropriately considered at the class certification stage ................................................................................................27

III. MOTION TO COMPEL CERTAIN PLAINTIFFS TO ARBITRATION ....................................................................................30

IV. MOTIONS TO DISMISS ...................................................................38

A.  Standard of Review ........................................................................38

B.  Whether Plaintiffs have standing to bring claims against LG Michigan ...............................................................................................39

C.  Whether Plaintiffs' fraud-based claims must be dismissed...........44

i.   Whether Plaintiffs have sufficiently alleged that Defendants knew about the fire-risk defect............................................................44

ii.  Whether Plaintiffs have stated fraud claims .............................53

iii. Whether Plaintiffs have alleged a duty to disclose for purposes of their fraudulent concealment claims ................................................61

iv. Whether Plaintiffs' fraudulent concealment claims are barred by the "economic loss doctrine" ............................................................69

v.   Whether certain Plaintiffs may bring claims under both the laws of the states where they live and the laws of the states where they purchased or leased their vehicles ....................................................72

vi. Whether certain Plaintiffs have sufficiently alleged that a defect "manifested" in their vehicles............................................................73

vii.   Summary of fraudulent concealment claims ............................74

D.  Whether Plaintiffs have sufficiently alleged consumer protection claims under the laws of certain states ...............................................75

i.   Whether certain states' consumer protection statutes cover vehicle sales .......................................................................................75

ii.  Whether Plaintiffs have sufficiently alleged causation and reliance as required by all states' consumer protection statutes .....79

iii.  Whether Plaintiffs may seek equitable relief..............................80

iv.  Whether Plaintiffs have standing to seek injunctive relief under certain states' consumer protection statutes ....................................82

v.  Whether certain states' products liability statutes allow class actions ........................................................................................84

vi.  Whether claims under the consumer protection laws of Virginia and Texas may be maintained against an upstream manufacturer 85

vii.   Summary of consumer protection claims...................................85

E.  Whether Plaintiffs can maintain state-law warranty claims........86

i.   Whether defendants created a representation-based express warranty......................................................................................86

ii.   Whether Plaintiffs' warranty claims must be dismissed for failure to allege their vehicles' mileage..............................................87

iii. Whether the claims of Plaintiffs who did not bring their vehicles in for repair must be dismissed ........................................................88

iv. Whether Plaintiffs have adequately alleged that the Limited Warranty failed its essential purpose ................................................91

v.   Whether Plaintiffs have adequately alleged pre-suit notice as required by certain states' laws..........................................................92

vi. Whether certain Plaintiffs may bring breach of warranty claims under the laws of the states where they live and where they purchased their vehicles ....................................................................95

vii.   Whether Plaintiffs have sufficiently alleged that their vehicles were unmerchantable at the time of sale..........................................96

viii.  Whether Plaintiffs' implied warranty claims must be dismissed for failure to plead their vehicles' mileage ........................................98

ix. Whether Plaintiffs' warranty claims must be dismissed for failure to allege privity with GM........................................................98

x.   Summary of warranty claims ...................................................102

F.  Whether Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claims must be dismissed...................................................................103

G.  Whether Plaintiffs may maintain unjust enrichment claims......104

H.  Whether Plaintiffs' claims are prudentially moot........................105

V.  CONCLUSION.................................................................................107

# I.  BACKGROUND

## A.  Relevant Parties

The thirty-six Plaintiffs in this matter purchased or leased their vehicles (or lived) in Arizona, California, Florida, Georgia, Illinois, Kansas, Massachusetts, Michigan, New York, Oregon, Texas, Virginia, Washington, or Wisconsin. All Plaintiffs purchased or leased model-year ("MY") 2017-2022 Chevrolet Bolt electric vehicles.[4]

Plaintiffs sue General Motors LLC ("GM"), the Bolt's original manufacturer (sometimes referred to as an "original equipment manufacturer" or "OEM"). Plaintiffs also sue several entities that loosely fall under the umbrella of the Korean entity LG Group (collectively "the LG Entities").[5] LG's corporate structure is fairly complicated, but for purposes of this case, only a few of the LG Entities are relevant.

Defendant LG Chem, Ltd. ("LG Chem") is a Korean corporation. Compl., ECF No. 27, PageID.1227. It is the parent company of Defendant LG Energy Solution, Ltd. ("LG Energy Solution") which in turn is the parent company of Defendant LG Energy Solution Michigan ("LG

---

[4] The facts presented here are drawn from the Plaintiffs' Complaint, and are not findings by the Court. Because this is a motion to dismiss, Plaintiffs' factual allegations are accepted as true.

[5] The ownership structure of LG Chem and LG Electronics is not relevant for purposes of this motion and was not briefed by the parties.

Michigan"). *Id.* at PageID.1227-28. LG Michigan was incorporated in 2010 as "LG Chem Michigan" but changed its name in late 2020 to LG Energy Solution Michigan. LG Michigan's Mot. to Dismiss, ECF No. 44, PageID.3013.

Defendant LG Electronics, Inc. is a separate South Korean company. It trades on the Korean Stock Exchange under a different ticker symbol from LG Chem. ECF No. 27, PageID.1227-29. One of LG Electronics' wholly owned subsidiaries is Defendant LG Electronics United States ("LGEUS"). *Id.* at PageID.1230. Also potentially involved in the Bolt supply chain is an "affiliate of LG Electronics" not named in this suit.[6]

### B.  GM develops the Bolt with the LG Entities' assistance

GM first introduced the Bolt as a concept car in 2015. *Id.* at PageID.1231. In a press release, GM described the Bolt as "a vision for an affordable, long-range all-electric vehicle designed to offer more than 200 miles of range starting around $30,000." *Id.* The Bolt's production version was introduced a year later for model year 2017. *Id.*

---

[6] It appears from the parties' statements during oral argument that this unnamed affiliate is a company known as "LG Electronics Vehicle Components USA LLC" or by a similar name. The precise identity of this affiliate is not at issue, and none of the LG Entities appears to dispute that the activities of the unnamed affiliate are attributable to LGEUS, at least for purposes of this motion. Accordingly, the Court will refer to this entity as "the LGEUS Affiliate."

According to the Complaint, GM partnered with the LG Entities to develop and manufacture the Bolt's battery pack and the individual cells that comprised the pack. *Id.* at PageID.1234. A 2015 press release from GM described certain LG companies' "unprecedented" role in the design of the battery, referring to a "strategic partnership" between GM and the LG companies that helped design and produce the Bolt:

> Offering consumers the first long-range, affordable EV, required an unprecedented supplier relationship combining expertise in infotainment, battery systems and component development with GM's proven in-house capabilities in electric motor design, battery control, system validation and vehicle body/system integration. Following joint planning and research, GM and LG Corp. brought the Chevy Bolt EV to reality.

*Id.* at PageID.1233-34 (quoting October 2015 Press Release, ECF No. 27-20, PageID.1642.). The statement described how "LG Electronics Vehicle Components led a team of LG Companies, including LG Chem . . . and LG Electronics, to help develop the Bolt EV," and detailed LG Electronics' significant investment to "support the component development and manufacturing for Bolt EV components." ECF No. 27-20, PageID.1642.

As far as the Court can discern, different LG companies manufactured various parts of the Bolt's battery at different times. LG Michigan says that it did not supply any components for the Bolt until mid-2018, so no model year 2017 or 2018 Bolts contained any components

manufactured by LG Michigan. ECF No. 44, PageID.3014. LG Michigan also says that it never supplied cells, modules or, indeed, any components to GM directly. Rather, it supplied cells to the unnamed LG Electronics Affiliate which in turn supplied parts to GM. *Id.* In a newspaper article attached to the Complaint as Exhibit 27-73, a GM spokesman is quoted as stating that "LG builds the battery cells at its LG Energy Solution Michigan, Inc., facility in Holland, Michigan . . . LG packs the cells into the modules, then into a battery pack at LG Electronics, a packing facility in Hazel Park." *Id.* at PageID.2203.

Although it is clear that no company can be held responsible for components it did not produce, at this stage it is unnecessary to determine with certainty which LG entity is actually responsible for producing the batteries at issue because the Court must accept the Complaint's factual allegations as true. In relevant part, the Complaint alleges that LG Michigan has a manufacturing plant in Holland, Michigan, that the "Holland, Michigan factory manufactures the Defective Batteries," and that LG Michigan (along with other LG companies) "conducts research and development, testing, engineering, manufacturing, and sales activities from its Holland, Michigan location." ECF No. 27, PageID.1228-29. The Complaint alleges that LG Electronics "manufactures and supplies core parts of the Defective Battery to GM" and "is listed as the component manufacturer of the involved components of the Defective Battery." *Id.* at PageID.1230.

## C. The Battery's design

Lithium-ion batteries, like the Bolt's, are made up of individual power-generating "cells," each of which "contains the basic functional components of a battery." ECF No. 27, PageID.1245-46.

To realize GM's cost and range goals for the Bolt, GM and some of the LG Entities designed a battery pack with "a new cell design and chemistry." Jan. 2016 Press Release, ECF No. 27-14, PageID.1577. This new chemistry "provide[d] improved thermal operating performance" over other designs and required "a smaller active cooling system for more efficient packaging." *Id.*

The Bolt battery's cells are "pouch cells, flat like a sheet of paper but thicker." Battery Article, ECF No. 27-46, PageID.1906. Cells are split into groups of three, each group housed in a "metal mechanical box assembly like a book." *Id.* These "books" are "oriented like books on a bookshelf" in modules. *Id.* Each module contains either eight or ten "books" of three cells each. *Id.* There are ten modules in the pack; eight comprise a bottom layer, and two sit on top. In total, each battery pack has 288 cells. *Id.*

Some design changes were made during the Bolt's production. Model-year 2017 and 2018 Bolts and certain model-year 2019 Bolts had batteries containing cells referred to as "design level N2.1," and had an estimated range of 238 miles. GM's. Mot. to Dismiss, ECF No. 36,

10

PageID.2419. Later Bolts' batteries used "design level N2.2" cells, and had a slightly longer range: 259 miles. *Id.*

Every Bolt sold by GM carried an express written warranty (the "Limited Warranty") which warranted the battery to be free of design, material, and workmanship defects. ECF No. 27, PageID.1309. GM agreed, in the Limited Warranty, to repair defects occurring within the first eight years or 100,000 miles of the vehicle's lifespan, whichever came first. ECF No. 27, PageID.1289-90.

### D. GM allegedly markets the Bolt's range

The Complaint alleges that the Bolt's designed range was a key selling point for the vehicle. ECF No. 27, PageID.1236. Plaintiffs contend that GM's marketing of the Bolt in advertisements and public statements emphasized the vehicle's range as a critical feature. *Id.* at PageID.1238-44.

### E. Problems emerge with the battery
#### i. 2016-2018: the "low-voltage condition" causes a loss of propulsion power in some Bolts

Shortly after GM released the 2017 model year Bolt in late 2016, GM began receiving complaints from owners that their vehicles had suddenly lost propulsion power while being driven. *See* ECF No. 27, PageID.1248, 1255-62 (detailing NHTSA complaints). In response, GM issued several Service Bulletins directing partial or total replacement of the battery pack to solve the issue. *Id.* at PageID.1249-1250. GM issued a subsequent "customer satisfaction notice" in early 2018. *Id.* at

11

PageID.1251-52. It instructed certain Bolt owners to bring their vehicles in for a software update that would detect the "loss of propulsion" problem early and allow cars to continue driving. Pls'. Ex. BE, ECF No. 27-58, PageID.78. A month later, GM issued another software update to *all* 2017 and 2018 model year Bolts that was intended to detect the problem and provide an additional warning. *Id.*

The root cause of the loss-of-propulsion issue was that the Bolt's software "w[ould] not detect the difference in the state of charge between the cell groups of the battery," and would then "over predict the indicated battery range." Customer Satisfaction Program 18125, ECF No. 27-57, PageID.2071.

### F.  Early 2019: the fire-risk defect emerges

On July 8, 2019, a Bolt owner submitted a complaint to the National Highway Traffic Safety Administration's database. ECF No. 27, PageID.1266. The owner complained that, in March 2019, his Bolt had spontaneously burst into flames shortly after being charged. *Id.* According to the complainant, GM "sent two engineers from Detroit" to the complainant's driveway "to inspect the [charger,]" and GM ultimately "purchased the car from the insurance company." Regrettably, more fires followed. Over the next 16 months, NHTSA received four more complaints of spontaneous Bolt fires. *Id.* at PageID.1262-1266.

### G. GM's response to the risk-of-fire defect
#### i. The initial recall of 2017-2019 Bolts: software updates

In late August, 2020, after receiving more complaints of fires, GM started an investigation. Nov. 2020 Safety Recall Report, ECF No. 27-59, PageID.2090. On November 13, 2020, GM completed the investigation and voluntarily recalled certain Bolts. It concluded that the battery "may pose a risk of fire when charged to full, or very close to full, capacity." *Id.* at PageID.2089. GM ultimately identified five fires: one in March of 2019, and four in the summer of 2020. *Id.* at PageID.2091. But GM limited the recall population to model year 2017-2019 Bolts with "design level N2.1 batteries manufactured at LG Chem's Ochang, Korea plant." *Id.* at PageID.2089.[7]

GM's recall proposed an "interim remedy:" a dealer-applied software update that would limit the battery's charge to 90% of its capacity. *Id.* at PageID.2091. Until they could bring their vehicles in, owners were instructed to manually limit the battery's capacity using the Bolt's "Hilltop Reserve" or "Target Charge Level" features (depending on model year). *Id.* GM further told customers not to park their vehicles in garages or under carports unless the customer or a dealer had implemented the charging limitations. *Id.*

---

[7] It is not entirely clear whether all 2017-2019 Bolts were manufactured with such batteries. In any event, the November recall affected approximately 50,000 vehicles. ECF No. 27-50, PageID.2089.

GM also stated that model-year 2020 Bolts were not affected by the defect because they were built with different battery technology (the N2.2 cells). ECF No. 27, PageID.1169.

### ii. The second software update

About five months after issuing the first recall, GM issued another: a diagnostic software tool used to "identify potential battery anomalies and replace battery module assemblies as necessary." ECF No. 27, PageID.1277. The purpose of the software was to "proactively look for the conditions or indications that could lead to a fire," allowing the customer to avoid those conditions or have their battery replaced before the condition triggered a fire. *Id.* The software was also intended to detect an imminent fire and notify the operator by blaring the vehicle's horn and flashing the lights. *Id.* at PageID.1278. The fix did not prevent battery fires, but potentially provided advance warning, though GM did describe it as "a remedy to complete the previously announced safety recall." *Id.* at PageID.1277.

Unfortunately, however, additional fires were reported—even in vehicles that had received both software updates. *Id.* at PageID.1279-80. In July, 2021, GM directed customers—even those who had received both software updates—not to park their vehicles inside or near structures. NHTSA Alert, ECF No. 27-2, PageID.1496. Later that month, GM updated their original recall guidance. GM announced that it had determined the cause of the fires: "the simultaneous presence of two rare

manufacturing defects in the same battery cell:" a "torn anode" and a "folded separator." July 2021 Safety Recall Report, ECF No. 36-3, PageID.2476; ECF No. 36, PageID.2420.

In that July, 2021 announcement, GM also promised to replace "defective battery modules." ECF No. 27, PageID.1280. In the meantime, GM instructed customers to limit the battery to 90% of its capacity, "charge their vehicle after each use and avoid depleting the battery below approximately 70 miles of remaining range" and "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight." *Id.* at PageID.1280-81; ECF No. 36-3, PageID.2477. GM did not provide a timeline for when battery replacements would be available. ECF No. 27, PageID.1280. According to the complaint, the recommended limits on battery charge caused a reduction in the vehicles' range to approximately 144 miles, about a 40% reduction. *Id.* at PageID.1281.

### H.   GM expands the recall to all model years

Shortly thereafter, GM apparently discovered that the defect could also be present in cells manufactured outside of LG Chem's Ochang facility that were not "design level N2.1" cells. Accordingly, in August 2021, GM expanded the recall population to include all 2019-2022 Bolts and directed owners to take the same precautions: limiting the battery to 90% of a full charge, charging after each use and avoiding battery

15

depletion, and parking outside after charging. Aug. 2021 Safety Recall Report, ECF No. 27-10, PageID.1552.

## I.   Currently pending motions

The Court held oral argument on July 20, 2022 to hear argument on the following motions: GM's Motion to Compel Certain Plaintiffs' Claims to Arbitration (ECF No. 35); GM's Motion to Dismiss (ECF No. 36); GM's Motion to Strike Nationwide Class Allegations (ECF No. 37); LG Michigan's Motion to Dismiss (ECF No. 44); LG Michigan's Motion to Compel Arbitration (ECF No. 46); LGEUS's Motion to Join LG Michigan's Motion regarding arbitration (ECF No. 47); LGEUS's Motion to Strike (ECF No. 48); and LGEUS's Motion to Dismiss (ECF No. 49).

## J.   Chart summarizing counts
### Figure 1: Chart Summarizing Plaintiffs' Claims

| Count | Cause of Action | On Behalf Of | Against |
|---|---|---|---|
| 1 | Affirmative Misrepresentation | Nationwide Class or State Subclasses | GM |
| 2 | Fraudulent Concealment/Fraud by Omission | Nationwide Class or State Subclasses | GM |
| 3 | Fraudulent Concealment/Fraud by Omission | Nationwide Class or State Subclasses | LG Defendants |
| 4 | Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq* | Nationwide Class or State Subclasses | GM |
| 5 | Unjust Enrichment | Nationwide Class or State Subclasses | GM |

16

| 6 | Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522 | AZ Subclass | All Defendants |
|---|---|---|---|
| 7 | Breach of Express Warranty, Ariz. Rev. Stat. § 47-2313 | AZ Subclass | GM |
| 8 | Breach of the Implied Warranty of Merchantability, Ariz. Rev. Stat. § 47-2314 | AZ Subclass | GM |
| 9 | Fraud by Concealment | AZ Subclass | All Defendants |
| 10 | Unjust Enrichment | AZ Subclass | GM |
| 11 | Violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 *et seq* | CA Subclass | All Defendants |
| 12 | Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 | CA Subclass | All Defendants |
| 13 | Violation of the California False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq* | CA Subclass | GM |
| 14 | Breach of Express Warranty, Cal. Com. Code §§ 2313, 10210 | CA Subclass | GM |
| 15 | Breach of the Implied Warranty of Merchantability, Cal. Com. Code §§ 2314, 10212 | CA Subclass | GM |
| 16 | Violation of the Song-Beverly Act, Breach of Express Warranty, Cal. Civ. Code §§ 1791.2, 1793.2(D) | CA Subclass | GM |
| 17 | Violation of the Song-Beverly Act, Breach of Implied Warranty of Merchantability, Cal. Civ. Code §§ 1792, 1791.1 *et seq* | CA Subclass | GM |
| 18 | Fraud by Concealment | CA Subclass | All Defendants |
| 19 | Violation of the Florida Unfair & Deceptive Trade Practices Act, Fla. Stat. § 501.201 *et seq* | FL Subclass | All Defendants |
| 20 | Breach of Express Warranty, Fla. Stat. §§ 672.313, 680.21 | FL Subclass | GM |
| 21 | Breach of Implied Warranty of Merchantability, Fla. Stat. §§ 672.314, 680.212 | FL Subclass | GM |
| 22 | Fraud by Concealment | FL Subclass | All Defendants |
| 23 | Unjust Enrichment | FL Subclass | GM |
| 24 | Violation of Georgia's Fair Business Practices Act, Ga. Code § 10-1-390 *et seq* | GA Subclass | All Defendants |
| 25 | Violation of Georgia's Uniform Deceptive Trade Practices Act, Ga. Code § 10-1-370 *et seq* | GA Subclass | All Defendants |
| 26 | Breach of Express Warranty, Ga. Code §§ 11-2-313 & 11-2A-210 | GA Subclass | GM |
| 27 | Breach of the Implied Warranty of Merchantability, Ga. Code. §§ 11-2-314 & 11-2A-212 | GA Subclass | GM |
| 28 | Fraudulent Concealment | GA Subclass | All Defendants |

| 29 | Unjust Enrichment | GA Subclass | GM |
|----|-------------------|-------------|-----|
| 30 | Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 814 Ill. Comp. Stat. 515/1 *et seq* & 720 Ill. Comp. Stat. 295/1A | IL Subclass | All Defendants |
| 31 | Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq* & 720 Ill. Comp. Stat. 295/1A | IL Subclass | All Defendants |
| 32 | Breach of Express Warranties, 810 Ill. Comp. Stat. 5/2-313 | IL Subclass | GM |
| 33 | Breach of the Implied Warranty of Merchantability, 810 Ill. Comp. Stat. 5/2-314 & 810 Ill. Comp. Stat. 5/2A-212 | IL Subclass | GM |
| 34 | Fraud by Concealment | IL Subclass | All Defendants |
| 35 | Unjust Enrichment | IL Subclass | GM |
| 36 | Violation of the Kansas Consumer Protection Act, Kan. Stat. § 50-623 *et seq* | KS Subclass | All Defendants |
| 37 | Breach of Express Warranty, Kan. Stat. §§ 84-2-313 & 84-2A-210 | KS Subclass | GM |
| 38 | Breach of the Implied Warranty of Merchantability, Kan. Stat. §§ 84-2-314 & 84-2A-212[8] | KS Subclass | GM |
| 39 | Fraud by Concealment | KS Subclass | All Defendants |
| 40 | Unjust Enrichment | KS Subclass | GM |
| 41 | Deceptive Acts or Practices Prohibited by Massachusetts Law, Mass. Gen. Laws Ch. 93A, § 1, *et seq* | MA Subclass | All Defendants |
| 42 | Breach of Express Warranty, Mass. Gen. Laws Ch. 106 §§ 2-313 & 2A-210 | MA Subclass | GM |
| 43 | Breach of the Implied Warranty of Merchantability, Mass. Gen. Laws Ch. 106 §§ 2-314 & 2A-212 | MA Subclass | GM |
| 44 | Fraudulent Concealment | MA Subclass | All Defendants |
| 45 | Unjust Enrichment | MA Subclass | GM |
| 46 | Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq* | MI Subclass | All Defendants |
| 47 | Breach of Express Warranty, Mich. Comp. Laws §§ 440.2313 & 440.2860 | MI Subclass | GM |

---

[8] Plaintiffs' Complaint appears to cite to Kentucky, rather than Kansas law with respect to Count 38. *See* ECF No. 27, PageID.1385 (citing Ky. Rev. Stat.). As best the Court can discern, Kan. Stat. §§ 84-2-314 & 84-2A-212 are the sections of Kansas law that deal with implied warranties of merchantability in the context of sales and leases.

| 48 | Breach of the Implied Warranty of Merchantability, Mich. Comp. Laws § 440.314 | MI Subclass | GM |
|----|----|----|----|
| 49 | Fraud by Concealment | MI Subclass | All Defendants |
| 50 | Unjust Enrichment | MI Subclass | GM |
| 51 | Violation of New York General Business Law § 349 | NY Subclass | All Defendants |
| 52 | Violation of New York Gen. Bus. Law § 350 | NY Subclass | All Defendants |
| 53 | Breach of Express Warranty, N.Y. U.C.C. Law §§ 2-313 & 2A-210 | NY Subclass | GM |
| 54 | Breach of Implied Warranty of Merchantability, N.Y. U.C.C. Law §§ 2-313 & 2A-210 | NY Subclass | GM |
| 55 | Fraud by Concealment | NY Subclass | All Defendants |
| 56 | Unjust Enrichment | NY Subclass | GM |
| 57 | Violation of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §646.605-646.656 | OR Subclass | All Defendants |
| 58 | Breach of Express Warranty, Or. Rev. Stat. §§ 72.3130 & 72A.2100 | OR Subclass | GM |
| 59 | Breach of the Implied Warranty of Merchantability, Or. Rev. Stat § 72.8020 *et seq* | OR Subclass | GM |
| 60 | Fraud by Concealment | OR Subclass | All Defendants |
| 61 | Unjust Enrichment | OR Subclass | GM |
| 62 | Violation of the Texas Deceptive Trade Practices Act – Consumer Protection Act, Tex. Bus. & Com. Code §§ 1741 *et seq* | TX Subclass | All Defendants |
| 63 | Breach of Express Warranty, Tex. Bus. & Com. Code § 2.313 | TX Subclass | GM |
| 64 | Breach of the Implied Warranty of Merchantability, Tex. Bus. & Com. Code § 2.314 | TX Subclass | GM |
| 65 | Fraudulent by Concealment | TX Subclass | All Defendants |
| 66 | Unjust Enrichment | TX Subclass | GM |
| 67 | Violation of the Virginia Consumer Protection Act, Va. Code §§ 59.1-196 *et seq* | VA Subclass | All Defendants |
| 68 | Breach of Express Warranty, Va. Code §§ 8.2-313 & 8.2A-210 | VA Subclass | GM |
| 69 | Breach of the Implied Warranty of Merchantability, Va. Code §§ 8.2-313 & 8.2A-212 | VA Subclass | GM |
| 70 | Fraud by Concealment | VA Subclass | All Defendants |
| 71 | Unjust Enrichment | VA Subclass | GM |

| 72 | Violation of the Washington Consumer Protection Act, Rev. Code Wash. §§ 19.86.010 *et seq* | WA Subclass | All Defendants |
| 73 | Breach of Express Warranty, Rev. Code Wash. §§ 62A.2-313 & 62A.2A-210 | WA Subclass | GM |
| 74 | Breach of the Implied Warranty of Merchantability, Rev. Code Wash. § 62A.2-314/315 | WA Subclass | GM |
| 75 | Fraud by Concealment | WA Subclass | All Defendants |
| 76 | Unjust Enrichment | WA Subclass | GM |
| 77 | Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18 | WI Subclass | All Defendants |
| 78 | Breach of Express Warranty, Wis. Stat. §§ 402.313 & 411.210 | WI Subclass | GM |
| 79 | Breach of the Implied Warranty of Merchantability, Wis. Stat. §§ 402.314 & 411.212 | WI Subclass | GM |
| 80 | Fraud by Concealment | WI Subclass | All Defendants |
| 81 | Unjust Enrichment | WI Subclass | GM |

## II.   MOTIONS TO STRIKE CLASS ALLEGATIONS

Federal Rule of Civil Procedure 12(f) allows a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Federal Rule of Civil Procedure 23 allows courts to issue orders that "require that the pleadings be amended to eliminate allegations about representation of absent persons." Fed. R. Civ. P. 23(d)(1)(D). GM and LGEUS have each moved to strike certain allegations from the Complaint.[9] They ask the Court to strike the allegations that seek to state claims for affirmative misrepresentation, fraudulent concealment, violations of the MMWA, and unjust enrichment on behalf of a nationwide class because different states' laws would apply to class members' claims, rendering a nationwide class fundamentally

---

[9] LGEUS' motion incorporates GM's motion by reference.

unworkable. In the alternative, they argue that plaintiffs lack standing to assert claims under the laws of the states where no plaintiff lives or purchased a Bolt. The Court addresses these arguments in turn.

### A. Whether Defendants have shown that Plaintiffs' proposed nationwide class claims would be fundamentally unworkable

GM contends that a nationwide class would be fundamentally unworkable, because under Michigan's choice-of-law principles, each Plaintiff's claim would be governed by the laws of the state in which they lived or purchased their vehicle. Because all of those states' laws differ in key respects, GM says, class certification would be impossible for failure to meet Rule 23's predominance requirement. Under Fed. R. Civ. P. 23(b)(3), for a class to be certified, the court must find among other things "that the questions of law or fact common to class members *predominate* over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Defendants' motion relies principally upon *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011). There, a group of consumers sued the operators of a healthcare discount program, alleging that the defendants had used misleading advertising. *Id.* at 945. The Sixth Circuit affirmed the district court's decision to strike nationwide class allegations from the complaint. The *Pilgrim* court identified three reasons underpinning its decision. First, class members' claims would all

be governed by the laws of their home states, which were different in key respects. Second, common issues of fact could not overcome the differences in state laws, because the defendants' discount program had not operated in the same way in each state, and plaintiffs had therefore suffered distinct injuries. Third, the Sixth Circuit noted that the Third, Fifth, Seventh, and Ninth Circuits had all reached similar conclusions in similar cases.

GM acknowledges that, in a recent decision, this Court declined to strike class allegations at the motion to dismiss stage. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1305-6 (E.D. Mich. 2021). But GM urges that this case is different for two reasons. First, in *Chapman*, GM sought to dismiss all class allegations, here GM seeks only to dismiss the four claims asserted on behalf of a nationwide class. Second, GM says that in *Chapman* this Court focused on the questions of fact common to all plaintiffs, while the Sixth Circuit in *Pilgrim* held that it would be appropriate to strike class allegations even in the face of significant factual overlap between plaintiffs' claims.

GM also seeks to distinguish the recent decision in the Eastern District of Michigan, *In re Gen. Motors Air Conditioning Marketing and Sales Practices Litig.*, 2021 WL 4972636 (E.D. Mich. Oct. 26, 2021). There, Judge Leitman explained that the motion to strike was premature because GM had not shown that potential class members' claims would be governed by laws of their home states or "provided the Court a detailed

and careful showing of the precise differences between the various state laws that could apply." *Id.* at 845. GM says that it has done both here.

Plaintiffs respond that GM is seeking premature resolution of the class certification issue and that this case should be allowed to proceed to discovery so that the class certification question may be considered with the benefit of a fully developed record.

Defendants' arguments do have some merit, and Defendants have identified substantial obstacles that might preclude the certification of a nationwide class with respect to several of Plaintiffs' claims. But for the reasons set forth below, the Court declines to strike the class allegations at this time.

First, in *Pilgrim*, the Sixth Circuit specifically suggested that the possibility that "a nationwide class covering claims governed by the laws of various States could overcome [the problem of differing state laws] by demonstrating considerable factual overlap," but concluded that *Pilgrim* was "not such a case" because of the substantial factual differences in various plaintiffs' claims. *Pilgrim*, 660 F.3d at 947. On that basis, courts in the Sixth Circuit have distinguished *Pilgrim*. *See Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 576 (M.D. Tenn. 2020) (declining to strike nationwide MMWA, breach of implied warranty of merchantability, breach of express warranty, and unjust enrichment claims and explaining that "the Court does not find *Pilgrim* controlling because the potential class members here allegedly suffered the same

overpayment injury regardless of where they may have purchased" the allegedly defective product). Here, Plaintiffs' allegations about the Defendants' alleged conduct regarding the marketing and sale of the Bolt and the alleged battery defect appears essentially identical in every state. Unlike the *Pilgrim* plaintiffs, Plaintiffs here do not complain of advertisements or other conduct that differed state-by-state.

Second, "state law does not need to be universal in order to justify nationwide class certification." *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997). It is not wholly clear that Defendants have born the burden of showing that the state laws that would apply to the claims of each possible class members are so different that these nationwide classes could not possibly be certified. Courts must exercise "caution" when striking class allegations based solely on the pleadings. *Sauter v. CVS Pharmacy, Inc.*, 2014 WL 1814076 at *2 (S.D. Ohio May 7, 2014) (quoting *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 56 (1st Cir.2013)). For example, at least one court in the Sixth Circuit has declined to strike allegations seeking to maintain a nationwide breach-of-warranty class, observing that such claims were "governed by identical [Uniform Commercial Code] provisions adopted by every state," and thus could potentially be resolved on a class-wide basis despite the "slightly different interpretations" of those provisions. *Albright v. Sherwin-Williams Co.*, 2019 WL 5307068 at *17 (N.D. Ohio Jan. 29, 2019).

24

Third, the Court is not persuaded that allowing the nationwide class claims to proceed would, in and of itself, generate time-consuming and wasteful discovery. Independent of the nationwide class claims Plaintiffs seek to maintain, the parties will be conducting discovery on Plaintiffs' fourteen state-specific classes—to the extent that they survive Defendants' various motions to dismiss—and the nationwide class claims are fundamentally premised on the same alleged facts and course of conduct. To be sure, striking the nationwide class allegations and limiting the state laws at issue to just those of the fourteen states with named plaintiffs representing a possible state-specific class would save the parties and the Court time and briefing at the class certification stage. But letting them continue would not impose a substantially higher discovery burden on the parties. And in any event, such concerns "counsel for a careful plan of discovery management, not for preemptively striking dozens of states in which viable subclasses still might be formulated." *Kirkbride v. Kroger* Co., 2022 WL 2703960 at *13 (S.D. Ohio July 12, 2022).

Fourth, and perhaps most important, Plaintiffs have not yet moved to certify any class. As this litigation develops, Plaintiffs may, as they argue, "conclude [] that some other grouping may be appropriate depending on how the facts develop." Pls'. Resp. to Motions to Strike, ECF No. 59, PageID.5379. Accordingly, "the issues Defendant[s] raise[] about differences in states' [] laws may never materialize." *Kimber Baldwin*

25

*Designs, LLC v. Silv Commc'ns, Inc.*, 2016 WL 10520133 at *6 (S.D. Ohio Dec. 15, 2016); *see also Kirkbride*, 2022 WL 2703960 at *12 (declining to strike nationwide class claims until "classes are formulated more precisely"). Similarly, alternative methods of managing the potentially disparate state laws at issue may make class treatment practicable. For example, Plaintiffs may identify a manageably small number of subclasses grouping states that have similar legal doctrines. *See, e.g., In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 140 (D.D.C. 2016). Or Plaintiffs may propose jury instructions that resolve the possible problems that a nationwide class would present.

*Pilgrim* allows, but does not require, a district court to strike class allegations from a complaint. *See Kirkbride*, 2022 WL 2703960 at *12. Though this is a close question, the Court declines to strike the nationwide class allegations at this stage in the litigation.[10] The Court recognizes, however, that the class certification question should be resolved "at an early practicable time" given the burdens associated with class action litigation. Fed. R. Civ. P. 23(c)(1)(A). Accordingly, the Court

---

[10] *See, e.g., In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014 at *42 (E.D. Tenn. June 24, 2015) ("The numerous states under which the Downstream Purchasers bring their antitrust and consumer protection claims will almost certainly raise issues with some of the requirements under Rule 23. However, with the facts stated in the Complaint, the Court is reluctant to strike these allegations at this stage in the litigation.").

will enter a scheduling order that prioritizes discovery on the class certification issue and sets an appropriately early deadline for the filing and briefing of any motion for class certification so that these questions may be resolved as promptly as possible, but still with the benefit of full briefing and fact discovery.

### B. Whether Plaintiffs' standing to represent certain absent class members is more appropriately considered at the class certification stage

Defendants also argue that Plaintiffs lack standing to assert claims under the laws of states in which no plaintiff lives or purchased a vehicle. The familiar principles of Article III standing require "Plaintiffs to show [(1)] that they have suffered an injury-in-fact that was [(2)] caused by Defendants' conduct and that [(3)] this Court can likely redress the injury with a decision for Plaintiffs." *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019). GM argues that, for states where no named plaintiff lives or purchased a vehicle, no Plaintiff can show an injury for claims under those states' laws, and therefore this Court lacks jurisdiction over claims brought under those states because of a deficiency in standing.

There remain differing approaches in this district and elsewhere about whether it is proper to resolve this standing question at the motion to dismiss stage or at the class certification stage. In past decisions, this Court has adopted the latter view, concluding that the class certification inquiry is "logically antecedent" to the Article III standing question, and

27

thus that class certification should be resolved first. *See Chapman*, 531 F. Supp. 3d at 1274.

GM acknowledges this court's prior decision in *Chapman*, but encourages this court to instead follow the recent opinion of Judge Michelson in *Withrow v. FCA US LLC*, 2021 WL 2529847 (E.D. Mich. June 21, 2021). There, Judge Michelson concluded that, in a case where two plaintiffs sought to bring multiple claims on a nationwide class basis, standing ought to be considered at the motion to dismiss stage. Judge Michelson's decision was principally based on three things: (1) that the cases other judges had relied upon in reaching the opposite result were factually distinguishable; (2) that those cases did not acknowledge that standing "must be determined on a claim-by-claim, relief-by-relief basis"; and (3), that, at least with respect to some types of classes, the standing inquiry is not the same as the Rule 23 class certification inquiry. *Id.* at *6-7.

GM also points to the Supreme Court's recent decision in *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021), and posits that the Supreme Court has "strongly suggested, without deciding," that a court must address standing issues before class certification. ECF No. 37, PageID.2815. But this Court does not read *TransUnion* so broadly. The Supreme Court's entire discussion was contained in a one-sentence footnote that explicitly reserved decision on the issue: "We do not here address the distinct question whether every class member must

demonstrate standing before a court certifies a class." *TransUnion*, 141 S.Ct. 2208 n. 4. The *TransUnion* court then cited an Eleventh Circuit decision as one example of a court that requires standing issues to be resolved before class certification. Such a reference cannot be considered a clear indication of the Supreme Court's opinion about this issue in either direction.

*Withrow* represents a thorough and well-reasoned analysis of one position. Another recent decision by Judge Leitman, similarly persuasive, represents the other position. *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488 (E.D. Mich. 2021). In *Johnson*, Judge Leitman acknowledged the *Withrow* decision, but explained that two federal courts of appeal—the Second and Seventh Circuits—had reached the issue, and both had concluded that "as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of [standing] under Article III." *Id*. at 495. (citing *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 92 (2d Cir. 2018) (alteration in original). Judge Leitman further explained that the Second and Seventh Circuit approaches were "consistent with the two most relevant decisions from the Sixth Circuit." *Id*. at 496 (discussing *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410

(6th Cir. 1998) and *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011)).

Ultimately, both approaches—considering standing at the motion to dismiss stage or at class certification—have ample support in case law. In this case, the Court will be consistent with its prior decisions, and that of Judge Leitman in *Johnson*, and will defer the standing inquiry to the class certification stage.

## III. MOTION TO COMPEL CERTAIN PLAINTIFFS TO ARBITRATION

GM, LG Michigan, and LGEUS have moved to compel sixteen plaintiffs' claims to arbitration. *See* ECF Nos. 35, 46, 47. Plaintiffs Barrett, Chung, Connelly, Daniel and Vincent Corry, DeRosa, Dornetto, Ives, Michael and Denise Holbrook, Kass, Khorey, Kuchar, Schulz, Sterba, and Verzura all signed arbitration agreements when they purchased their vehicles. The agreements read as follows in pertinent part:

> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase [or lease] or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. . . .

30

GM's Br., ECF No. 35, PageID.2258 (quoting Sales Agreements, ECF Nos. 35-4, 35-5, 35-6, 35-7, 35-8, 35-9, 35-10, 35-11, 35-12, 35-13, 35-14).[11]

Written agreements to arbitrate contained in contracts involving interstate commerce are valid, irrevocable, and enforceable under the Federal Arbitration Act. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. § 2). Faced with a valid arbitration agreement, a district court has no discretion and must order the parties to arbitrate their dispute. *Id.* The agreements at issue here fall within the FAA's ambit.

The agreements also include a "delegation clause." As the Supreme Court explained in *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010), such a clause is "an agreement to arbitrate threshold issues concerning the arbitration agreement," such as "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 69-70. Here, that clause reads as follows: "any claim or dispute . . . including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute . . . shall . . . be resolved by neutral, binding arbitration[.]" ECF No. 35, PageID.2258.

---

[11] The agreement Plaintiff Barrett signed contained different arbitration language. *See* Barrett Sales Agreement, ECF No. 35-3, PageID.2290. But Plaintiff Barrett, along with Plaintiff Khorey, has been voluntarily dismissed from this case so the Court need not consider that alternative language. *See* ECF No. 53, PageID.3175.

Parties may delegate arbitrability questions to an arbitrator so long as their agreement does so "by clear and unmistakable evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citation and internal marks omitted). "A valid delegation clause precludes courts from resolving any threshold arbitrability disputes, even those that appear wholly groundless." *Swiger v. Rosette*, 989 F.3d 501, 505 (6th Cir. 2021) (internal marks and citation omitted).

Plaintiffs do not dispute that the agreements they signed include an arbitration provision, nor that the provision contains a delegation clause. But Plaintiffs argue that neither GM nor any LG Entity can invoke the arbitration provision. They argue that the provision can only be invoked, under its own terms, by "you" and "us," which are defined elsewhere in the sales contracts as the customer and the selling dealership. Defendants respond that an arbitrator must decide whether GM and the LG Entities may invoke the Arbitration Provision because of the delegation clause.

This question, whether an entity (like an automobile manufacturer), which did not actually sign the contract containing an arbitration provision, has the ability to invoke that provision to require arbitration—is a question of arbitrability. The parties may agree to delegate such questions of arbitrability to the arbitrator herself by including a delegation clause in their contract. *Swiger*, 989 F.3d at 507; *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022). That

32

is what the parties did here, because the agreements here included a delegation clause. Consequently, an arbitrator must decide whether GM or any LG entity has standing to enforce the agreements.

Plaintiffs argue that they never agreed to allow GM or anyone else—other than the dealers from which they purchased or leased their vehicles—to invoke the arbitration agreement and delegation clause. But precisely the same argument was recently raised and rejected in the context of vehicle sales agreements in *Cunningham v. Ford Motor Co.*, 2022 WL 2819115 at *4 (E.D. Mich. July 19, 2022). As the *Cunningham* court explained,

> *Swiger* makes clear that . . . where a plaintiff has signed a contract with an arbitration provision and a delegation clause and where a non-party to the contract seeks to compel the plaintiff to arbitrate claims that bear some relation to the contract – the question is not whether the plaintiff specifically intended that the non-party could enforce the delegation clause. Rather, the sole question is whether the delegation clause clearly and unmistakably delegates questions of arbitrability to the arbitrator.

*Cunningham*, 2022 WL 2819115 at *6 (citing *Swiger*, 989 F.3d at 507). Here, the agreements clearly and unmistakably delegate arbitrability questions to the arbitrator by explicitly stating as much. *See Bossart v. Gen. Motors LLC*, 2022 WL 3573855 at *4 (E.D. Mich. Aug. 19, 2022) (concluding that an identical clause "clearly and unmistakably delegate[d] questions of arbitrability to the arbitrator.").

Plaintiffs raise the exact same argument rejected in *Cunningham*—that they never intended for GM or anyone other than the selling dealers to be able to enforce the arbitration clause—and the argument is foreclosed by *Swiger* for the same reasons it was in *Cunningham*. *See also Lyman v. Ford Motor Co.*, 2022 WL 856393 at \*4 (E.D. Mich. Mar. 22, 2022) (whether non-signatory vehicle manufacturer could enforce arbitration provision and delegation clause was question for arbitrator); *Bossart*, 2022 WL 3573855 at \*4 (same).

But just as in *Cunningham*, Plaintiffs make another argument as to why this Court, and not an arbitrator, should decide whether their claims are subject to arbitration: even where an agreement includes a delegation clause, a Court must still decide "challenges to the formation or existence of an agreement in the first instance." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879 (6th Cir. 2021) (internal marks and citation omitted).

Under *StockX*, the Sixth Circuit has prescribed a two-step analysis: first, a court must "resolve any challenge that pertains to the *formation* or *existence* of the contract containing the delegation provision." *Id*. at 880 (emphasis in original). Here, Plaintiffs do not challenge the formation, existence, or validity of the underlying sales contracts. *See* Tr., ECF No. 104, PageID.6217 ("[Plaintiff's Counsel:] We do not challenge the underlying agreement at all, which is the finance agreements.").

34

Next, if a contract exists, as here, the court then must decide "any remaining *enforceability* or *validity* challenge only if it would affect the delegation provision alone or the basis of the challenge is directed specifically to the delegation provision." *StockX*, 19 F.4th at 879. Only a *specific challenge* to the delegation clause itself, not a challenge to the entire arbitration agreement "brings arbitrability issues back within the court's province." *Swiger*, 989 F.3d at 505.

A party may attack a delegation clause under the same legal doctrine it uses to challenge the entire arbitration agreement, but must specifically direct their challenge toward the delegation clause itself; "merely challenging the entire agreement will not suffice." *Swiger*, 989 F.3d at 506. And a party's "mere statement that it is challenging the delegation provision is not enough; courts must look to the substance of the challenge." *StockX*, 19 F.4th at 885. That test is "hard to meet." *Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 356 (6th Cir. 2022).

Fundamentally, however they cast their challenge, the Court sees Plaintiffs as seeking to attack "the 'existence' of any agreement—either an arbitration agreement or a delegation provision—between" themselves and the Defendants here. *Becker*, 39 F.4th at 356. As Plaintiffs' counsel argued at the hearing held on this matter, the thrust of Plaintiffs' challenges to the delegation clause and the arbitration agreement are the same: Plaintiffs never intended or agreed to have

disputes *with GM and/or the LG Entities* arbitrated, nor to delegate arbitrability questions to the arbitrator.

But that is exactly the sort of challenge the Sixth Circuit rejected in *Becker* and that district courts have repeatedly rejected in the automobile sales context: Plaintiffs rely on "a single circumstance"—that Defendants are not signatories to the sales agreements—to challenge the enforceability of both the arbitration and delegation provisions. *See Becker*, 39 F.4th at 356. Accordingly, those challenges are "identical in substance," and Plaintiffs' challenge is not directed to the delegation provision with sufficient specificity to require the court, and not an arbitrator, to decide arbitrability. *Id.*

Plaintiffs rely heavily on the first footnote of the Supreme Court's *Rent-A-Center* decision in an attempt to distinguish this case from *Becker*. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010) ("[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so,") (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Plaintiffs read that footnote to hold that when a party argues that they never manifested an *intent* to delegate arbitrability questions, a court may not compel arbitration absent clear and unmistakable evidence that both parties did indeed agree to delegate arbitrability questions. But here Plaintiffs *have* clearly and unmistakably agreed to delegate arbitrability questions in the terms of

the sales contracts, and they do not dispute those contracts' validity. The only dispute is *who may invoke* the delegation and arbitration provisions in a contract the Plaintiffs agree that they signed. And the Sixth Circuit has repeatedly held that that very question is one of arbitrability that an arbitrator must decide when the agreement has a delegation clause. *See generally Becker*, 39 F.4th 351, 356; *Swiger*, 989 F.3d at 507-508; *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845 n. 1. (6th Cir. 2020).

This Court declines to depart from the Sixth Circuit's interpretation of *Rent-A-Center*, *Swiger*, and *Becker*, and from the recent and well-reasoned opinions of other courts in this district applying those decisions in the automobile sales context. *See Lyman*, 2022 WL 856393 at *3-4; *Cunningham*, 2022 WL 2819115 at *4-7; *Bossart*, 2022 WL 3573855 at *4. Accordingly, the claims of Plaintiffs, Chung, Connelly, Corry, DeRosa, Dornetto, Ives, Holbrook, Kass, Kuchar, Schulz, Sterba, and Verzura must be submitted to arbitration. The arbitrator will decide whether Defendants can invoke the arbitration agreement that these Plaintiffs signed. All claims by those Plaintiffs will be stayed pending the outcome of arbitration. *See Cunningham*, 2022 WL 2819115 at *7 (citing 9 U.S.C. § 3) (where arbitration is required, a district court should "stay[ ] ... federal court action to permit the remaining claims to be arbitrated under the [FAA.]") (alterations in original).

## IV.   MOTIONS TO DISMISS[12]
### A.  Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a court to dismiss a lawsuit if it "fails to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 8(a) requires only that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though this standard is liberal, courts have held that it requires plaintiffs to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of their grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

---

[12] Because the Court stays the claims of Plaintiffs subject to the delegation clause, the Court will only address Defendant's arguments in support of dismissal as to the remaining plaintiffs who represent putative state sub-classes for Arizona, California, Georgia, Illinois, Massachusetts, New York, Oregon, Texas, Washington, and Wisconsin. The Court will not now consider dismissal of claims brought by Plaintiffs Dornetto and Ives (under Virginia law), Denise and Michael Holbrook (under Michigan law), or Plaintiffs Schulz and Verzura (under Florida law). Even though the claims brought by Plaintiff Barrett (under Texas law) and Plaintiff Khorey (under California law) are dismissed, and those brought by Plaintiff DeRosa (under Washington law) and Plaintiffs Chung, Connelly, Vincent Corry, Daniel Corry, Kass, Kuchar, and Sterba (all under California law) are stayed, the Court still considers the claims brought under Texas, Washington, and California law, as those putative state sub-classes are represented by other plaintiffs whose claims are not stayed. S*ee Lyman v. Ford Motor Co.*, 2022 WL 856393 at *4 n. 2 (E.D. Mich. Mar. 22, 2022); *Straub v. Ford Motor Co.*, 2021 WL 5085830 at *10 (E.D. Mich. Nov. 2, 2021).

In evaluating a motion to dismiss under Rule 12(b)(6), courts must construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)). Consideration of a motion to dismiss under Rule 12(b)(6) is generally confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Courts may, however, consider any exhibits attached to the complaint or the defendant's motion to dismiss "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

### B. Whether Plaintiffs have standing to bring claims against LG Michigan

The basic principles of standing are explained in section II.B, *supra*. To reiterate, a plaintiff must show that they (1) have suffered an injury in fact; (2) that was caused by the defendants' conduct; and (3) that a favorable decision of this Court can likely redress the plaintiff's injury. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1272 (E.D. Mich. 2021) (citing *Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 405 (6th Cir. 2019)).

LG Michigan argues that Plaintiffs lack standing to pursue any claims against it. LG Michigan argues that Plaintiffs have not made

sufficiently specific allegations against LG Michigan, instead referring only to "LG" or "the LG Defendants." LG Michigan's Mot. to Dismiss, ECF No. 44, PageID.3021. The Court understands LG Michigan to argue that Plaintiffs have not sufficiently alleged that their injuries are fairly traceable to the conduct of LG Michigan.[13]

LG Michigan points principally to *Bojicic v. DeWine*, 569 F. Supp. 3d 669, 682 (N.D. Ohio 2021) (aff'd, 2022 WL 3585636 (6th Cir. Aug. 22, 2022)). There, another court in the Sixth Circuit explained that plaintiffs had failed to allege the "traceability" prong of standing because they did not "allege that the defendants' specific actions caused their harm." *Id.* at 682-83. The plaintiffs in that case did not "attribute specific actions to

---

[13] To the extent LG Michigan is arguing that Plaintiffs have not alleged an injury in fact because their claim is premised on "a risk of future harm," or because the defect never materialized in most Plaintiffs' vehicles, that argument fails. Plaintiffs allege a theory of overpayment at the time they purchased their vehicles. *See, e.g.*, ECF No. 27, PageID.1301 (alleging that "the LG Defendants are liable to Plaintiffs . . . for their lost benefit of the bargain and overpayment at the time of purchase or lease, and/or for the diminished value of the Class Vehicles[.]"). That is sufficient to allege an injury redressable by a favorable decision of this Court. *Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019) ("Plaintiffs' overpayment theory is sufficient to provide standing to sue Bosch LLC because of its role in the use and concealment of a cheat device that allegedly constrained the emissions control system of the vehicles purchased by Plaintiffs . . . they paid for a product that did not operate in the way they believed it did. Claims of overpayment, wherein a plaintiff paid a premium but did not receive the anticipated consideration, are cognizable injuries in fact. . . . And, financial damages are fully redressable by a favorable decision.").

specific defendants" and some defendants "had no apparent involvement in issuing" the order about which the plaintiffs complained, and "took specific action that . . . caused or added to the injuries" that the plaintiffs allegedly suffered. *Id.* at 683-84. Many of the *Bojicic* plaintiffs' allegations were also conclusory. *Id.* In short, as the Sixth Circuit explained, "the complaint never identifie[d] *any* specific action taken by *any* specific Defendant at all." *Bojicic*, 2022 WL 3585636 at *2 (emphasis added).

But the Complaint here does not have those problems; Plaintiffs make specific allegations against LG Michigan. Fundamentally, they allege that the LG Defendants worked together with GM to design, develop, and produce critical components for the Bolt. As to LG Michigan specifically, Plaintiffs allege that LG Michigan "worked with" the other named LG entity defendants to "design, produce, and manufacture" the Bolt's battery, and that LG Michigan produced parts itself at its Holland, Michigan facility. Courts in this district have allowed similar claims to proceed against component suppliers, despite their more attenuated connection to the plaintiff's ultimate injury. *See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019). As then-Chief Judge Hood explained:

> [A]lthough Bosch LLC's role in the alleged fraudulent concealment is more indirect than Ford's role, the causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the

> plaintiff need only allege injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court. While Bosch LLC may ultimately prevail in its argument that it should not be held liable for Plaintiffs' overpayment, Plaintiffs' allegation that Bosch LLC was intimately involved in the creation of the component that caused the overpayment establishes Article III standing.

*Id.* (internal marks and citations omitted).

LG Michigan replies that it never sold components directly to GM, but rather was a "Tier 2" supplier: LG Michigan (the Tier 2 supplier) sold parts to a "Tier 1" supplier, who in turn sold components to GM. LG Michigan also argues that it was not part of the "strategic partnership" between GM and other LG Entities.[14] But these arguments are more

---

[14] LG Michigan argues that subjecting a Tier 2 supplier to liability on these factual allegations would cause "litigation involving automobile manufacturers in this district" to "become infinitely more unwieldy and complex, with every case involving a multitude of different suppliers in addition to the OEM itself." LG Michigan's Repl., ECF No. 64, PageID.5604. LG Michigan reiterated this policy argument at the hearing. Hearing Tr., ECF No. 104, PageID.6251-52 ("I think about the thousands of mom and pop supplier shops around the Midwest who now suddenly would have new exposure under consumer fraud theories if this type of claim were allowed to move forward."). That argument is well taken—as this case proceeds, Plaintiffs may face serious difficulties prosecuting their claims against LG Michigan due to LG Michigan's more attenuated relationship to the Bolt than other Defendants. But at this stage, the Court's analysis is governed by the Complaint, which alleges that LG Michigan worked closely with GM to design and produce the components, and does not speak to the distinction between Tier 1 and

appropriately directed to a motion for summary judgment; at this early stage, the Court must accept all of Plaintiffs' allegations as true. And to the extent that attachments to the Complaint show that LG Michigan was not part of the strategic partnership, that argument is not persuasive. It is true that "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1334 (E.D. Mich. 2011). But the attached exhibit that LG Michigan suggests is proof that it was not part of the strategic partnership is not so definitive. According to that exhibit, a GM press release: "LG Electronics Vehicle Components led a team of LG companies, including LG Chem, LG Innotek, LG Display and LG Electronics, to help develop the Bolt EV." ECF No. 27-20, PageID.1642. The exhibit's use of the words "a team of LG companies, including . . ." suggests that the list of involved LG companies may not be exhaustive. Further, LG Michigan is a wholly owned subsidiary of LG Chem—which is listed by name—so it is entirely

---

Tier 2 suppliers. And furthermore, LG Michigan's concern is unlikely to materialize, given that the LG Entities are only involved in this case due to Plaintiffs' allegations (which the Court must accept for purposes of this motion) that the LG Entities were intimately involved in the design of the battery itself. Rarely, if ever, will a mere supplier find themselves in such a position—unless they actually were so involved. This order is not, and should not be seen as, an invitation for consumers to sue any manufacturer involved in a vehicle manufacturer's supply chain.

plausible that LG Michigan participated in this "strategic partnership" despite not being specifically named in the press release.

Ultimately, viewing the factual allegations in the light most favorable to the Plaintiffs and drawing reasonable inferences in their favor, the allegations in the complaint are enough to satisfy the "not overly demanding" traceability requirements of Article III. *Withrow v. FCA US LLC*, 2021 WL 2529847 at *5 (E.D. Mich. June 21, 2021) (citing *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 713 (6th Cir. 2015)). Plaintiffs' claims against LG Michigan need not be dismissed for lack of standing.

### C. Whether Plaintiffs' fraud-based claims must be dismissed

#### i. Whether Plaintiffs have sufficiently alleged that Defendants knew about the fire-risk defect

Defendants argue that the Complaint does not sufficiently allege pre-sale knowledge. Under all of the states' laws under which Plaintiffs seek to assert affirmative fraud and fraudulent omission claims, pre-sale knowledge is an essential element. *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1300 (E.D. Mich. 2021). While many of Plaintiffs' claims sound in fraud, and are therefore subject to the heightened pleading standards found in Rule 9(b) of the Federal Rules of Civil Procedure, Plaintiffs need only plead knowledge "generally." *Persad v. Ford Motor Co.*, 2018 WL 3428690 at *3 (E.D. Mich. July 16, 2018)

Defendants split their challenge into two time periods. First, they argue that the Complaint fails to allege knowledge about the defect in 2017-2019 model-year Bolts until November 5, 2020—the day GM finished its investigation into the several fires. Second, they argue that even though GM knew about problems with the 2017-2019 Bolts in November, 2020, they had no reason to believe that the later 2020-2022 Bolts were *also* defective.

### a. GM's knowledge with respect to 2017-2019 Bolts

Plaintiffs point to the following facts, arguing that they combine to sufficiently allege knowledge: first that lithium-ion batteries, like those in the Bolt, have a "well documented history of fire issues," including in the Bolt's predecessor, the Chevrolet Volt. ECF No. 27, PageID.1244-45. Second, GM's admitted knowledge of the "low-voltage condition" that emerged shortly after the Bolt went on sale. ECF No. 27, PageID.1248-53. Third, the several fires Bolt owners reported to NHTSA. ECF No. 27, PageID.1253, 1262-66.

Defendants respond that none of those facts are relevant. As to the inherent fire risk in lithium-ion batteries, GM says that this risk is far too general to establish knowledge that the Bolts had a particular propensity for fires. As to the low voltage condition, GM says that problem is unrelated to the fire risk defect, and thus could not put GM on knowledge of the fire risk. Finally, as to the 2019 fire, GM says that a single incident is not enough to put it on notice as to the existence of a

defect and, as to the other fires, GM did not definitively have knowledge of the fires' cause until its investigation into the fires was complete.

General awareness in the automotive industry that lithium-ion batteries may pose a fire risk is not enough to establish knowledge of a defect. It makes Plaintiffs' knowledge allegations somewhat more plausible, but is not specific enough to suggest knowledge of the specific fire-risk defect in the particular vehicle at issue here. *See, e.g., Miller v. Gen. Motors*, LLC, 2018 WL 2740240 at *13 (E.D. Mich. June 7, 2018) ("The connection between GM's knowledge of a safety defect and various recalls by different auto manufacturers of struts from the 'same supplier' used by GM is tenuous at best, and Plaintiff makes no attempt to bridge the gap between those recalls and GM's alleged knowledge of a safety defect[.]").

Plaintiffs' allegations regarding the low-voltage condition are a closer call. The Complaint clearly alleges that GM knew about the low-voltage condition. Indeed, GM issued multiple service bulletins about the issue and replaced at least some of the affected batteries. *See generally*, Compl., ECF No. 27, PageID.1248-53. And the low-voltage condition obviously related to the battery's management system. But there are only two allegations connecting the low-voltage condition to the risk-of-fire defect. One, made on information and belief, is that the same defect causes both problems. *Id.* at PageID.1253. The second is that "the

46

Vehicle's battery management system is or was unable to accurately sense the actual state of the cells within the battery." *Id.* at PageID.1250.

In *Hall v. GM*, 2020 WL 1285636 (E.D. Mich. 2020), the court addressed a similar situation. Plaintiffs complained of a defect with a "StabiliTrak" system which was designed to help maintain control in slippery conditions. GM had issued several service bulletins about StabiliTrak and related systems, but these problems were unrelated to the specific defect with the StabiliTrak system that Plaintiffs identified, because they did not mention the safety hazards that Plaintiffs alleged were inherent in the defect. *Id.* at *9. The Court explained that the safety hazard was too attenuated to the content of the bulletins to establish GM's knowledge of the specific defect about which the plaintiffs complained—the bulletins did not "identify or mention any of the core features of the StabiliTrak Defect as defined by Plaintiffs." *Id.* at *7.

The same appears true in this case. The NHTSA complaints about the battery's low voltage condition (found at ECF No. 27, PageID.1255-1262) discuss *a* safety risk—losing power while driving—but not the *specific* risk alleged by the Plaintiffs here—the possibility of spontaneous fires. The same is true of the service and customer satisfaction bulletins GM issued about the low-voltage condition: none of them mention a risk of fire or of overheating.

Plaintiffs attempt to distinguish *Hall*, and argue that their claims more closely resemble those in several other cases, including *In re Gen.*

*Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 634 (E.D. Mich. 2019) and *Milisits v. FCA US LLC*, 2021 WL 3145704 at *9 (E.D. Mich. July 26, 2021). But in those cases, the service bulletins and customer complaints directly referenced the specific defect about which the plaintiffs complained. Not so here: the service bulletins addressed an entirely different issue.

And Plaintiffs' allegation concerning the possible relationship between the low-voltage problem and any fire risk is not supported beyond an allegation that it is made "on information and belief." It is alleged that the battery's "management system is or was unable to accurately sense the actual state of the cells within the battery," but that alleged failure is not the physical manufacturing defect that was found to be responsible for the fire-risk defect (a "torn anode" and a "folded separator"), nor does the Complaint allege that this problem of allegedly inaccurately sensing the actual state of the cells extended to failing to detect the manufacturing defect that caused the fire risk.

Ultimately, however, while the allegations about general industry knowledge of a fire risk posed by lithium-ion batteries and the complaints and service bulletins about the low-voltage issue are not enough to establish GM's knowledge throughout the entire relevant period, Plaintiffs' allegations are sufficient to plausibly establish that, at *some* point prior to November 2020 when it completed its investigation, GM

48

had knowledge of the fire-risk defect, particularly in light of the multiple fires reported to NHTSA.

On July 8, 2019, a Bolt owner submitted a complaint to NHTSA stating that the Bolt had burst into flames while charging in March of 2019. ECF No. 27, PageID.1266. According to the complainant, GM "sent two engineers from Detroit" to inspect the owner's charger, and GM purchased the destroyed Bolt from the owner's insurance company. *Id*.

GM responds that a single NHTSA complaint is not enough to put it on notice, and cites a number of cases in which numerous NHTSA complaints were not enough to establish knowledge. ECF No. 36, PageID.2429. *See, e.g.*, *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 281 (E.D. Mich. 2021) (36 NHTSA complaints over nine years insufficient); *Roe v. Ford Motor Co.*, 2019 WL 3564589 at *7 (E.D. Mich. Aug. 6, 2019) (14 complaints over three years insufficient).

But those cases are distinguishable. Neither case involved a defect as serious or potentially deadly as this one, and the rationale underpinning those cases is inapplicable here. In the ordinary case, it makes good sense to require more than just a handful of NHTSA complaints, because GM and other manufacturers are "awash in a sea of complaints and repairs" and unlikely to notice just a few complaints about a particular issue. *Roe*, 2019 WL 3564589 at *7. But two facts about this case undercut that reasoning. First, a vehicle's spontaneous combustion is neither routine nor ordinary and it likely would have been

more than a mere "blip on [GM's] complaints-and-repairs radar." *Id.*
Even a single incident of spontaneous combustion is so significant that it
would draw immediate and intense scrutiny. Second, and more
important, the NHTSA complaint itself reports that GM responded to the
fire with just such an appropriate degree of scrutiny: the company "sent
two engineers from Detroit" to the complainant's driveway to inspect the
vehicle's charging system and then purchased the destroyed vehicle from
the owner's insurance company—presumably in order to carefully
examine it and thoroughly investigate the fire's cause. Though the
complaint was made to NHTSA, GM was unquestionably aware of it. The
subsequent fires only compound this conclusion.

While it is hard to pinpoint a precise moment when GM developed
knowledge of the fire-risk defect, Plaintiffs have alleged enough facts to
show that, at some point in the time period contemplated by the
Complaint, it is plausible that GM was aware of the defect. For the
reasons explained above, the evidence of knowledge is strongest after
first fire in 2019, but the complaint overall "raises a plausible allegation
of knowledge of the problem at the time when the vehicles were
manufactured, before any Plaintiffs bought their [Bolts]." *Chapman*, 531
F. Supp. 3d at 1290. But, of course, it is also clear that no claims requiring
proof of pre-purchase knowledge can survive if those purchases occurred
before GM had knowledge of this defect—whenever that was. *Id.* Facts
clarifying when, if at all, GM and the other defendants had knowledge

will emerge in discovery, and this question may be addressed again at summary judgment.

### b. GM's knowledge with respect to 2020 and later Bolts

GM argues that, even though it admittedly was aware of the fire-risk-defect by at least November of 2020, it believed that the defect was limited to only certain vehicles: model year 2017-2019 Bolts, which had batteries with design-level N2.1 cells manufactured at LG Chem's Ochang facility. GM says that it had no reason to believe that 2020-2022 Bolts—which used design-level N2.2 cells manufactured elsewhere— were also defective in the same way. GM says it had no knowledge that vehicles in the "expanded recall population" were potentially defective until it announced an expanded recall in August, 2021.

For this proposition, GM relies upon *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 792 (E.D. Mich. 2019). There, the court explained that complaints about 2015 and 2016 model-year vehicles could not establish knowledge about problems with 2017 model year vehicles because of "design changes" between the vehicles. *Id.* at 792-93. That argument is not persuasive here for several reasons. First, the *Matanky* plaintiffs did not respond to the argument, unlike Plaintiffs here. Second, where—as here—an automaker "has knowledge of a defect in a prior similar design of a particular part, that accretion of knowledge can be used to show that the automaker had pre-sale knowledge of the same

51

defect in the at-issue part." *Milisits v. FCA US LLC*, 2021 WL 3145704 at *9 (E.D. Mich. July 26, 2021) (internal marks and citation omitted). Third, the fact-intensive nature of this inquiry makes resolution at this early stage inappropriate. It may ultimately be determined that the design-level N2.1 and N2.2 cells are so different that GM could not have developed knowledge about problems with the N2.2 cells simply because it knew that the N2.1 cells were flawed. Or it may be that the manufacturing processes used at LG Chem's Ochang facility and those used elsewhere are so different that GM could not have expected the manufacturing defect that caused the fire risk to crop up in cells made outside of the Ochang plant. But those questions are more appropriately addressed at summary judgment, not on a motion to dismiss.

### c. Knowledge of the defect as to LGEUS and LG Michigan

Although LG Michigan and LGEUS's connections to the final assembled vehicle are more attenuated, Plaintiffs have plausibly alleged that both entities had knowledge of the defect, at least at some point relevant to the events of this Complaint. Plaintiffs allege that the LG Entities were aware of the defect "through joint planning, design, research, engineering, manufacture, testing, validation, integration, and assembly." ECF No. 27, PageID.1300.

Further, Plaintiffs' allegations about the relationship between the parties are sufficient to allege knowledge, at least at this early stage.

Plaintiffs have alleged that the LG Entities were intimately involved in the development, design, and manufacture of the Bolt's battery system. It is not only entirely plausible that GM would have consulted LG Michigan and LGEUS or otherwise involved the LG Entities in GM's effort to investigate or remediate the defect, it is implausible to suggest that GM would not have consulted them in some capacity. Accordingly, the Court will not dismiss any claims against the LG Entities for failure to allege knowledge.

### ii. Whether Plaintiffs have stated fraud claims

Plaintiffs concede that, to sustain their fraud claims, they must meet the heightened particularity requirements found in Fed. R. Civ. P. 9(b). There are two kinds of fraudulent concealment claims—affirmative and omission-based—and different standards apply to each:

> Sixth Circuit precedent demands that claims for affirmative misrepresentations: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008). For claims involving fraudulent omissions, Rule 9(b) requires that Plaintiffs plead "the who, what, when, where, and how" of the alleged omission. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012). Specifically, a plaintiff must allege "(1) precisely what was omitted; (2) who should have made the representation; (3) the content of the alleged

omission and the manner in which the omission
was misleading; and (4) what [defendant] obtained
as a consequence of the alleged fraud." *Id.* Stating
a claim for fraudulent omission also requires
pleading a duty to disclose. *MacDonald v. Thomas
M. Cooley Law Sch.*, 724 F.3d 654, 665 (6th Cir.
2013).

*Chapman*, 531 F. Supp. 3d at 1287 (quoting *Raymo*, 475 F. Supp. 3d at
705).

### a. Plaintiffs have not stated a claim based on affirmative misrepresentations

Count One of the Complaint seeks to assert a common law fraud
claim against GM based on affirmative misrepresentations allegedly
made in GM's advertisements and pre-release statements about the Bolt.
ECF No. 27, PageID.1296. GM allegedly claimed that the Bolt had a
range of 238 miles, was "safe, durable, and would travel farther on a
single charge than comparable vehicles," and "had no significant defects
and would perform and operate properly." *Id.* As to the latter assertion,
Plaintiffs do not point to any specific statement in GM's advertising
material that the vehicle "would perform and operate properly." Plaintiffs
do identify several statements by GM about the Bolt's range: several pre-
release statements that the Bolt was "designed to offer more than 200
miles of range," *id.* at PageID.1231-32, and repeated statements of the
Bolt's EPA-estimated range in marketing materials. *See, e.g.*, *Id.* at
PageID.1240-42.

"No misrepresentation occurs when a manufacturer merely advertises EPA estimates." *Gray v. Toyota Motor Sales, U.S.A., Inc.*, 554 F. App'x 608, 609 (9th Cir. 2014). Indeed, the advertisements that Plaintiffs identify specifically offer a disclaimer that the EPA estimate is just that—an estimate—and that customers' real world range may vary. "The mere use of EPA estimates, as opposed to any other supposed estimates of 'actual' fuel-economy, are not actionable. *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369 at *32 (S.D.N.Y. Nov. 12, 2015) ("*Ford Fuel Econ. Litig*") (collecting cases).

Only where a manufacturer makes "specific 'additional' representations that go beyond those EPA estimates" are statements of fuel efficiency and range actionable. *Id.* at *32. The Complaint does indeed allege "that GM heavily relied on the range of the [Bolt]" in advertisements, and that GM knew range was an important consideration for customers, all of which is plausible. Pls'. Resp. to GM's Mot. to Dismiss ECF No. 55, PageID.3210. But even making the EPA-estimated range—accompanied by appropriate caveats—a central feature of the Bolt's advertising campaign does not mean that GM "went beyond" the EPA estimates by, for example, conducting and advertising the results of their own range or fuel economy tests to show that the EPA estimates were achievable in real-world driving. *Cf. Ford Fuel Econ. Litig,* 2015 WL 7018369 at *32 (collecting cases) (manufacturer went beyond EPA estimates by creating commercial in which manufacturer

compared their own vehicle to a competitor's in their own purportedly real-world testing). Accordingly, Plaintiffs' affirmative misrepresentation claims must be dismissed. *See In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 2022 WL 551221, at *19 (E.D. Mich. Feb. 23, 2022) (dismissing affirmative fraud claims based on advertising of EPA-estimated fuel economy, comparisons between different vehicles' EPA-estimated fuel economy, and statements that vehicles had "best-in-class fuel economy.").

### b. Plaintiffs have stated a claim for fraudulent concealment against GM

Plaintiffs' fraudulent concealment claims are different. Fraudulent concealment or omission claims are subject to a "slightly more relaxed pleading burden; the claim can succeed without the same level of specificity required by a normal fraud claim." *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751 (E.D. Mich. 2017) (internal marks and citation omitted). As explained above, Plaintiffs must allege the "who, what, when, where, and how" of the alleged omission: what was omitted, who should have made the representation, the content of the omission, and what the defendant gained by the alleged fraud. *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 256 (6th Cir. 2012).

A factually similar case, *Friche v. Hyundai Motor, Am.*, 2022 WL 1599868 at *4 (C.D. Cal. Jan. 28, 2022), provides helpful guidance. There, a plaintiff sued a car manufacturer on a fraudulent omission theory

where the manufacturer heavily advertised the range of its electric vehicle, but that range was allegedly only achievable if the battery was charged to a dangerous degree, risking a battery fire. The *Friche* court explained that the plaintiff had stated a fraudulent omission claim by alleging the content of the misleading statements, the identity of the speaker, and where an appropriate disclosure could have been made. *Id.*

So too here. Plaintiffs have identified the disclosure that GM should have made by alleging that GM "failed to disclose to consumers for over a year that charging the [Bolt] to 100% capacity could cause combustion and fire." ECF No. 27, PageID.1298. As discussed above, Plaintiffs identify where the misrepresentation was made and where a disclosure could have been made by pointing to specific advertisements for the Bolt. Plaintiffs have also alleged when GM made its statements—before Plaintiffs purchased their vehicles. Finally, Plaintiffs have alleged what GM received as a result of concealing the fire risk. They allege that range-based marketing "was particularly important for GM because around the same time as the release of the Bolt," another manufacturer released a comparable vehicle with a significantly faster charging time, making the Bolt's range more important. ECF No.27, PageID.1239.

### c. Plaintiffs have stated a claim of fraudulent concealment as to the LG Entities

LGEUS and LG Michigan argue that Plaintiffs' fraudulent concealment claims against them should be dismissed for two reasons.

First, because the LG Entities lacked knowledge of the alleged defect; second, because Plaintiffs have engaged in impermissible "group pleading." As to the first argument, the Complaint plausibly alleges the LG Entities knowledge of the defect for the reasons explained above.

As to the second, LGEUS and LG Michigan accuse Plaintiffs of engaging in "group pleading"—failing to differentiate their claims against each defendant and instead alleging their claims against "Defendants" or "LG" generally. The Sixth Circuit has explained that, at least in the context of affirmative misrepresentations, a plaintiff may not simply "articulate[] general averments of fraud attributed to 'the defendants.'" *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992).

Engaging in a similar analysis, a California district court dismissed fraud claims against several Toyota-affiliated auto manufacturer defendants. *Drake v. Toyota Motor Corp.*, 2020 WL 7040125 (C.D. Cal. Nov. 23, 2020). The *Drake* court explained that, while the complaint alleged that the entities had a "unity of ownership . . . such that any individuality or separateness between them has ceased," and "communicate[d] with each other concerning virtually all aspects of the Toyota vehicles," these allegations were conclusory and insufficient for purposes of Rule 9(b). *Id.* at *11 The *Drake* plaintiffs had "identif[ied] the various functions performed by the individual defendants within Toyota's ecosystem," but these allegations were not sufficient because, while the

plaintiffs "describe[d] with sufficiently particularized detail the operations and the role of each Defendant within Toyota," they had failed to provide "detailed allegations of . . . the various roles *played in the alleged conspiracy*." *Id*. (emphasis added, internal marks and citations omitted).

Closer to home, Judge Ludington reached a different result in *In re Duramax Diesel Litig*., 298 F. Supp. 3d 1037 (E.D. Mich. 2018). There, plaintiffs sued an automaker and two component part suppliers, both of which allegedly "operate[d] under the umbrella of the Bosch Group." *Id*. at 1056. The complaint further alleged that employees of both subsidiaries held themselves out as "working for 'Bosch,'" such that identifying which Bosch defendant was involved in which particular acts was not always possible, though the overall role of Bosch in the fraudulent omission scheme was "clear." *Id*.

This case is more analogous to *Duramax*. First, *Drake* is distinguishable because Plaintiffs have alleged more than merely the "various functions performed by the individual defendants within [LG's] ecosystem." They have specifically alleged LG Michigan and LGEUS' respective roles *in the events at issue here*: the Complaint accuses the LG Entities of designing, developing, and documenting the defective battery, investigating the battery defect, and of being GM's "partner in discovering and investigating the Battery Defect, failing to disclose it,

and rolling out the inadequate and misleading recalls" at issue here. ECF No. 27, PageID.1268.

And, similar to *Duramax*, GM and the LG Entities appear to have referred to the LG Entities collectively in numerous public statements. *See, e.g.,* October 2015 Press Release, ECF No. 27-20, PageID.1642 ("GM and *LG Corp.* brought the [Bolt] to reality. . . *LG* supplied an array of new components and systems [] including . . . [the] Battery Cells and Pack") (emphasis added); ECF No. 27-22, PageID.1652 ("Being selected as GM's EV technology partner positions *LG* as a key player in next-generation vehicular technologies") (emphasis added). Accordingly, in line with the approach of *Duramax* the Court will decline to dismiss any claims against the LG Entities due to "group pleading." As the *Duramax* court explained, "[a]lthough the precise identity of the subsidiary . . . which may have taken certain actions is unclear, that level of detail is unnecessary to put the [LG] Defendants on notice of the claims made against them." *Duramax*, 298 F. Supp. 3d at 1057.

But it should be noted that LG Michigan and LGEUS do not appear to have transacted any business with any customers directly, issued any customer a warranty, or otherwise had a direct relationship with any customers. Accordingly, as explained below, although they survive a "group pleading" challenge, Plaintiffs' fraudulent concealment claims against the LG Entities must nevertheless be dismissed under most states' laws for failure to allege a duty to disclose.

### iii. Whether Plaintiffs have alleged a duty to disclose for purposes of their fraudulent concealment claims
#### a. As to GM

GM argues that common law fraud claims brought under the laws of Michigan, Texas, and Wisconsin should be dismissed for failure to allege a duty to disclose under those states' laws.

Plaintiffs' Texas-law claim must be dismissed because—as Plaintiffs concede—Texas law does not recognize fraudulent concealment as a cause of action. ECF No. 55, PageID.3215 ("Plaintiffs concede that fraudulent concealment is not recognized as an independent cause of action under Texas law."); *In re Subaru Battery Drain Prod. Liab. Litig.*, 2021 WL 1207791 at *30 (D.N.J. Mar. 31, 2021) (collecting cases and explaining that "[Texas] courts regularly dismiss fraudulent concealment claims pled as independent causes of action."). Accordingly, the fraudulent concealment claims brought under Texas law by Plaintiffs Edward and Janet Rock and Jason Vaaler must be dismissed.

Because GM explicitly states that it joins in LGEUS and LG Michigan's arguments, the Court will also consider below whether Plaintiffs have alleged a duty to disclose under the laws of Wisconsin or any of the other states identified by LGEUS and LG Michigan. [15]

---

[15] Count 49, brought by Denise and Michael Holbrook on behalf of a putative Michigan subclass is stayed due to the arbitration issue discussed above. So too is Count 22, brought by Evi Schulz and Tony Verzura on behalf of a Florida subclass and Count 70 brought by William Dornetto and Russel Ives on behalf of a Virginia subclass. Defendants' arguments with respect to those states will not be considered at this time.

### b. As to the LG Entities

There is limited authority that helps answer the question of when the manufacturer of a component that is integrated into a vehicle may be subject to a duty to disclose a known fault to purchasers or lessees of the final vehicle. The LG Defendants argue that Plaintiffs have not alleged that they had any relationship—commercial or otherwise—with any LG entity. Accordingly, the LG Defendants argue, they had no duty to disclose the purported battery defect under the laws of any relevant state. The Court addresses each state's law in turn

In Arizona, "being a party to a transaction is a necessary element of a fraudulent concealment claim." *Counts v. Gen. Motors*, LLC, 2022 WL 2079757 at *16 (E.D. Mich. June 9, 2022) (dismissing claims against vehicle manufacturer and component part manufacturer where plaintiff never transacted with either manufacturer directly) (quotation marks and citation omitted). That principle compels dismissal of claims against a component manufacturer whose product was integrated into a vehicle. *See Hale v. Norcold Inc.*, 2019 WL 3556882, at *2 (D. Ariz. Aug. 5, 2019) ("Plaintiffs' claim should immediately fail because the Plaintiffs and the Defendants were never parties to the same transaction; rather, the Plaintiffs bought their RV from a third party with the Refrigerator made by the Defendants already installed."). Accordingly, Plaintiffs' claims under Arizona law must be dismissed against all defendants.

Under California law, a duty to disclose arises in four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 467 F. Supp. 3d 849, 860 (N.D. Cal. 2020). There are no allegations that Plaintiffs were in a fiduciary relationship with any LG entity. And, as California courts have held, "each of the latter three circumstances in which nondisclosure may be actionable presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise." *Id.* Here, there was no direct relationship between Plaintiffs and the LG Entities, so Plaintiffs' California-law fraudulent concealment claim must be dismissed as to the LG Entities. *See id.* (dismissing fraudulent concealment claims against component part supplier for failure to allege a duty to disclose). However, courts applying California law have imposed a duty to disclose on manufacturers under an "active concealment" theory based on allegations that "the defendant had knowledge of the defect and failed to appropriately address the problem" *Id.* Since the Complaint plausibly alleges that GM had knowledge, Plaintiffs' fraudulent concealment claim need not be dismissed as to GM for failure to allege a duty to disclose.

63

Georgia courts may impose a duty to disclose even where the plaintiff and defendant were not parties to a transaction or contract, but only where there is "some relationship" between the parties. *McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1351 (N.D. Ga. 2015). Here, there was no relationship between any of the Plaintiffs and any LG entity, so a fraudulent concealment claim under Georgia law may not proceed against the LG Entities. However, because any relationship between Plaintiffs and GM was considerably less attenuated, and there was at least some contact between them, Plaintiffs' Georgia-law fraudulent concealment claims against GM need not be dismissed.

Under Illinois law, a plaintiff may, even without "direct contact . . . establish a duty to speak for fraudulent concealment purposes in situations where (i) a defendant's acts contribute to plaintiff's misapprehension of a material fact and defendant fails to correct it or (ii) the defendant's silence is accompanied by deceptive conduct." *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 414 (S.D.N.Y. 2017). On that basis, courts have held that "a manufacturer of cars (or car parts) owed a duty to consumers under Illinois law to disclose safety defects." *Id.* Because the alleged fire risk associated with the battery is a safety risk, Plaintiffs have alleged enough to impose a duty to disclose under Illinois law.

Kansas law recognizes a duty to disclose when one contracting party has "superior knowledge, or knowledge that is not within the

reasonable reach of the other party," but "a plaintiff must maintain a certain relationship with the defendant, who allegedly has superior knowledge, for a duty to arise." *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 232 (D.N.J. 2020). Accordingly, a "duty to disclose based on superior knowledge under Kansas law, does not apply in the absence of a direct business transaction between a buyer and a seller. *Id.* at 232-33 (collecting cases, internal marks and citation omitted). Because there was no direct transaction between any Plaintiff and GM or any LG entity, Kansas-law claims for fraudulent concealment are dismissed for failure to allege a duty to disclose.

Courts applying Massachusetts law have rejected fraudulent concealment or fraud-by-omission claims against vehicle manufacturers and component part manufactures absent allegations of an ambiguous or incomplete disclosure concerning the relevant topic or of a fiduciary relationship.[16] *See Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 102 (D. Mass. 2021); *Cohen v. Subaru of Am., Inc.*, 2022 WL 714795, at *20 (D.N.J. Mar. 10, 2022) ("*Cohen I*") (dismissing claim against vehicle component supplier for same reasons). Plaintiffs' claims will be dismissed under Massachusetts law.

---

[16] And any "incomplete disclosure" must be more than a manufacturer's "general statements about the safety of its cars, which amount to non-actionable puffery" *Costa*, 542 F. Supp. at 102.

Under New York law although normally the "duty to disclose [due to superior knowledge] arises in the context of direct business transactions, courts have also imposed this duty on a manufacturer who has exclusive knowledge of a product defect or danger." *Cohen I*, 2022 WL 714795 at \*21 (citing *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 125 (E.D.N.Y. 2011)). That logic has also been extended to the manufacturers of vehicle parts. *See Cohen I*, 2022 WL 714795 at \*21. Here, for the reasons explained above, Plaintiffs have plausibly alleged that the LG Entities had knowledge of the alleged defect. Further, because of the latent nature of the defect, the LG Entities stood in a position of superior knowledge to any purchaser. Accordingly, Plaintiffs have plausibly alleged a duty to disclose on the part of GM and the LG Entities under New York law.

In Oregon, a special relationship giving rise to a duty to disclose "does not exist if the parties were merely in an 'arm's-length' commercial or business relationship where they were acting in their own economic interest." *See Cohen I*, 2022 WL 714795 at \*22 (vehicle part supplier had no duty to disclose) (quoting *Martell v. Gen. Motors LLC*, 492 F. Supp. 3d 1131, 1143 (D. Or. 2020)). Accordingly, claims against GM and the LG Entities under Oregon law will be dismissed.

Before a duty to disclose can be imposed under Washington law, "some type of special relationship" must exist. *Colonial Imports, Inc. v. Carlton Nw., Inc.*, 121 Wash. 2d 726, 732 (1993). Accordingly, courts

66

applying Washington law have dismissed claims against component suppliers where the supplier transacted no business with the plaintiff. *See, e.g.*, *Wetzel v. CertainTeed Corp.*, 2019 WL 3976204, at *5 (W.D. Wash. Mar. 25, 2019) (connection between plaintiff homeowner and manufacturer of faulty shingles that sold only to wholesalers was too tenuous to support duty to disclose). Accordingly, Plaintiffs' claims under Washington law will be dismissed as to the LG Entities. However, because courts have allowed similar claims to proceed against vehicle manufacturers where they have "superior information regarding defects that are not readily ascertainable to customers," Plaintiffs' claims will not be dismissed as to GM. *See Cohen v. Subaru of Am., Inc.*, 2022 WL 721307, at *25 (D.N.J. Mar. 10, 2022) ("*Cohen II*") (citation and quotation marks omitted).

Wisconsin law recognizes a duty to disclose where (1) the non-disclosing party knew the other party was not aware of the fact; (2) the mistaken party could not reasonably be expected to discover the fact; and (3) the mistaken party would not have entered the transaction if he or she knew the fact. *Cohen II*, 2022 WL 721307 at *26 (citing *Kaloti Enterps., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 213 (Wis. 2005)). While it is not clear whether this duty extends beyond parties to a direct

transaction,[17] the Court cannot say, at this early stage of litigation, that Plaintiffs' claims are absolutely barred by a failure to allege a duty to disclose. The fraudulent concealment claims under Wisconsin law may therefore proceed.

The chart below summarizes the Court's determination of which claims must be dismissed for failure to allege a duty to disclose.

**Figure 2: Dismissal of Fraudulent Concealment Claims for Failure to Allege a Duty to Disclose**

| Count | State | Claims against GM | Claims Against LG Entities |
|-------|-------|-------------------|----------------------------|
| 65 | Texas | Dismissed | Dismissed |
| 9 | Arizona | Dismissed | Dismissed |
| 18 | California | Not Dismissed | Dismissed |
| 22 | Florida | Stayed | Stayed |
| 28 | Georgia | Not Dismissed | Dismissed |
| 34 | Illinois | Not Dismissed | Not Dismissed |
| 39 | Kansas | Dismissed | Dismissed |
| 44 | Massachusetts | Dismissed | Dismissed |
| 49 | Michigan | Stayed | Stayed |
| 55 | New York | Not Dismissed | Not Dismissed |
| 60 | Oregon | Dismissed | Dismissed |
| 70 | Virginia | Stayed | Stayed |
| 75 | Washington | Not Dismissed | Dismissed |
| 80 | Wisconsin | Not Dismissed | Not Dismissed |

---

[17] *See Pac. Cycle, Inc. v. Powergroup Int'l, LLC*, 2013 WL 5945701 at *6 (W.D. Wis. Nov. 6, 2013) (suggesting that no duty to disclose could arise absent a direct contractual relationship between parties to a transaction but resolving on other grounds).

### iv. Whether Plaintiffs' fraudulent concealment claims are barred by the "economic loss doctrine"

The economic loss doctrine, which is a feature of many states' laws, prevents the purchaser of a defective product from bringing tort claims against the manufacturer to recover only economic damages. Defendants argue that the economic loss doctrine bars fraud claims asserted under the laws of Arizona, California, Florida, Illinois, Michigan, New York, Texas, and Wisconsin.[18] In their response, Plaintiffs do not seem to deny that they assert only economic damages, and the Court's review of the Complaint does not reveal that Plaintiffs are alleging any other injury. See ECF No. 27, PageID.1171 ("Plaintiffs and Class members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles [and] suffered an ascertainable loss of money, property, and/or value and resale value of their Class Vehicles."). The Court will consider each state's law in turn.

Arizona has explicitly rejected a bar on tort recovery in the products liability context where a plaintiff alleges only economic losses. *Est. of Pilgrim v. Gen. Motors LLC*, 2022 WL 989322 at *11 (E.D. Mich. Mar. 31, 2022). Instead, under Arizona law "[e]ach case must be examined to determine whether the facts preponderate in favor of the application of tort law or commercial law exclusively or a combination of the two."

---

[18] As discussed above, Plaintiffs' Michigan, Virginia, and Florida claims are stayed and Plaintiffs concede that fraudulent concealment is not a distinct tort under Texas law.

*Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 Ariz. 320, 324 (2010). Given the fact-intensive nature of this test, the economic loss rule does not require dismissal of Plaintiffs' Arizona-law fraudulent concealment claim.

California's economic loss rule bars fraudulent omission claims in the products liability context absent allegations of affirmative misrepresentations. *In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 483 F. Supp. 3d 838, 847-49 (C.D. Cal. 2020). The fraud exception to the economic loss rule does not extend, however, to fraudulent omission claims. *Id.* Accordingly, the economic loss doctrine bars Plaintiffs' fraudulent omission claims under California law.

Illinois law recognizes an exception to its economic loss doctrine for claims alleging fraud, including fraudulent omission/concealment claims. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 n.12 (7th Cir. 2012). That exception extends to fraudulent concealment claims. *Id.* ("This exception saves [plaintiff's] fraudulent concealment claim but not the negligent misrepresentation or concealment claim").

New York's economic loss rule does not bar fraudulent concealment claims. *Nuwer v. FCA US LLC*, 552 F. Supp. 3d 1344, 1360 (S.D. Fla. 2021) (collecting cases); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 433 (S.D.N.Y. 2017) (explaining that intentional torts are not precluded by New York's economic loss doctrine and declining to dismiss fraudulent concealment claims).

70

In Wisconsin, "the economic loss doctrine precludes recovery in tort for economic losses resulting from the failure of a product to live up to a contracting party's expectations." *Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 162. The doctrine extends to claims of fraudulent concealment or failure to disclose where—as here—the alleged fraud "ultimately concern[s] the quality of the product sold." *Id.* at 163-65.

Accordingly, as summarized in the chart below, Plaintiffs fraudulent concealment claims under California and Wisconsin law are dismissed due to those states' economic loss doctrines. Plaintiffs' claims under the laws of Arizona, Illinois, and New York need not be dismissed due to the economic loss doctrine.

**Figure 3: Dismissal of Certain Fraudulent Concealment Claims due to the Economic Loss Doctrine**

| Count | State | Disposition |
|---|---|---|
| 9 | Arizona | Not Dismissed |
| 18 | California | Dismissed |
| 22 | Florida | Stayed |
| 34 | Illinois | Not Dismissed |
| 49 | Michigan | Stayed |
| 55 | New York | Not Dismissed |
| 80 | Wisconsin | Dismissed |

### v. Whether certain Plaintiffs may bring claims under both the laws of the states where they live and the laws of the states where they purchased or leased their vehicles

Plaintiffs Kuchar and Hickey attempt to bring claims under the laws of the states where they live (AZ, IL) *and* under the laws of the states where they purchased their vehicles (CA, KS). GM says that, under Michigan's choice-of-law principles, it is the law of the states where plaintiffs live, not where they bought their cars, that governs their fraud claims. Because Plaintiff Kuchar's claims are stayed, the Court will consider only the claims of Plaintiff Hickey.

Judge Michelson was recently faced with a similar situation in *Withrow v. FCA US LLC*, 2021 WL 2529847 at *11 (E.D. Mich. June 21, 2021). As Judge Michelson explained, Michigan's choice-of-law principles for tort claims provide that Michigan law shall apply unless another state has a greater interest in having its laws apply. *Id.* Factors to be considered are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered. *Stalker v. MBS Direct*, LLC, 2012 WL 6642518 at *5 (E.D. Mich. Dec. 20, 2012).

In *Withrow*, a Connecticut resident sought to invoke Connecticut common law and consumer protection statutes, even though he purchased his vehicle in New Jersey. The conduct he complained of was

a manufacturer's false advertisements and failure to disclose problems with the vehicle. The court explained that the plaintiff's claims were properly brought under Connecticut law because the alleged fraud was "primarily, if not exclusively, pre-purchase deception, which . . . occurred in Connecticut" because the plaintiff was exposed to FCA's advertisements in Connecticut, where he lived. *Withrow*, 2021 WL 2529847 at *12.

Plaintiffs point to no authority that would allow them to bring their fraudulent concealment claims under the laws of two states simultaneously. Accordingly, the laws of the state in which Plaintiff Hickey lives and was exposed to GM's allegedly fraudulent advertising (Illinois) will govern his fraud by concealment claims, and his Kansas claim will be dismissed.

### vi. Whether certain Plaintiffs have sufficiently alleged that a defect "manifested" in their vehicles

As Plaintiffs concede, New York and Texas law require that a defect actually manifest in a customer's vehicle in order to for claims to proceed under Texas and New York consumer protection laws or common law fraud regimes. ECF No. 55, PageID.3213-14; *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 429 (S.D.N.Y. 2017) ("[p]urchasers of an allegedly defective product have no legally recognizable claim [under NY GBL § 349] where the alleged defect has not manifested itself in the product they own."); *id.* at 451 ("[T]he great

weight of Texas authority suggests that manifestation is necessary, at least in the context of frequently used products like cars, for a plaintiff to bring an action for solely economic losses."); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99-100 (S.D.N.Y. 1997) (applying same rule to New York common-law fraud claim).

Plaintiffs have sufficiently alleged that the purported defect has manifested in their vehicles because GM's interim remedy continues to substantially limit how the vehicles may be used. Plaintiff Kotchmar alleges that his vehicle now has reduced range because of the software update GM installed to mitigate the risk of fire. Am. Compl., ECF No. 27 at PageID.1206. The Rocks say that they have reduced the "Target Charge Level" substantially to provide what they believe is a necessary margin of safety, and that their Bolt now has only 50 miles of range. *Id.* at PageID.1210-11. Vaaler alleges that his range has been reduced to only 120 miles by GM's interim software remedy. *Id.* at PageID.1220. Although none of these Plaintiffs' cars have caught fire, the defect, and GM's response to it, has limited how they can use their vehicles. Accordingly, their claims need not be dismissed due to the manifestation requirements imposed by Texas and New York law.

### vii.  Summary of fraudulent concealment claims

The chart below summarizes the Court's findings with respect to Plaintiffs' fraudulent concealment claims. Where a claim is due to be dismissed for multiple reasons, all are included.

74

**Figure 4: Disposition of Fraudulent Concealment Claims**

| Count | State | Claims against GM | Claims Against LG Entities |
|---|---|---|---|
| 65 | TX | Dismissed (fraudulent concealment not recognized under Texas law as an independent claim) | Dismissed (fraudulent concealment not recognized under Texas law as an independent claim) |
| 9 | AZ. | Dismissed (duty to disclose) | Dismissed (duty to disclose) |
| 18 | CA. | Dismissed (economic loss doctrine) | Dismissed (duty to disclose, economic loss doctrine) |
| 22 | FL | Stayed | Stayed |
| 28 | GA | Not Dismissed | Dismissed (duty to disclose) |
| 34 | IL | Not Dismissed | Not Dismissed |
| 39 | KS | Dismissed (duty to disclose, choice of law) | Dismissed (duty to disclose, choice of law) |
| 44 | MA | Dismissed (duty to disclose) | Dismissed (duty to disclose) |
| 49 | MI | Stayed | Stayed |
| 55 | NY | Not Dismissed | Not Dismissed |
| 60 | OR | Dismissed (duty to disclose) | Dismissed (duty to disclose) |
| 71 | VA | Stayed | Stayed |
| 75 | WA | Not Dismissed | Dismissed (duty to disclose) |
| 80 | WI | Dismissed (economic loss doctrine) | Dismissed (economic loss doctrine) |

### D. Whether Plaintiffs have sufficiently alleged consumer protection claims under the laws of certain states

#### i. Whether certain states' consumer protection statutes cover vehicle sales

LG Michigan argues that the Arizona Consumer Fraud Act ("Arizona CFA") the Florida Unfair and Deceptive Trade Practice Act ("Florida UDTPA"), the Georgia Fair Business Practices Act ("Georgia

FBPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDPA"), the Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), the Massachusetts statute that regulates business practices ("Massachusetts Chapter 93A"), the Michigan Consumer Protection Act ("MCPA"), the and Virginia Consumer Protection Act ("Virginia CPA") do not apply to acts and practices regulated by state or federal law, so claims brought under those statutes must be dismissed. ECF No. 44, PageID.3043-44. LG Michigan further argues that the basis for Plaintiffs' consumer protection claim is the mere disclosure of EPA estimates, which is required by federal law and therefore not actionable under any of the relevant states' consumer protection laws.

With respect to Michigan's MCPA, LG Michigan is correct; vehicle sales are exempted from the law. In *Chapman*, relying on a recent opinion by the Michigan Court of Appeals, this Court concluded that the MCPA exempts motor vehicle sales. *Chapman*, 531 F. Supp. 3d at 1302 (citing *Cyr v. Ford Motor Co.*, 2019 WL 7206100, at *1-3 (Mich. Ct. App. Dec. 26, 2019)). Since *Chapman*, the Michigan Supreme Court has declined to hear *Cyr*. *Cyr v. Ford Motor Co.*, 506 Mich. 950 (2020). Plaintiffs point out that, in declining to hear *Cyr*, two justices of the Michigan Supreme Court questioned whether the Michigan Supreme Court's prior decisions interpreting the MCPA were correct. *Cyr v. Ford Motor Co.*, 507 Mich. 1029 (2021) (Welch, J. and Bernstein, J.

76

concurring). However, unless and until the Michigan Supreme Court revisits the issue, this Court may not interpret Michigan law in a manner contrary to the decisions of Michigan's highest court.[19]

For the remainder of the states at issue, LG Michigan relies on a recent decision in this district, *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707 (E.D. Mich. 2021). The *Gant* court dismissed claims under the MCPA, then dismissed claims under several other states' consumer protection laws because each statute had similar language. *Id.* at 719-720. However, the *Gant* decision is distinguishable: there, the plaintiffs did not "present precedent that the analysis under other states' consumer-protection statutes is different" from the MCPA analysis. *Id.* at 720. Here, Plaintiffs have presented a number of cases suggesting that other states' laws are not interpreted as broadly as the MCPA. *See* ECF No. 56, PageID.4003-4009. Accordingly, the Court declines to follow *Gant*.

Defendants also argue that claims related to fuel efficiency estimates are generally barred by the relevant statutes' "safe harbor" provisions—provisions that exempt conduct specifically required or permitted by federal law. The Court agrees: presentation of EPA-estimated range figures is generally required by federal law, and thus falls within the relevant statutes' "safe-harbor" provisions. *See Brett v.*

---

[19] Although the Holbrooks' MCPA claim is stayed, interpretation of the MCPA is still necessary, as it may bear on interpretation of other states' consumer protection laws, as it did in *Gant v. Ford Motor Co.*, 517 F. Supp. 3d 707 (E.D. Mich. 2021).

*Toyota Motor Sales, U.S.A., Inc.*, 2008 WL 4329876 at *7 (M.D. Fla. Sept. 15, 2008) ("The Defendant's practice of advertising the fuel economy estimates provided by the EPA is permitted by the rules and regulations of the FTC, and required in any advertising that contains other fuel economy representations."). But statements that "go beyond" such EPA estimates may not fall into the safe harbor. *Ford Fuel Econ. Litig.*, 2015 WL 7018369 at *32 ("the Court finds that Plaintiffs' other claims, namely those targeting specific 'additional' representations that go beyond those EPA estimates, state a claim under state consumer protection law."). For the reasons explained above in section IV.C.ii, *supra*, the Court is not persuaded that Plaintiffs have alleged that any statements went "beyond" mere disclosure of EPA estimates.

However, Plaintiffs' consumer protection claims are not premised solely on the inclusion of EPA estimates. They are also premised upon Defendants' alleged failure to disclose the alleged fire-risk defect and the safety hazard associated with it. *See, e.g.*, ECF No. 27, PageID.1391-92 (alleging that Defendants "also knowingly failed to disclose . . . material facts regarding the Defective Battery and the safety hazards associated with it" and "violated the Massachusetts Act by . . . willfully failing to state a material fact"). Accordingly, Plaintiffs have pleaded sufficient facts to "allow [] the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged," *Bossart v. Gen. Motors LLC*, 2021 WL 5278191, at *11 (E.D. Mich. May 19, 2021), and

none of Plaintiffs' state-law consumer protection claims must be dismissed on the basis that vehicle sales are exempted or that the alleged conduct falls within the statutes' "safe harbor" provisions.

### ii. Whether Plaintiffs have sufficiently alleged causation and reliance as required by all states' consumer protection statutes

As this Court recognized in *Chapman*, each states' consumer protection statutes "at a minimum require deceptive conduct, reliance, and causation to be pled with the same level of particularity required by Fed. R. Civ. P. 9(b)." *Chapman v. Gen. Motors LLC*, 531 F. Supp. 3d 1257, 1300 (E.D. Mich. 2021). LGEUS alleges that Plaintiffs have not alleged that they relied upon any statements or omissions by the LG Entities, nor that any statements or omissions by the LG Entities caused them harm. As this Court observed in *Chapman*, courts generally defer consideration of such issues at the motion to dismiss stage. *Id.*; *see also Bossart*, 2021 WL 5278191 at *11 ("Further, issues such as reliance, causation, and compliance with limitations periods are inherently fact-specific and do not lend themselves to resolution on a motion to dismiss.").

Somewhat more problematic for Plaintiffs is the lack of any alleged representation by any of the LG Entities. But Plaintiffs' consumer protection claims are based on a fraudulent omission theory. As explained above in Section IV.C.i.c, *supra*, the Complaint alleges that the LG Entities worked closely with GM in all aspects of the allegedly defective battery's design and production, and further alleges that GM

repeatedly touted the LG Entities' involvement in the Bolt's production. The Complaint further alleges that GM and the LG Entities, at least at some point, were aware of the defect, and that each Plaintiff would not have purchased their vehicle had the defect been disclosed. Accordingly, Plaintiffs have pleaded enough facts to draw the reasonable inference that the LG Entities were involved in deceptive conduct upon which a customer could reasonably rely—enough to survive a motion to dismiss.

### iii. Whether Plaintiffs may seek equitable relief

GM argues that Plaintiffs cannot pursue equitable relief under the consumer protection laws of several states because Plaintiffs have not alleged that they lack an adequate legal remedy. GM's argument is premised on *Sonner v. Premier Nutrition Corporation*, 971 F.3d 834 (9th Cir. 2020), a recent decision of the Ninth Circuit. There, a plaintiff sought equitable relief and damages under California's consumer protection laws. On the eve of trial, the plaintiff dismissed her damages claim. *Id.* at 845. The *Sonner* court ruled that the plaintiff could not seek equitable remedies because she had not adequately shown that she lacked an available remedy at law. The *Sonner* court concluded that, even when applying state law, a federal court sitting in diversity is still constrained by the federal principles governing equitable relief—specifically, that lack of an adequate legal remedy is a necessary prerequisite. *Id.* at 840-42.

80

This case is distinguishable from *Sonner* because Plaintiffs here seek an injunction—a remedy not available at law, which the *Sonner* plaintiff did not do. *C.f. Glassburg v. Ford Motor Co.*, 2021 WL 5086358 at *7 (C.D. Cal. Nov. 2, 2021) (distinguishing *Sonner* where plaintiff sought an order "ordering Defendant to extend repair and replacement remedies to all Class members in California" because injunctive relief was by definition not available at law) *with* ECF No. 27, PageID.1481 (requesting an injunctive order requiring GM to buy back or permanently repair all Class Vehicles). Given that Plaintiffs request an injunction which is, by definition not a remedy available at law, and given the ongoing debate about the proper interpretation of *Sonner* even in courts for which *Sonner* represents binding law, the Court declines to dismiss claims on the basis of *Sonner* at this time.[20]

---

[20] *See, e.g., Cepelak v. HP Inc.*, 2021 WL 5298022 at *2 (N.D. Cal. Nov. 15, 2021) ("Some courts have suggested that *Sonner* prevents parties from pleading claims for legal and equitable relief in the alternative. . . [t]his may be a plausible reading of *Sonner* but it is not the best reading. *Sonner* primarily speaks to the ability of a federal court to *award* equitable relief at the end of the case.") (emphasis in original); *Amans v. Tesla, Inc.*, 2022 WL 2952474 at *1 (N.D. Cal. July 26, 2022) ("Courts in the Ninth Circuit are divided on how exacting of a standard *Sonner* imposes on plaintiffs who plead claims for equitable and legal remedies at the pleading stage.") (quotation marks and citation omitted).

### iv. Whether Plaintiffs have standing to seek injunctive relief under certain states' consumer protection statutes

GM argues that Plaintiffs cannot seek an injunction against GM's allegedly deceptive practices because each Plaintiff has already purchased their vehicle and is aware of the defect, and thus cannot allege that they are likely to be damaged again by GM's allegedly misleading marketing practices. ECF No. 36, PageID.2444-46. Plaintiffs respond that they have alleged continuing harms resulting from GM's conduct. ECF No. 55, PageID.3223-24.

GM is correct, at least with respect to any claims that seek an injunction against GM's allegedly deceptive marketing. *See Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 801 (E.D. Mich. 2019) ("Although Plaintiffs allege they will suffer ongoing and future harm because of the alleged defect, that harm is the result of GM's previous alleged deceptive trade practice, and an injunction would not prevent the reoccurrence of the harm alleged."). Just as in *Matanky*, no Plaintiff here is likely to be harmed by GM's allegedly deceptive practices.

Plaintiffs' response focuses on other ongoing harms—the risk of fire, reduced range, and the like—but as Judge Roberts explained in *Matanky*, "that harm is the result of GM's previous alleged deceptive trade practice, and an injunction would not prevent the reoccurrence of the harm alleged." *Id.* at 801. Accordingly, Plaintiffs' claims under the

various states' laws are dismissed to the extent they seek an injunction against Defendants' allegedly deceptive marketing of the Bolt.

GM also argues that the counts based on the consumer protection laws of Illinois and Georgia should be dismissed in their entirety. This because, as discussed above, Plaintiffs cannot obtain an injunction against the allegedly fraudulent marketing practices to which Plaintiffs have already been subject, and because those statutes do not allow for money damages. But Plaintiffs' deceptive practices claims appear to be targeted not just at GM's marketing practices, but also at GM's ongoing conduct after the recalls. This brings the case closer to *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 355 F. Supp. 3d 582, 597 (E.D. Mich. 2018), in which the court declined to dismiss claims for injunctive relief under Georgia's UDTPA and other state consumer protection statutes where vehicles allegedly "contain[ed] a serious safety defect rendering them unsafe to drive, which ha[d] not been remedied by the defendant's repeated attempts at repairs." As the court explained,

> the existence of an alleged defect, coupled with failed attempts at repairs, or "band aid" fixes only, along with representations made after each repair that the vehicles are free from the defect, is sufficient to establish likely future harm resulting from similar unsatisfactory efforts by the defendant to skirt liability for the problem without an effective fix.

*Id.* (citing *Amin v. Mercedes-Benz USA, LLC*, 301 F.Supp.3d 1277, 1294 (N.D. Ga. 2018)). Plaintiffs here raise similar claims: they allege that GM

has issued several purported interim fixes for the fire-risk defect, each of which has turned out to be ineffective. Accordingly, Plaintiffs' claims for injunctive relief, including those under Illinois and Georgia law, may proceed to the extent they are premised on continuing conduct.

### v. Whether certain states' products liability statutes allow class actions

GM argues that claims under the consumer protection statutes of Georgia and Virginia cannot be brought as part of class actions. In *Chapman*, this Court explained the framework for analyzing such arguments:

> In *Shady Grove v. Allstate*, the Supreme Court considered this question of what to do when a state statute conflicts with Fed. R. Civ. P. 23, which governs class actions. *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010); see *In re FCA Gearshift,* 355 F. Supp. 3d at 599-600 (summarizing *Shady Grove* decision). Our district, like many others, treats Justice Stevens' opinion in *Shady Grove* as controlling, which directs us to ask: is the state law substantive (in which case it will control) or procedural (in which case Fed. R. Civ. P. 23 can supersede)?

*Chapman*, 531 F. Supp. 3d at 1301. With respect to the Georgia FBPA, this Court remains convinced—as it was in *Chapman*—by Judge Roberts' opinion in *Matanky* that the class action bar imposed by Georgia's consumer protection statute is a substantive policy choice, and is not procedural. *Id.* (citing *Matanky*, 370 F. Supp 3d at 778-79). Accordingly, Plaintiffs' class claim under the Georgia FBPA will be dismissed. Because

claims brought by Plaintiffs William Dornetto and Russell Ives under the Virginia CPA are stayed, the Court will not consider whether that law bars class actions.

### vi. Whether claims under the consumer protection laws of Virginia and Texas may be maintained against an upstream manufacturer

LG Michigan argues that claims against an "upstream" manufacturer or component part supplier are not viable under the Texas DTPA and Virginia CPA. ECF No. 44, PageID.3041-42. LG Michigan is correct. The Texas Supreme Court "has made clear that DTPA claims based on allegedly false, misleading, deceptive, or unconscionable acts cannot be brought against remote, or 'upstream,' manufacturers and suppliers that never directly transacted with the plaintiff-consumer." *Chavez v. Ford Motor Co.*, 2018 WL 6190601 at *3 (W.D. Tex. Sept. 26, 2018) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)). According to the Complaint, no Plaintiff ever transacted with GM or any LG Entity. Accordingly, Plaintiffs' Texas DTPA claim is dismissed. Because Plaintiffs' Virginia claims are stayed, the Court will not consider whether claims may be maintained under the Virginia CPA against an upstream component part supplier or a manufacturer.

### vii. Summary of consumer protection claims

In sum, Plaintiffs' claims under the Texas DTPA (Count 62) are dismissed; Plaintiffs' Georgia FBPA claim (Count 24) may not be brought as part of a class action and is dismissed; finally, Plaintiffs' claims for

injunctive relief may proceed only to the extent they are premised on Defendants' post-sale conduct, not on Plaintiffs' marketing practices.

### E. Whether Plaintiffs can maintain state-law warranty claims

#### i. Whether defendants created a representation-based express warranty

There are two potentially applicable express warranties. First, there is GM's "New Vehicle Limited Warranty," which covers certain defects in the battery and propulsion system of the Bolt. Second, Plaintiffs argue that GM created a representation-based warranty through its statements and advertisements.

The Court notes that Plaintiffs' representation-based warranty claim is fairly general. In each of its state-law warranty claims, plaintiffs allege that "GM expressly warranted—through statements and advertisements—that the vehicles were of high quality, and at a minimum, would work properly and safely." *See, e.g.,* ECF No. 27, PageID.1310; ECF No. 36, PageID.2448 n. 20 (citing all instances in the Amended Complaint). But Plaintiffs seem to be basing their representation-based warranty theory only on GM's publication of the range figures.

GM points out that, by its own terms, the statute that requires vehicle manufacturers to affix fuel economy stickers to new cars explicitly states that legally-mandated fuel economy disclosures do not create an express warranty. 49 U.S.C. § 32908(d). This is correct, but it applies only

to legally-mandated disclosures, not to advertisements. *Ford Fuel Econ. Litig.*, 2015 WL 7018369 at *36. Where a manufacturer makes "[g]uarantees beyond a mere disclosure" as to fuel economy, an express warranty may be created. *Id.*

Just as above in section IV.C.ii.a, however, the court is not persuaded that Plaintiffs have sufficiently alleged that GM made any representations "beyond" a mere disclosure of EPA estimates. Plaintiffs' do not tie their other allegation—that GM warranted that the vehicles were "of high quality, and at a minimum, would work properly and safely"—to any specific facts such as advertisements or other statements. Accordingly, Plaintiffs have not stated a claim for a representation-based warranty. Plaintiffs' express warranty claims, therefore, may only proceed to the extent they are based on the express Limited Warranty.

### ii. Whether Plaintiffs' warranty claims must be dismissed for failure to allege their vehicles' mileage

GM says that the Limited Warranty covering the battery runs for eight years or 100,000 miles, whichever comes first. While every plaintiff has alleged when he or she bought their vehicle, none has alleged how many miles the vehicle had been driven. Therefore, GM says, no Plaintiff has adequately alleged that the warranty is still in effect for those vehicles.

Courts in this district have concluded that where a plaintiff alleges that their vehicle still within the durational limit of the warranty *or* is

under the mileage limit, their claim may proceed. *See, e.g., In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1016 (E.D. Mich. 2017); *Miller v. Gen. Motors, LLC*, 2018 WL 2740240, at *6 (E.D. Mich. June 7, 2018) (citing *Darne v. Ford Motor Co.*, 2017 WL 3836586 at *6 (N.D. Ill. Sept. 1, 2017) for the proposition that "to state a claim for a breach of warranty, plaintiff must 'at least state the date it purchased the vehicle in question, as well as either the date that a given problem appeared *or* the number of miles the vehicle had been driven when the problem appeared, in order to establish that the alleged issues fell within the covered period.'") (emphasis added); *but see Wozniak v. Ford Motor Co.*, 2019 WL 108845, at *2 (E.D. Mich. Jan. 4, 2019) (requiring plaintiffs to plead that vehicles were within both duration and mileage limits).

To be sure, no Plaintiff who had driven their vehicle more than 100,000 miles when the alleged defect first arose may recover under the Limited Warranty. But given that most of the vehicles at issue here were one or two years old when the alleged defect was discovered, Plaintiffs have plausibly alleged that they fell within the mileage limitations too, and the Court will not dismiss warranty claims on this basis at this time.

### iii. Whether the claims of Plaintiffs who did not bring their vehicles in for repair must be dismissed

GM argues that the Limited Warranty, by its terms, requires customers to take the vehicle to a Chevrolet dealer within the warranty period and request the needed repairs. GM argues that Plaintiffs

Altobelli, Barrett, Cannon, Connelly, Harris and Duprez, the Rocks, and Taylor do not allege that they ever brought their vehicles in for repair, and thus cannot claim GM breached its obligations under the warranty.

Plaintiffs respond that they should be excused from the presentment requirement because bringing their Bolts in would have been futile. GM replies that Plaintiffs have not borne the "heavy" burden required to plead futility.

Courts in this district and elsewhere have acknowledged the possibility of a futility exception to an express warranty's presentment requirement. *See Gregorio v. Ford Motor Co*., 522 F. Supp. 3d 264, 289 (E.D. Mich. 2021) (holding that "even assuming a futility argument is theoretically possible, here, there are insufficient allegations in the complaint to make futility plausible."); *In re MyFord Touch Consumer Litig*., 46 F. Supp. 3d 936, 989 (N.D. Cal. 2014) ("the Court recognizes the possibility of a futility exception. However . . . the Court cannot say that resort to the informal dispute settlement procedure provided for by Ford would have been futile for each Plaintiff.") (citation omitted); *Benkle v. Ford Motor* Co., 2017 WL 9486154, at *12 (C.D. Cal. Dec. 22, 2017) (applying Florida, California, and Georgia law and concluding that "because they plausibly alleged that there is a design defect common to all vehicles and that a repair would have been temporary and inadequate,

[plaintiffs] were not required to allege that they presented their vehicles for repair to proceed at this stage.).[21]

The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair. Plaintiffs have made the sort of representations the *Gregorio* court suggested would be sufficient: that there is a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation that GM offered were insufficient. *Gregorio*, 522 F. Supp. 3d at 289.

Here, Plaintiffs have alleged a defect common to all vehicles. They have also alleged that GM was consistently unable to repair or replace the faulty batteries, that GM specifically instructed them that no battery replacements were yet available, and that GM only began shipping replacement batteries after this litigation was initiated. Accordingly, because GM specifically told customers that no battery replacements

---

[21] The Sixth Circuit also found in a 2013 case "[no] case law indicating that [the MMWA's "opportunity to cure"] requirement can be waived if a plaintiff subjectively determines that demand would be futile and does not so much as request the seller to cover the necessary repair." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 576 (6th Cir. 2013). But that case is factually distinguishable, because there the plaintiff subjectively concluded that the warranty at issue did not cover the alleged defect when in reality, it did. Further, the defendant had already issued service bulletins indicating that the warranty covered the defect at issue. Here, the Defendant automaker specifically instructed vehicle owners that, though the warranty covered the defect, no repair was yet possible.

were yet available, the Court will not dismiss warranty claims brought by Plaintiffs who did not present their vehicles for repair. At this stage, it is ultimately Defendant's burden to demonstrate that these claims fail as a matter of law, and the Court does not find that Defendant has carried its burden on this issue at this time.

### iv. Whether Plaintiffs have adequately alleged that the Limited Warranty failed its essential purpose

GM argues that the exclusive remedy available under the Limited Warranty is repair of the vehicle, and that—under the terms of the warranty—reasonable time must be allowed for a dealer to perform necessary repairs. Plaintiffs allege in each express warranty count that the warranty has "failed its essential purpose" because GM has been unwilling or unable to repair the vehicles within a reasonable time. GM contends that the warranty has not failed its essential purpose.

Generally, "a repair-or-replace warranty fails its essential purpose when the seller is either unwilling or unable to repair the vehicle." *Gregorio*, 522 F. Supp. 3d at 290; *Roe v. Ford Motor Co.*, 2019 WL 3564589 at *11 (E.D. Mich. Aug. 6, 2019) ("Legally, repair-or-replace warranties usually fail their essential purpose when, after several tries, the manufacturer is not able to bring the product up to snuff.").

Defendants point to case law suggesting that a warranty has only failed its essential purpose when a manufacturer makes several failed attempts at repair, and further argue that no Plaintiff alleges having

brough their vehicle in for repairs several times. *See* ECF No. 36, PageID.2453. But the Court finds those cases unpersuasive and inapplicable in a situation where the manufacturer has acknowledged— at least at the time this suit was filed—that it is unable to fix the allegedly defective cars. GM issued the software updates as explicitly temporary remedies, and issued notices to each customer in August 2021 stating that "parts to repair your vehicle are not currently available." ECF No. 27, PageID.1283. It would be senseless to require a plaintiff to present their vehicle for repair multiple times to a manufacturer who has already said that it is currently unable to provide a lasting, permanent fix.

Accordingly, the Court is persuaded that Plaintiffs have plausibly alleged that the Limited Warranty has failed its essential purpose because they have alleged that GM failed to repair or replace the allegedly defective batteries within a reasonable time.

### v. Whether Plaintiffs have adequately alleged pre-suit notice as required by certain states' laws

GM argues that Plaintiffs Cannon, V. Corry, Taylor, Barrett, Rock, and Vaaler never notified GM of the alleged breach of the Limited Warranty before filing suit, which GM says is a requirement under several states' laws.[22] ECF No.36, PageID.2455. This notice requirement

---

[22] The claims brought by Plaintiff Vincent Corry are stayed and Plaintiff Barrett has been dismissed from this suit, so arguments regarding those claims will not be considered here.

stems from the provisions of the Uniform Commercial Code, specifically UCC § 2-607, as codified by California, Oregon, and Texas at Cal. Com. Code § 2607, Or. Rev. Stat. § 72.6070, and Tex. Bus. & Com. Code § 2.607, respectively.

As this Court observed in *Chapman*, "when Plaintiffs can successfully allege providing at least some notice, the question of adequacy and timeliness of notice becomes one of fact, and the claim should not be defeated at the motion to dismiss stage." *Chapman*, 531 F. Supp. 3d at 1279. But where a plaintiff fails to allege notice, a court must examine state-specific standards to determine if a claim can survive.

Plaintiffs respond by pointing to a number of letters they sent to GM prior to filing suit. *See* ECF No. 55-3. GM appears to concede that Plaintiff Cannon provided notice, but further replies that Taylor sent no letter, and that the Rocks and Vaaler only notified GM of their consumer protection claims, not their warranty claims. GM's. Repl., ECF No. 61, PageID.5548.

The purpose of the pre-suit notice requirement found in the laws of these and other states is to "minimize[] the possibility of prejudice to the seller by giving him ample opportunity to cure the defect, inspect the goods, investigate the claim or do whatever may be necessary to properly defend himself or minimize his damages while the facts are fresh in the minds of the parties." *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 679 (E.D. Mich. 2020) (citation and quotation marks omitted). Further,

the notification requirement is intended "to defeat commercial bad faith, not deprive a good faith consumer of his remedy." *Id.* (citation and internal marks omitted). Accordingly, courts in this district have allowed claims to proceed where plaintiffs gave "some notice" by presenting their vehicles for repair, deferring to a later stage of litigation the question of whether that notice was sufficient. *Id.* at 680.

Plaintiffs Vaaler and the Rocks also sent a letter to GM informing them of their consumer protection claims. There is no suggestion that any of these Plaintiffs operated in bad faith, or that GM was otherwise denied a reasonable opportunity to cure the alleged defect. And, in any event, given that the letter sent on behalf of Plaintiffs Vaaler and the Rocks fully apprised GM of the facts of those Plaintiffs' consumer protection claims, *see* ECF No. 55-3, PageID.3945-46, even if not the exact legal contours of every claim, those Plaintiffs provided GM with "some notice," and the question of whether that letter also served to put GM on notice of those plaintiffs' warranty claims is more appropriately resolved at a later stage.

The warranty claims of Plaintiff Taylor—who sent no letter and does not allege that he presented his vehicle for repair or otherwise gave GM notice of his warranty claim—will be dismissed. *See Banh v. Am. Honda Motor Co., Inc.*, 2019 WL 8683361 at *12 (C.D. Cal. Dec. 17, 2019) (dismissing Oregon breach-of-warranty claims against auto manufacturer because plaintiffs failed to allege pre-suit notice).

94

### vi. Whether certain Plaintiffs may bring breach of warranty claims under the laws of the states where they live and where they purchased their vehicles

GM points out that Hickey and Kuchar[23] seek to bring breach of warranty claims under the laws of the states where they live and the states where they purchased their vehicles. Smith seeks to assert his warranty claim under the laws of the state where he lives. GM contends that, under Michigan's choice-of-law principles, all three may only bring claims under the laws of the states in which they purchased their vehicles. ECF No. 36, PageID.2456. GM relies on Judge Michaelson's *Withrow* decision, discussed above in section IV.C.v. Plaintiffs respond that the *Withrow* decision "improperly focused primarily on the place of contracting and failed to fully consider all applicable factors." ECF No. 55, PageID.3220.

The Court again finds *Withrow* persuasive. Here, as there, the Court will apply the laws of the states in which the vehicles were sold to each Plaintiff's warranty claims.[24] The claims of Plaintiffs Hickey and

---

[23] As before, Plaintiff Kuchar's claims are stayed.

[24] The Court recognizes that it reached a different result in Section IV.C.v. with respect to which state's laws applied to certain Plaintiffs' fraud claims. As Judge Michelson explained in *Withrow*, Michigan's choice of law principles compel a different result for fraud claims (which focus on pre-purchase deception in the states in which the relevant plaintiffs lived) and warranty claims (which pertain to transactions entered in the states of purchase). *Withrow*, 2021 WL 2529847 at *11-12 (plaintiff's fraud claims were governed by the laws of his state of residence, but warranty claims were governed by the laws of the state in which plaintiff purchased his vehicle.)

Smith, brought under the laws of their states of residence (Illinois and Wisconsin, respectively) will be dismissed.

### vii. Whether Plaintiffs have sufficiently alleged that their vehicles were unmerchantable at the time of sale

GM argues that, under the laws of the relevant states, any plaintiff seeking to state a claim for breach of an implied warranty of merchantability must allege that the vehicle was unmerchantable at the time of sale. Plaintiffs appear to concede that they must show the vehicles were unmerchantable, but they argue that they have done so adequately.

The elements of an implied warranty of merchantability claim are fairly similar across states. *See In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975, 1013 (E.D. Mich. 2017) (collecting cases). In the context of automotive defect cases, a plaintiff must allege that the defect "rendered the car unfit for its intended purpose by compromising the vehicle's safety, rendering it inoperable, or drastically reducing its mileage range." *Id.* at 1015 (cleaned up).

The alleged fire-risk defect clearly constitutes a serious safety defect, and is enough to render a vehicle unmerchantable. As Judge Lawson recognized in the *Monostable Elec. Gearshift Litigation*, courts have allowed claims to proceed with significantly less serious safety-related problems. *Id.* (citing *Brand v. Hyundai Motor Am.*, 173 Cal. Rptr. 3d 454, 460 (2014) (car sunroof that could open without warning was serious enough safety defect to implicate warranty of merchantability)).

96

Further, GM's required recall "drastically reduc[ed]" the Bolt's mileage range. GM concedes that the recall could impose a "roughly 40% reduction" in range. ECF No. 36, PageID.2458. Cutting the range of a vehicle by nearly half—particularly a vehicle that takes hours to recharge, rather than mere minutes at a gas station and cannot be charged overnight due to the very defect in question—is enough to render a vehicle unmerchantable.

GM points to *Beck v. FCA US LLC*, 273 F. Supp. 3d 735 (E.D. Mich. 2017), but that citation is unavailing. The *Beck* court held that no implied warranty of merchantability claims could survive because the putative class plaintiff continued to drive his vehicle. *Id.* at 762. But the Court is not persuaded by *Beck's* reasoning, for the reasons explained another recent decision in this district: that the *Beck* rubric "fails to account for situations where a plaintiff continues to use their vehicle but is forced to limit their use to prevent or mitigate the effects of a defect." *Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635, 651 (E.D. Mich. 2021) ("Although it is true that courts often dismiss implied warranty claims where a plaintiff continues to drive their vehicle, . . . that is not a bright-line rule; it is merely a useful proxy for whether a plaintiff has plausibly alleged a defect that renders their vehicle unsafe."). That is exactly what has happened here: although at least some Plaintiffs continued to use their vehicles, they have been forced to limit the nature of their use and enjoyment of the vehicle due to the alleged defect.

Accordingly, Plaintiffs have sufficiently alleged that their vehicles were unmerchantable at the time of the sale.

### viii. Whether Plaintiffs' implied warranty claims must be dismissed for failure to plead their vehicles' mileage

GM argues that, under all applicable state laws—other than those of Kansas and California—allow a seller to place "express and conspicuous limits on the implied warranty of merchantability. GM says that limitations are permitted under the laws of Arizona, Massachusetts, Michigan, New York, Virginia, Washington, and Wisconsin, *see* ECF No. 36, PageID.2460-61 n.30, and that it placed such a limit in the Limited Warranty. Plaintiffs do not appear to dispute that those states' laws allow such limits to be imposed or that GM imposed a limit here.

Therefore, claims by any Plaintiff whose Bolt falls outside the 100,000 mile/eight-year limitation in the Limited Warranty must be dismissed. But for the same reasons discussed above in section IV.E.ii, Plaintiffs' implied warranty claims need not be dismissed merely because they failed to allege the mileage of their vehicles.

### ix. Whether Plaintiffs' warranty claims must be dismissed for failure to allege privity with GM

GM argues that the implied warranty laws of Arizona, California, Florida, Georgia, Illinois, New York, Oregon, Virginia, Washington, and Wisconsin require privity of contract between a manufacturer and a

purchaser in order to state an implied warranty claim.[25] Plaintiffs do not disagree that certain states impose a privity requirement, but instead argue that—for each relevant state—Plaintiffs have either alleged that privity exists or an exception to that state's privity rules applies. The Court addresses each state's laws in turn.

In Arizona, one who purchases a new vehicle from a dealership is not in privity with the vehicle's manufacturer, and cannot maintain an implied warranty claim. *Francis v. Gen. Motors, LLC*, 504 F. Supp. 3d 659, 678 (E.D. Mich. 2020); *Chaurasia v. Gen. Motors Corp.*, 212 Ariz. 18, 24 (Ct. App. 2006).

California law recognizes a third-party beneficiary exception to the privity requirement, and courts have allowed implied warranty claims to proceed under California law where plaintiffs alleged that they purchased their vehicles from a network of authorized dealers, were the intended consumers, and that the dealers had no rights under the warranty agreements. *Tershakovec v. Ford Motor Co.*, 2018 WL 3405245, at *11 (S.D. Fla. July 12, 2018). Plaintiffs make similar allegations here, and their claims therefore need not be dismissed for failure to allege privity. ECF No. 27, PageID.1329. ("California Plaintiffs . . . are intended third-party beneficiaries of contracts between GM and its authorized dealers and are intended beneficiaries of GM's implied warranties. The

---

[25] Claims brought by Plaintiffs Schulz and Verzura (under Florida law) and Dornetto and Ives (under Virginia law) are stayed.

dealers were not intended to be the ultimate consumers of Class Vehicles, and the warranties were . . . intended to benefit the ultimate consumers only.").

Georgia law appears to consider a consumer who purchases a vehicle from a manufacturer's authorized dealer to be in privity with the manufacturer. *Helpling v. Rheem Mfg. Co.*, 2016 WL 1222264 at *5 (N.D. Ga. Mar. 23, 2016) (citing *Chrysler Corp. v. Wilson Plumbing Co., Inc.*, 208 S.E.2d 321, 323 (Ga. Ct. App. 1974)). But Plaintiff Strong, the Georgia Plaintiff, did not purchase her vehicle from a GM authorized dealership; she bought her Bolt used from Carvana, a third-party retailer. ECF No. 27, PageID.1216. Because Strong is not in privity with GM and no exception applies, her claim must be dismissed. *See Helpling*, 2016 WL 1222264 at *5 (dismissing implied warranty claims for lack of privity where plaintiff "fail[ed] to allege that Taylor purchased his Rheem Unit from a Rheem-authorized dealer.").

New York law recognizes a third-party beneficiary exception to the privity requirement. *Francis*, 504 F. Supp. 3d at 677. The fact-intensive nature of that exception "is not amenable to resolution at the pleading stage." *Id*. Accordingly, Plaintiffs' New York law implied warranty claims will not be dismissed for failure to allege privity.[26]

---

[26] Though this Court reached a different result in *Chapman*, there the Court relied on a case in which a plaintiff "failed to allege facts plausibly suggesting the applicability of [the third-party beneficiary] exception

Similarly, while Illinois law requires privity to sustain implied warranty claims, *see Chapman,* 531 F. Supp. 3d at 1278, the privity analysis in the context of automotive sales involving manufacturer-authorized dealers is fact-intensive and better resolved with the benefit of a more fully developed record. *See Flynn v. FCA US LLC*, 327 F.R.D. 206, 217 (S.D. Ill. 2018).

*In Crawford v. FCA US LLC*, 2021 WL 3603342 at *7 (E.D. Mich. Aug. 13, 2021), Judge Murphy explained that Oregon courts allow claims under an implied warranty to proceed by a person within "the distributive chain" of a product. *Id.* (citing *Torch v. Windsor Surry Co.*, 2019 WL 6709379, at *11 n.5 (D. Or. Dec. 9, 2019). On that basis, the *Crawford* court declined to dismiss claims against a vehicle manufacturer where the plaintiff purchased his vehicle from the manufacturer's authorized dealer. This Court will follow the same approach here, and Plaintiffs' Oregon-law implied warranty claim need not be dismissed for lack of privity.

Under Washington law, lack of privity is a defense to claims for breach of warranty. *Monostable Elec. Gearshift Litig*., 355 F. Supp. 3d at

---

because she [did] not include[] any factual allegations regarding the contract between Defendant and the authorized dealer, much less any factual allegations plausibly suggesting that the contract was intended to provide a sufficiently immediate benefit to her." *See Cummings v. FCA US LLC*, 401 F. Supp. 3d 288, 313 (N.D.N.Y. 2019). Here, Plaintiffs have alleged that the contract was intended to benefit them as end consumers of the vehicles.

596 (citing *Johnson v. Metro-Goldwyn-Mayer Studios Inc.*, 2017 WL 3313963 at *6 (W.D. Wash. Aug. 3, 2017)). But Washington recognizes a limited third-party beneficiary exception. *Chapman*, 531 F. Supp. 3d at 1277. As explained above, Plaintiffs have sufficiently alleged enough to meet the third-party beneficiary exception at this stage of the case.

Wisconsin law requires privity of contract to sustain an implied warranty claim and courts applying Wisconsin law have, on that basis, dismissed similar claims against manufacturers where plaintiffs purchased vehicles from dealers, rather than from the manufacturer itself. *Lamont v. Winnebago Indus., Inc.*, 569 F. Supp. 2d 806, 815-16 (E.D. Wis. 2008); *Francis*, 504 F. Supp. 3d at 678.

In sum, Plaintiffs' claims will be dismissed for failure to allege privity under the laws of Arizona, Georgia, and Wisconsin.

### x. Summary of warranty claims

### Figure 5: Disposition of Warranty Claims

| Counts[27] | State | Express Warranty[28] | Implied Warranty |
|---|---|---|---|
| *63; 64* | TX | Not Dismissed | Not Dismissed |
| *7; 8* | AZ | Not Dismissed | Dismissed (lack of privity) |

---

[27] In the "Counts" column the first number refers to express warranty claims, the second to implied warranty claims. As to the California claims, Count 14 is an express warranty claim under the Cal. Com. Code and Count 16 is an express warranty claim under the Song-Beverly Act. Count 15 is an implied warranty claim under the Cal. Com. Code, and Count 17 is an implied warranty claim under the Song-Beverly Act.
[28] These claims only survive to the extent they are based on the Limited Warranty, not any representation-based warranty.

| | | | |
|---|---|---|---|
| *14, 16; 15, 17* | CA | Not Dismissed | Not Dismissed |
| *20; 21* | FL | Stayed | Stayed |
| *26; 27* | GA | Not Dismissed | Dismissed (lack of privity) |
| *32; 33* | IL | Dismissed as to Hickey only | Dismissed as to Hickey only |
| *37; 38* | KS | Not Dismissed | Not Dismissed |
| *42; 43* | MA | Not Dismissed | Not Dismissed |
| *47; 48* | MI | Stayed | Stayed |
| *53; 54* | NY | Not Dismissed | Not Dismissed |
| *58; 59* | OR | Dismissed as to Taylor only | Dismissed as to Taylor only |
| *68; 69* | VA | Stayed | Stayed |
| *73; 74* | WA | Not Dismissed | Dismissed (lack of privity) |
| *78; 79* | WI | Dismissed (choice of law) | Dismissed (choice of law) |

## F. Whether Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claims must be dismissed

The MMWA only provides a federal cause of action for consumers who are damaged by a defendant's failure to comply with state warranty laws; MMWA claims therefore "stand or fall" with valid state law warranty claims. *Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d at 1017. Therefore, any Plaintiffs that have viable state law warranty claims will also have viable MMWA claims. Plaintiffs' MMWA count will therefore be dismissed in part. MMWA claims by any Plaintiff who has no remaining viable state-law warranty claims are dismissed. *See, e.g., In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 986 (N.D. Cal. 2014) ("Accordingly, the Court concludes that the MMWA claim is

103

dismissed in part—more specifically, to the extent the Court has dismissed any of the state express and implied warranty claims.").

### G. Whether Plaintiffs may maintain unjust enrichment claims

Defendants contend that, under each relevant state's laws, unjust enrichment claims are not available when a contract governs the dispute. ECF No. 36, PageID.2463. Accordingly, Defendants argue, courts routinely dismiss unjust enrichment claims in the face of an express written warranty. *Id.* Plaintiffs respond that their claims should proceed because GM disclaims the availability of a contractual remedy and that, in any event, Plaintiffs may plead their unjust enrichment claims in the alternative.

The Court agrees with Defendants and will dismiss Plaintiffs' unjust enrichment claims. First, as Defendants point out, courts "have regularly dismissed unjust enrichment claims filed against automobile manufacturers where a valid, enforceable express warranty covers the same subject matter as plaintiffs' unjust enrichment claims." *In re Gen. Motors Air Conditioning Mktg. & Sales Pracs. Litig.*, 406 F. Supp. 3d 618, 634 (E.D. Mich. 2019) (collecting cases); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 294 (E.D. Mich. 2021) (explaining that "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for . . . unjust enrichment . . ." and collecting cases) (citation and quotation marks omitted); *Hall v. Gen.*

*Motors*, LLC, 2020 WL 1285636 at *9 (E.D. Mich. Mar. 18, 2020); *Bossart v. Gen. Motors LLC*, 2021 WL 5278191 at *9 (E.D. Mich. May 19, 2021) ("Because GM's [New Vehicle Limited Warranty] covers the express warranty claims raised in the complaint, plaintiffs' unjust enrichment claim must be dismissed.").

Second, while pleading in the alternative may be permitted when "there is a dispute between the parties as to whether an express agreement exists," *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 796 (6th Cir. 2016), here GM admits that an express warranty governs the parties' relationship. Contrary to Plaintiffs' suggestion, GM does not dispute that the Limited Warranty exists, is valid, and covers the alleged battery defect. ECF No. 61, PageID.5548. Accordingly, Plaintiffs may not plead their unjust enrichment claims in the alternative. *See Hall*, 2020 WL 1285636 at *10 ("While alternative pleading is usually allowed, Plaintiffs may not plead their unjust enrichment claim in the alternative here because it is undisputed that GM's express limited warranty governs the subject matter of Plaintiffs' claims."). For the above reasons, Plaintiffs' unjust enrichment claims are dismissed.

### H.  Whether Plaintiffs' claims are prudentially moot

LGEUS argues that this case is "prudentially moot" because events have "so overtake[n] [the] lawsuit that the anticipated benefits of a remedial decree no longer justify the trouble of deciding a case on the merits." LGEUS's Mot. to Dismiss, ECF No. 49, PageID.3156 (quoting

*Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012). LGEUS argues that the case is prudentially moot because all of Plaintiffs' alleged injuries are directly attributable to the defective battery, and GM has already agreed to replace batteries in the class vehicles for free.

The Court recognizes that, on at least one other occasion, a court in this district has dismissed claims against an automaker on the basis of prudential mootness because the automaker was undertaking a comprehensive recall. *See Flores v. FCA US LLC*, 2020 WL 7024850 at *4 (E.D. Mich. Nov. 30, 2020). But for two reasons, the Court declines to dismiss any claims on the basis of prudential mootness. First, in a recent decision, Judge Drain distinguished *Flores* and declined to dismiss claims on the basis of prudential mootness because "the *Flores* plaintiffs sought monetary damages due to the Defendant's failure to correct the defective product, and not for overpayment at the point of purchase." *Weidman v. Ford Motor Co.*, 2022 WL 1071289, at *5 (E.D. Mich. Apr. 8, 2022) (internal quotation marks omitted). In this case, just as in *Weidman*, Plaintiffs allege overpayment at the point of purchase, and so this case is distinguishable from *Flores* as well.

And more fundamentally, the Court is reluctant to dismiss a case like this one as moot without the benefit of any discovery merely because a recall is being conducted. Determining the effectiveness of the recall and its effect on Plaintiffs' claims would necessarily be a highly fact-

intensive inquiry. On this procedural posture and without the benefit of discovery, the Court would be unable to conduct an appropriate mootness analysis. So the Court will not dismiss any claims on the basis of prudential mootness.

## V. CONCLUSION

**IT IS ORDERED** that Plaintiffs' affirmative misrepresentation claim (Count 1) is **DISMISSED**.

**IT IS FURTHER ORDERED** that Plaintiffs' nationwide fraudulent concealment claim against GM (Count 2) is **DISMISSED IN PART**, specifically claims are dismissed under the laws of any state where the Court also orders dismissal of a state-specific fraudulent concealment claim, as described below.

**IT IS FURTHER ORDERED** that Plaintiffs' nationwide fraudulent concealment claim against the LG Entities (Count 3) is **DISMISSED IN PART**, specifically claims are dismissed under the laws of any state where the Court also orders dismissal of a state-specific fraudulent concealment claim, as described below.

**IT IS FURTHER ORDERED** that Plaintiffs' nationwide Magnuson-Moss Warranty Act claim is **DISMISSED IN PART**, specifically to the extent the Court has dismissed any of the state express and implied warranty claims, as described below.

**IT IS FURTHER ORDERED** that Plaintiffs' nationwide unjust enrichment claim is **DISMISSED**.

**IT IS FURTHER ORDERED** that, with respect to Plaintiffs' state-specific fraudulent concealment claims, Counts 22 (FL), 49 (MI), and 71 (VA) are **STAYED**. Counts 65 (TX), 9 (AZ), 18 (CA), 39 (KS), 44 (MA), 60 (OR), and 80 (WI) are **DISMISSED** with respect to all defendants. Counts 28 (GA) and 75 (WA) are **DISMISSED** with respect to LG Michigan and LGEUS only. Counts 34 (IL) and 55 (NY) may proceed against GM and the LG Entities, and Counts 28 (GA) and 75 (WA) may proceed against GM only.

**IT IS FURTHER ORDERED** that, as to Plaintiffs' consumer protection claims, Plaintiff's claims under Florida, Michigan, and Virginia law (Counts 19, 46, and 67) are **STAYED**. Count 62 (TX) is **DISMISSED**. Count 24 (GA) is **DISMISSED**. All other consumer protection claims may proceed.

**IT IS FURTHER ORDERED** that, as to Plaintiffs' express warranty claims, Counts 20 (FL), 47 (MI), and 68 (VA) are **STAYED**. Count 32 (IL) is **DISMISSED** as to Plaintiff Hickey only. Count 58 (OR) is **DISMISSED** as to Plaintiff Taylor only. Count 78 (WI) is **DISMISSED**. All other express warranty claims may proceed to the extent they are based on the Limited Warranty, not on any representation-based warranty.

**IT IS FURTHER ORDERED** that as to Plaintiffs' implied warranty of merchantability claims, Counts 21 (FL), 48 (MI), and 69 (VA) are **STAYED**. Counts 8 (AZ), 27 (GA), 74 (WA), and 79 (WI) are

**DISMISSED**. Count 33 (IL) is **DISMISSED** as to Plaintiff Hickey only. Count 59 (OR) is **DISMISSED** as to Plaintiff Taylor only. All other implied warranty of merchantability claims may proceed.

**IT IS FURTHER ORDERED** that Plaintiffs' state-specific unjust enrichment claims (Counts 10, 23, 29, 35, 40, 45, 50, 56, 61, 66, 71, 76, and 81) are **DISMISSED**.

**IT IS FURTHER ORDERED** the recently-filed motions to dismiss by additional foreign-based LG Defendants, that is, the motions to dismiss by LG Energy Solution (ECF No. 92); LG Electronics (ECF No. 87) and LG Chem (ECF No. 94), because they raise many of the same arguments that are resolved by this Order, are hereby **STRICKEN** as **MOOT**.

Within twenty-one (21) days of the date of this Order, counsel for all parties shall meet and confer (telephonically or by videoconference) to discuss whether Defendants LG Energy Solution, LG Electronics, and/or LG Chem stand in a materially different position from LG Electronics USA or LG Energy Solution Michigan with respect to the rulings contained in this Opinion and Order. Counsel should work together in good faith to narrow any remaining legal questions that may need to be resolved by the Court with respect to the recently-served foreign defendants in light of the conclusions reached in this Opinion and Order.

The Court will schedule a Rule 26(f) conference as soon as the Court's calendar allows. Parties should be prepared to discuss at that

conference the results of their discussions, and what issues, if any, remain as to the recently-served foreign defendants.

**IT IS SO ORDERED** this 30th day of September, 2022.

BY THE COURT:


<u>/s/Terrence G. Berg</u>
TERRENCE G. BERG
United States District Judge